Page 6

J. Diroche

1
2  A.  Yes.
3  Q.  Do you understand that you are to give
4  truthful answers to my questions?
5  A.  Yes.
6  Q.  Is there any reason today that you
7  could not give truthful answers to my questions?
8  A.  No.
9  Q.  Are you taking any medication that
10 would interfere with your ability to understand my
11 questions?
12 A.  No.
13 Q.  Are you taking any medication that
14 would interfere with your ability to give truthful
15 answers?
16 A.  No.
17 Q.  Who are you employed by now?
18 A.  I'm a taxi driver right now.
19 Q.  Was there a time when you worked for
20 the defendants as a parking attendant?
21 A.  Yes.
22 Q.  When was the last date on which you
23 worked as a parking attendant for the defendants?
24 A.  I don't remember exactly, but it has
25 been a month and three weeks. Around there.

Page 7

J. Diroche

1
2  Q.  Did you resign from your employment or
3  were you terminated?
4  A.  I resigned.
5  Q.  What was the reason that you resigned?
6  A.  To start cabbing. I wasn't happy with
7  what was going on.
8  Q.  What were you not happy about?
9  A.  I was earning little.
10 Q.  Did you tell anyone that the reason you
11 quit your job was because you were not getting
12 enough hours?
13 A.  I let Raj know that I was leaving the
14 job because of that, yes. Yes. They took away
15 some hours.
16 Q.  Just prior to when you quit your job
17 how many hours per week were you working?
18 A.  Fifty-eight.
19 Q.  When did you first start work with the
20 defendants?
21 A.  I don't remember the date, but it was
22 at the beginning of 2001.
23 Q.  When you first began working for
24 defendants in 2001 what garage did you work at?
25 A.  I started at 199 and Webster. And from

Page 8

J. Diroche

1
2  there I went to Jerome. 169 and Jerome.
3  Q.  How long did you work at 199 and
4  Webster?
5  A.  I worked there for about four days.
6  Then they put me on -- then they put me to work at
7  169 and Jerome.
8  Q.  How long did you work at 169 Jerome?
9  A.  I have worked there the whole time.
10 Q.  Did you work at any other garages
11 besides 199 Webster or 169 Jerome?
12 A.  Yes.
13 Q.  What other garages did you work at?
14 A.  187 and Valentine, and Bienvenido which
15 is next to 169 at 1277. And 155 and Saint
16 Nicholas.
17 Q.  Where did you work most of the time?
18 A.  The most part of the time -- 169 and
19 Jerome.
20 Q.  When you first started work in 2001 who
21 was your supervisor?
22 A.  At that time the supervisor was
23 Cardozo.
24 Q.  Is Cardozo still employed by
25 defendants?

Page 9

J. Diroche

1
2  A.  No.
3  Q.  When did he leave working for
4  defendants?
5  A.  Around the time when I started working
6  with them. He didn't last too long after that.
7  Q.  Who was your supervisor after Cardozo?
8  A.  A man named Pablo.
9  Q.  How long was Pablo your supervisor?
10 A.  Couple of months.
11 Q.  Who was your supervisor after Pablo?
12 A.  Raj.
13 Q.  Was Raj your supervisor the entire time
14 after Pablo?
15 A.  He has been the one always. Raj and
16 another Pablo that works for Sam.
17 Q.  When you first started working for
18 defendants in 2001 how many hours per week did you
19 work?
20 A.  I have always worked six days, 60
21 hours. Sometimes they would take away days.
22 Sometimes they would give my days more. It
23 depends. But normally it was six or seven days we
24 worked. In case somebody was missing, they needed
25 someone.

1       J. Diroche
2    Q.   Was your regular workweek six days?
3    A.   Yes.
4    Q.   How many hours per day did you work?
5    A.   Twelve hours.  From seven to seven.
6    Q.   Did there come a time when your hours
7  were reduced to 48 hours?
8    A.   Yes.
9    Q.   When was that?
10   A.   2006.
11   Q.   When in 2006?
12   A.   I don't remember the date.
13   Q.   Do you remember whether it was early in
14 the year of 2006?
15   A.   Yes.  Around there.
16   Q.   Could it have been February of 2006?
17   A.   More or less.  Around there.
18   Q.   When your hours were reduced to 48
19 hours in February of 2006 how many days per week
20 did you work?
21   A.   Five.
22   Q.   Is that five days per week?
23   A.   Yes.
24   Q.   How many hours per day did you work on
25 each of the five days?

