Page 10

```
1         L. Luna
2   otherwise having difficulty understanding, please
3   let me know.
4       A.   Okay.
5       Q.   Please let me finish my question before
6   you answer it. This way, the court reporter can
7   take down a clean record. Also, as I mentioned,
8   you should answer the questions verbally so the
9   court reporter can take everything down. The
10  reporter and the interpreter cannot take down nods
11  of the head or other nonverbal gestures.
12  Understood?
13      A.   Good.
14      Q.   If you need a break, please let me know
15  and we can take a break. This is not an endurance
16  test. All I ask is that if I ask you a question
17  and the answer is still pending, you respond to
18  the question before we take a break.
19      A.   Okay.
20      Q.   Is there any reason at all why you
21  would not be able to give full and complete
22  testimony today?
23      A.   No, there is no reason.
24      Q.   Are you taking any medications that
25  could impair your ability to recollect or testify
```
TSG Reporting - Worldwide    877-702-9580

Page 11

```
1         L. Luna
2   truthfully?
3       A.   No.
4       Q.   Mr. Luna, what is your current address?
5       A.   1254 Sherman. Apartment 3-F.
6       Q.   And in what borough is that located?
7       A.   In the Bronx.
8       Q.   What is your Social Security number?
9       A.   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.
10      Q.   What is your date of birth?
11      A.   2/27/69.
12      Q.   Where were you born?
13      A.   Santo Domingo.
14      Q.   Have you ever been deposed before?
15      A.   No.
16      Q.   Did you prepare for this deposition
17  today?
18      A.   Yes.
19      Q.   Besides speaking with your attorney,
20  what did you do to prepare?
21      A.   Only the truth. What I am supposed to
22  say.
23      Q.   Did you review any documents in
24  preparation for this deposition?
25      A.   No, I didn't review any documents.
```
TSG Reporting - Worldwide    877-702-9580

Page 12

```
1         L. Luna
2       Q.   Did you meet with anyone other than
3   Mr. Faillace to prepare for the deposition today?
4       A.   No.
5       Q.   Have you discussed this case with
6   anyone else?
7       A.   No.
8       Q.   Have you ever been a plaintiff or a
9   defendant in any civil litigation other than this
10  case?
11      A.   No.
12      Q.   Mr. Luna, you're no longer employed by
13  the defendants; is that correct?
14      A.   No.
15      Q.   By whom are you currently employed?
16      A.   I work for a company called Sele
17  (phonetic) in New Jersey. That's where they
18  prepare the food for the animals.
19      Q.   When were you hired by Sele?
20      A.   Two months ago.
21      Q.   What do you do for Sele?
22      A.   I am packaging the merchandise.
23      Q.   What is your hourly wage for Sele?
24      A.   8.25.
25      Q.   What are your hours at Sele?
```
TSG Reporting - Worldwide    877-702-9580

Page 13

```
1         L. Luna
2       A.   You get in at four o'clock in the
3   afternoon. But there's no schedule to leave,
4   because if there's work, you have to stay.
5       Q.   Approximately how many hours a week do
6   you work for Sele?
7       A.   Thirty-five, thirty-six. More or less.
8       Q.   Do you currently work for any other
9   employer other than Sele?
10      A.   No.
11      Q.   You testified that you began working
12  for Sele approximately two months ago. Was that
13  approximately October 2007 that you were hired by
14  Sele?
15      A.   Yes.
16      Q.   By whom were you employed prior to
17  October 2007?
18      A.   I was working in a bodega.
19      Q.   What bodega?
20      A.   Grand Concourse. Yamasa Grocery on
21  Grand Concourse. 168 Grand Concourse.
22      Q.   When you say 168 Grand Concourse, where
23  are you referring?
24      A.   That's where the bodega is.
25      Q.   Where is Grand Concourse?
```
TSG Reporting - Worldwide    877-702-9580

