# EXHIBIT D



620 Eighth Avenue

New York, New York 10018-1405

(212) 218-5500

fax (212) 218-5526

www.seyfarth.com

Writer's direct phone

Writer's e-mail

February 13, 2008

**<u>VIA FACSIMILE (212) 317-1620</u>**
**<u>AND U.S. MAIL</u>**

Michael A. Faillace, Esq.
Michael A. Faillace & Associates, P.C.
110 East 59th Street
32nd Floor
New York, NY 10022

     Re:   <u>Pena et al v. SP Payroll, Inc. et al, 07-CV-7013 (S.D.N.Y.)</u>

Dear Mr. Faillace:

     Yesterday, you and I spoke regarding the spreadsheet calculation of the alleged back pay and damages which you prepared in the above-referenced matter and forwarded to me on January 25, 2008.

     During our discussion, you advised that you arrived at the back pay figure of $274,419.78 (exclusive of attorneys fees and costs of approximately $33,900.00) not based on any documents, but rather, predicated on the recollections of the six individuals who have thus far been deposed in this matter. However, I, too, have reviewed the deposition testimony of these six individuals and can find no basis upon which to support your figures.

     You also claimed that the compensation purportedly due your clients for the lunch hours through which they claim to have worked, but were not paid, comprises seventy-five percent (75%) of the total amount which you believe Defendants owe to plaintiffs. While we dispute that your clients were not paid for lunch, even utilizing your figures, the amount allegedly claimed for lunch hours -- $67,409.27 -- is not seventy-five percent (75%) of the total damages you are claiming, either inclusive or exclusive of the penalty amounts you have identified.

     I also note that your spreadsheet lists Edison Alvarez in two different sections of the spreadsheet and it appears that he is the only plaintiff for whom you are seeking certain overtime compensation. This is fallacious. As you know, Mr. Alvarez, in his own handwriting, certified that he had been fully compensated for all overtime hours, during the period for which you are seeking overtime on his behalf.

BRUSSELS    WASHINGTON, D.C.    SAN FRANCISCO    SACRAMENTO    NEW YORK    LOS ANGELES    HOUSTON    CHICAGO    BOSTON    ATLANTA



Michael A. Faillace, Esq.
February 13, 2008
Page 2

In addition, the spreadsheet which you provided contains calculations for liquidated damages as well as pre-judgment interest. While we do not believe your clients would be entitled to either damages penalty, it is well settled that a plaintiff cannot collect both liquidated damages and pre-judgment interest. Likewise, your spreadsheet seeks liquidated damages for spread of hours pay violations. As you well know, it is settled under New York law that a class action cannot be maintained where the statute under which the claim is brought imposes a penalty and no such penalty can be recovered.

In reviewing your damages spreadsheet, I note that you have included Patricio Gonzales as one of the plaintiffs and you claim that Mr. Gonzales is owed $34,005.69 in damages. Your spreadsheet is the first time that Mr. Gonzales' name has been raised during this litigation and I note that, according to the Court's docket, he has not filed a consent to join this action. Thus, any alleged claim by Mr. Gonzales is not before the Court.

Finally, during our discussion, you also represented that you and your clients have no interest in continuing to mediate this matter. If that is so, you, out of courtesy, should advise mediator John Cannon of your decision.

Finally, you further represented that you will not be filing a motion for Rule 23 class certification for your New York Labor Law claims since the original named plaintiffs have no interest in representing other employees or former employees of the Defendants.

Very truly yours,

SEYFARTH SHAW LLP

Peter A. Walker

cc:    Lori M. Meyers

NY1 26502179.1

# EXHIBIT E

# Michael Faillace & Associates, P.C.

### Employment and Litigation Attorneys

110 East 59th Street, 32nd Floor
New York, New York 10022

Telephone: (212) 317-1200
Facsimile: (212) 317-1620

Faillace@employmentcompliance.com

June 10, 2008

**<u>VIA FIRST CLASS MAIL</u>**

Peter Arnold Walker
Seyfarth Shaw LLP
620 8th Avenue
New York, NY 10018

   <u>Re:</u>  Pena et al. v. SP Payroll, Inc., et al.
       <u>Index No. 1:07-cv-07013-RJH</u>

Dear Mr. Walker:

   Enclosed are Plaintiffs' [Proposed] First Amended Complaint, and a draft Stipulation and [Proposed] Order for your review. We would prefer to jointly submit the amendment by stipulation rather than applying directly to the Court. Please review both and then contact me to advise me as to whether the proposed First Amended Complaint and stipulation are acceptable to Defendants.

        Very truly yours,

        Michael Faillace

Enclosures.

*Certified as a minority-owned business in the State of New York*

MICHAEL FAILLACE & ASSOCIATES, P.C.
Michael A. Faillace, Esq. [MF-8436]
110 East 59th Street, 32nd Floor
New York, New York 10022
(212) 317-1200
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
ANGELO PENA, ROLANDO ROJAS, JOSE
DIROCHE, FRANKLIN SANTANA,
CHRISTAIN SANTOS, LUIS RAMON
LUNA, MIGUEL ALCANTARA, MIGUEL
GARCIA, MIGUEL ROJAS, PATRICIO
GONZALEZ, VICTOR GONZALEZ, JOSE
DE ARCE REYES, and EDISON ALVAREZ,

                          *Plaintiffs,*

           -against-

SP PAYROLL, INC., NICHOLAS PARKING,
CORP., IVY PARKING, CORP.,
BIENVENIDO, LLC, CASTLE PARKING
CORP., SAGE PARKING CORP., and SAM
PODOLAK,

                      *Defendants.*
-------------------------------------------------------X

**07 CV 7013**

**[PROPOSED] FIRST**
**AMENDED COMPLAINT**

**ECF Case**

      Plaintiffs Angelo Pena, Rolando Rojas, Jose Diroche, Franklin Santana, Christian Santos,

Luis Ramon Luna, Miguel Alcantara, Miguel Garcia, Miguel Rojas, Patricio Gonzalez, Victor

Gonzalez, Jose De Acre Reyes, and Edison Alvarez, individually, by and through their attorneys,

Michael Faillace & Associates, P.C., allege upon information and belief of the Defendants, as

follows:

## NATURE OF ACTION

1.      Plaintiffs are current and former parking lot attendants of SP Payroll, Inc.,

Nicholas Parking, Corp., Ivy Parking, Corp., Bienvenido, LLC, Castle Parking Corp., and Sage

Parking Corp. (collectively referred to as "Defendant Corporations"), and Sam Podolak

("Defendant Podolak"), who owns and operates Defendant Corporations.

2.      Defendant Corporations, by and through their owner, operate a chain of parking

lots in New York City.

3.      Defendant Corporations are owned and operated by individual Defendant Sam

Podolak.

4.      At all times relevant to this complaint, Defendants have maintained a policy and

practice of requiring their parking lot attendants to work in excess of forty (40) hours per week

without providing them the minimum wage and overtime compensation required by federal and

state law and regulations.

5.      Plaintiffs now bring this action on behalf of themselves for unpaid minimum

wages and overtime wage orders pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. §

201 *et seq.* ("FLSA"), the New York Labor Law ("NYLL") § 650 *et seq.*, and the spread of hours

and overtime wage orders of the New York Commissioner of Labor (the "spread of hours order"

and "overtime wage order" respectively codified at 12 N.Y.C.R.R. § 142-2.2, 2.4.).

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 216(b) (FLSA)

and 28 U.S.C. § 1331 (interstate commerce).  Supplemental jurisdiction over Plaintiffs' state law

claims is conferred by 28 U.S.C. § 1367(a).

7.    Venue is proper in this District under 28 U.S.C. §1391(b) and (c) because all or a substantial part of the events or omissions giving rise to the claims occurred in the State of New York within this district. Defendant Corporations reside in this district and Plaintiffs were employed by Defendants in this district.

## THE PARTIES

### *Plaintiffs*

8.    Angelo Pena ("Plaintiff Pena") is an adult individual residing in New York County, New York. Plaintiff Pena has been employed by Defendants from approximately October 2003 through the present. Plaintiff Pena regularly works 60 hours a week (7 a.m. to 7 p.m., five days a week). Plaintiff Pena received payment in the form of a check for only 40 hours. In addition to his weekly wages paid by check, Plaintiff Pena was given approximately $10 to $20 per week in cash. Plaintiff Pena has worked at the following locations: 199 Street and Western Avenue, Bronx, NY; 404 W. 155th Street, New York, NY; W. 145th Street, New York, NY; and 1295 Jerome Street, New York, NY 10452.

9.    Rolando Rojas ("Plaintiff Rojas") is an adult individual residing in New York County, New York. Plaintiff Rojas was employed by Defendants from approximately May 2003 through January 20, 2007. Plaintiff Rojas regularly worked 60 hours a week (7 p.m. to 7 a.m., five days a week). Plaintiff Rojas received payment in the form of a check for only 40 hours. In addition to his weekly wages paid by check, Plaintiff Rojas was given approximately $15 to $20 per week in cash. Plaintiff Rojas has worked at the following locations: 404 W. 155th Street, New York, NY; and 199th Street and Webster Avenue, Bronx, NY.

10.    Jose Diroche ("Plaintiff Diroche") is an adult individual residing in Bronx County, New York. Plaintiff Diroche has been employed by Defendants from approximately

- 3 -

February 2001 through the present. Plaintiff Diroche regularly works 72 hours per week (7 p.m. to 7 a.m., six days a week). Plaintiff Diroche received payment in the form of a check for only 40 hours. In addition to his weekly wages paid by check, Plaintiff Diroche was given approximately $15 to $20 per week in cash. Plaintiff Diroche has worked at the following locations: 1295 Jerome Avenue, New York, NY 10452; 1277 Jerome Avenue, New York, NY 10452; 199 Street & Western Avenue, Bronx, NY; 404 W. 155th Street, New York, NY.

