# EXHIBIT P

Page 1

1

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------

3

4

ANGELO PENA, ROLANDO ROJAS, JOSE DIROCHE,
and FRANKLIN SANTANA, individually and on
behalf of others similarly situated,

5

6

Plaintiffs,

7

vs.              No. 07 CV 7013

8

SP PAYROLL, INC., NICHOLAS PARKING, CORP.,
IVY PARKING CORP., BIENVENIDO, LLC,
CASTLE PARKING CORP., SAGE PARKING CORP.,
and SAM PODOLAK,

9

10

Defendants.

11

------------------------------

12

13

14

15

DEPOSITION OF LUIS LUNA

16

New York, New York

17

Friday, December 7, 2007

18

19

20

21

22

23

Reported by:

24

Meredith Stoeckel

25

JOB NO. 14367

Page 14

```
 1          L. Luna
 2     A.   Grand Concourse -- it's an avenue.  The
 3  building of the bodega is 1269.
 4     Q.   What street?
 5     A.   On Grand Concourse.  That's in the
 6  Bronx.
 7     Q.   That's what I was asking.  Thank you.
 8  How long did you work at the bodega in Grand
 9  Concourse?
10     A.   Eight months.
11     Q.   Is it correct then to say that you
12  began working for Grand Concourse in the beginning
13  of 2007?
14     A.   Yes.
15     Q.   What did you do for the bodega at Grand
16  Concourse?
17     A.   Arranging the merchandise.
18     Q.   What was your hourly wage?
19     A.   It was a fixed salary.  They would pay
20  350 per week.
21     Q.   Did you receive that in cash or check?
22     A.   Cash.
23     Q.   How many hours a week did you work for
24  the bodega?
25     A.   From four to eleven.  From four o'clock
```

Page 15

```
 1          L. Luna
 2  in the afternoon to eleven o'clock.  Six days a
 3  week.
 4     Q.   So you worked for the bodega
 5  approximately 42 hours a week?
 6     A.   Yes.
 7     Q.   And you were paid solely in cash by the
 8  bodega?
 9     A.   Yes.
10     Q.   Where did you work prior to working for
11  the bodega?
12     A.   In the parking.
13     Q.   You worked for the defendants prior to
14  working for the bodega?
15     A.   Yes.
16     Q.   During what period of time did you work
17  for the defendants?
18     A.   From 2002 to the end of 2004.
19     Q.   When were you initially hired by the
20  defendants?  You mentioned 2002.  When in 2002?
21     A.   26th March.
22     Q.   And approximately when did you stop
23  working for the defendants?  You mentioned the end
24  of 2004.  Does November 2004 sound accurate to
25  you?
```

Page 16

```
 1          L. Luna
 2     A.   Yes.
 3     Q.   What did you do for defendants?
 4     A.   Park the cars.
 5     Q.   Why did you stop working for the
 6  defendants in November 2004?
 7     A.   Because we couldn't understand each
 8  other.
 9     Q.   Did you resign from your employment
10  with the defendants or were you terminated?
11     A.   They fired me.
12     Q.   Why were you fired?
13          MR. FAILLACE:  Objection.  He
14  already answered.  He said, We didn't
15  understand each other.  What more do you
16  need?
17     Q.   I'll ask the question again.  Why were
18  you fired?
19          MR. FAILLACE:  Objection.  He
20  answered already.  He can answer.  Go
21  ahead.  Repeat the question.
22     A.   Because we couldn't understand each
23  other.  Too many hours of work, and I was not
24  making enough money.
25     Q.   What was the reason the defendants told
```

Page 17

```
 1          L. Luna
 2  you they were firing you?
 3          MR. FAILLACE:  Objection.  He has
 4  already answered it twice.  Interpreter,
 5  please tell him what I'm saying.  But go
 6  ahead.  Answer.
 7     A.   Can you please repeat the question?
 8          MS. WHITE:  Can the court reporter
 9  please repeat the question?
10          (Record read.)
11     A.   There were too many hours of work and
12  that we couldn't understand each.
13     Q.   Who told you that?
14     A.   I told him that.
15     Q.   You told who?
16     A.   Raj, the supervisor.
17     Q.   If I understand correctly, you told
18  Raj, your supervisor, that there were too many
19  hours of work, and that you were not making enough
20  money?
21     A.   Exactly.
22     Q.   So I'll ask you again, Did you resign
23  from the company or did they fire you?
24     A.   They fired me because I didn't want to
25  continue.
```

Page 22

L. Luna

1
2  employment around March 26th of 2002. Who at the
3  company hired you?
4      A.  Raj.
5      Q.  And for which garage were you initially
6  hired?
7      A.  187 and Valentine.
8      MR. FAILLACE: For clarification,
9  when he says 187 Valentine, he means
10  187th Street and Valentine Avenue. The
11  same as 162 -- so we don't go through the
12  same mess with Grand Concourse. When
13  they say a number and a name, they mean
14  this street and that avenue. Okay.
15     Q.  Just to clarify, Mr. Luna, you were
16  just referring to 187 Valentine as the garage
17  where you were initially hired. Were you
18  referring to 187th Street and -- the intersection
19  of 187th Street and Valentine?
20     A.  Yeah.
21     Q.  Do you know the name of that parking
22  garage?
23     A.  Ivy Parking.
24     Q.  For how long did you work at Ivy
25  Parking?

Page 23

L. Luna

1
2      A.  Until the end of 2004.
3      Q.  For which garage did you work after you
4  worked for Ivy Parking?
5      A.  For the same one -- 169.
6      Q.  Do you know the name of that garage?
7      A.  It's called the parking of 169, because
8  it's the same company. And when they needed
9  somebody there, they would move the person there.
10     Q.  So after you worked at Ivy Parking on
11  187th Street, you worked at 169th Street?
12     A.  Because it's the same company, the same
13  owner.
14     MR. FAILLACE: Excuse me. Your
15  question was after you worked at 187 you
16  went to work at 169. He is answering at
17  the same time he worked at both places.
18  And you can ask the interpreter.
19     MS. WHITE: Let me ask the
20  interpreter. Is that exactly what he
21  said, or is Mr. Faillace interpreting
22  what he said?
23     THE INTERPRETER: I don't
24  remember. Sorry.
25     MS. WHITE: I will confirm.

Page 24

L. Luna

1
2      Q.  Did you work for Ivy Parking and the
3  garage at 169th Street at the same time, or did
4  you work for one after you worked for the other?
5      A.  If there was people not coming or
6  missing on 169th Street, they would send people
7  who didn't have much work on Ivy Parking to work
8  on the 169.
9      Q.  Okay. What other garages did you work
10  at between March 2002 and November 2004 besides
11  Ivy Parking and the garage at 169th Street?
12     A.  No others.
13     Q.  Those are the only two garages you
14  worked for the defendants?
15     A.  Yes.
16     Q.  For which garage did you work the most?
17     A.  187 and Valentine.
18     Q.  Did you have any other jobs while you
19  were employed by the defendants?
20     A.  No.
21     Q.  Did you own your own business at the
22  time that you were working for the defendants?
23     A.  No.
24     Q.  What were your hours when you were
25  initially hired by the defendants in March 2002?