1       J. Diroche
2    A.   Four days at ten hours a day.  And one
3  day at eight.
4    Q.   Were you paid by check?
5    A.   Yes.
6    Q.   Were you paid by check for the entire
7  time that you worked for defendants?
8    A.   Lunch hour was always missing.
9    Q.   Were you always paid by check?
10   A.   Yes.  Check and cash.
11   Q.   How much were you paid in cash?
12   A.   Fifteen, $20.
13   Q.   Who gave you the cash?
14   A.   The check was inside the envelope.
15 The supervisor would give it to me -- Raj.
16   Q.   In the complaint in paragraph 12 it
17 states that you were paid 20 to $70 a week in
18 cash.  Is that correct or incorrect?
19   A.   That's incorrect.
20   Q.   Did anyone tell you why you were
21 receiving this cash?
22   A.   No one told me.
23   Q.   Did you ever ask anyone why you were
24 receiving this cash?
25   A.   I did not ask.  I figured it was for

1       J. Diroche
2  the extra hours I worked.
3    Q.   Did there come a time when you stopped
4  receiving cash?
5    A.   In 2006 when I was working.
6    Q.   Did anyone tell you why you stopped
7  receiving cash?
8    A.   No.
9    Q.   Did you ever ask anyone why you stopped
10 receiving cash?
11   A.   No.
12   Q.   Did you stop receiving cash at the same
13 time that your hours were reduced in February of
14 2006?
15   A.   No.  Before that.
16   Q.   How long before that?
17   A.   I don't remember.
18   Q.   Isn't it a fact that you stopped
19 receiving the cash because the company started
20 paying for your lunch hour?
21   A.   No.
22   Q.   Did your paycheck have a stub that
23 listed the number of hours that you worked?
24   A.   Yes.
25   Q.   Did your paycheck list what your hourly

1       J. Diroche
2  rate of pay was?
3    A.   They put it on the check, but not
4  completely.
5    Q.   I was asking whether it contained your
6  hourly rate of pay?
7    A.   Yes.
8    Q.   And did it list overtime hours on this
9  stub?
10   A.   Yes.
11   Q.   And do you understand what time and a
12 half is?
13   A.   No.
14   Q.   Do you understand that if you work over
15 40 hours in a week you must be paid time and a
16 half of your hourly rate?
17   A.   If I would have known that I would have
18 told them -- claimed it.
19   Q.   Do you know if you received a higher
20 rate of pay for hours you worked over 40?
21   A.   No.
22   Q.   In your lawsuit against the defendants
23 what hours are you claiming defendants did not pay
24 you?
25   A.   The lunch hour.

Page 14

1        J. Diroche
2    Q.   Any other hours?
3    A.   They took out two hours a day from my
4  check. I don't know why. I told Raj about it.
5  They never paid it. Never paid it.
6    Q.   During what period of time did they
7  take two hours out per day?
8    A.   Till now. Till the beginning of 2006.
9    Q.   From the beginning of 2006 until now?
10   A.   I worked with them since I came into
11 this country.
12   Q.   I want to know when did they first
13 start taking out two hours per day?
14   A.   I don't remember.
15   Q.   Do you remember what year it first
16 began?
17   A.   I don't know, because I noticed that on
18 my check about a year or so ago.
19   Q.   When you went to work did you punch a
20 time clock?
21   A.   Yes.
22   Q.   What time did you start work?
23   A.   Seven p.m. to seven a.m.
24   Q.   And when you finished work at seven
25 a.m. did you punch out your time card?

TSG Reporting - Worldwide        877-702-9580

Page 15

1        J. Diroche
2    A.   Yes.
3    Q.   On your check were you paid for all of
4  the hours from punching in at seven p.m. until you
5  punched out at seven a.m.?
6    A.   No. The lunch hour was missing.
7    Q.   Were there any other hours missing?
8    A.   What you asked me before about time and
9  a half, that they were supposed to pay, they
10 didn't pay.
11   Q.   Were there any hours that you were not
12 paid at all for other than the lunch hour?
13   A.   No.
14   Q.   What hours did you work that you were
15 not paid for other than the lunch hour?
16   A.   When I worked seven days and Raj would
17 call me, someone was missing, someone was out, he
18 would call me. I go and cover for him.
19   Q.   Did you punch in when you covered for
20 this person?
21   A.   That's why they didn't pay me because I
22 didn't have the card with me. It was in the place
23 where I worked normally.
24   Q.   How often did you work on a seventh day
25 for someone?