Page 14

```
 1              L. Luna
 2      A.   Grand Concourse -- it's an avenue. The
 3   building of the bodega is 1269.
 4      Q.   What street?
 5      A.   On Grand Concourse. That's in the
 6   Bronx.
 7      Q.   That's what I was asking. Thank you.
 8   How long did you work at the bodega in Grand
 9   Concourse?
10      A.   Eight months.
11      Q.   Is it correct then to say that you
12   began working for Grand Concourse in the beginning
13   of 2007?
14      A.   Yes.
15      Q.   What did you do for the bodega at Grand
16   Concourse?
17      A.   Arranging the merchandise.
18      Q.   What was your hourly wage?
19      A.   It was a fixed salary. They would pay
20   350 per week.
21      Q.   Did you receive that in cash or check?
22      A.   Cash.
23      Q.   How many hours a week did you work for
24   the bodega?
25      A.   From four to eleven. From four o'clock
```
TSG Reporting - Worldwide    877-702-9580

Page 15

```
 1              L. Luna
 2   in the afternoon to eleven o'clock. Six days a
 3   week.
 4      Q.   So you worked for the bodega
 5   approximately 42 hours a week?
 6      A.   Yes.
 7      Q.   And you were paid solely in cash by the
 8   bodega?
 9      A.   Yes.
10      Q.   Where did you work prior to working for
11   the bodega?
12      A.   In the parking.
13      Q.   You worked for the defendants prior to
14   working for the bodega?
15      A.   Yes.
16      Q.   During what period of time did you work
17   for the defendants?
18      A.   From 2002 to the end of 2004.
19      Q.   When were you initially hired by the
20   defendants? You mentioned 2002. When in 2002?
21      A.   26th March.
22      Q.   And approximately when did you stop
23   working for the defendants? You mentioned the end
24   of 2004. Does November 2004 sound accurate to
25   you?
```
TSG Reporting - Worldwide    877-702-9580

Page 16

```
 1              L. Luna
 2      A.   Yes.
 3      Q.   What did you do for defendants?
 4      A.   Park the cars.
 5      Q.   Why did you stop working for the
 6   defendants in November 2004?
 7      A.   Because we couldn't understand each
 8   other.
 9      Q.   Did you resign from your employment
10   with the defendants or were you terminated?
11      A.   They fired me.
12      Q.   Why were you fired?
13           MR. FAILLACE: Objection. He
14      already answered. He said, We didn't
15      understand each other. What more do you
16      need?
17      Q.   I'll ask the question again. Why were
18   you fired?
19           MR. FAILLACE: Objection. He
20      answered already. He can answer. Go
21      ahead. Repeat the question.
22      A.   Because we couldn't understand each
23   other. Too many hours of work, and I was not
24   making enough money.
25      Q.   What was the reason the defendants told
```
TSG Reporting - Worldwide    877-702-9580

Page 17

```
 1              L. Luna
 2   you they were firing you?
 3           MR. FAILLACE: Objection. He has
 4      already answered it twice. Interpreter,
 5      please tell him what I'm saying. But go
 6      ahead. Answer.
 7      A.   Can you please repeat the question?
 8           MS. WHITE: Can the court reporter
 9      please repeat the question?
10           (Record read.)
11      A.   There were too many hours of work and
12   that we couldn't understand each.
13      Q.   Who told you that?
14      A.   I told him that.
15      Q.   You told who?
16      A.   Raj, the supervisor.
17      Q.   If I understand correctly, you told
18   Raj, your supervisor, that there were too many
19   hours of work, and that you were not making enough
20   money?
21      A.   Exactly.
22      Q.   So I'll ask you again, Did you resign
23   from the company or did they fire you?
24      A.   They fired me because I didn't want to
25   continue.
```
TSG Reporting - Worldwide    877-702-9580

Page 22

1  L. Luna
2  employment around March 26th of 2002. Who at the
3  company hired you?
4    A.  Raj.
5    Q.  And for which garage were you initially
6  hired?
7    A.  187 and Valentine.
8      MR. FAILLACE: For clarification,
9  when he says 187 Valentine, he means
10 187th Street and Valentine Avenue. The
11 same as 162 -- so we don't go through the
12 same mess with Grand Concourse. When
13 they say a number and a name, they mean
14 this street and that avenue. Okay.
15   Q.  Just to clarify, Mr. Luna, you were
16 just referring to 187 Valentine as the garage
17 where you were initially hired. Were you
18 referring to 187th Street and -- the intersection
19 of 187th Street and Valentine?
20   A.  Yeah.
21   Q.  Do you know the name of that parking
22 garage?
23   A.  Ivy Parking.
24   Q.  For how long did you work at Ivy
25 Parking?