11.    Franklin Santana ("Plaintiff Santana") is an adult individual residing in Bronx County, New York. Plaintiff Santana has been employed by Defendants from approximately 2003 through the present. Plaintiff Santana regularly worked 72 hours per week (7 p.m. to 7 a.m., six days per week). Plaintiff Santana received payment in the form of a check for only 40 hours. In addition to his weekly wages paid by check, Plaintiff Santana was given approximately $15 to $30 per week in cash. Plaintiff Santana worked at the 1277 Jerome Avenue, Bronx, NY 10452 location.

12.    Christian Santos ("Plaintiff Santos") is an adult individual residing in New York County, New York. Plaintiff Santos has been employed by Defendants from December 4, 2005 through approximately November 2006. Plaintiff Santos regularly worked 72 hours per week (7 p.m. to 7 a.m., six days per week). Plaintiff Santos was paid his weekly wages by check in the sum of approximately $260.00 per week. Plaintiff Santos worked at the following locations: 144th Street and Bryan Avenue, New York, NY; 404 W. 155th Street, New York, NY; and 1277 Jerome Avenue, Bronx, NY 10452.

13.    Luis Ramon Luna ("Plaintiff Luna") is an adult individual residing in Bronx County, New York. Plaintiff Luna has been employed by Defendants from approximately March 26, 2002 through November 2004. Plaintiff Luna regularly worked 72 hours per week

(6:00 p.m. to 6:00 a.m., six days per week). Plaintiff Luna was paid his weekly wages by check in the sum of approximately $385.00 per week. In addition to his weekly wages paid by check, Plaintiff Luna was given approximately $15 to $40 per week in cash. Plaintiff Luna worked at the following locations: 187th Street and Valentine Avenue, Bronx, NY; and 169th Street, New York, NY.

14.    Miguel Alcantara ("Plaintiff Alcantara") is an adult individual residing in Bronx County, New York. Plaintiff Alcantara has been employed by Defendants from May 1, 2003 through approximately October 2006. Plaintiff Alcantara regularly worked 60 hours per week (7 p.m. to 7 a.m., five days per week). Plaintiff Alcantara received payment in the form of a check for only 40 hours. In addition to his weekly wages paid by check, Plaintiff Alcantara was given $30 to $40 per week in cash. Plaintiff Alcantara worked at the following locations: W. 145th Street, New York, NY, W. 155th Street, New York, NY, 169th Street and Jerome Avenue, Bronx, NY, and 199th Street and Webster Avenue, Bronx, NY.

15.    Miguel Garcia ("Plaintiff Garcia") is an adult individual residing in Bronx County, New York. Plaintiff Garcia has been employed by Defendants from May 1, 2003 through approximately September 2005. Plaintiff Garcia regularly worked 60 hours per week (7 p.m. to 7 a.m., five days per week). Plaintiff Garcia received payment in the form of a check for only 40 hours. In addition to his weekly wages paid by check, Plaintiff Garcia was given approximately $10 to $15 per week in cash. Plaintiff Garcia worked at the W. 145th Street, New York, NY location.

16.    Miguel Rojas ("Plaintiff Miguel Rojas") is an adult individual residing in New York County, New York. Plaintiff Miguel Rojas has been employed by Defendants from approximately April 2003 through November 2006. Plaintiff Miguel Rojas regularly worked 72

hours per week (6 p.m. to 6 a.m., six days per week). Plaintiff Miguel Rojas received payment in the form of a check for only 40 hours. Plaintiff Miguel Rojas worked at the following locations: 404 W. 155th Street, New York, NY; 187 Street and Valentine Avenue, Bronx, NY; and 1277 Jerome Avenue, Bronx, NY.

17.    Patricio Gonzalez ("Plaintiff Patricio Gonzalez") is an adult individual residing in Queens County, New York. Plaintiff Patricio Gonzalez has been employed by Defendants from approximately March 2001 through the present date. Plaintiff Patricio Gonzalez regularly worked 40 to 50 hours per week. Plaintiff Patricio Gonzalez received payment in the form of a check for only 40 hours. In addition to his weekly wages paid by check, Plaintiff Patricio Gonzalez was given approximately $35 to $40 per week in cash. Plaintiff Patricio Gonzalez worked at the following locations: 2046 Webster Avenue, Bronx, NY; and 1295 Jerome Avenue, Bronx, NY.

18.    Victor Gonzalez ("Plaintiff Victor Gonzalez") is an adult individual residing in New York County, New York. Plaintiff Victor Gonzalez has been employed by Defendants from June 12, 2005 until February 4, 2006. Plaintiff Victor Gonzalez regularly worked between 72 and 84 hours per week (7 p.m. to 7 a.m., six to seven days per week). Plaintiff Victor Gonzalez received payment in the form of a check for only 40 hours. In addition to his weekly wages paid by check, Plaintiff Victor Gonzalez was given approximately $10 to $15 per week in cash. Plaintiff Victor Gonzalez worked at the following locations: 199 Street and Western Avenue, Bronx, NY; 404 W. 155th Street, New York, NY; W. 145th Street, New York, NY; 144th Street and Bryan Avenue, New York, NY; 1277 Jerome Avenue, Bronx, NY; and 1295 Jerome Street, Bronx, New York, NY.

19.    Jose De Arce Reyes ("Plaintiff Reyes") is an adult individual residing in New York County, New York.   Plaintiff Reyes had been employed by Defendants for approximately three months in 2002, and nine months in 2004.  Plaintiff Reyes regularly worked between 40 and 60 hours per week (five days per week).  Plaintiff Reyes received payment in the form of a check for only 40 hours.  In addition to his weekly wages paid by check, Plaintiff Reyes was given approximately $15 to $20 per week in cash.  Plaintiff Reyes worked at the following locations: 199 Street and Western Avenue, Bronx, NY; and 187 Street and Valentine Avenue, Bronx, NY.

20.    Edison Alvarez ("Plaintiff Alvarez") is an adult individual residing in Queens County, New York.   Plaintiff Alvarez had been employed by Defendants from approximately June 2001 through January 28, 2006.  Plaintiff Alvarez regularly worked 72 hours per week (six days per week).  Plaintiff Alvarez received payment in the form of a check for only 40 hours.  In addition to his weekly wages paid by check, Plaintiff Alvarez was given approximately $180 to $200 per week in cash.  Plaintiff Alvarez worked at the following locations: 15th Street (between 2nd and 3rd Avenues), New York, NY; 303 East 6th Avenue, New York, NY; 1277 Jerome Avenue, Bronx, NY; 1832 2nd Avenue, New York, NY; and 311 East 11th Street, New York, NY

*Defendants*

21.    Defendant SP Payroll Inc. is a corporation organized and existing under the laws of the State of New York.  Community Parking Inc., operates parking lots and maintains its corporate headquarters at 1832 Second Avenue, New York, NY 10128.

22.    Defendant Nicholas Parking Corp. is a corporation organized and existing under the laws of the State of New York.  Nicholas Parking Corp. operates parking lots and maintains its corporate headquarters at 1832 Second Avenue, New York, NY 10128.

- 7 -

23.     Defendant Ivy Parking, Corp. is a corporation organized and existing under the laws of the State of New York.  Ivy Parking, Corp. operates parking lots and maintains its corporate headquarters at 1832 Second Avenue, New York, NY 10128.

24.     Defendant Bienvenido, LLC is a corporation organized and existing under the laws of the State of New York.  Bienvenido LLC operates parking lots and maintains its corporate headquarters at 1832 Second Avenue, New York, NY 10128.

25.     Defendant Castle Parking Corp. is a corporation organized and existing under the laws of the State of New York.  Castle Parking Corp. operates parking lots and maintains its corporate headquarters at 9 E. 40th Street, New York, NY 10016.

26.     Defendant Sage Parking Corp. is a corporation organized and existing under the laws of the State of New York. Sage Parking Corp. operates a parking lot and maintains its corporate headquarters at 9 E. 40th Street, New York, NY 10016.

27.     Defendant Sam Podolak is an individual engaged in business in the City and County of New York.  Defendant Podolak, who is sued individually in his capacity as an owner, officer and/or agent of Defendant Corporations, possesses operational control over Defendant Corporations, possess an ownership interest in Defendant Corporations, controls significant functions of Defendant Corporations, determines the wages of the parking lot attendants, and makes hiring decisions.

## STATEMENT OF FACTS

### *Defendant Corporations Constitute Joint Employers*

28.     SP Payroll, Inc., Nicholas Parking, Corp., Ivy Parking, Corp., Bienvenido, LLC, Castle Parking Corp., and Sage Parking Corp. are shell corporations controlled by the same owner, or owner group, operating as a unified operation.

- 8 -

29.     Defendant Corporations are associated and joint employers, utilizing Plaintiffs in a fungible and interchangeable manner as parking lot attendants between the parking lots operated by the Defendant Corporations.

30.     Defendant Corporations share the same employees among them, act in the interest of each other with respect to employees, pay their employees by the same method and in the same amount, share control over the employees, and are themselves under common control.

31.     Upon information and belief, Defendant Podolak is the owner and/or executive director of the Defendant Corporations.

32.     At all relevant times, Defendant Podolak employed and/or jointly employed the Plaintiffs.

33.     The gross annual volume of sales made or business done by Defendant Corporations, for each year in existence, was not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).

34.     At all relevant times, Defendants were the Plaintiffs' employers within the meaning of the FLSA and New York Labor Law.  Defendants had the power to hire and fire Plaintiffs, control their terms and conditions of employment, and determine the rate and method of any compensation in exchange for Plaintiffs' services.

*Defendants' General Compensation and Employment Practices*

35.     At all times relevant to this action, Plaintiffs worked as attendants in parking lots owned and/or operated by Defendants.  As such, Plaintiffs' work was involved with or related to the movement of goods for interstate commerce.

36.     Defendants regularly require Plaintiffs to work in excess of forty (40) hours per week and more than ten (10) hours a day without paying them the proper regular rate of pay, overtime wages, or spread of hour compensation.