Page 25

L. Luna

1
2      A.  From six in the afternoon to six
3  o'clock in the morning.
4      Q.  How many hours a week did you work?
5      A.  Twelve and thirteen hours. Because
6  sometimes the other people wouldn't come and we
7  had to wait.
8      Q.  Let me repeat the question.
9      How many hours per week did you work?
10  You testified you worked from seven p.m. to
11  six a.m. How many hours a week?
12     MR. FAILLACE: Objection. He
13  worked from six p.m. to six a.m.
14     Q.  Six p.m. to six a.m.
15     How many hours per week did you work?
16     A.  Sometimes I would work 72 hours.
17     Q.  How many days a week did you work?
18     A.  Six and sometimes seven.
19     Q.  Let me make sure I'm understanding your
20  testimony. Your regular schedule was typically
21  from six p.m. to six a.m., six days a week. And
22  sometimes you worked seven days a week; is that
23  correct?
24     A.  Yes.
25     Q.  How often did you work seven days a

Page 30

L. Luna

2    Q.   So it's your testimony that you would
3  receive 10 or $15 in cash to compensate you for
4  that hour that you came in before the beginning of
5  your shift?
6         MR. FAILLACE:  Objection.  That is
7  not his testimony.  You're putting
8  words --
9         MS. WHITE:  I'm asking -- I'm
10 asking if that's his testimony.  He can
11 respond to the question.
12        MR. FAILLACE:  That is not his
13 testimony.  You're putting words in his
14 mouth.
15        MS. WHITE:  He can respond to the
16 question.
17        MR. FAILLACE:  Objection.  You're
18 putting words in his mouth.  That is not
19 his testimony.
20        MS. WHITE:  Your objection is
21 noted, Mr. Faillace.  I'm asking a
22 question and --
23        MR. FAILLACE:  Please interpret
24 what I'm saying.  Please, interpreter,
25 say what I'm saying.  Please let my

Page 31

L. Luna

2  client know what I'm saying.
3    A.   It was not per hour.  It was per week.
4    Q.   So you received 10 to $15 in cash per
5  week?
6    A.   Yes, per week.
7    Q.   Did you ever receive more than $15 in
8  cash in a week?
9    A.   No.
10   Q.   So are you testifying under oath that
11 you never received more than $40 in cash in a
12 week?
13   A.   No.
14   Q.   Just to clarify, you never received
15 greater than $100 in cash in a week?
16   A.   $100, no, no.
17   Q.   Never?
18   A.   No, never.
19   Q.   Were there ever any weeks when you
20 didn't receive any cash?
21   A.   No.
22   Q.   When you came into work at five p.m.,
23 why didn't you punch in at five p.m.?
24   A.   Because my time -- my schedule was from
25 six o'clock.

Page 32

L. Luna

2    Q.   Did somebody tell you not to punch in
3  at five p.m.?
4    A.   It was not -- I was not supposed to
5  punch before six.
6    Q.   Who told you that you were not supposed
7  to punch before six?
8    A.   The supervisor himself told me.
9    Q.   Which supervisor told you that?
10   A.   Raj.
11   Q.   When did Raj tell you that?
12   A.   He would say that to us right there in
13 the parking.
14   Q.   When you say "us," who are you
15 referring to?
16   A.   To me and the workers.
17   Q.   Which workers are you referring to?  I
18 would like their names.
19   A.   The people that work there.
20   Q.   Which people?  I would like their
21 names.
22   A.   Of the schedule that work with me.
23 People that work with me and my schedule.
24   Q.   Who worked with you?
25   A.   There was a worker that was called Jose

Page 33

L. Luna

2  and myself on that shift.
3    Q.   Did you ever work with anybody else
4  besides Jose on your shift?
5    A.   With him.  That was my colleague.
6    Q.   Did you hear Raj tell Jose that he was
7  not to punch in before the beginning of his shift?
8    A.   Yes.
9    Q.   How many times a week would you come in
10 at five o'clock p.m. instead of six o'clock p.m.?
11        MR. FAILLACE:  Objection.  He
12 already answered.
13        MS. WHITE:  He can answer the
14 question again.
15   A.   That was when they call you to come
16 earlier.
17   Q.   You testified earlier that --
18   A.   Three or four times during the week.
19   Q.   So is it your testimony that even
20 though your shift was typically six p.m. to six
21 a.m. three to four times per week, from March 2002
22 to November 2004, you came in at five p.m. instead
23 of six p.m.?
24   A.   Yes.
25   Q.   Every single week?

Page 34

```
1              L. Luna
2      A.   Yes.  Whenever we were called in to
3   come.
4      Q.   And your testimony is you were never
5   paid for that hour besides the cash that you
6   received each week?
7      A.   Because the cash was only like 40, 45
8   pesos.
9      Q.   Did you receive dollars or pesos?
10     A.   Dollars.
11     Q.   So your testimony is that you received
12  about 40, $45 per week in cash?
13     A.   Yes.
14     Q.   Mr. Luna, a little while ago I asked
15  you how much in cash you received each week.  And
16  I asked you if you ever received $40 a week in
17  cash.  And you just testified that you did.
18  Before, you testified that you didn't.  Which is
19  it?
20     A.   Well, I'm talking now about when we
21  came an hour earlier.
22     Q.   Then you would receive 40 to $45 in
23  cash that week?
24     A.   Yes.
25     Q.   Would you agree that you received at
```

Page 35

```
1              L. Luna
2   least $40 in cash almost every week that you
3   worked for the defendants?
4          MR. FAILLACE:  Objection.  He said
5   already he didn't.
6          So please tell him what I just
7   said.
8          He can answer it.  I'm just
9   saying -- I objected because he already
10  told her something different.  She's
11  putting words in his mouth again.  She's
12  attempting to put words in my client's
13  mouth.
14     Q.   Let me rephrase the question.
15         You testified that every week three or
16  four times a week you would come in to work at
17  five p.m. instead of six p.m., correct?
18     A.   Yes.
19     Q.   You also testified, correct me if I'm
20  wrong, that on those weeks when you did come in at
21  five p.m. instead of six p.m. that you received
22  approximately $40 in cash; is that correct?
23     A.   Yes.
24     Q.   If every week you came in to work at
25  five p.m. instead of six p.m. at least once, then
```

Page 36

```
1              L. Luna
2   your testimony is that you received around $40 in
3   cash that week to compensate you for that extra
4   hour?
5      A.   Yes.
6      Q.   Did you ever continue to work after six
7   a.m.?
8      A.   Yes.
9      Q.   How often would you work after six
10  a.m.?
11     A.   About ten weeks.
12     Q.   But generally your shift ended at six
13  a.m., correct?
14     A.   Yes.
15     Q.   You testified earlier that you worked
16  with Jose; is that correct?
17     A.   Yes, that was my working buddy.
18     Q.   Did Jose also park cars?
19     A.   Yes.
20     Q.   Did you ever let Jose punch your
21  timecard in or out?
22     A.   No.
23     Q.   Did you ever pay another employee to
24  work one of your shifts?
25     A.   No.
```