TSG Reporting - Worldwide        877-702-9580

Page 16

1        J. Diroche
2    A.   It wasn't too frequently. It was when
3  someone was out and he needed to cover.
4    Q.   In all of the time that you worked for
5  the defendants how often did you cover for someone
6  on a seventh day?
7    A.   I don't remember.
8    Q.   Was your regular day off a Sunday?
9    A.   No.
10   Q.   The number of times that you covered
11 for another employee was it less than 10?
12   A.   More or less.
13   Q.   Does that mean that about 10 is the
14 right number of times?
15   A.   Yes.
16   Q.   Did you ever ask anyone why you were
17 not being paid when you covered for someone?
18   A.   Raj I did.
19   Q.   What did Raj say?
20   A.   That he is paying me.
21   Q.   Did he say anything else?
22   A.   Yes. To call Sam.
23   Q.   Did you call Sam?
24   A.   No, I don't usually call him.
25   Q.   Did Raj tell you that the hours you

TSG Reporting - Worldwide        877-702-9580

Page 17

1        J. Diroche
2  worked when covering for someone were included in
3  your check?
4    A.   Yes.
5    Q.   Are you claiming that you were not paid
6  for any of the hours you worked when you were
7  covering for someone else?
8    A.   Sometimes they paid.
9    Q.   Sometimes they paid for all of the
10 hours when you worked for someone else?
11   A.   Not all, not all.
12   Q.   On each of the days on which you
13 covered for someone else did they pay some of your
14 hours?
15   A.   Excuse me?
16   Q.   Is there any day that you worked for
17 someone else that you did not receive any pay at
18 all?
19   A.   No.
20   Q.   So on all of the days that you worked
21 for someone else you received pay for some of your
22 hours?
23   A.   Yes.
24   Q.   And on each of these days how many
25 hours were you not paid for?

TSG Reporting - Worldwide        877-702-9580

Page 22

```
1          J. Diroche
2   RQ      MR. WALKER: I would ask for production
3     of both the old passport and the new
4     passport.
5          And we would direct counsel to
6     direct his client not to destroy or
7     otherwise dispose of those
8     passports.
9     A.   What if I can't find the old one?
10    Q.   You should make your best and diligent
11  search for it.
12         What is the longest that you remember
13  staying in the Dominican Republic since 2001?
14    A.   Five months.
15    Q.   What is the shortest trip you remember?
16    A.   One month, four weeks.
17    Q.   Other than your trips to the Dominican
18  Republic have you left the United States since
19  2001?
20    A.   No.
21    Q.   Other than your trips to the Dominican
22  Republic have you taken any vacation time from
23  your job with defendants since 2001?
24    A.   No.
25    Q.   Since you have been employed by
```

Page 23

```
1          J. Diroche
2   defendants in 2001 have you taken any sick days?
3     A.   No.
4          (Diroche Exhibit 1, SP Payroll
5     document, marked for identification, as
6     of this date.)
7     Q.   I'm going to show the witness what has
8   been marked as Exhibit 1, and ask if that is your
9   signature on the document?
10    A.   Yes.
11    Q.   Do you know when you signed this
12  document?
13    A.   I know I signed it, but I don't
14  remember the date.
15    Q.   Do you remember the year?
16    A.   It was now.  2006.
17    Q.   Did you sign this document about the
18  time that your hours changed in February 2006?
19    A.   I don't remember.
20    Q.   Did you sign this before your hours
21  changed or after your hours changed?
22    A.   I don't remember.
23    Q.   Who gave you this document to sign?
24    A.   Supervisor.  The midnight supervisor.
25  I was busy, busy.  He said, here, sign this right
```

Page 24

```
1          J. Diroche
2   away.  And he had to go get some checks.  I signed
3   it and I continued working.
4     Q.   Did you read it before you signed it?
5     A.   I didn't read it.  Later on he told me
6   if they -- if it was okay that they took an hour
7   out of my check for lunch.  I don't take lunch.
8   I eat lunch at home.  I work nights, not days.
9   All my life I have worked nights.
10    Q.   Is it your testimony that during the
11  time that you worked for the company from seven
12  p.m. to seven a.m. you did not take a meal break?
13    A.   No.
14    Q.   Did Raj tell you that you should be
15  taking one hour for lunch?
16    A.   No.
17    Q.   The document that you have in front of
18  you is also in Spanish is it not?
19    A.   Yes.
20    Q.   Can you read that Spanish?
21    A.   Yes.
22    Q.   Does that say that you will receive a
23  one-hour meal break?
24    A.   It says it there.  But when I signed it
25  I didn't read it.  I was busy working.  A lot of
```