TSG Reporting - Worldwide     877-702-9580

Page 23

1  L. Luna
2    A.  Until the end of 2004.
3    Q.  For which garage did you work after you
4  worked for Ivy Parking?
5    A.  For the same one -- 169.
6    Q.  Do you know the name of that garage?
7    A.  It's called the parking of 169, because
8  it's the same company. And when they needed
9  somebody there, they would move the person there.
10   Q.  So after you worked at Ivy Parking on
11 187th Street, you worked at 169th Street?
12   A.  Because it's the same company, the same
13 owner.
14     MR. FAILLACE: Excuse me. Your
15 question was after you worked at 187 you
16 went to work at 169. He is answering at
17 the same time he worked at both places.
18 And you can ask the interpreter.
19     MS. WHITE: Let me ask the
20 interpreter. Is that exactly what he
21 said, or is Mr. Faillace interpreting
22 what he said?
23     THE INTERPRETER: I don't
24 remember. Sorry.
25     MS. WHITE: I will confirm.

TSG Reporting - Worldwide     877-702-9580

Page 24

1  L. Luna
2    Q.  Did you work for Ivy Parking and the
3  garage at 169th Street at the same time, or did
4  you work for one after you worked for the other?
5    A.  If there was people not coming or
6  missing on 169th Street, they would send people
7  who didn't have much work on Ivy Parking to work
8  on the 169.
9    Q.  Okay. What other garages did you work
10 at between March 2002 and November 2004 besides
11 Ivy Parking and the garage at 169th Street?
12   A.  No others.
13   Q.  Those are the only two garages you
14 worked for the defendants?
15   A.  Yes.
16   Q.  For which garage did you work the most?
17   A.  187 and Valentine.
18   Q.  Did you have any other jobs while you
19 were employed by the defendants?
20   A.  No.
21   Q.  Did you own your own business at the
22 time that you were working for the defendants?
23   A.  No.
24   Q.  What were your hours when you were
25 initially hired by the defendants in March 2002?

TSG Reporting - Worldwide     877-702-9580

Page 25

1  L. Luna
2    A.  From six in the afternoon to six
3  o'clock in the morning.
4    Q.  How many hours a week did you work?
5    A.  Twelve and thirteen hours. Because
6  sometimes the other people wouldn't come and we
7  had to wait.
8    Q.  Let me repeat the question.
9      How many hours per week did you work?
10 You testified you worked from seven p.m. to
11 six a.m. How many hours a week?
12     MR. FAILLACE: Objection. He
13 worked from six p.m. to six a.m.
14   Q.  Six p.m. to six a.m.
15     How many hours per week did you work?
16   A.  Sometimes I would work 72 hours.
17   Q.  How many days a week did you work?
18   A.  Six and sometimes seven.
19   Q.  Let me make sure I'm understanding your
20 testimony. Your regular schedule was typically
21 from six p.m. to six a.m., six days a week. And
22 sometimes you worked seven days a week; is that
23 correct?
24   A.  Yes.
25   Q.  How often did you work seven days a

TSG Reporting - Worldwide     877-702-9580

### Page 26

```
 1          L. Luna
 2   week?
 3       A.   An average of four months. Something
 4   like that.
 5       Q.   Are you testifying that for a period of
 6   approximately four months you worked seven days a
 7   week?
 8       A.   Yes.
 9       Q.   When was it that you worked seven days
10   a week?
11       A.   Because they needed me and they didn't
12   have any personnel.
13       Q.   In what year was it that you worked
14   seven days a week?
15       A.   For instance, on a year that we -- that
16   year we didn't have personnel. So we went on
17   working seven days a week.
18       Q.   Let me try to clarify this. You
19   testified that you had worked seven days a week
20   for about four months, correct? Are you
21   testifying that you worked those seven days a week
22   in four consecutive months?
23       A.   No, not consecutive.
24       Q.   So for approximately four months over
25   the entire time that you worked for the defendants
```

### Page 27

```
 1          L. Luna
 2   you worked seven days a week?
 3       A.   Yes.
 4       Q.   Was your shift generally six p.m. to
 5   six a.m. till the end of 2004 when you stopped
 6   working for defendants, or did your shift change?
 7       A.   Yes, it was like that. No, it did not
 8   change.
 9       Q.   What day of the week did you generally
10   have off?
11       A.   Tuesday.
12       Q.   Did you always punch a time clock when
13   you arrived at the beginning of your shift?
14       A.   Yes.
15       Q.   Did you punch a time clock when you
16   left at the end of your shift?
17       A.   Yes.
18       Q.   Did you ever punch out if you left
19   during your shift?
20       A.   But if I would leave, I would have to
21   punch or add an hour or two, but I would always
22   have to punch the clock at six o'clock in the
23   afternoon. And I -- six o'clock in the morning.
24           MS. WHITE: I'm sorry. Can you
25   repeat that?
```