37.     Defendants willfully disregarded and purposefully evaded recordkeeping requirements of the Fair Labor Standards Act and New York State Labor Law by failing to maintain proper and complete timesheets or payroll records.

38.     Defendants paid Plaintiffs with a combination of check and cash, without providing an accurate indication as to their rate of pay, daily hours worked, or total hours worked each week for the full amount of weekly hours.  Although Plaintiffs regularly worked 60 to 72 hours per week, their pay checks routinely only reflected 40 hours per week.  Defendants also regularly paid an additional cash amount to the Plaintiffs.  However, the cash payments never accurately reflected the hours above the 40 that were paid by check.  As such, Plaintiffs were not properly paid for their overtime hours.

39.     Plaintiffs could not leave the parking lot unattended and as a result, were required to work their entire 12-hour shift without receiving a meal break.

40.     Defendants denied Plaintiffs time off for meals and breaks in violation of New York State Labor Law § 162.2.  Plaintiffs received neither a thirty-minute break for lunch, nor an additional 20 minute break between 5 P.M. and 7 P.M. for those employed on a shift starting before 11 A.M. and continuing after 7 P.M.

41.     At no time during the course of this action did Plaintiffs ever observe on Defendants' premises any posted notice regarding employees' rights under the Fair Labor Standards Act, New York State Labor Law and Regulations or the procedures for filing a charge for violations of these state and federal labor laws.

### FIRST CAUSE OF ACTION
### Minimum Wage Act Under the FLSA

42.     Plaintiffs repeat and reallege all paragraphs above as though fully set forth herein.

43.     At all times relevant to this action, Plaintiffs were engaged in interstate commerce in an industry or activity affecting commerce.

44.     At all times relevant to this action, Defendants were Plaintiffs' employers within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(d). Defendants had the power to hire and fire Plaintiffs, control their terms and conditions of employment, and determine the rate and method of any compensation in exchange for their employment.

45.     Defendant Corporations constitute an enterprise within the meaning of the FLSA, 29 U.S.C. § 203(r)-(s).

46.     Defendants willfully failed to pay Plaintiffs at the applicable minimum hourly rate in violation of 29 U.S.C. §§ 206(a) and 255(a).

47.     Plaintiffs have been damaged in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### Overtime Wage Order Under the FLSA

1.     Plaintiffs repeat and reallege all paragraphs above as though fully set forth herein.

2.     Defendants willfully failed to pay Plaintiffs pursuant to the overtime wage order at rates of one and one-half times the regular rate of pay for each hour worked in excess of forty hours per workweek, in violation of 29 U.S.C. §§ 207(a)(1) and 255(a).

3.     Plaintiffs have been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Minimum Wage Act Under the NYLL

48.     Plaintiffs repeat and reallege all paragraphs above as though fully set forth herein.

49.     At all times relevant to this action, Defendants were Plaintiffs' employers within the meaning of the N.Y. Lab. Law §§ 2 and 651. Defendants had the power to hire and fire Plaintiffs, control their terms and conditions of employment, and determine the rates and methods of any compensation in exchange for their employment.

50.     Defendants knowingly paid Plaintiffs less than the minimum wage in violation of NYLL § 652(1) and the supporting regulations of the New York State Department of Labor.

51.     Defendants' failure to pay Plaintiffs minimum wage was willful within the meaning of NYLL § 663.

52.     Plaintiffs have been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Overtime Wage Order Under the NYSLL

53.     Plaintiffs repeat and reallege all paragraphs above as though fully set forth herein.

54.     Defendants willfully failed to pay Plaintiffs overtime at the rate of one and one-half times the regular rate of pay for each hour worked in excess of forty hours per workweek, in violation of NYLL § 190 *et seq.* and regulations of the New York State Department of Labor.

55.     Defendants' failure to pay Plaintiffs overtime was willful within the meaning of NYLL § 663.

56.     Plaintiffs have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Spread of Hours Wage Order

57.     Plaintiffs repeat and reallege all paragraphs above as though fully set forth herein.

58.     Defendants failed to pay Plaintiffs one additional hour's pay at the minimum wage rate for each day Plaintiffs worked more than ten hours in violation of the Spread of Hours Wage Order.

59.    Defendants' failure to pay Plaintiffs an additional hour's pay for each day Plaintiffs in excess of ten hours was willful within the meaning of NYLL § 663.

60.    Plaintiffs have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants:

(a)    Declaring that Defendants have violated the minimum wage orders of the FLSA and NYLL as to Plaintiffs;

(b)    Declaring that Defendants have violated the overtime wage orders of the FLSA and NYLL as to Plaintiffs;

(c)    Declaring that Defendants' violation of the FLSA and NYLL were willful as to Plaintiffs;

(d)    Declaring that Defendants have violated the Spread of Hours Wage Order of the New York Commission of Labor;

(e)    Awarding Plaintiffs damages for the amount of unpaid minimum and overtime wages, as well as spread of hours pay under the FLSA and NYLL;

(f)    Awarding Plaintiffs liquidated damages of 100% of their damages due under the FLSA's minimum and overtime wage orders, pursuant to 29 U.S.C. § 216(b);

(g)    Awarding Plaintiffs liquidated damages in an amount equal to twenty-five percent (25%) of the total amount of minimum wage, spread of hours pay, and overtime compensation shown to be owed pursuant to NYLL § 663;

(h)    Awarding Plaintiffs prejudgment interest;

(i)       Awarding Plaintiffs the expenses incurred in this action, including costs and

attorney's fees; and

(j)       Awarding Plaintiffs all such other and further relief as the Court deems just and

proper.

Dated: New York, New York
      June _____, 2008

                                      MICHAEL FAILLACE & ASSOCIATES, P.C.

                                  By: _____

                                        Michael A. Faillace, Esq. [MF-8436]
                                        110 East 59th Street, 32nd Floor
                                        New York, New York 10022
                                        (212) 317-1200
                                        *Attorneys for Plaintiffs*

# EXHIBIT F

# SEYFARTH
### ATTORNEYS SHAW LLP

620 Eighth Avenue

New York, New York 10018-1405

(212) 218-5500

fax (212) 218-5526

www.seyfarth.com

Writer's direct phone

(212) 218-5570

Writer's e-mail

pwalker@seyfarth.com

July 3, 2008

**VIA FACSIMILE AND**
**REGULAR MAIL**

Michael A. Faillace, Esq.
Michael A. Faillace & Associates, P.C.
110 East 59th Street
32nd Floor
New York, NY 10022

Re: <u>Pena et al v. SP Payroll, Inc. et al, 07-CV-7013 (S.D.N.Y.)</u>

Dear Mr. Faillace:

We are in receipt of your request that Defendants stipulate to permit you to amend the complaint in accordance with the Proposed First Amended Complaint which you provided to us. If you recall, at the conference before the judge, we agreed to consider stipulating to permit Plaintiffs to remove the collective and class claims based on your representation that your clients did not want to represent anyone other than themselves, and to add the opt-in plaintiffs as named plaintiffs for the federal and state claims. We did not agree to stipulate to allow you to amend the complaint in any other respect.

Therefore, we will agree to stipulate to permit you to amend your complaint solely to add seven of the nine opt-ins as named plaintiffs and to drop the class and collective claims. However, we will not agree to allow you to include Patricio Gonzalez or Edison Alvarez as named plaintiffs. As you know, Mr. Gonzalez has signed a document, that was produced to you in discovery, which admits that he has been fully paid by Defendants and that Defendants owe him no additional money. Mr. Alvarez is not owed any money by the Defendants and there are documents that were produced to you and which you produced to us that reflect varying additional amounts of cash given to Mr. Alvarez while he was employed by Defendants. In fact, by our calculations, Mr. Alvarez was paid more than $30,000 in cash, in addition to his paychecks, and he actually was overpaid and owes the Company more than $13,000. Accordingly, in light of our intent to file a partial motion for summary judgment, amending the complaint to add these individuals would be futile.

We also will not agree to permit you to change the allegations from the original complaint, which you have sought to do in the Proposed First Amended Complaint. For example, in addition to adding allegations pertaining to the newly named plaintiffs and removing the class and collective

BRUSSELS    WASHINGTON, D.C.    SAN FRANCISCO    SACRAMENTO    NEW YORK    LOS ANGELES    HOUSTON    CHICAGO    BOSTON    ATLANTA



Michael A. Faillace, Esq.
July 3, 2008
Page 2

claims, the First Amended Complaint varies from the original complaint in paragraphs 8, 9, 10, 11, 38, 39 and 45 of the First Amended Complaint.

Accordingly, if you provide us with a revised Proposed First Amended Complaint which addresses the items identified above, we will agree to stipulate to the amendment. As noted above, we will be serving and filing our partial motion for summary judgment on July 14, 2008.

Very truly yours,

SEYFARTH SHAW LLP

Peter A. Walker

# EXHIBIT G

Page 1

1

2

UNITED STATES DISTRICT COURT

3

SOUTHERN DISTRICT OF NEW YORK

4

-----------------------------

5

ANGELO PENA, ROLANDO ROJAS,
JOSE DIROCHE, and FRANKLIN SANTANA,

6

individually and on behalf of others
similarly situated,

7

Plaintiffs,

8

vs.                    No. 07 CV 7013

9

SP PAYROLL, INC., NICHOLAS PARKING,

10

CORP., IVY PARKING, CORP., BIENVENIDO,
LLC, CASTLE PARKING CORP., SAGE PARKING

11

CORP., and SAM PODOLAK,

12

Defendants.