Page 37

```
1              L. Luna
2      Q.   Has another employee ever paid you to
3   work his or her hours?
4      A.   No.
5      Q.   In the time that you worked for
6   defendants between March 2002 and November 2004,
7   did you ever take a leave of absence from work?
8      A.   No, I didn't take any vacation.
9      Q.   Did you ever take any other time off of
10  work?
11     A.   No.
12     Q.   Did you ever leave the country between
13  March 2002 and November 2004?
14         MR. FAILLACE:  Objection.
15     A.   No.  You can check my passport.
16     Q.   I have your passport right here.  I'm
17  about to show you.
18         Did you leave the country in March
19  2003?
20     A.   No.
21     Q.   You did not?
22     A.   No.
23         MR. FAILLACE:  Can we take a
24  break?
25         MS. WHITE:  Can I have two minutes
```

Page 50

1          L. Luna
2    that is in front of you?
3      A.  Yes.
4      Q.   Do you agree that the bottom has been
5    Bates stamped P00417 and that the last page is
6    Bates stamped P00457?
7      A.  Yes.
8      Q.   And what is the exhibit that has been
9    marked Luna Exhibit 2?
10     A.  That is a copy of a check.
11     Q.   So these documents here that have been
12   Bates stamped P00417 through P00457 are copies of
13   your pay stubs; is that correct?
14     A.  Yes.
15     Q.   Mr. Luna, if you'll turn to the page
16   that's marked at the bottom P00452.  At the top of
17   the page, do you agree it says "period ending
18   October 3, 2004" at the very top, correct?
19     A.  Yes.
20     Q.   Under that, the pay date is "October 9,
21   2004," correct?
22     A.  Yes.
23     Q.   And this is a check for 40 hours of pay
24   at gross pay of $206; is that correct?
25     A.  Yes.

Page 51

1          L. Luna
2      Q.   If you turn to the following page that
3    has been marked as P00453.  Do you see at the top
4    the period ending and the pay date is the same as
5    the previous page?
6      A.  Yes.
7      Q.   Okay.  So am I correct that for the pay
8    date October 9, 2004 you received two checks, each
9    check for a gross pay of $206?
10     A.  Yes.
11     Q.   Does this refresh your recollection
12   that at least one of these checks was for vacation
13   pay?
14     A.  I'm not sure.  I see that I received
15   two checks.
16     Q.   Do you know why you received two
17   checks?
18     A.  Vacations.  They give you first one
19   week and then they give you the other week.
20     Q.   So this is for two weeks of vacation
21   pay?
22     A.  No.  This is for two years.
23     Q.   But the amount of the check is for
24   vacation pay -- for one week salary?
25     A.  Yes.  One week vacation, yes.

Page 52

1          L. Luna
2      Q.   Have you ever been paid for time that
3    you didn't work other than these two weeks of
4    vacation pay?
5      A.  No.  If I wouldn't work, they wouldn't
6    pay me.
7      Q.   Did you ever receive holiday pay?
8      A.  No.
9      Q.   Did you ever receive sick pay?
10     A.  No.
11     Q.   Did you ever receive a loan from the
12   company in the amount of $320?
13     A.  No.
14     Q.   Did you ever receive a loan from the
15   company in any amount?
16         MR. FAILLACE:  I'm sorry.  The
17   interpreter said a payment from the
18   company.
19         Is that what you said, a payment?
20         MS. WHITE:  A loan.
21     A.  No.  Loan, no.
22     Q.   Did you ever borrow money from the
23   company?
24         MR. FAILLACE:  Objection.  He
25   answered.

Page 53

1          L. Luna
2      A.  No.
3      Q.   How often did you get paid by the
4    defendants?
5      A.  Weekly.
6      Q.   Did you always receive a paycheck for
7    each pay period?
8      A.  Yes.
9      Q.   Did your paycheck indicate the number
10   of hours that you worked?
11     A.  Yes.
12     Q.   Did it list your hourly rate of pay?
13     A.  Yes.
14     Q.   Did you receive at least minimum wage
15   for the first 40 hours that you worked in any pay
16   period?
17     A.  I think that the minimum wage was 5.15
18   that they pay me.
19     Q.   Do you understand what overtime is?
20     A.  Yes.  When you work more.
21     Q.   Do you understand that overtime is when
22   you work more than 40 hours in a week?
23     A.  Yes.
24     Q.   Did your paycheck also list overtime
25   hours?

Page 54

```
1            L. Luna
2     A.  No.
3     Q.  Your paycheck never listed overtime
4  hours?
5     A.  No, no.
6     Q.  If you look at the very first page of
7  Exhibit 2 that's in front of you right here, see
8  where it says "regular"?  "Forty hours at 5.15."
9  Do you see that?
10    A.  Yes.
11    Q.  And do you see under that it says
12 overtime?
13    A.  But they didn't give us that on the
14 check.  They would give it to us cash.
15        MR. FAILLACE:  He didn't say that.
16        THE INTERPRETER:  No?
17        MR. FAILLACE:  No.
18    Q.  Could you repeat what you just said for
19 the interpreter?
20    A.  That money was not given to us on the
21 check.  The overtime, no.
22    Q.  So right here where it says overtime --
23 six hours.  Do you see that on here?  And it says
24 that at a rate of $7.25 per hour.  Do you see
25 that?
   TSG Reporting - Worldwide      877-702-9580
```

Page 55

```
1            L. Luna
2     A.  Yes.
3     Q.  And you see across it says "for this
4  period, $46.35," correct?  And that's in addition
5  to $206 of regular pay.  Do you see that?
6     A.  Yes.
7     Q.  For a total gross pay of 252.35.
8     A.  Yes.  But they would give that to us in
9  cash.
10    Q.  Okay.  Do you see where it says "net
11 pay" on here, "$218.79"?  Please look at Exhibit
12 2.  Would you receive in that check the entire
13 amount of net pay?
14    A.  I don't remember.  But if it says so, I
15 am sure that -- but I don't remember.
16    Q.  Let me rephrase my question.  These
17 paychecks that you have in front of you, the pay
18 stubs, reflect that you were paid by check for at
19 least some overtime hours; isn't that correct?
20    A.  Yes.  They would give it to me on a
21 check.
22    Q.  Okay.  That's my question.  Thank you.
23 Do you understand what the term "time
24 and a half" means?
25    A.  No.
   TSG Reporting - Worldwide      877-702-9580
```

Page 56

```
1            L. Luna
2     Q.  Do you understand that the overtime
3  rate of pay was one and a half times your regular
4  rate of pay?
5     A.  The overtime, yes.  Yes, that's time
6  and a half.
7     Q.  Did you receive time and a half for
8  your overtime hours?
9         MR. FAILLACE:  He was asking.  He
10 was asking.
11    Q.  He was asking?  What were you asking?
12 I'm sorry.
13    A.  No, I'm telling you that time and a
14 half -- that's the hour for overtime.
15    Q.  Right.  Do you agree that you were paid
16 time and a half for the overtime hours that you
17 worked?
18    A.  Yeah, the overtime.
19    Q.  You testified that you received cash in
20 addition to your check, correct?
21    A.  When you work more.
22    Q.  Why did you receive -- explain to me
23 why you received cash in addition to your check.
24    A.  Because it goes over the 40 hours of
25 the five days of work.
   TSG Reporting - Worldwide      877-702-9580
```