Page 25

```
1          J. Diroche
2   cars fill up the garage.  I have to take them out.
3     Q.   You were here last Friday for the
4   depositions were you not?
5     A.   Yes.
6     Q.   You heard Mr. Pena testify?
7     A.   Yes.
8     Q.   You heard Mr. Rojas testify?
9     A.   Yes.
10    Q.   What do you think the odds are of all
11  three of you having signed the same document
12  without read it?
13    A.   I don't know about them.  I know about
14  me.
15         MR. FAILLACE: Objection.  You are
16  making him make assumptions about other
17  people.  He is talking about himself.
18    A.   They work different hours than I do.  I
19  don't know about them.
20    Q.   Isn't it a fact that you're saying that
21  you didn't read it because you heard them saying
22  they didn't read it?
23         MR. FAILLACE: Objection.
24    A.   No, I swore here today not to tell a
25  lie.
```

Page 26

1         J. Diroche
2    Q.   Is it your testimony that during the
3  entire time that you worked for defendants that
4  you never took breaks whatsoever?
5    A.   No. My shift was the one that you
6  worked the most in. I couldn't.
7    Q.   Is it your testimony that you never
8  left the garage during your shift to perform any
9  personal errands?
10    A.   No. How would I do that? It's my job.
11  How am I going to abandon my job? It's two
12  floors. One upstairs, one downstairs. There are
13  a lot of cars in there. When there's one
14  upstairs, there's one downstairs receiving.
15  Couldn't do it.
16    Q.   How many cars entered and left the
17  garage during a typical hour during your shift?
18    A.   In one hour maybe 15, 20. Between the
19  monthlies and the dailies.
20    Q.   How many employees were on duty working
21  during your shift?
22    A.   Two.
23    Q.   Two including you or two plus you?
24    A.   One plus myself.
25    Q.   Just prior to your resignation what was

TSG Reporting - Worldwide      877-702-9580

Page 27

1         J. Diroche
2  the name of the employee that you worked with?
3    A.   My co-worker?
4    Q.   Yes.
5    A.   There were several. Now they got three
6  shifts. Before it was only two shifts.
7    Q.   I want to know what was the name of the
8  individual who was working during your shift?
9    A.   Pedro Breton, Edison.
10    Q.   Alvarez?
11    A.   I don't know his last name. To me he's
12  Breton, because Breton is his father.
13  Bienvenido worked with me also. Edwardo Colon.
14       The ones that worked on my shift only
15  or ones that relieved me also?
16    Q.   Just your shift.
17    A.   Right now Pedro Breton. Bienvenido.
18  Edison. Edwardo Colon. I don't remember the
19  others.
20    Q.   Did you ever work with Samuel Gerraro?
21    A.   At the beginning when I started working
22  at the parking garage.
23    Q.   When was the last time you spoke to
24  Mr. Gerraro?
25    A.   I don't remember.

TSG Reporting - Worldwide      877-702-9580

Page 28

1         J. Diroche
2    Q.   Have you spoken to him in the last
3  year?
4    A.   We talked when I used to work there.
5  We used to work together. But since I left I
6  haven't spoken to him.
7    Q.   Have you spoken to him in the last
8  year?
9    A.   Yes.
10    Q.   Was that by telephone or in person?
11    A.   In person. We worked together. It was
12  only a wall that divided us. We worked together.
13    Q.   And was there any discussion about any
14  lawsuit against defendants?
15    A.   No.
16    Q.   Did Mr. Gerraro mention any lawsuit
17  against defendants?
18    A.   No.
19    Q.   Did you mention any lawsuit that you
20  were going to bring against defendants?
21    A.   No. I don't talk about that with no
22  one.
23    Q.   Do you know a Percio Ramon-Amparo?
24    A.   Yes. We worked together for a little
25  while.