### Page 28

```
 1          L. Luna
 2          (Record read.)
 3       Q.   Let me rephrase the question.
 4           Did you ever punch out the time clock
 5   in the middle of your shift?
 6       A.   In the morning I had to leave at six.
 7       Q.   Right. You would come in at six p.m.
 8   and you would punch the time clock, correct?
 9       A.   Come in.
10       Q.   And you would punch out at six in the
11   morning?
12       A.   Yes.
13       Q.   Did you ever punch out if you left the
14   garage between six p.m. and six a.m.?
15           MR. FAILLACE: Objection. Form.
16       A.   No, because you would not leave there.
17       Q.   Did you ever start work prior to the
18   start of your shift?
19       A.   Yes, sometimes I would come at five.
20       Q.   Did you punch in at five o'clock or
21   would you punch in at six o'clock?
22       A.   No, I had to punch my card at six.
23       Q.   How many times did you come in at five
24   o'clock and punch in at six o'clock?
25       A.   When they told me to do so.
```

### Page 29

```
 1          L. Luna
 2       Q.   How often did that happen?
 3       A.   Weekly.
 4       Q.   So your testimony is every single week,
 5   at least once every single week, during the time
 6   you were employed with the defendant, you came in
 7   at five o'clock at night instead of six o'clock at
 8   night?
 9       A.   Yes, because we were supposed to punch
10   at six and not at five.
11       Q.   Did you get paid for that hour between
12   five p.m. and six p.m.?
13       A.   No.
14       Q.   So your testimony is you never got paid
15   when you came into work an hour early?
16       A.   If I would come at five o'clock to
17   work, no, I wasn't, because my schedule -- my
18   shift was from six to six.
19       Q.   If you came in at five o'clock, what
20   time would you leave?
21       A.   At six o'clock in the morning.
22       Q.   Were you ever paid in cash for that
23   hour that you worked between five p.m. and six
24   p.m.?
25       A.   10 or $15 he would give us per week.
```

TSG Reporting - Worldwide    877-702-9580

Page 34

```
 1              L. Luna
 2     A.  Yes.  Whenever we were called in to
 3  come.
 4     Q.  And your testimony is you were never
 5  paid for that hour besides the cash that you
 6  received each week?
 7     A.  Because the cash was only like 40, 45
 8  pesos.
 9     Q.  Did you receive dollars or pesos?
10     A.  Dollars.
11     Q.  So your testimony is that you received
12  about 40, $45 per week in cash?
13     A.  Yes.
14     Q.  Mr. Luna, a little while ago I asked
15  you how much in cash you received each week.  And
16  I asked you if you ever received $40 a week in
17  cash.  And you just testified that you did.
18  Before, you testified that you didn't.  Which is
19  it?
20     A.  Well, I'm talking now about when we
21  came an hour earlier.
22     Q.  Then you would receive 40 to $45 in
23  cash that week?
24     A.  Yes.
25     Q.  Would you agree that you received at
```
TSG Reporting - Worldwide    877-702-9580

Page 35

```
 1              L. Luna
 2  least $40 in cash almost every week that you
 3  worked for the defendants?
 4        MR. FAILLACE:  Objection.  He said
 5  already he didn't.
 6        So please tell him what I just
 7  said.
 8        He can answer it.  I'm just
 9  saying -- I objected because he already
10  told her something different.  She's
11  putting words in his mouth again.  She's
12  attempting to put words in my client's
13  mouth.
14     Q.  Let me rephrase the question.
15        You testified that every week three or
16  four times a week you would come in to work at
17  five p.m. instead of six p.m., correct?
18     A.  Yes.
19     Q.  You also testified, correct me if I'm
20  wrong, that on those weeks when you did come in at
21  five p.m. instead of six p.m. that you received
22  approximately $40 in cash; is that correct?
23     A.  Yes.
24     Q.  If every week you came in to work at
25  five p.m. instead of six p.m. at least once, then
```
TSG Reporting - Worldwide    877-702-9580