-----------------------------

13

14

15

16

DEPOSITION OF ANGELO PENA

17

New York, New York

18

Friday, November 9, 2007

19

20

21

22

23

Reported by:

24

Meredith Stoeckel

25

JOB NO. 14011-A

Page 6

A. Pena

1    my clients are here to listen to you.
2    Can you project, please?
3          THE INTERPRETER: No problem,
4    Mr. Faillace.
5          MR. FAILLACE: They have to hear
6    what you're saying.
7        Q.  Mr. Pena, if you need a break at any
8    time, you should let us know.  This is not a
9    torture test.  The only limitation on that is if I
10   have asked you a question, you should answer that
11   question before we take a break.
12         Do you understand what the interpreter
13   is saying to you?
14      A.  Yes, sir.
15      Q.  Is there any reason as you sit here
16   today that you cannot answer my questions
17   truthfully?
18      A.  No.
19      Q.  Are you taking any medications today
20   that would prevent you from understanding my
21   questions?
22      A.  No, sir.
23      Q.  Are you taking any medications today
24   that would prevent you from answering my questions

Page 7

A. Pena

1    truthfully?
2       A.  No, sir.
3       Q.  Who are you now employed by?
4       A.  I am still working at the company.
5       Q.  When you say "the company," what
6    company do you mean?
7       A.  The name I don't know, but it is for
8    Sam Podolak.
9       Q.  What is your job?
10      A.  At a parking lot parking the cars,
11   taking care of customers.  Sometimes cleaning
12   toilets and maintaining the parking lot cleaning.
13      Q.  And where do you currently perform your
14   duties?
15      A.  I work at 199th Street and Webster.
16      Q.  Is this in the Bronx?
17      A.  That's in the Bronx.
18      Q.  What is the name of that parking
19   garage?
20      A.  On the logo, it says Saget Parking.
21      Q.  Do you mean Sage Parking?
22      A.  Yes.
23      Q.  How long have you worked at this
24   parking garage?

Page 8

A. Pena

1       A.  That one I lasted nine months.
2       Q.  Nine months before today?
3       A.  Yes, sir.
4       Q.  Prior to that nine months, where did
5    you work?
6       A.  That's who I started working for the
7    first time.
8       Q.  Prior to nine months ago, were you
9    employed by the company?
10      A.  No.
11      Q.  Where did you work?
12      A.  That's the first job I had when I came
13   into this country.
14      Q.  Do you remember what month you started
15   at Sage Parking?
16      A.  October 2003.
17      Q.  Have you worked for Sage Parking
18   continuously since October of 2003?
19      A.  I worked till 2006.  Then I left the
20   company for six months and I returned back.
21      Q.  Who did you work for when you left the
22   company?
23      A.  I worked with Imperial Parking.
24      Q.  What month in 2006 did you leave

Page 9

A. Pena

1    working for the company?
2       A.  I don't recall exactly, but it was
3    towards the end of November, December.
4       Q.  November of 2006?
5       A.  Yes.
6       Q.  When did you come back to work for Sage
7    Parking?
8       A.  I'm not sure exactly but January 2007,
9    around there.
10      Q.  You said you left for about six months;
11   is that correct?
12      A.  From six to nine months.
13      Q.  If you left in November of 2006, if you
14   came back in January of 2007, that would not be
15   six to nine months.
16      A.  I told you I'm not sure whether it was
17   six or nine months, but the payroll checks will
18   verify that.
19      Q.  Did you work for the company at any
20   time prior to October 2003?
21      A.  No, sir.
22      Q.  Other than the six to nine months you
23   left the company, did you leave the company on any
24   other occasions?

Page 10

```
1              A. Pena
2      A.  No.
3      Q.  Who is your current supervisor at the
4  garage right now?
5      A.  Mr. Raj.
6      Q.  What hours does Mr. Raj work?
7      A.  He passes by to pick up the reports.
8  Sometimes he passes by in the morning, sometimes
9  he passes by at night.
10     Q.  Does Mr. Raj actually work at the
11  garage, or just pass by the garage to pick up the
12  reports?
13     A.  He doesn't work in the garage.  He just
14  picks up the reports.
15     Q.  What hours do you work?
16     A.  Twelve hours a day.
17     Q.  When do you start work?
18     A.  I started working from seven a.m. to
19  seven p.m.
20     Q.  How long have you worked from seven
21  a.m. to seven p.m.?
22     A.  I worked that shift for about two
23  years.  Sometimes I had to cover vacation or
24  something like that for another employee.
25  Covering shifts.
```
TSG Reporting - Worldwide      877-702-9580

Page 11

```
1              A. Pena
2      Q.  Isn't it a fact that you are currently
3  working eight hours per day?
4      A.  Now, yes.
5      Q.  When did you start working eight hours
6  a day?
7      A.  This year, 2007.
8      Q.  When in 2007?
9      A.  I don't know exactly.
10     Q.  Besides you, does anyone else work at
11  the garage with you?
12     A.  One other person, yes.
13     Q.  Who is that?
14     A.  I worked with Juan --
15         MR. FAILLACE:  I'm going to object
16  for vagueness.  I think there is a need
17  for clarification.  He's not
18  understanding the time period you are
19  asking.
20         MR. WALKER:  Right now.
21     A.  Right now, who I work with?
22     Q.  Yes.
23     A.  Sometimes I work with Pedro Brito, Juan
24  Lorenzo, Pedro Breton.  There are two other
25  persons, but I don't remember the names.
```
TSG Reporting - Worldwide      877-702-9580

Page 12

```
1              A. Pena
2      Q.  How many of these employees that you
3  just named work during all or part of the shift
4  that you work?
5      A.  I work with them because I started four
6  p.m. until twelve.  They are the ones that do the
7  day shifts -- there are other people that relieve
8  also.  That relieve us.
9      Q.  You previously testified you were
10  working seven a.m. to seven p.m.  You have
11  testified you are working four p.m. to midnight.
12  Which is it?
13         MR. FAILLACE:  Objection.  He was
14  confused as to time.  Objection because
15  he was confused about time.  I already
16  objected.  He wasn't clear about the
17  time.  When he was saying seven to seven
18  he meant some other --
19     Q.  As you sit here today, what hours are
20  you working at the garage?
21     A.  Right now in 2007, I am working from
22  four p.m. to twelve a.m.
23     Q.  Isn't it a fact that you have worked
24  eight hours a day since March of 2006?
25     A.  I am not sure, no.
```
TSG Reporting - Worldwide      877-702-9580

Page 13

```
1              A. Pena
2      Q.  During 2007 when you have been working
3  from four p.m. to midnight, what other employees
4  would be at the garage during that time?
5      A.  Jose Suazo.
6      Q.  Anyone else?
7      A.  I worked also with Diroche Colon.
8      Q.  Anyone else?
9      A.  Of that garage, I don't remember any
10  other names.
11     Q.  Do all of the employees who work at the
12  garage when you work at the garage park cars?
13         MR. FAILLACE:  Objection.  Can you
14  please specify?
15         MR. WALKER:  When he's working.
16     A.  Repeat the question.
17     Q.  During the time that you're working and
18  other employees are working at the garage, do
19  these employees also park cars?
20     A.  Yes, sir.
21     Q.  During any time that you have been
22  working during 2007, what is the most number of
23  employees who have been working at the same time
24  as you?
25     A.  There are six employees.  Three at
```
TSG Reporting - Worldwide      877-702-9580

Page 14

```
 1          A. Pena
 2   night. Three in the day.
 3        Q.   You testified that during 2007 you have
 4   been working four p.m. to midnight, correct?
 5        A.   Yes, sir.
 6        Q.   At seven p.m. on those nights when you
 7   are working, how many other employees are also
 8   working with you?
 9        A.   One only.
10        Q.   You mentioned three work during the day
11   and three work at night.
12        A.   No.  There are three different shifts.
13   Yes, sir.
14        Q.   What times are each of these shifts?
15        A.   There is one from six a.m. to four p.m.
16   That's where I come in from four to twelve.  And
17   from twelve to ten a.m. another one comes in.
18        Q.   You mentioned that you left the company
19   for six to nine months to go to Imperial Parking;
20   is that correct?
21        A.   What happened was they sold one garage
22   and then left me there with that company.
23        Q.   That was Imperial Parking?
24        A.   Yes.
25        Q.   When you came back to the company, did
     TSG Reporting - Worldwide    877-702-9580
```

Page 15

```
 1          A. Pena
 2   you go to the Sage Parking garage that you work at
 3   now?
 4        A.   No.
 5        Q.   Where did you come back to work?
 6        A.   I went to 155th Street and Saint
 7   Nicholas for a while.  They also sent me to
 8   Wooster Parking on Canal Street for about a month
 9   or so only.
10        Q.   Do you know the name of the garage at
11   155th Street?
12        A.   I don't know it, but it has the same
13   logo as Sage Park.
14        Q.   And do you know the name of the garage
15   on Canal Street?
16        THE INTERPRETER:  I asked him to
17   spell it out, but he doesn't know --
18   Walster -- I get Walster from him.
19        Q.   Then after the Canal Street garage, did
20   you come to the Sage Parking garage that you're
21   currently working at?
22        A.   Yes.
23        Q.   During 2007, what has your hourly rate
24   of pay been?
25        A.   Minimum wage.
     TSG Reporting - Worldwide    877-702-9580
```

Page 16

```
 1          A. Pena
 2        Q.   What is that?
 3        A.   Whatever the salary is in 2007 -- 6.75,
 4   6.15.
 5        Q.   How often do you get paid?
 6        A.   Every week.
 7        Q.   Do you get paid by check?
 8        A.   Yes.
 9        Q.   What day of the week do you receive
10   your check?
11        A.   Friday.
12        Q.   Is the check for the week before, or is
13   it for that week?
14        A.   I don't understand the question.
15        Q.   On the day that you receive your
16   paycheck, who gives you the paycheck?
17        A.   The man that goes to get the reports,
18   he leaves it right there in the office.
19        Q.   You testified you are now working eight
20   hours per day during 2007; is that correct?
21        A.   Yes, sir.
22        Q.   How many days per week do you work?
23        A.   Right now?
24        Q.   Yes.
25        A.   Six days.
     TSG Reporting - Worldwide    877-702-9580
```