Page 57

```
1            L. Luna
2     Q.  So let me -- I'm trying to understand
3  your testimony.  Is your testimony that you
4  received cash to compensate you for hours that you
5  worked in addition to the hours that were
6  compensated in your paycheck?
7     A.  Yes.  Because that was when you went
8  over the time.  When you work seven days -- if you
9  work more than seven days -- five days -- for
10 instance, if you work seven days, they would give
11 you 40 to $45 for that.
12    Q.  Who gave you the cash?
13    A.  Raj.
14    Q.  Isn't it true that some of the cash
15 that you received was to compensate you for a
16 lunch hour or a meal break during your shift?
17    A.  No, we never got breaks.  There were no
18 breaks.
19    Q.  Did you keep a record of the amount of
20 cash that you received?
21    A.  The check.  No, no.  Now that you're
22 mentioning cash -- no, no.  There was no receipt,
23 nothing.
24    Q.  Did you make any note of the amount of
25 cash that you received?
   TSG Reporting - Worldwide      877-702-9580
```

Page 62

```
1          L. Luna
2    understand very well what's going on.
3    And you're putting words in his mouth to
4    suit your own record. But go ahead. Do
5    it. It's not going to make any
6    difference. Do it.
7          MS. WHITE: Are you finished,
8    Mr. Faillace?
9          MR. FAILLACE: I am finished. But
10   let the record show you're taking
11   advantage of my client's lack of
12   education and lack of knowledge. Go
13   ahead.
14         MS. WHITE: Are you now finished,
15   Mr. Faillace?
16         MR. FAILLACE: Yes.
17         MS. WHITE: I'd like to state on
18   the record --
19         MR. FAILLACE: Please repeat what
20   I said in Spanish to my client.
21    Q.   When I ask you, Mr. Luna, is it your
22   testimony, if you disagree with what I'm saying,
23   you understand that you should tell me; isn't that
24   correct? In other words, if I mischaracterize
25   your testimony, it is your obligation to let me
```
TSG Reporting - Worldwide     877-702-9580

Page 63

```
1          L. Luna
2    know, correct?
3     A.   Yes.
4     Q.   Okay. I'm just trying to understand.
5    I'm not trying to mischaracterize your testimony.
6    I'm trying to understand your testimony.
7          With respect to the hours that you
8    worked over 40 hours in a week, is it correct that
9    you were paid overtime for those hours?
10    A.   Yes, they paid the overtime.
11    Q.   So is it your claim that what you
12   weren't paid for is your lunch hour?
13         MR. FAILLACE: Objection. He
14   already told you he didn't get paid for
15   lunch, and for six or seven additional --
16   when he worked a six or seven additional
17   day. You're trying to twist his claim.
18   He said it clearly. Let the record show
19   that you're twisting his claim again.
20         MS. WHITE: Mr. Faillace --
21         MR. FAILLACE: No, he said, Lunch
22   hour, and when I worked an extra day, I
23   wasn't paid. He said it. Now, you're
24   trying to twist it and say, No, you only
25   said lunch.
```
TSG Reporting - Worldwide     877-702-9580

Page 64

```
1          L. Luna
2          MS. WHITE: Mr. Faillace, I'm
3    trying to get my response on the record.
4    Please tell me when you're done.
5          MR. FAILLACE: No. You're trying
6    to get what you want on the record. Go
7    ahead.
8          MS. WHITE: Please tell me when
9    you're done.
10         MR. FAILLACE: Keep going.
11         MS. WHITE: Are you done?
12         MR. FAILLACE: But let the record
13   show you're twisting his testimony again.
14   Go ahead.
15         MS. WHITE: Are you done?
16         MR. FAILLACE: Go ahead.
17         MS. WHITE: Let the record show --
18   I'm responding now. Mr. Faillace, under
19   the federal rules of evidence, you are
20   permitted to object. You are not
21   permitted to lead the witness. If you
22   have an objection --
23         MR. FAILLACE: I'm not leading the
24   witness because the interpreter is not
25   saying a word. Let the record show that
```
TSG Reporting - Worldwide     877-702-9580

Page 65

```
1          L. Luna
2    the interpreter is not saying a word of
3    what I'm saying. So how can I lead my
4    witness who doesn't speak a word of
5    English? Excuse me. Let the record show
6    you're trying to again make statements
7    that are totally false. My client hasn't
8    heard a word of what I said in Spanish.
9          MS. WHITE: Are you directing the
10   interpreter not to repeat your objection?
11         MR. FAILLACE: No, I'm not. But
12   she didn't say a word of what I was
13   saying. Did she?
14         MS. WHITE: Would you like her to?
15         MR. FAILLACE: I mean, she can say
16   it.
17         MS. WHITE: Would you like her to?
18   I'm asking if you want your objection
19   interpreted to your witness?
20         MR. FAILLACE: I have asked her to
21   do it, but she didn't say it on that
22   occasion.
23         MS. WHITE: Mr. Faillace, we both
24   can't talk at the same time because the
25   court reporter can't get it down.
```
TSG Reporting - Worldwide     877-702-9580

Page 66

```
1          L. Luna
2       Would you like the interpreter to
3   repeat to your witness the objection that
4   you made?
5       MR. FAILLACE: I have asked her
6   repeated times to do so, but she didn't
7   do it.
8       MS. WHITE: Right now are you
9   asking her?
10      MR. FAILLACE: I mean, she knows
11  what to do. I don't have to repeat it to
12  her. She's a smart lady.
13      MS. WHITE: I'm going to ask the
14  interpreter to repeat -- if the court
15  reporter could repeat back Mr. Faillace's
16  first objection. And we will repeat it
17  to the witness so that the witness hears
18  all that is going on today.
19      (Record read.)
20      Q.   Just to clarify, I'm not trying to
21  mischaracterize your testimony. I'm just trying
22  to understand. For the hours that you worked that
23  were not reflected on your paycheck, did you
24  receive cash to compensate you for those hours?
25      MR. FAILLACE: Objection. Already
```

TSG Reporting - Worldwide    877-702-9580

Page 67

```
1          L. Luna
2   answered.
3       Q.   You can answer the question.
4       A.   On the seven days -- on the seven days
5   you mean? They gave us 40 to 45.
6       Q.   Previously your testimony was that you
7   worked seven days in a week for a period of about
8   four months; is that correct?
9       A.   For eight to ten weeks we worked seven
10  days a week.
11      Q.   And in those weeks your testimony is
12  that you received 40 to $45 in cash for the extra
13  time that you worked; is that correct?
14      A.   Yes.
15      Q.   Other than those eight to ten weeks
16  that you were just testifying about, were you
17  compensated for the hours that you worked?
18      A.   No.
19      Q.   What were you not compensated for?
20      A.   The lunch time.
21      Q.   Were you not compensated for anything
22  else?
23      A.   No.
24      Q.   Thank you. Did you ever leave the
25  premises during a shift?
```