TSG Reporting - Worldwide      877-702-9580

Page 29

1         J. Diroche
2    Q.   Have you spoken to him in the last
3  year?
4    A.   No. Since he's left the garage, no.
5    Q.   Have you ever had any discussions with
6  Mr. Ramon-Amparo regarding lawsuits against the
7  defendant?
8    A.   No.
9    Q.   Do you know Roberto Rojas?
10    A.   I worked with him at 199 and Webster.
11    Q.   Have you spoken to Mr. Rojas in the
12  last year?
13    A.   No.
14    Q.   Have you had any discussions with
15  Mr. Rojas regarding any lawsuits against
16  defendant?
17    A.   No. I haven't seen that man in about
18  two years. Ever since they -- they sent us to
19  different places. He went somewhere. And I
20  haven't seen him since.
21    Q.   Do you know who Nestor Cedeno is?
22    A.   Yes, we worked together.
23    Q.   When was the last time you spoke to
24  Mr. Cedeno?
25    A.   I don't remember. Ever since he left

TSG Reporting - Worldwide      877-702-9580

Page 30

1       J. Diroche
2  the garage.
3       Q.  Have you had any discussions with
4  Mr. Cedeno regarding lawsuits against the
5  defendants?
6       A.  No.  Since he left I haven't seen him
7  since.
8       Q.  Do you know who Jose Tavares is?
9       A.  No.
10      Q.  When did you first meet Mr. Faillace?
11      A.  I found the number that said lawyer
12  over there at the garage, the parking garage.
13  And I called him to check with me, and to consult
14  with me about my case.  He gave me the address and
15  I went.  Told me what I had to bring and I brought
16  it.
17      Q.  Did you go alone or with anyone else?
18      A.  Alone.
19      Q.  When did you go visit Mr. Faillace for
20  the first time?
21      A.  It's been -- several months ago.
22      Q.  What is your Social Security number?
23      A.  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.
24      Q.  Have you ever worked for defendants
25  under any other name other than your name here

TSG Reporting - Worldwide      877-702-9580

Page 31

1       J. Diroche
2  today?
3       A.  No.
4       Q.  Have you ever allowed anyone to punch
5  in your time card?
6       A.  No.
7       Q.  Have you ever allowed anyone to punch
8  out your time card?
9       A.  No.
10      Q.  I just want to be sure that I
11  understand your testimony.  Is it your testimony
12  that you were paid for all of the hours from the
13  time you punched in until the time you punched out
14  except for your lunch hour?
15      A.  Yes.
16      Q.  Do you claim that you worked any time
17  before you punched in at your job?
18      A.  Before, no.  After punching out my
19  card, yes.
20      Q.  What hours did you work after punching
21  out your card?
22      A.  Raj has sent me to 199.  To 155.  Next
23  door to Bienvenido.
24      Q.  Were those the times that you were
25  covering for another employee?

TSG Reporting - Worldwide      877-702-9580

Page 32

1       J. Diroche
2       A.  Yes.
3       Q.  Those were the approximately 10 times
4  that you were covering for another employee?
5       A.  More or less in the time that I was
6  working there, yes.
7       Q.  And you were paid for part of that
8  time, but not all of that time; is that correct?
9       A.  Yes.
10      Q.  Did you ever pay anyone to work for you
11  at the garage?
12      A.  If someone has paid to work for me?
13      Q.  Yes.  Did you ever pay anyone to work
14  for you?
15      A.  No.
16      Q.  Did you ever declare on your income tax
17  form the amount of money you received in cash?
18      A.  No.
19      Q.  Did you keep any of your pay stubs?
20      A.  I saved all of them.
21      Q.  You saved all of them?
22         MR. FAILLACE:  We'll provide them
23  to you.  We're getting them stamped.
24      Q.  Did you take any documents from the
25  defendants?

TSG Reporting - Worldwide      877-702-9580

Page 33

1       J. Diroche
2       A.  No.
3       Q.  Other than the pay stubs do you have
4  any other documents concerning any compensation
5  you received from defendants?
6       A.  I got verification that they paid me
7  when I went to Santo Domingo.
8       Q.  You were paid vacation when you went to
9  Santo Domingo?
10      A.  Yes.
11      Q.  How much were you paid?
12      A.  They gave me 510.  Something like that.
13      Q.  Approximately?
14      A.  510, 540.  Something like that.
15      Q.  Did you receive this in a check or in
16  cash?
17      A.  By check.
18      Q.  Who gave you this check?
19      A.  Raj.
20      Q.  Did Raj say anything to you when he
21  gave you this check?
22      A.  No.  He told me to return by the 17th
23  or something like that.  That he was going to go
24  on vacation then.
25      Q.  Did you ever get paid for any other

TSG Reporting - Worldwide      877-702-9580