Page 36

```
 1              L. Luna
 2  your testimony is that you received around $40 in
 3  cash that week to compensate you for that extra
 4  hour?
 5     A.  Yes.
 6     Q.  Did you ever continue to work after six
 7  a.m.?
 8     A.  Yes.
 9     Q.  How often would you work after six
10  a.m.?
11     A.  About ten weeks.
12     Q.  But generally your shift ended at six
13  a.m., correct?
14     A.  Yes.
15     Q.  You testified earlier that you worked
16  with Jose; is that correct?
17     A.  Yes, that was my working buddy.
18     Q.  Did Jose also park cars?
19     A.  Yes.
20     Q.  Did you ever let Jose punch your
21  timecard in or out?
22     A.  No.
23     Q.  Did you ever pay another employee to
24  work one of your shifts?
25     A.  No.
```
TSG Reporting - Worldwide    877-702-9580

Page 37

```
 1              L. Luna
 2     Q.  Has another employee ever paid you to
 3  work his or her hours?
 4     A.  No.
 5     Q.  In the time that you worked for
 6  defendants between March 2002 and November 2004,
 7  did you ever take a leave of absence from work?
 8     A.  No, I didn't take any vacation.
 9     Q.  Did you ever take any other time off of
10  work?
11     A.  No.
12     Q.  Did you ever leave the country between
13  March 2002 and November 2004?
14        MR. FAILLACE:  Objection.
15     A.  No.  You can check my passport.
16     Q.  I have your passport right here.  I'm
17  about to show you.
18        Did you leave the country in March
19  2003?
20     A.  No.
21     Q.  You did not?
22     A.  No.
23        MR. FAILLACE:  Can we take a
24  break?
25        MS. WHITE:  Can I have two minutes
```
TSG Reporting - Worldwide    877-702-9580

Page 54

```
 1            L. Luna
 2    A.   No.
 3    Q.   Your paycheck never listed overtime
 4  hours?
 5    A.   No, no.
 6    Q.   If you look at the very first page of
 7  Exhibit 2 that's in front of you right here, see
 8  where it says "regular"?  "Forty hours at 5.15."
 9  Do you see that?
10    A.   Yes.
11    Q.   And do you see under that it says
12  overtime?
13    A.   But they didn't give us that on the
14  check.  They would give it to us cash.
15       MR. FAILLACE:  He didn't say that.
16       THE INTERPRETER:  No?
17       MR. FAILLACE:  No.
18    Q.   Could you repeat what you just said for
19  the interpreter?
20    A.   That money was not given to us on the
21  check.  The overtime, no.
22    Q.   So right here where it says overtime --
23  six hours.  Do you see that on here?  And it says
24  that at a rate of $7.25 per hour.  Do you see
25  that?
```
TSG Reporting - Worldwide    877-702-9580

Page 55

```
 1            L. Luna
 2    A.   Yes.
 3    Q.   And you see across it says "for this
 4  period, $46.35," correct?  And that's in addition
 5  to $206 of regular pay.  Do you see that?
 6    A.   Yes.
 7    Q.   For a total gross pay of 252.35.
 8    A.   Yes.  But they would give that to us in
 9  cash.
10    Q.   Okay.  Do you see where it says "net
11  pay" on here, "$218.79"?  Please look at Exhibit
12  2.  Would you receive in that check the entire
13  amount of net pay?
14    A.   I don't remember.  But if it says so, I
15  am sure that -- but I don't remember.
16    Q.   Let me rephrase my question.  These
17  paychecks that you have in front of you, the pay
18  stubs, reflect that you were paid by check for at
19  least some overtime hours; isn't that correct?
20    A.   Yes.  They would give it to me on a
21  check.
22    Q.   Okay.  That's my question.  Thank you.
23       Do you understand what the term "time
24  and a half" means?
25    A.   No.
```
TSG Reporting - Worldwide    877-702-9580