Page 17

```
 1          A. Pena
 2        Q.   Do you work eight hours per day on each
 3   of the six days?
 4        A.   Now?
 5        Q.   Yes.
 6        A.   Yes, sir.
 7        Q.   How long during 2007 have you worked
 8   six days per week?
 9        A.   Till now.
10        Q.   When did you first start working six
11   days per week?
12        A.   When I started working in 2003.
13        Q.   Have you ever worked five days per
14   week?
15        A.   Five.  Even up to seven days per week.
16        Q.   For what period of time did you work
17   five days per week?
18        A.   I don't remember.
19        Q.   Have you ever worked five days per week
20   during 2007?
21        A.   Yes.
22        Q.   When, during 2007, did you work five
23   days per week?
24        A.   I'm not sure because when the
25   supervisor needs me to work additional time, he
     TSG Reporting - Worldwide    877-702-9580
```

Page 22

```
1           A. Pena
2      Corp. document signed by Angelo Pena,
3      marked for identification, as of this
4      date.)
5      Q.  Mr. Pena, I'm showing you what has been
6  marked as Defendants' Exhibit 1 for
7  identification.  I ask if you have ever seen that
8  document.
9      A.  This document I saw it.  But the only
10 time I signed it, they didn't tell me what it was.
11     Q.  Did you read the document before you
12 signed it?
13     A.  No.
14     Q.  Is the document written in both English
15 and Spanish?
16     A.  Yes, sir.
17     Q.  Do you understand the Spanish that is
18 written there?
19     A.  Yes, sir.
20     Q.  Are you in the custom of signing
21 documents that you don't read?
22     A.  No, sir.
23     Q.  But you signed this one without reading
24 it?
25     A.  I signed it because the supervisor
```

TSG Reporting - Worldwide    877-702-9580

Page 23

```
1           A. Pena
2  passed it to me.  At that moment, I was parking
3  cars.  I signed it right away and gave it back to
4  him.  I had no time to read it.
5      Q.  Is it a fact that another employee read
6  this document to you in Spanish?
7      A.  No, sir.  The only one that gave it to
8  me was the supervisor.  He took it back right
9  away.
10     Q.  Do you know who Chris Chorez is?
11     A.  No.
12     Q.  Do you know any employee named Chris?
13     A.  I don't know.  I used to go to work and
14 I didn't ask too many questions about people's
15 names.
16     Q.  Did any employee ever read to you that
17 document in Spanish?
18         MR. FAILLACE:  Objection.
19 Already answered.
20     Q.  You can answer it.
21     A.  No, sir.
22     Q.  Did anyone at the company ever tell you
23 you were entitled to a one-hour lunch break?
24     A.  Never.
25     Q.  During the time in 2007 that you have
```

TSG Reporting - Worldwide    877-702-9580

Page 24

```
1           A. Pena
2  been employed by the company, have you taken any
3  sick days?
4      A.  No, sir.
5      Q.  During any shift that you've worked at
6  the garage, have you -- during 2007, have you ever
7  left the garage?
8      A.  No, sir.
9      Q.  During your shift, you have never left
10 the garage to buy food?
11     A.  No, sir.
12     Q.  Do you bring any lunch to the garage
13 with you?
14     A.  No, sir.
15     Q.  Your testimony is you do not eat at the
16 garage?
17     A.  No, sir.  I have no time.
18     Q.  Do any of the employees you work with
19 take lunch?
20     A.  No.
21     Q.  Is it your testimony that during
22 2007 -- during the time that you've worked at the
23 Sage Parking Garage that you have never taken a
24 break?
25     A.  After 2007 we still don't take breaks,
```

TSG Reporting - Worldwide    877-702-9580

Page 25

```
1           A. Pena
2  no.
3      Q.  Let me make sure you understand the
4  question.  During 2007 during the hours that you
5  have worked at the Sage Parking Garage, have you
6  ever taken a break?
7      A.  No, sir.
8      Q.  So it is your testimony that every
9  minute that you have been at the garage during
10 2007, you have been working?
11         MR. FAILLACE:  Objection.  The
12 interpreter forgot to add 2007.
13     A.  Yes, sir.
14     Q.  When you started work for the company
15 in October of 2003, which garage did you work at?
16     A.  199th and Webster.
17     Q.  How long did you work at that garage?
18     A.  I told you before, nine months.
19     Q.  After you worked at 199 Webster, where
20 at the company did you work?
21     A.  155th and Saint Nicholas.
22     Q.  How long did you work at that garage?
23     A.  I'm not sure because they would --
24 shifting.  I worked a couple months at 155 and
25 different places.  169 -- I worked at just about
```

TSG Reporting - Worldwide    877-702-9580

## Page 26

```
1              A. Pena
2  the majority of all their garages.
3      Q.  At the time that you left the company,
4  which garage were you working at?
5          MR. FAILLACE: Objection. He did
6      not say he left the company. The company
7      left him.
8      A.  That's what I'm trying to say. They
9  left me. With the other company from -- at a
10 garage that they sold. At 144th. I don't
11 remember the name too well. It was a building
12 that had their own parking. I worked there alone.
13     Q.  You were there for six to nine months?
14     A.  I worked there the whole year until
15 they sold it.
16         MR. FAILLACE: He doesn't
17     understand your question.
18     Q.  You worked at Imperial for six to nine
19 months?
20     A.  Yes, sir.
21     Q.  Is it a fact that you were given the
22 choice to stay with the company or go with
23 Imperial?
24     A.  No, sir.
25     Q.  Do you understand what overtime means?
```

## Page 27

```
1              A. Pena
2      A.  Yes, sir.
3      Q.  What does overtime mean?
4      A.  It is hours that I work or one works
5  according to state laws over 40. Regular hours
6  are eight hours. I worked 12, 13 or 14 sometimes.
7      Q.  During 2007, you testified that you did
8  not work 12 hours; is that correct?
9      A.  Yes, sir.
10     Q.  So you worked eight hours per day
11 during 2007; isn't that correct?
12     A.  Yes, sir.
13     Q.  During the period of time during 2007
14 that you were working eight hours per day, how
15 many hours did you work during a week?
16     A.  In 2007?
17     Q.  2007.
18     A.  Eight hours a day, I worked six days a
19 week. So that's 46 -- 48 -- 48.
20     Q.  Do you have an understanding of how
21 much you are supposed to be paid for the overtime
22 hours over 40 hours?
23     A.  No.
24     Q.  Have you ever heard the term "time and
25 a half"?
```

## Page 28

```
1              A. Pena
2      A.  No, they haven't told me that.
3      Q.  When you receive your paycheck, does
4  your paycheck list the number of hours that you
5  work?
6      A.  Yes, sir.
7      Q.  Does it list your rate of pay?
8      A.  Yes, sir.
9      Q.  Have you ever seen the word "overtime"
10 on your check?
11     A.  I have seen it, but I don't know what
12 it means.
13     Q.  Do you know if you're paid more for the
14 overtime hours that you work?
15     A.  Can you repeat the question?
16     Q.  Sure. You previously testified that
17 you receive the minimum wage as your hourly rate.
18     A.  Yes, sir.
19     Q.  Do you know if you receive more than
20 the minimum wage for your overtime hours?
21     A.  Yes, sir.
22     Q.  How much do you receive for your
23 overtime hours?
24     A.  Depends on how many I work.
25     Q.  Let's say you work eight overtime
```

## Page 29

```
1              A. Pena
2  hours.
3          MR. FAILLACE: Objection.
4      Q.  How much would you be paid?
5          MR. FAILLACE: Objection. You're
6      asking him to do mathematical
7      calculations. He's no mathematician.
8      Q.  Do you know how much you get paid for
9  eight overtime hours?
10     A.  No, I don't know.
11     Q.  Do you know if your hourly rate of pay
12 is greater than the minimum wage for overtime
13 hours?
14         MR. FAILLACE: Objection. He
15     already answered.
16         MR. WALKER: I want to make sure.
17     It's not clear to me.
18     Q.  Do you know if your hourly rate of pay
19 is greater for overtime hours than for your
20 regular hours?
21     A.  I don't understand the question.
22     Q.  You testified that you're paid the
23 minimum rate, the minimum wage, for your regular
24 hours.
25     A.  Yes, sir.
```

Page 30

1           A. Pena
2      Q.   You testified that you were paid more
3  for overtime hours; is that correct?
4      A.   Yes, sir.
5      Q.   I'm trying to find out how much more
6  you were paid for your overtime hours than your
7  regular hours.  Are you paid more per hour for
8  your overtime hours than your regular hours?
9      A.   Of course.
10     Q.   How much more are you paid for your
11 overtime hours per hour than your regular hours?
12     A.   I don't know exactly.
13     Q.   Is it more than $9 per hour?
14     A.   No.
15     Q.   As you sit here today, you do not know
16 the amount that you are paid for overtime hours?
17         MR. FAILLACE:  Objection.  You're
18 not giving him a time frame.
19         MR. WALKER:  2007.
20         MR. FAILLACE:  Make it clear to
21 him.
22     A.   2007, they paid 6.75.
23     Q.   Do you know how much more they paid per
24 hour for overtime hours in 2007?
25     A.   Like nine -- nine something.  I don't

Page 31

1           A. Pena
2  know.  Nine something.  Now in 2007.
3      Q.   Do you know how much you were paid for
4  overtime hours in 2006?
5      A.   I don't know.  I started about 5.15.
6  And then they raised it according to what the
7  state said.
8      Q.   During the entire time that you have
9  been employed by the company, have you received
10 more for overtime hours than for regular hours?
11     A.   No.
12     Q.   During what period of time did you not
13 receive more for overtime hours?
14     A.   In all of them.
15     Q.   Other than 2007?
16     A.   I'm still working -- I'm working six
17 days a week, eight hours a day, 48 hours.  And
18 they still put 40 hours at one rate and eight
19 hours at another rate.  They pay me more regular
20 time than overtime.
21     Q.   So on your paycheck, there is 40 hours
22 at one rate; is that correct?
23     A.   Can you specify a little more the
24 question?  Can you break it down?
25     Q.   Is it a fact that you're paid one rate,

Page 32

1           A. Pena
2  the minimum wage, for your regular hours?
3      A.   Yes, sir.
4      Q.   And you're paid a higher rate for your
5  overtime hours after 40 hours a week?
6      A.   That's the overtime hours?
7      Q.   Yes.
8      A.   Yes.  They pay more for the overtime.
9      Q.   And that has occurred all throughout
10 2007; is that correct?
11     A.   Yes, sir.
12     Q.   Prior to 2007, was there always a
13 higher rate for hours over 40?
14     A.   Yes, sir.
15     Q.   Since October of 2003, have you always
16 been paid by check by the company?
17     A.   The first 15 days, no.  But then after
18 that, yes, by check.
19     Q.   Have you ever received any cash
20 payments from anyone at the company?
21     A.   The first -- like I told you, the first
22 15 days they gave me cash.
23     Q.   So that was back in October 2003, they
24 gave you cash?
25     A.   Yes, sir.