TSG Reporting - Worldwide    877-702-9580

Page 68

```
1          L. Luna
2       MR. FAILLACE: Objection. He
3   already answered.
4       A.   No.
5       Q.   Did you ever take a meal break during
6   your shift?
7       A.   No.
8       Q.   Did you ever eat while you were on your
9   shift?
10      A.   We eat like that. Running and working
11  and eating, because it was very busy.
12      Q.   Is it your testimony that you would eat
13  food while you were working?
14      A.   Every five minutes a car would come.
15  So we would have to leave our food and take care
16  of the car and go back. We had to leave our food
17  and we had to run.
18      Q.   Did you ever leave the premises to go
19  get food?
20      A.   No.
21      Q.   Did you bring the food into work with
22  you?
23      A.   Yes.
24      Q.   Did anyone tell you that you were
25  entitled to a meal break?
```

TSG Reporting - Worldwide    877-702-9580

Page 69

```
1          L. Luna
2       A.   Yes.
3       Q.   Who told you that you were entitled to
4   a meal break?
5       A.   The same customers would tell me that I
6   had a right to have a moment to eat.
7       Q.   Did anyone at the company tell you that
8   you are entitled to a meal break?
9       A.   No. From the company, no. The
10  customers would.
11      MS. WHITE: I'm going to mark this
12  as Luna Exhibit 3.
13      (Luna Exhibit 3, SP Payroll
14  document, marked for identification, as
15  of this date.)
16      Q.   Mr. Luna, if you'll take a look at the
17  document that is in front of you that has been
18  marked Exhibit 3. Is that your signature at the
19  bottom of the document?
20      A.   Yes, that's my signature.
21      Q.   Do you recognize what this document is?
22      A.   No.
23      Q.   Did you read this document before you
24  signed it?
25      A.   No.
```

TSG Reporting - Worldwide    877-702-9580

Page 70

```
1              L. Luna
2      Q.   You see that the document is written in
3  both English and Spanish; is that correct?  In
4  that second paragraph --
5          MR. FAILLACE: He hasn't answered
6  your question.
7          MS. WHITE: I'm trying to assist
8  him.
9          MR. FAILLACE: Maybe he can't read
10 it.
11     Q.   Are you able to read Spanish, Mr. Luna?
12     A.   Yes.  They never gave us that.
13     Q.   That's not my question.  Do you see
14 that second paragraph where it's written in
15 Spanish?
16     A.   Yes.
17     Q.   Are you able to read the Spanish that
18 is written there?
19     A.   Yes.  But we never got the hour for
20 lunch.
21     Q.   Is it your testimony that you never
22 read this document?
23     A.   No, I didn't read it.
24     Q.   Are you in the custom of signing
25 documents that you don't read?
```
TSG Reporting - Worldwide        877-702-9580

Page 71

```
1              L. Luna
2          MR. FAILLACE: Objection.
3      Objection.
4      A.   Well, I was trusting.
5      Q.   I will repeat the question.  Are you in
6  the custom of signing documents that you don't
7  read?
8      A.   Yes, I am used to it.
9      Q.   Is it your testimony that you do not
10 know that you can take a break?
11         MR. FAILLACE: Objection.  He has
12     already --
13     A.   Nobody would take the break.  There was
14 no time.
15     Q.   Did anybody tell you not to take a
16 break?
17     A.   There was no time.  The supervisor
18 never told us that we had an hour for lunch.
19     Q.   Did you take a break of any length
20 during your shift when you worked?
21     A.   No, we couldn't.
22     Q.   Is it your testimony here today that
23 you never took even a minute break during your
24 shift when you worked with the defendants in the
25 entire time between March 2002 and November 2004?
```
TSG Reporting - Worldwide        877-702-9580

Page 72

```
1              L. Luna
2      A.   No.  We didn't take lunch.
3      Q.   Did you ever take a break for any
4  reason, not just for lunch or to eat a meal?
5      A.   Only when I was going to the bathroom.
6      Q.   With the exception of using the
7  restroom, did you ever take a break for any other
8  reason?
9      A.   No.
10     Q.   Did you ever see Jose the individual
11 with whom you worked take a break?
12     A.   That was very busy.  We had to run,
13 both of us.
14     Q.   How many cars did you generally park or
15 return to customers in an hour?
16     A.   That depends on the movement because
17 the cars were coming in and going out.  It was
18 like an elevator.  It was five stories of cars.
19     Q.   Are you able to estimate the
20 approximate number of cars that came in or went
21 out of the garage in an hour when you were working
22 during your shift?
23     A.   Thirty to 40 vehicles.  And according
24 to how they are coming, you have to park them.
25 You have to put them in the elevator and park
```
TSG Reporting - Worldwide        877-702-9580

Page 73

```
1              L. Luna
2  them.
3      Q.   Did you ever take time off of work to
4  care for a family member?
5          MR. FAILLACE: Objection.
6      A.   No.
7      Q.   Did you ever take time off to run a
8  personal errand?
9      A.   I would do everything on a Tuesday.
10 That was my free day.
11     Q.   How did you get to work?
12     A.   On bus.
13     Q.   Was the bus ever late in getting you to
14 work?
15     A.   No, I knew my timing.
16     Q.   Was the bus ever delayed in picking you
17 up?
18     A.   No.  I would always come ten to
19 fifteen -- ten or five minutes before the time.  I
20 knew my time.
21     Q.   Were you ever disciplined during your
22 employment with the company?
23     A.   No.
24     Q.   Has anyone ever informed you that they
25 wished to be part of this lawsuit?
```
TSG Reporting - Worldwide        877-702-9580

Page 78

```
1           L. Luna
2       Who handed you this document to sign?
3           MR. FAILLACE: Objection. He
4    answered that his lawyer gave him the
5    document. So go ahead.
6           MS. WHITE: Can you repeat
7    Mr. Faillace's objection?
8    A.   My lawyer.
9    Q.   Have you met or talked to anyone else
10   about this lawsuit besides Mr. Faillace?
11   A.   No.
12   Q.   Have you talked to Mr. Reyes about this
13   lawsuit?
14   A.   No.
15   Q.   Did you ever complain to anyone at the
16   garages that you were not being paid for hours
17   worked other than Raj in November 2004?
18   A.   No.
19   Q.   Do you know who Sam Podolak is?
20   A.   Sam, yes.
21   Q.   Who is Sam Podolak?
22   A.   The owner of the parking.
23   Q.   Do you know if Sam plays any role in
24   preparing the payroll to employees?
25   A.   He has to do something with it because
```

TSG Reporting - Worldwide     877-702-9580

Page 79

```
1           L. Luna
2    he's the owner.
3    Q.   Do you personally know that Sam plays a
4    role in preparing the payroll to employees?
5    A.   I don't know.
6    Q.   Did you ever complain to Sam that you
7    were not being paid for hours due?
8    A.   No.
9    Q.   Are you familiar with an individual by
10   the name of Samuel Gerraro?
11   A.   No.
12   Q.   Are you familiar with an individual by
13   the name of Percio Ramon-Amparo?
14   A.   No.
15   Q.   Do you know an individual named Roberto
16   Rojas?
17   A.   No, I don't know anyone.
18   Q.   Do you know an individual by the name
19   of Nestor Cedeno?
20   A.   No.
21   Q.   Do you know an individual by the name
22   of Angelo Pena?
23   A.   No.
24   Q.   Do you know Rolando Rojas?
25   A.   No.
```