Page 56

```
 1            L. Luna
 2    Q.   Do you understand that the overtime
 3  rate of pay was one and a half times your regular
 4  rate of pay?
 5    A.   The overtime, yes.  Yes, that's time
 6  and a half.
 7    Q.   Did you receive time and a half for
 8  your overtime hours?
 9       MR. FAILLACE:  He was asking.  He
10  was asking.
11    Q.   He was asking?  What were you asking?
12  I'm sorry.
13    A.   No, I'm telling you that time and a
14  half -- that's the hour for overtime.
15    Q.   Right.  Do you agree that you were paid
16  time and a half for the overtime hours that you
17  worked?
18    A.   Yeah, the overtime.
19    Q.   You testified that you received cash in
20  addition to your check, correct?
21    A.   When you work more.
22    Q.   Why did you receive -- explain to me
23  why you received cash in addition to your check.
24    A.   Because it goes over the 40 hours of
25  the five days of work.
```
TSG Reporting - Worldwide    877-702-9580

Page 57

```
 1            L. Luna
 2    Q.   So let me -- I'm trying to understand
 3  your testimony.  Is your testimony that you
 4  received cash to compensate you for hours that you
 5  worked in addition to the hours that were
 6  compensated in your paycheck?
 7    A.   Yes.  Because that was when you went
 8  over the time.  When you work seven days -- if you
 9  work more than seven days -- five days -- for
10  instance, if you work seven days, they would give
11  you 40 to $45 for that.
12    Q.   Who gave you the cash?
13    A.   Raj.
14    Q.   Isn't it true that some of the cash
15  that you received was to compensate you for a
16  lunch hour or a meal break during your shift?
17    A.   No, we never got breaks.  There were no
18  breaks.
19    Q.   Did you keep a record of the amount of
20  cash that you received?
21    A.   The check.  No, no.  Now that you're
22  mentioning cash -- no, no.  There was no receipt,
23  nothing.
24    Q.   Did you make any note of the amount of
25  cash that you received?
```
TSG Reporting - Worldwide    877-702-9580

## Page 58

```
 1         L. Luna
 2    A.   No.
 3    Q.   Did you declare the cash on your income
 4  tax returns?
 5    A.   No. That was on the side.
 6    Q.   Did you receive any bonuses during the
 7  time that you worked for the defendants?
 8    A.   No.
 9    Q.   Did you ever receive any tips?
10    A.   In the parking you mean?
11    Q.   Yes.
12    A.   Yes, but that was from the customer.
13    Q.   How much would you receive on a daily
14  basis in tips?
15    A.   Fifteen, $12.
16    Q.   Did you receive tips every day?
17    A.   Yes.
18    Q.   Did you ever give the tips to your
19  supervisor?
20    A.   No.
21    Q.   Did you ever tell your supervisor how
22  much you received in tips?
23    A.   Yes. But he wouldn't interfere with
24  that.
25    Q.   So your supervisor never took the tips
        TSG Reporting - Worldwide    877-702-9580
```

## Page 59

```
 1         L. Luna
 2  away from you?
 3    A.   No.
 4    Q.   Did you share your tips with any other
 5  employees?
 6    A.   Yes, with my buddy.
 7    Q.   You're referring to Jose? You shared
 8  your tips with Jose?
 9    A.   Yes, Jose, yes.
10    Q.   How much of your tips would you give to
11  Jose?
12    A.   It was half and half. We would share
13  it.
14    Q.   Did you personally receive 15 to $20 in
15  tips, or did you receive half of 15 to $20?
16    A.   Half of it, because we would divide it
17  between the two of us.
18    Q.   So did you personally receive between
19  7.50 and $10 in tips a day, or did you personally
20  receive 15 to $20 in tips a day?
21         MR. FAILLACE: Objection.
22    Q.   I'm just trying to understand your
23  testimony.
24         MR. FAILLACE: He answered already
25  that he split it.
        TSG Reporting - Worldwide    877-702-9580
```

## Page 60

```
 1         L. Luna
 2    Q.   Okay. I'm just trying to understand
 3  your testimony. Could you repeat the -- let me
 4  ask the question again.
 5         Did you and Jose receive a total of 15
 6  to $20 in tips, or did you receive a total of 30
 7  to $40 dollars in tips?
 8         MR. FAILLACE: Objection. He's
 9  already answered it. And you're trying
10  to confuse him.
11         MS. WHITE: Objection noted.
12    A.   Between 30 and 40 between the two of
13  us.
14         MR. FAILLACE: You're confusing
15  him, but that's fine.
16    Q.   So let me confirm. You would receive
17  between 30 to $40 in tips per day. So you and
18  Jose would each get half of that, or 15 to $20 in
19  tips per day; is that correct?
20    A.   We would divide between the two of us.
21  If we only got 20, we would get 10 and 10 each.
22    Q.   Okay. Mr. Luna, in this lawsuit, what
23  is it that you are claiming that you weren't paid
24  for?
25    A.   He didn't pay us a lunch hour.
        TSG Reporting - Worldwide    877-702-9580
```