Page 33

1           A. Pena
2      Q.   Since those first 15 days, have you
3  received any cash from the company?
4      A.   No.
5      Q.   How much cash did you receive during
6  the first 15 days?
7      A.   The first five or six days that I
8  worked, they paid me about $260.
9      Q.   What about after that?
10     A.   After that, they paid me by check.
11     Q.   Did you declare that cash on your
12 income tax?
13     A.   No, sir.  I didn't know I had to.
14     Q.   So after the first 15 days, you have
15 only been paid by check and you have not received
16 any cash; is that correct?
17     A.   A couple of times, I received 10 or $20
18 that they gave me.
19     Q.   A couple of times?
20     A.   A couple of times.
21     Q.   Does that mean two times?
22     A.   It was 2003.  2006.  It was around 2006
23 that they gave me cash.
24     Q.   In 2006?
25     A.   Yes.

Page 34

1          A. Pena
2     Q.   How many times in 2006 did they give
3 you cash?
4     A.   I don't remember because those are
5 hours that I worked, and the supervisor didn't put
6 it down in the shift. I would ask him about it.
7 And he found out hours are missing, so I would get
8 it in cash.
9     Q.   How many times during 2006 did that
10 happen?
11    A.   I don't remember exactly.
12    Q.   Was it once?
13    A.   No. It was more than once.
14    Q.   It was more than twice?
15    A.   Yes.
16    Q.   Was it more than five times?
17    A.   Like from nine to ten times, around
18 nine to ten times.
19    Q.   So your testimony is that you did not
20 receive cash during 2004; is that correct?
21    A.   Yes, sir.
22    Q.   You did not receive any cash during
23 2005; is that correct?
24    A.   Yes, sir.
25    Q.   You did not receive cash during 2007;

TSG Reporting - Worldwide     877-702-9580

Page 35

1          A. Pena
2 is that correct?
3     A.   No, sir.
4     Q.   You have received cash during 2007?
5     A.   No, sir.
6     Q.   So your testimony is that you have not
7 received cash in 2007?
8     A.   Yes, sir.
9     Q.   And you did receive cash in 2006
10 nine or ten times?
11    A.   Yes, sir.
12    Q.   How much cash did you receive on each
13 of those nine or ten occasions?
14         MR. FAILLACE: Objection. He
15    already answered.
16    Q.   You can answer.
17    A.   Between 10 and $20 depending on the
18 amount of hours that they didn't pay me.
19 Sometimes I worked 12, 13 hours, and they just
20 forgot to put it on the check.
21    Q.   After they paid you the cash, had you
22 been paid for all of your hours?
23    A.   No, sir.
24    Q.   What hours were you not paid for?
25    A.   An hour every day. The one that they

TSG Reporting - Worldwide     877-702-9580

Page 36

1          A. Pena
2 say was a lunch break.
3     Q.   Other than the lunch break that you
4 were not paid for, were there any other hours that
5 you were not paid for?
6     A.   The ones I told you before. The one or
7 two hours that weren't put down.
8     Q.   I understand. But your testimony is
9 that you got paid for the hours that were not put
10 down?
11    A.   That's the 10 or $20 I told you.
12    Q.   So you were paid for those hours; isn't
13 that a fact?
14    A.   Yes, sir. Yes, those hours, yes.
15    Q.   So the only hours that you claim you
16 were not paid for is the lunch break hour?
17    A.   Yes, sir.
18    Q.   Do you punch a time clock?
19    A.   Yes, sir.
20    Q.   Have you ever let anyone else punch
21 your time card?
22    A.   No, sir. Can't be done. There was no
23 one else. The other one is the one that relieves
24 you.
25    Q.   By the way, which individual person

TSG Reporting - Worldwide     877-702-9580

Page 37

1          A. Pena
2 paid you the 10 to $20 per cash?
3     A.   I'm not sure exactly because the
4 supervisor would give me an envelope. I don't
5 know what was in the envelope or who put it in
6 there.
7     Q.   Did the supervisor give you the cash
8 because you complained that you were not paid for
9 a certain time?
10    A.   Yes, sir.
11    Q.   When you finish work, do you punch your
12 time card out?
13    A.   Of course. If not, they wouldn't pay
14 me.
15    Q.   Have you ever worked at the garage
16 during 2007 after you punched your time clock out,
17 time card?
18    A.   Yes, sir.
19    Q.   This is during 2007?
20    A.   No, no. Not 2007.
21    Q.   So during 2007, you have never
22 performed any work after you punched your time
23 card out?
24    A.   No, sir.
25    Q.   In 2006, did you ever perform any work

TSG Reporting - Worldwide     877-702-9580

Page 38

1      A. Pena
2  after you punched your time card out?
3      A.  No.
4      Q.  During 2005, did you perform any work
5  after you punched your time card out?
6      A.  I'm not sure if it was during 2004 or
7  2005. I went -- I worked my 12 hours at one
8  parking garage, and then I had to go to another
9  garage for another 12 hours to replace someone
10  that didn't show up. I worked a full day straight
11  that time.
12     Q.  So your testimony is you worked 12
13  hours at one garage, and then you went to a second
14  garage to work another 12 hours; is that correct?
15     A.  Yes, sir.
16     Q.  How long did it take you to get from
17  the first garage to the second garage?
18     A.  The supervisor himself took me. It was
19  about maybe five to ten minutes.
20     Q.  Did you punch in at the second garage?
21     A.  I don't remember if I did. I didn't
22  have my card with me, because I had the card at
23  the other garage. When he took me, I didn't have
24  the card with me.
25     Q.  When you left the first garage, did you
TSG Reporting - Worldwide    877-702-9580

Page 39

1      A. Pena
2  punch out?
3      A.  Yes.  That's where I had it.
4      Q.  Were you paid for the time you worked
5  at the second garage?
6      A.  They paid me but not all.
7      Q.  How many hours did they not pay you
8  for?
9      A.  The overtime.
10     Q.  Is it your testimony that you were paid
11  regular pay for all of the hours you worked at the
12  second garage?
13     A.  Yes, sir.
14     Q.  So what you were not paid was time and
15  a half for the hours at that second garage; is
16  that correct?
17     A.  No, sir.
18     Q.  What were you not paid for?
19     A.  The extra hours. They only paid me
20  like it was a regular day.
21     Q.  But you were paid your regular minimum
22  wage rate for all of those hours you worked at the
23  second garage?
24        MR. FAILLACE: Objection. He has
25        answered it twice.
TSG Reporting - Worldwide    877-702-9580

Page 40

1      A. Pena
2        MR. WALKER: It's unclear to me.
3      Q.  Is that correct?
4      A.  Yes, sir.
5      Q.  How often did that happen that you
6  would go from one garage to the other garage?
7      A.  I did that maybe two or three times.
8      Q.  Other than those two or three times,
9  were you paid for all of the hours that you worked
10  by the company?
11        MR. FAILLACE: Objection. He has
12        already answered that question.
13        MR. WALKER: No, he hasn't.
14        MR. FAILLACE: Yes, he has. He
15  told you what hours he was paid.
16     Q.  You can answer the question.
17     A.  No, sir.
18     Q.  Other than the two or three times when
19  you went to work in the second garage, were there
20  any other hours that you were not paid for? Other
21  than the cash payments?
22     A.  Yes, sir. The lunch hour.
23     Q.  Other than the lunch hour and other
24  than the two or three times that you worked at the
25  second garage, were you paid for all of the hours
TSG Reporting - Worldwide    877-702-9580

Page 41

1      A. Pena
2  that you worked by the company?
3      A.  The City also states that after 10
4  hours of work, the company has to pay you one hour
5  more and they didn't pay that.
6      Q.  Other than that and the lunch and the
7  two or three times, were there any other hours you
8  were not paid for?
9      A.  If I would be able to say my sick days.
10     Q.  What do you mean your sick days?
11     A.  Days that I have had to go to the
12  doctor or one has to go to the doctor, or
13  something like that, or get sick or something.
14        (Recess taken from 10:32 a.m. to
15        10:48 a.m.)
16     Q.  Mr. Pena, when we took our break, the
17  last question you answered is that you had said
18  you had not been paid for sick days; is that
19  correct?
20     A.  I answered that because you asked me
21  what days I wasn't paid for. I don't know if
22  that's what -- I don't know if that's in the
23  politics.
24     Q.  During 2007, how many sick days have
25  you taken?
TSG Reporting - Worldwide    877-702-9580

# EXHIBIT H

**SP Payroll corp.**

1832 Second Ave
New York, NY 10128
212 289 3800
fax: 212 202 5354

I understand that company policy is I will receive a 1 hour meal break per shift. The 1 hour per shift will be deducted from the time card total. The break must be taken, at employee discretion.