TSG Reporting - Worldwide     877-702-9580

Page 80

```
1           L. Luna
2    Q.   Do you know Jose Diroche?
3    A.   Jose?
4    Q.   Jose.
5           MR. FAILLACE: You're not saying
6    his name correctly.
7    A.   I only know Jose that worked with me,
8    but it's more than two years that I haven't seen
9    him. It's more than two years I haven't seen
10   him. Do you know any individual by the name
11   Diroche?
12   A.   No.
13   Q.   Do you know Franklin Santana?
14   A.   No.
15   Q.   Have you at any time sat down and tried
16   to calculate the amount of money that you believe
17   is owed to you?
18   A.   No.
19   Q.   Have you kept any notes about the
20   number of hours you worked at the company?
21   A.   By the checks.
22   Q.   Other than the pay stubs, do you have
23   any other notes about the number of hours that you
24   worked for the defendants?
25   A.   No.
```

TSG Reporting - Worldwide     877-702-9580

Page 81

```
1           L. Luna
2    Q.   Other than your pay stubs, do you have
3    any documents or notes that show any compensation
4    that you received from the company?
5    A.   No payments, no.
6    Q.   Do you have any documents at all that
7    you received from the company other than your pay
8    stubs?
9    A.   No.
10   Q.   Other than what we have talked about
11   today, are you claiming any other wrongful conduct
12   against you by defendants?
13   A.   Conduct, no.
14          MS. WHITE: I think I'm done.
15   Thank you.
16   EXAMINATION BY
17   MR. FAILLACE:
18   Q.   Mr. Luna, did you work more than ten
19   hours a day?
20   A.   Yes.
21   Q.   How many days a week did you work more
22   than ten hours a day?
23   A.   It was right after the two initial
24   months.
25   Q.   Did you ever get paid additional pay
```

TSG Reporting - Worldwide     877-702-9580

Page 82

```
1              L. Luna
2   for working more than ten hours a day?
3       MS. WHITE: Objection to form.
4   A.  No.
5       MR. FAILLACE: That's it. Thank
6   you.
7       MS. WHITE: It is now 12:50 p.m.
8   I'm suggesting that we take a lunch
9   break. We have another witness here,
10  Mr. Reyes, correct, who is scheduled to
11  testify.
12      Mr. Faillace has something he
13  would like to add to the record.
14      MR. FAILLACE: Mr. Reyes is
15  willing to be deposed. He's ready,
16  willing and able. He's just -- has to do
17  it right now. He's saying he's willing
18  to do it if we continue right now.
19      MS. WHITE: Okay. My question is,
20  it's 12:55. We haven't had a lunch break
21  yet. We have to take a lunch break.
22  We're going to take a lunch break. Are
23  you saying that Mr. Reyes cannot
24  continue -- cannot begin the deposition
25  after the lunch break or can he?
```
TSG Reporting - Worldwide    877-702-9580

Page 83

```
1              L. Luna
2       THE INTERPRETER: (Through
3   Mr. Reyes). If it's short.
4       MS. WHITE: So if we take a lunch
5   break, you are able to return and do your
6   deposition?
7       THE INTERPRETER: (Through Mr.
8   Reyes). I'm going to call my company to
9   see what happens.
10      MS. WHITE: We are going to take a
11  lunch break. When we come back, we'll
12  see if he can move forward with the
13  deposition. It is now just before 1:00.
14      (Time noted: 12:58 p.m.)
15
16
17
18
19
20      _____
            LUIS LUNA
21
22  Subscribed and sworn to before me
23  this ____ day of _____, 2007.
24
25      _____
```
TSG Reporting - Worldwide    877-702-9580

Page 84

```
1
2          CERTIFICATE
3   STATE OF NEW YORK   )
4                      : ss.
5   COUNTY OF NEW YORK  )
6
7       I, Meredith Stoeckel, a Notary
8   Public within and for the State of New
9   York, do hereby certify:
10      That LUIS LUNA, the witness whose
11  deposition is hereinbefore set forth,
12  was duly sworn by me and that such
13  deposition is a true record of the
14  testimony given by the witness.
15      I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, and that I
18  am in no way interested in the outcome
19  of this matter.
20      IN WITNESS WHEREOF, I have
21  hereunto set my hand this 19th day of
22  December, 2007.
23
24
25      _____
            Meredith Stoeckel
```
TSG Reporting - Worldwide    877-702-9580

Page 85

```
1
2   -------------------I N D E X-------------------
3   WITNESS      EXAMINATION BY         PAGE
4   LUIS LUNA       MS. WHITE        5
5                   MR. FAILLACE     81
6
7   ----------------INFORMATION REQUESTS-----------
8   REQUESTS: Page 44, line 22
9
10  -------------------- EXHIBITS-------------------
11  DEFENDANTS'          PAGE
12  Exhibit 1, Copy of Passport......... 38
13  Exhibit 2, Earnings Statement....... 49
14  Exhibit 3, SP Payroll document....... 69
15  Exhibit 4, Consent to Join Lawsuit... 76
16
17
18
19
20
21
22
23
24
25
```
TSG Reporting - Worldwide    877-702-9580

# EXHIBIT Q

# SP Payroll corp.

1832 Second Ave
New York, NY 10128
212 289 3800
fax: 212 202 5354

I understand that company policy is I will receive a 1 hour meal break per shift. The 1 hour per shift will be deducted from the time card total.

Yo entiendo que la reglas de la compania es que yo recibire 1 hora de luch por cada turno. La hora por cada turno sera reducida de el total de horas de la tajeta.

_Luis Ramirez_

employee name

_Lucas Collado_

employee signature

LUNA

DEF001468

**EXHIBIT R**

Sage Parking Corp
1295 Jerome Ave
Bronx NY 10452

9/10/07

To whom it may Concern,

I, Patricio Gonzalez, have received $5,000 Cash from Sage Parking Corp. I realize I have no claim against Sage or SP Payroll Inc for anything. I have been paid in full for every hour I have worked including time and a half for every hour over 40 hours per week plus an extra hour for any days where I worked over 10 hours. I have not been pressured into signing this agreement.

A Quien le entereca
Yo Patricio Gonzalez, he recivido $5,000 en efectivo
de Sage Parking Corp.

File
Sage
Legal

DEF004881

Patricio Gonzalez    Patricio Gonzalez

# EXHIBIT S

10/13/02

I, Edison Alvarez
have been paid for
all my hours in full
prior to 10/13/02. I
understand that beginning
10/14/02 I will be
working 40 hours at
the rate of $5 15/6
per hour

Edison Alvarez

DEF001738



To Whom It May Concern, I Tedison
Alvarez have been working for Bren and
Sage Parking for a total of 40 hours per
week since 9/1/02.