## Page 61

```
 1         L. Luna
 2    Q.   Anything else?
 3    A.   When we work the seven or six days, he
 4  would give us only 40, $45. That's it.
 5    Q.   Your paycheck reflected that you were
 6  paid for the first 40 hours that you worked in any
 7  week, that's correct, right?
 8    A.   Yes.
 9    Q.   And earlier you testified that you were
10  paid overtime for your hours worked that you
11  worked in addition to 40 hours; is that correct?
12         MR. FAILLACE: Objection. You're
13  putting words in my client's mouth.
14         MS. WHITE: Correct me if I'm
15  wrong.
16         MR. FAILLACE: You're putting
17  words in my client's mouth. And you very
18  well know he's confused. And you're
19  trying to get words in his mouth. Let
20  the record show --
21         MS. WHITE: I'd like to state --
22         MR. FAILLACE: You've done this
23  all through the deposition. You're
24  taking advantage that my client is an
25  uneducated person; that he doesn't
        TSG Reporting - Worldwide    877-702-9580
```

Page 66

```
 1        L. Luna
 2     Would you like the interpreter to
 3  repeat to your witness the objection that
 4  you made?
 5     MR. FAILLACE:  I have asked her
 6  repeated times to do so, but she didn't
 7  do it.
 8     MS. WHITE:  Right now are you
 9  asking her?
10     MR. FAILLACE:  I mean, she knows
11  what to do.  I don't have to repeat it to
12  her.  She's a smart lady.
13     MS. WHITE:  I'm going to ask the
14  interpreter to repeat -- if the court
15  reporter could repeat back Mr. Faillace's
16  first objection.  And we will repeat it
17  to the witness so that the witness hears
18  all that is going on today.
19     (Record read.)
20     Q.  Just to clarify, I'm not trying to
21  mischaracterize your testimony.  I'm just trying
22  to understand.  For the hours that you worked that
23  were not reflected on your paycheck, did you
24  receive cash to compensate you for those hours?
25     MR. FAILLACE:  Objection.  Already
```

Page 67

```
 1        L. Luna
 2  answered.
 3     Q.  You can answer the question.
 4     A.  On the seven days -- on the seven days
 5  you mean?  They gave us 40 to 45.
 6     Q.  Previously your testimony was that you
 7  worked seven days in a week for a period of about
 8  four months; is that correct?
 9     A.  For eight to ten weeks we worked seven
10  days a week.
11     Q.  And in those weeks your testimony is
12  that you received 40 to $45 in cash for the extra
13  time that you worked; is that correct?
14     A.  Yes.
15     Q.  Other than those eight to ten weeks
16  that you were just testifying about, were you
17  compensated for the hours that you worked?
18     A.  No.
19     Q.  What were you not compensated for?
20     A.  The lunch time.
21     Q.  Were you not compensated for anything
22  else?
23     A.  No.
24     Q.  Thank you.  Did you ever leave the
25  premises during a shift?
```

Page 68

```
 1        L. Luna
 2     MR. FAILLACE:  Objection.  He
 3  already answered.
 4     A.  No.
 5     Q.  Did you ever take a meal break during
 6  your shift?
 7     A.  No.
 8     Q.  Did you ever eat while you were on your
 9  shift?
10     A.  We eat like that.  Running and working
11  and eating, because it was very busy.
12     Q.  Is it your testimony that you would eat
13  food while you were working?
14     A.  Every five minutes a car would come.
15  So we would have to leave our food and take care
16  of the car and go back.  We had to leave our food
17  and we had to run.
18     Q.  Did you ever leave the premises to go
19  get food?
20     A.  No.
21     Q.  Did you bring the food into work with
22  you?
23     A.  Yes.
24     Q.  Did anyone tell you that you were
25  entitled to a meal break?
```