Yo entiendo que la reglas de la compania es que yo recibire 1 hora de luch por cada turno. La hora por cada turno sera reducida de el total de horas de la tajeta. El tiempo para la comida devera ser cojido.

_Argelio Peña_
employee name

_(signature)_
employee signature

DEF001464

# EXHIBIT I

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4        ----------------------------
 5   ANGELO PENA, ROLANDO ROJAS,
     JOSE DIROCHE, and FRANKLIN SANTANA,
 6   individually and on behalf of others
     similarly situated
 7
             Plaintiffs,
 8
        vs.                    No. 07 CV 7013
 9
     SP PAYROLL, INC., NICHOLAS PARKING, CORP.,
10   IVY PARKING, CORP., BIENVENIDO, LLC,
     CASTLE PARKING CORP., SAGE PARKING CORP.,
11   and SAM PODOLAK,
12           Defendants.
        ----------------------------
13
14
15               DEPOSITION OF ROLANDO ROJAS
16                  New York, New York
17               Friday, November 9, 2007
18
19
20
21
22
23   Reported by:
24   Meredith Stoeckel
25   JOB NO. 14011-B
```

Page 6

```
1           R. Rojas
2  oath and are supposed to give truthful testimony?
3      A.   Yes, sir.
4      Q.   Is there any reason as you sit here
5  today that you cannot answer my questions
6  truthfully?
7      A.   I can answer.
8      Q.   Truthfully?
9      A.   Yes, sir.
10     Q.   Are you taking any medication which
11 would impair your ability to understand my
12 questions?
13     A.   No, sir.
14     Q.   Are you taking any medication that
15 would prevent you from answering my questions
16 truthfully?
17     A.   No, sir.
18     Q.   Isn't it a fact that you are no longer
19 employed by the company?
20     A.   No, sir.
21         THE INTERPRETER: "Isn't it a
22 fact" interprets terribly in Spanish. So
23 you will get the wrong answer.
24         MR. WALKER: I will rephrase my
25 question.
```

Page 7

```
1           R. Rojas
2      Q.   Sir, you are no longer employed by the
3  company, are you?
4      A.   No, I am not.
5      Q.   Where are you employed?
6      A.   I am not working.
7      Q.   You resigned from your employment with
8  the company, didn't you?
9      A.   I left in 2007. About the 12th or the
10 13th of January. And I left to Santo Domingo.
11     Q.   After you resigned on January 12th or
12 13th of 2007, you have not performed any work for
13 the company, have you?
14     A.   No, sir.
15     Q.   You're not making any claim, are you,
16 that the company owes you any money for any work
17 done after January 12th or 13th 2007?
18     A.   No, sir. After I left 2007, no.
19 Before, yes.
20     Q.   At the time you left your employment
21 with the company, at which garage were you
22 working?
23     A.   After I left the company, I went to
24 Santo Domingo. That was in January.
25     Q.   What was the last garage you worked for
```

Page 8

```
1           R. Rojas
2  for the company?
3      A.   199 and Webster. I worked there for
4  three months.
5      Q.   Prior to that garage, where did you
6  work?
7      A.   155th and Saint Nicholas.
8      Q.   How long did you work there?
9      A.   I worked there from May 1, '03 to May
10 12, '06.
11     Q.   Did you work at any other garage
12 between the time you worked at the 155 Saint
13 Nicholas garage and the 199 Webster garage?
14         MR. FAILLACE: Objection. I'm
15 sorry. I would please ask that the
16 opposing counsel restate the question.
17 That is not what the opposing question
18 asked.
19         MR. WALKER: I will restate the
20 question.
21     Q.   You testified that you worked at 199
22 and Webster for the last three months of your
23 employment; is that correct?
24     A.   Yes, sir.
25     Q.   And you testified you worked at 155 and
```

Page 9

```
1           R. Rojas
2  Saint Nicholas until May 12, 2006; is that
3  correct?
4      A.   Around there, yes.
5      Q.   Where did you work between May 12th of
6  2006 and the time that you came to work at 199
7  Webster?
8      A.   Around October '06, around the 12th or
9  13th, I started working at 199 and Webster, until
10 about January 2007.
11     Q.   Where did you work between May of '06
12 and October of '06?
13     A.   I was in Santo Domingo.
14     Q.   Do you have a passport issued by the
15 Dominican Republic?
16     A.   Yes, sir.
17     Q.   Do you have an American passport?
18     A.   No, sir.
19 RQ    MR. WALKER: We request production of
20 his passport.
21         MR. FAILLACE: Take it under
22 advisement.
23     Q.   You testified that you worked at the
24 garage at 155 Saint Nicholas from May of '03 until
25 May of '06; isn't that correct?
```

Page 10

R. Rojas

2  A.  Yes. May 2003 until May 2006.
3  Q.  Did you work at any other garage for
4  the company from May of 2003 until May of 2006?
5  A.  They would send me sometimes to cover a
6  day off of another employee at 145 and Saint
7  Nicholas Avenue. Just to cover a day off of
8  somebody or something like that.
9  Q.  From May of 2003 until May of 2006, did
10 you ever visit the Dominican Republic?
11 A.  In May 2005, I went on vacation for one
12 month.
13 Q.  Between May of 2003 and May of 2006,
14 did you go on any other vacations other than the
15 one in May of 2005?
16 A.  After 2005, no.
17 Q.  Prior to 2005, did you go on any
18 vacations while you were employed by the company?
19 A.  No, sir.
20 Q.  During the vacation that you took in
21 May of 2005, did you receive any pay for time not
22 worked by the company?
23 A.  No, sir.
24 Q.  During your employment with the
25 company, did you ever take any sick days?

TSG Reporting - Worldwide    877-702-9580

Page 11

R. Rojas

2  A.  No, sir.
3  Q.  Did you ever receive any sick pay?
4  A.  No, sir.
5  Q.  At the time that you began employment
6  with the company in May of 2003, what were your
7  hours of work?
8  A.  Seven p.m. to seven a.m.
9  Q.  Did you punch a time clock?
10 A.  Yes, punched the clock.
11 Q.  Did you punch the time clock when you
12 started work?
13 A.  Yes, sir.
14 Q.  Did you punch the time clock when you
15 ended work?
16 A.  Yes, sir.
17 Q.  Did you ever have anyone else punch
18 your time card?
19 A.  No, sir.
20 Q.  Were you paid for all of the hours that
21 were recorded on your time card?
22 A.  They pay me the minimum. And overtime
23 was paid but not completely.
24 Q.  In what respect was the overtime not
25 paid?

TSG Reporting - Worldwide    877-702-9580

Page 12

R. Rojas

2  A.  I worked 12 hours. They paid the 40
3  hours at the minimum. And the others they did not
4  pay completely.
5  Q.  I want to understand, Mr. Rojas. The
6  company paid you for the first 40 hours at the
7  minimum wage; is that correct?
8  A.  Yes, sir.
9  Q.  And you were paid for all 40 of those
10 hours; is that correct?
11 A.  Forty hours they paid at the minimum.
12 Q.  And for hours after 40 hours in a work
13 week, what were you paid?
14 A.  They pay a little something at time and
15 a half, but they wouldn't pay completely.
16 Q.  When you say they would pay a little
17 something at time and a half, how many hours would
18 they pay time and a half?
19 A.  It could have been 10 or 15, depending.
20 More or less.
21 Q.  Did you receive any pay for hours that
22 were not paid at time and a half after 40?
23 A.  Can you rephrase that?
24 Q.  For the hours that you worked after 40
25 that you did not receive time and a half, were you

TSG Reporting - Worldwide    877-702-9580

Page 13

R. Rojas

2  paid any pay at all?
3  A.  No, sir.
4  Q.  Did you ever ask anyone at the company
5  why they were not paying you?
6  A.  I would go to the supervisor and ask
7  him to pay us for the five hours of lunch. And he
8  would simply say get out of here.
9  Q.  Are you saying that you were not
10 paid -- that the only hours you were not paid for
11 were the five hours of lunch?
12 A.  The lunch hour, the five-hours lunch,
13 and the hour that was supposed to be paid by law
14 after one works 10 hours.
15 Q.  Other than the five hours of lunch and
16 the one hour pay for working over 10 hours, are
17 you claiming that you were not paid for any other
18 time?
19 A.  I am alleging they didn't pay the five
20 hours lunch and the hour after the 10 hours. What
21 are you saying? Repeat it to me, please.
22 Q.  Other than the five hours of lunch, and
23 the one hour pay after 10 hours, are you saying
24 that you were paid for all other hours?
25 A.  They would pay me, but not completely.

TSG Reporting - Worldwide    877-702-9580

Page 14

R. Rojas

1
2    Q.   I am trying to understand what hours
3    they did not pay for.  So far I understand your
4    testimony is you were not paid for five hours of
5    lunch per week.  And I understand that you say you
6    were not paid for the one hour for working after
7    10. Is there anything else besides those that you
8    were not paid for?
9        A.   No, sir.
10       Q.   Are you paid by a paycheck from a
11   company?
12       A.   Check.  Yes, sir.
13       Q.   Have you been paid by a paycheck since
14   2003 when you started work?
15       A.   Yes, sir.
16       Q.   Does the stub attached to the paycheck
17   have certain information about the hours you
18   worked?
19       A.   Yes, sir.
20       Q.   And did it have information about your
21   hourly rate of pay?
22       A.   Yes, the minimum.  That's what they
23   pay.
24       Q.   Did it have information on there about
25   the hours you were paid at an overtime rate?

Page 15

R. Rojas

1
2        A.   Yes.
3        Q.   Did you also receive any payments in
4    cash from the company?
5        A.   No, sir.
6        Q.   Did you ever read the complaint in this
7    case?
8        A.   No, sir.
9        Q.   The complaint in the action in
10   paragraph 11 states the following.  It says,
11   quote, In addition to his weekly wages paid by
12   check, plaintiff Rojas was given approximately $20
13   to $70 a week in cash.
14           THE INTERPRETER:  Would you repeat
15       it again.  He didn't understand.
16       Q.   I'm going to read to you a sentence
17   that's in the complaint.
18       A.   Yes, sir.
19       Q.   Then I'm going to ask you whether that
20   is correct or incorrect.  "In addition to his
21   weekly wages paid by check, plaintiff Rojas was
22   given approximately $20 to $70 a week in cash."
23       A.   No.  15 to $20 a week in cash.
24       Q.   When I asked you before, you said you
25   didn't receive any cash?

Page 16

R. Rojas

1
2        A.   Well, you didn't refer to -- I thought
3    you meant if the cash was together with the check.
4        Q.   Who gave you the cash?
5        A.   The supervisor could take the envelope
6    and leave it in the office.  And then we would
7    receive our check.  The envelope.
8        Q.   How often did you receive cash?
9        A.   Weekly.
10       Q.   Did anyone tell you what this cash was
11   for?
12       A.   No, sir.
13       Q.   Did you ever ask anyone what this cash
14   was for?
15       A.   Never.
16       Q.   Did anyone ever tell you this was pay
17   for your lunch hour?
18       A.   No, sir.
19       Q.   Did there ever come a time when the
20   company began to pay you for your lunch hour?
21       A.   No, sir.
22       Q.   Did you report the cash you received
23   from the company on your tax returns?
24       A.   No, sir.
25       Q.   When you worked at the garage, was your

Page 17

R. Rojas

1
2    job to park cars?
3        A.   Receive them, check them in, park them.
4    Turn them -- give them back to the people.
5    Cleaning.  Everything.
6        Q.   Did you ever receive tips from
7    customers?
8        A.   Sometimes they gave something.
9    Something.
10       Q.   Did you ever give those tips to your
11   supervisor?
12       A.   No, sir.
13       Q.   Did you ever tell your supervisor how
14   much you received in tips?
15       A.   No, sir.
16       Q.   Did your supervisor ever ask you to
17   give him those tips?
18       A.   No, sir.
19       Q.   Did you ever share any tips you
20   received with any other employees at the garage?
21       A.   Yes, sir.
22       Q.   Who do you remember giving tips to?
23       A.   I worked with Miguel Alcantara, a man
24   by the name of Jose.  I forget the other names.
25       Q.   Approximately how much did you receive

Page 18

1        R. Rojas
2   in tips on a weekly basis?
3       A.   8 or $10 a day.
4       Q.   How much of these tips that you
5   received did you share with other employees?
6       A.   If three guys worked, it was 8 to $10.
7   If there were two guys, it may have been 10 to 12
8   or so.
9       Q.   How often were there three guys working
10  at the garage when you were there?
11      A.   When we started, there was two or
12  three. Starting at seven o'clock at night.
13  Another guy would come in around eleven or twelve.
14  And we stay all together through. The ones that
15  came in at seven would leave at seven in the
16  morning.
17      Q.   During the period that you worked at
18  the garage from May 2003 to May 2006, were you
19  ever alone at the garage?
20      A.   No, sir.
21      Q.   Is it fair to say there were either two
22  or three employees there?
23      A.   Yes, sir.
24      Q.   During the period of May 2003 to May
25  2006, did you ever take any sick days?

TSG Reporting - Worldwide    877-702-9580

Page 19

1        R. Rojas
2       MR. FAILLACE:  Objection. He
3   answered it already.
4       MR. WALKER:  I asked whether he
5   received any pay at the time.
6       A.   No, sir.
7       Q.   Did you take any time off for any other
8   reasons such as to go to a doctor?
9       A.   No, sir.
10      (Rojas Exhibit 1, Payroll
11  document, marked for identification, as
12  of this date.)
13      Q.   I'm showing you what has been marked as
14  Rojas Exhibit 1 for identification.
15      Is that your signature on this
16  document?
17      A.   Yes, sir.
18      Q.   Do you know when you signed this?
19      A.   I don't remember the date.
20      Q.   Do you know who gave you this document?
21      A.   The supervisor.
22      Q.   What was the supervisor's name?
23      A.   His name was Raj, but I didn't know
24  what it said.
25      Q.   Is this document in both Spanish and

TSG Reporting - Worldwide    877-702-9580

Page 20

1        R. Rojas
2   English?
3       A.   I didn't read it. He just gave it to
4   me and I signed it and I gave it back.
5       Q.   I'm asking you the question. As you
6   look at this document, is it in both Spanish and
7   English?
8       A.   Yes, sir.
9       Q.   Can you read Spanish?
10      A.   I don't have my glasses with me. I
11  don't see too well.
12      Q.   If you did have your glasses with you,
13  could you read Spanish?
14      A.   I can read Spanish, yes.
15      Q.   When Raj gave you this document, what
16  did he say to you?
17      A.   He gave it to me. Told me to sign the
18  document. I was working so I just signed it and
19  gave it back. He said sign here. That's it.
20      Q.   Are you in the habit of signing
21  documents you don't read?
22      A.   No, sir. I have only worked at one
23  company.
24      Q.   Do you understand this document says
25  you're supposed to take a one-hour lunch break?

TSG Reporting - Worldwide    877-702-9580

Page 21

1        R. Rojas
2       A.   No, sir. We didn't get it. They never
3   gave it to us.
4       Q.   But you signed it though?
5       A.   Yes, I did.
6       Q.   And your testimony is you didn't read
7   it before you signed it?
8       A.   No, I didn't.
9       Q.   Did Raj or anyone at the company tell
10  you you are entitled to take a one-hour lunch
11  break?
12      A.   No, sir.
13      Q.   Did you ever take any meal breaks while
14  you were working at the garage?
15      A.   No, sir.
16      Q.   You never took even five minutes to
17  have a meal break?
18      A.   No, sir. I wouldn't go out.
19      Q.   Is it your testimony that you never
20  bought lunch at any restaurant or bodega outside
21  the garage?
22      A.   No, sir. I would not leave there.
23      Q.   Did you ever fall asleep while you were
24  working at the garage?
25      A.   No, sir.

TSG Reporting - Worldwide    877-702-9580

Page 22