9/6/02 - 12/31/02

9/6/02 *[signature]*
9/13/02 *[signature]*
9/20/02 *[signature]*
9/27/02 *[signature]*
10/4/02 *[signature]*
10/11/02 *[signature]*
10/18/02 *[signature]*
10/25/02 *[signature]*
11/1/02 *[signature]*
11/8/02 *[signature]*
11/15/02 *[signature]*
11/22/02 *[signature]*
11/29/02 *[signature]*
12/6/02 *[signature]*
12/13/02 *[signature]*
12/20/02 *[signature]*
12/27/02 *[signature]*

DEF001739

# EXHIBIT T

# Earnings Statement

**SP PAYROLL INC.**

Period Ending:     10/05/2003
Pay Date:        10/11/2003

Taxable Marital Status: Single
Exemptions/Allowances:
  Federal:  1
  State:    1
  Local:    1

Social Security Number: 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

**EDISON ALVAREZ**
**47-10 LAUREL HILL RD**
**4L**
**WOODSIDE, NY 11377**

## Earnings

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.4000 | 40.00 | 216.00 | 2,498.25 |
| Overtime | | | | 200.86 |
| Previous Reg | | | | 56.65 |
| **Gross Pay** | | | **$216.00** | 2,755.76 |

## Deductions

| Statutory | this period | year to date |
|---|---|---|
| Federal Income Tax | -10.54 | 142.68 |
| Social Security Tax | -13.39 | 170.86 |
| Medicare Tax | -3.13 | 39.96 |
| NY State Income Tax | -2.51 | 33.17 |
| New York Cit Income Tax | -1.91 | 26.48 |
| NY SUI/SDI Tax | -0.60 | 7.80 |
| **Other** | | |
| R | | 400.00 |
| **Net Pay** | | **$183.92** |

Your federal taxable wages this period are $216.00



CASH 200.00

©2001 Automatic Data Processing, Inc.

© 1931 ADP, Inc.

◄ TEAR HERE

AJ    000085 100600         0000001590   1

*SP PAYROLL INC.*

## Earnings Statement



| | |
|---|---|
| Period Ending: | 10/26/2003 |
| Pay Date: | 11/01/2003 |

Taxable Marital Status: Single
Exemptions/Allowances:
    Federal: 1
    State:   1
    Local:   1

**EDISON ALVAREZ**
**47-10 LAUREL HILL RD**
**4L**
**WOODSIDE, NY 11377**

Social Security Number: 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

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.4000 | 40.00 | 216.00 | 3,146.25 |
| Overtime | | | | 200.86 |
| Previous Reg | | | | 56.65 |
| **Gross Pay** | | | **$216.00** | 3,619.76 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal income Tax | -10.54 | 174.30 |
| | Social Security Tax | -13.40 | 224.43 |
| | Medicare Tax | -3.14 | 52.49 |
| | NY State Income Tax | -2.51 | 40.70 |
| | New York Cit Income Tax | -1.91 | 32.21 |
| | NY SUI/SDI Tax | -0.60 | 9.60 |
| | **Other** | | |
| | R | | 400.00 |
| | **Net Pay** | | **$183.90** |

Your federal taxable wages this period are $216.00

©2001 Automatic Data Processing, Inc.

▼ TEAR HERE

P 00274

AJ-  000085 100600          0000002876   1

*SP PAYROLL INC.*

## Earnings Statement

Period Ending:          07/11/2004
Pay Date:               07/17/2004

Taxable Marital Status: Single
Exemptions/Allowances:
   Federal:  1
   State:    1
   Local:    1

**EDISON ALVAREZ**
**47-10 LAUREL HILL RD**
**4L**
**WOODSIDE, NY 11377**

Social Security Number: 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

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.4000 | 40.00 | 216.00 | 5,038.20 |
| S | 5.4000 | 8.00 | 43.20 | |
| Other | | | | 16.20 |
| Gross Pay | | | $259.20 | 5,097.60 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -15.52 | 244.98 |
| | Social Security Tax | -16.07 | 316.05 |
| | Medicare Tax | -3.76 | 73.92 |
| | NY State Income Tax | -4.23 | 58.14 |
| | New York Cit Income Tax | -2.73 | 44.20 |
| | NY SUI/SDI Tax | -0.60 | 14.39 |
| Net Pay | | $216.29 | |

Your federal taxable wages this period are $259.20



CASH 223

210
223

©2001 Automatic Data Processing, Inc.

▼ TEAR HERE

COPY          COPY

AJ-   000085  100600   0000003375   1

*SP PAYROLL INC.*

# Earnings Statement

ADP

| Period Ending: | 10/17/2004 |
| Pay Date: | 10/23/2004 |

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: 1
Local: 1

**EDISON ALVAREZ**
**47-10 LAUREL HILL RD**
**4L**
**WOODSIDE, NY 11377**

Social Security Number: 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

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 5.4000 | 40.00 | 216.00 | 7,689.60 |
| Other | | | | 16.20 |
| Previous Reg | | | | 216.00 |
| **Gross Pay** | | | **$216.00** | 8,051.40 |

| Deductions | Statutory | | |
|------------|-----------|------|------|
| | Federal Income Tax | -10.54 | 374.98 |
| | Social Security Tax | -13.40 | 499.19 |
| | Medicare Tax | -3.14 | 116.75 |
| | NY State Income Tax | -2.51 | 88.26 |
| | New York Cit Income Tax | -1.91 | 67.70 |
| | NY SUI/SDI Tax | -0.60 | 22.19 |
| | **Net Pay** | **$183.90** | |

Your federal taxable wages this period are $216.00

©2001 Automatic Data Processing, Inc.

COPY   COPY

© 1991 ADP, Inc.

▼ TEAR HERE

*SP PAYROLL INC.*

# Earnings Statement

ADP

Period Ending:    11/28/2004
Pay Date:    12/04/2004

Taxable Marital Status: Single
Exemptions/Allowances:
   Federal:  1
   State:    1
   Local:    1

**EDISON ALVAREZ**
**47-10 LAUREL HILL RD**
**4L**
**WOODSIDE, NY 11377**

Social Security Number: 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

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.4000 | 32.00 | 172.80 | 8,942.40 |
| S | 5.4000 | 8.00 | 43.20 | |
| Other | | | | 16.20 |
| Previous Reg | | | | 216.00 |
| Gross Pay | | | $216.00 | 9,347.40 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -10.54 | 438.22 |
| | Social Security Tax | -13.39 | 579.54 |
| | Medicare Tax | -3.13 | 135.54 |
| | NY State Income Tax | -2.51 | 103.32 |
| | New York Cit Income Tax | -1.91 | 79.16 |
| | NY SUI/SDI Tax | -0.60 | .25.79 |
| Net Pay | | $183.92 | |

Your federal taxable wages this period are $216.00

©2001 Automatic Data Processing, Inc.

▼ TEAR HERE

© 1991 ADP, Inc.

AJ- 000085 100600    0000003733   1

*SP PAYROLL INC.*

# Earnings Statement

**ADP®**

Period Ending:      12/31/2004
Pay Date:           12/31/2004

Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 1
  State:   1
  Local:   1

**EDISON ALVAREZ**
**47-10 LAUREL HILL RD**
**4L**
**WOODSIDE, NY 11377**

Social Security Number: 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

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.4000 | 40.00 | 216.00 | 9,806.40 |
| Other | | | | 16.20 |
| Previous Reg | | | | 216.00 |
| **Gross Pay** | | | **$216.00** | 10,211.40 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -10.54 | 480.38 |
| | Social Security Tax | -13.40 | 633.11 |
| | Medicare Tax | -3.14 | 148.07 |
| | NY State Income Tax | -2.51 | 113.36 |
| | New York Cit Income Tax | -1.91 | 86.80 |
| | NY SUI/SDI Tax | -0.60 | 28.19 |
| | **Net Pay** | **$183.90** | |

Your federal taxable wages this period are $216.00

P 00329

SP PAYROLL INC.