Page 69

```
 1        L. Luna
 2     A.  Yes.
 3     Q.  Who told you that you were entitled to
 4  a meal break?
 5     A.  The same customers would tell me that I
 6  had a right to have a moment to eat.
 7     Q.  Did anyone at the company tell you that
 8  you are entitled to a meal break?
 9     A.  No.  From the company, no.  The
10  customers would.
11     MS. WHITE:  I'm going to mark this
12  as Luna Exhibit 3.
13     (Luna Exhibit 3, SP Payroll
14  document, marked for identification, as
15  of this date.)
16     Q.  Mr. Luna, if you'll take a look at the
17  document that is in front of you that has been
18  marked Exhibit 3.  Is that your signature at the
19  bottom of the document?
20     A.  Yes, that's my signature.
21     Q.  Do you recognize what this document is?
22     A.  No.
23     Q.  Did you read this document before you
24  signed it?
25     A.  No.
```

Page 70

```
1        L. Luna
2    Q.  You see that the document is written in
3  both English and Spanish; is that correct?  In
4  that second paragraph --
5        MR. FAILLACE:  He hasn't answered
6  your question.
7        MS. WHITE:  I'm trying to assist
8  him.
9        MR. FAILLACE:  Maybe he can't read
10 it.
11   Q.  Are you able to read Spanish, Mr. Luna?
12   A.  Yes.  They never gave us that.
13   Q.  That's not my question.  Do you see
14 that second paragraph where it's written in
15 Spanish?
16   A.  Yes.
17   Q.  Are you able to read the Spanish that
18 is written there?
19   A.  Yes.  But we never got the hour for
20 lunch.
21   Q.  Is it your testimony that you never
22 read this document?
23   A.  No, I didn't read it.
24   Q.  Are you in the custom of signing
25 documents that you don't read?
```

Page 71

```
1        L. Luna
2        MR. FAILLACE:  Objection.
3  Objection.
4    A.  Well, I was trusting.
5    Q.  I will repeat the question.  Are you in
6  the custom of signing documents that you don't
7  read?
8    A.  Yes, I am used to it.
9    Q.  Is it your testimony that you do not
10 know that you can take a break?
11       MR. FAILLACE:  Objection.  He has
12 already --
13   A.  Nobody would take the break.  There was
14 no time.
15   Q.  Did anybody tell you not to take a
16 break?
17   A.  There was no time.  The supervisor
18 never told us that we had an hour for lunch.
19   Q.  Did you take a break of any length
20 during your shift when you worked?
21   A.  No, we couldn't.
22   Q.  Is it your testimony here today that
23 you never took even a minute break during your
24 shift when you worked with the defendants in the
25 entire time between March 2002 and November 2004?
```

Page 72

```
1        L. Luna
2    A.  No.  We didn't take lunch.
3    Q.  Did you ever take a break for any
4  reason, not just for lunch or to eat a meal?
5    A.  Only when I was going to the bathroom.
6    Q.  With the exception of using the
7  restroom, did you ever take a break for any other
8  reason?
9    A.  No.
10   Q.  Did you ever see Jose the individual
11 with whom you worked take a break?
12   A.  That was very busy.  We had to run,
13 both of us.
14   Q.  How many cars did you generally park or
15 return to customers in an hour?
16   A.  That depends on the movement because
17 the cars were coming in and going out.  It was
18 like an elevator.  It was five stories of cars.
19   Q.  Are you able to estimate the
20 approximate number of cars that came in or went
21 out of the garage in an hour when you were working
22 during your shift?
23   A.  Thirty to 40 vehicles.  And according
24 to how they are coming, you have to park them.
25 You have to put them in the elevator and park
```

Page 73

```
1        L. Luna
2  them.
3    Q.  Did you ever take time off of work to
4  care for a family member?
5        MR. FAILLACE:  Objection.
6    A.  No.
7    Q.  Did you ever take time off to run a
8  personal errand?
9    A.  I would do everything on a Tuesday.
10 That was my free day.
11   Q.  How did you get to work?
12   A.  On bus.
13   Q.  Was the bus ever late in getting you to
14 work?
15   A.  No, I knew my timing.
16   Q.  Was the bus ever delayed in picking you
17 up?
18   A.  No.  I would always come ten to
19 fifteen -- ten or five minutes before the time.  I
20 knew my time.
21   Q.  Were you ever disciplined during your
22 employment with the company?
23   A.  No.
24   Q.  Has anyone ever informed you that they
25 wished to be part of this lawsuit?
```

TSG Reporting - Worldwide    877-702-9580