```
1              R. Rojas
2      Q.   So it's your testimony that for the
3  entire period of time that you were working at the
4  garage, you never took even one minute of break
5  from working?
6      A.   Out of the parking garage -- I never
7  went out, no.
8      Q.   Did you ever take a break in the
9  parking garage?
10     A.   No. I was working.
11     Q.   You were working every minute while you
12 were on shift at the parking garage?
13     A.   Yes, sir.
14     Q.   From the period of May 2003 until
15 January of 2007, were you employed by any other
16 company other than working at the garage?
17     A.   No, sir.
18     Q.   Did you receive any income from any
19 source other than from working at the garage?
20     A.   No, sir.
21     Q.   Were you ever paid for any time by the
22 company for periods of time when you were not
23 working?
24         MR. FAILLACE: Objection. Already
25     asked. Go ahead.
   TSG Reporting - Worldwide      877-702-9580
```

Page 23

```
1              R. Rojas
2         THE INTERPRETER: Can you repeat
3     that?
4      Q.   Did you ever receive any pay for the
5  company for hours that you did not actually work?
6      A.   No, sir.
7         (Recess taken from 1:26 p.m. to
8     1:34 p.m.)
9      Q.   Did there come a time when you stopped
10 working 12 hours per day?
11     A.   I stopped working 12 hours a day when I
12 was at 199 and Webster. I was working 10 hours
13 then. Ten and eight, but more ten.
14     Q.   When did you stop working 12 hours per
15 day?
16     A.   Twelve hours a day -- when I started in
17 October 2006 until 2007.
18     Q.   When you worked eight hours per day,
19 what time did you start and what time did you end
20 work?
21     A.   I worked from four p.m. until twelve
22 midnight.
23     Q.   During the time that you worked ten
24 hours per day, what time did you start work and
25 what time did you end work?
   TSG Reporting - Worldwide      877-702-9580
```

Page 24

```
1              R. Rojas
2      A.   I started at ten and come out at eight.
3      Q.   Ten a.m.?
4      A.   Yes, sir. Until eight p.m.
5      Q.   When you worked ten a.m. to eight p.m.,
6  did you punch your time card in at ten a.m. when
7  you started?
8      A.   Yes, sir.
9      Q.   Did you punch out at eight p.m. when
10 you ended work?
11     A.   Yes, sir.
12     Q.   When you worked four p.m. to midnight,
13 did you punch in at four p.m.?
14     A.   Yes, sir.
15     Q.   When you ended work at midnight, did
16 you punch out then?
17     A.   Yes, sir.
18     Q.   During this period of time beginning in
19 October of 2006, were you paid time and a half for
20 hours over 40?
21     A.   If I worked it, yes, sir. Yes.
22     Q.   For the period prior to October 2006,
23 were you paid time and a half for the hours you
24 worked over 40?
25     A.   They paid, yes, sir.
   TSG Reporting - Worldwide      877-702-9580
```

Page 25

```
1              R. Rojas
2      Q.   When you first started work with the
3  company in October of 2003, who was your first
4  supervisor?
5      A.   Raj.
6      Q.   During the time you were employed by
7  the company, did you have any supervisor other
8  than Raj?
9      A.   No, sir.
10     Q.   Did Raj actually work at the garage
11 parking cars and doing the other work that you
12 did?
13     A.   No, sir.
14     Q.   How often did Raj come to the garage
15 when you were working there?
16     A.   He would go daily in the morning hours.
17     Q.   How long did he stay at the garage?
18     A.   He wouldn't last too long there. An
19 hour, half hour.
20     Q.   Do you know if Raj ever saw you take a
21 break and leave the premises of the garage?
22     A.   No, sir.
23     Q.   Did you ever pay any other employee to
24 work your shift while you were not there?
25     A.   No, sir.
   TSG Reporting - Worldwide      877-702-9580
```