**Earnings Statement**

**ADP**®

Period Ending: 01/09/2005
Pay Date: 01/15/2005

Taxable Marital Status: Single
Exemptions/Allowances:
　Federal: 1
　State:　 1
　Local:　 1

Social Security Number: 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

**EDISON ALVAREZ**
**47-10 LAUREL HILL RD**
**4L**
**WOODSIDE, NY 11377**

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 6.0000 | 40.00 | 240.00 | 463.20 |
| Gross Pay | | | $240.00 | 463.20 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -12.75 | 23.82 |
| | Social Security Tax | -14.88 | 28.72 |
| | Medicare Tax | -3.48 | 6.72 |
| | NY State Income Tax | -3.47 | 6.26 |
| | New York Cit Income Tax | -2.37 | 4.42 |
| | NY SUI/SDI Tax | -0.60 | 1.20 |
| Net Pay | | $202.45 | |

Your federal taxable wages this period are $240.00

CAS # 26F

©2001 Automatic Data Processing, Inc.

▼ TEAR HERE

© 1991 ADP, Inc.

AJ-   000085 100800       CHECK NUMBER   420
                          0000003841   1

*SP PAYROLL INC.*

# Earnings Statement

**ADP**®

Period Ending:       01/16/2005
Pay Date:            01/22/2005

Taxable Marital Status: Single
Exemptions/Allowances:
  Federal:   1
  State:     1
  Local:     1

Social Security Number: 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

**EDISON ALVAREZ**
**47-10 LAUREL HILL RD**
**4L**
**WOODSIDE, NY 11377**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 6.0000 | 40.00 | 240.00 | 703.20 |
| Gross Pay | | | $240.00 | 703.20 |

| Deductions | Statutory | | |
|------------|-----------|--|--|
| | Federal Income Tax | -12.75 | 36.57 |
| | Social Security Tax | -14.88 | 43.60 |
| | Medicare Tax | -3.48 | 10.20 |
| | NY State Income Tax | -3.47 | 9.73 |
| | New York Cit Income Tax | -2.37 | 6.79 |
| | NY SUI/SDI Tax | -0.60 | 1.80 |
| Net Pay | | | $202.45 |

Your federal taxable wages this period are **$240.00**

©2001 Automatic Data Processing, Inc.

▼ TEAR HERE

© 1991 ADP, Inc.

# EXHIBIT U

Page 1

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
       ANGELO PENA, ROLANDO ROJAS,           )
4      JOSE DIROCHE, and FRANKLIN            )
       SANTANA, individually and on          )
5      behalf of others similarly            )
       situated,                             )
6                                            )
                  Plaintiffs,                )
7                                            )
       -against-                             )
8                                            ) Index No.
                                             ) 07 CV 7013
9      SP PAYROLL, INC., NICHOLAS            )
       PARKING, CORP., IVY PARKING           )
10     CORP., BIENVENIDO, LLC, CASTLE        )
       PARKING CORP., SAGE PARKING           )
11     CORP., and SAM PODOLAK,               )
                                             )
12                Defendants.                )
       _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
13

14

15

16

17

18

19            DEPOSITION OF DAVID SAPERSTEIN
                   New York, New York
20                  June 18, 2008
21

22

23

24     Reported by:
       Judi Johnson, RPR, CLR
25     Job No.: 17084

Page 50

DAVID SAPERSTEIN

to the -- to Mr. Alvarez's questions?

A    No.  The only conversations I had with Sam regarding Alvarez is Sam told me Alvarez couldn't make more than 40 hours on a check due to some sort of a personal issue and that he was to get 40 hours on a check and everything else in cash.

Q    Was there a limit to the number of hours that Mr. Alvarez could work?

A    That, I don't know.

Q    When you say a personal issue, I think you said?

A    Yeah.  I think it had something to do with his apartment.  I'm not sure.

Q    Do you have any more information about why Mr. Alvarez was limited in the way that you said he was?

A    No.

Q    After you spoke with Sam, did you make some changes in the amount of cash for Mr. Alvarez?

A    No.

Q    You gave him the amount that Sam said to give him?

Page 51

DAVID SAPERSTEIN

A    Yes.

Q    When was the last time, if you can recall, that Mr. Alvarez complained to you about the amount of his pay?

A    I don't remember.

Q    Was it anytime in the last year?

A    No.

Q    Do you know Jose Diroche?

A    I know the name.

Q    Did you ever meet him?

A    Not personally, no.

Q    Have you ever spoken with him?

A    No.

Q    You recognize the name as one of the employees; is that right?

A    I recognize him both as an employee and a member of this proceeding.

Q    But you knew who he was before the lawsuit?

A    I knew the name.

Q    You knew the name?

A    Yes.

Q    Before the lawsuit got started?

A    Yes.

Page 52

DAVID SAPERSTEIN

Q    How about Patricio Gonzalez, do you know who that is?

A    I know the name.

Q    You never met or spoke with him?

A    I never met him.  I am aware of paperwork regarding him and this suit where he had come to some sort of a settlement previous to this suit.

Q    Do you know who Victor Gonzalez is?

A    An employee.

Q    Have you ever met or spoken with him?

A    No.

Q    How about Luis Luna?

A    Employee.

Q    Have you ever met or spoken with him?

A    No.

Q    Have you ever met or spoken with Angelo Pena?

A    Yes.

Q    Once?  More than once?

A    More than one occasion.

Q    Can you put a timeframe on those meetings?

A    No.

Page 53

DAVID SAPERSTEIN

Q    Was that at a garage or somewhere else?

A    At a garage.

Q    Do you recall which one?

A    1155, maybe 145.

Q    What generally was discussed between you and Mr. Pena?

A    Nothing of substance, just hello and goodbye.

Q    Do you know who Miguel Rojas is?

A    Yes.

Q    Have you ever met or spoken with him?

A    I don't know whether I've ever met him.  I just know the name.  I could've met him in a garage, I don't know.

Q    How about Rolando Rojas, do you know who he is?

A    I know who he is.  I've met him; but if I met him again, I wouldn't know it was him.

Q    What do you recall about meeting him?

A    Just cordial.  Again, he speaks limited English.

Q    Franklin Santana, do you know who he is?

# EXHIBIT V

**SP Payroll corp.**

1832 Second Ave
New York, NY 10128
212 289 3800
fax: 212 202 5354

I understand that company policy is I will receive a 1 hour meal break per shift. The 1 hour per shift will be deducted from the time card total.

Yo entiendo que la reglas de la compania es que yo recibire 1 hora de luch por cada turno. La hora por cada turno sera reducida de el total de horas de la tajeta.

EDISON F. ALVAREZ

employee name

employee signature

IVY

# EXHIBIT W

**SP Payroll corp.**

1832 Second Ave
New York, NY 10128
212 289 3800
fax: 212 202 5354

I understand that company policy is I will receive a 1 hour meal break per shift. The 1 hour per shift will be deducted from the time card total.

Yo entiendo que la reglas de la compania es que yo recibire 1 hora de luch por cada turno. La hora por cada turno sera reducida de el total de horas de la tajeta.

*Miguel Rojas*
employee name

*Miguel Rojas*
employee signature

SAGE