MICHAEL FAILLACE & ASSOCIATES, P.C.
Michael A. Faillace, Esq. [MF-8436]
110 East 59th Street, 32nd Floor
New York, New York 10022
(212) 317-1200
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ANGELO PENA, ROLANDO ROJAS, JOSE
DIROCHE, and FRANKLIN SANTANA,
*individually and on behalf of others similarly
situated,*

                        *Plaintiffs,*

                -against-

SP PAYROLL, INC., NICHOLAS PARKING,
CORP., IVY PARKING, CORP.,
BIENVENIDO, LLC, CASTLE PARKING
CORP., SAGE PARKING CORP., and SAM
PODOLAK,

                        *Defendants.*
-----------------------------------------------------------X

07 CV 7013

**AFFIDAVIT OF MICHAEL
FAILLACE, ESQ IN OPPOSITION
TO DEFENDANTS' MOTION FOR
PARTIAL SUMMARY
JUDGMENT**

**ECF Case**

STATE OF NEW YORK    )
                      ) ss
COUNTY OF NEW YORK  )

      MICHAEL A. FAILLACE, an attorney duly admitted to practice in New York and in this

court, affirms on penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

      1.     I represent plaintiffs Angelo Pena, Rolando Rojas, Jose Diroche, and Franklin

Santana (the "Named Plaintiffs"), as well as eight prospective named plaintiffs Christian Santos,

Luis Ramon Luna, Miguel Alcantara, Miguel Garcia, Miguel Rojas, Victor Gonzales, Jose De

Arce Reyes, and Edison Alvarez (the "Prospective Named Plaintiffs") (collectively the

"Plaintiffs"), in this lawsuit for unpaid wages and overtime, and for other violations under the FLSA and New York Labor Law and associated rules and regulations.

2.    I submit this affidavit in support of Plaintiffs' motion papers submitted in opposition to Defendants' Motion for Partial Summary Judgment.

3.    On August 6, 2007 the Named Plaintiffs filed their Complaint against Defendants Bienvendio, LLC, Castle Parking Corp., Sage Parking Corp., Sam Podolak, SP Payroll, Inc., Nicholas Parking, Corp., and IVY Parking Corp. (the "Defendants"). A true and correct copy of the Complaint is attached as "Exhibit A."

4.    On August 14, 2007, Prospective Named Plaintiffs Edison Alvarez and Jose De Arce Reyes[1] filed consent forms to become party plaintiffs under 29 U.S.C. 201 et seq. (the "Fair Labor Standards Act" or "FLSA"). Notably, issue had yet to be joined as of this date, and therefore, Plaintiffs could amend as of right. True and correct copies of the consent forms are attached as "Exhibits B" and "C," respectively.

5.    On or about September 18, 2007 Defendants filed their Answer in this action. A copy of the electronic docket sheet (showing the timing of the filing of papers with the Court), printed out from pacer and dated July 11, 2008 is attached hereto as "Exhibit D."

6.    Thereafter, On September 28, 2007 Prospective Named Plaintiff Miguel Alcantara filed his consent form to become party plaintiffs under the FLSA. A true and correct copy of Alcantara's consent form is attached hereto as "Exhibit E."

7.    On October 1, 2007 an initial conference was held, and a Joint Discovery Plan was adopted *inter alia* setting the date by which Plaintiffs were to make their application for class certification by January 15, 2008, and setting a status conference for April 18, 2008.

---

[1] a.k.a. Jesus De Arce Reyes

8.    On October 3, 2007, Prospective Named Plaintiffs Christian Santos Vargas and Victor Gonzales filed their consent forms to become party plaintiffs under the FLSA, and on October 4, 2007, Miguel Garcia filed his consent form. These consent forms were filed prior to the last day to amend as of right (20 days from the filing of the Answer). True and correct copies of the consent forms of Vargas, Gonzales and Garcia are attached hereto as "Exhibits F," "G," and "H," respectively.

9.    On October 12, 2007, and October 30, 2007 consent forms to become party plaintiffs were filed by Luis Roman Luna, and Miguel Rojas, respectively. True and correct copies of these consent forms are attached hereto as "Exhibits I" and "J," respectively.

10.    Defendants conducted depositions of all of the Named Plaintiffs, and two of the Prospective Named Plaintiffs as follows:

> Named Plaintiff Angelo Pena on November 9, 2007;
> Named Plaintiff Rolando Rojas on November 9, 2007;
> Named Plaintiff Jose Diroche on November 12, 2007;
> Named Plaintiff Franklyn Santana on November 12, 2007;
> Prospective Named Plaintiff Miguel Alcantara on November 13, 2007; and
> Prospective Named Plaintiff Luis Luna on December 7, 2007.

11.    Defendants also had planned to depose Prospective Named Plaintiff Edison Alverez, and noticed his deposition for December 6, 2007.

12.    However, despite counsel and Prospective Named Plaintiff Edison Alverez arriving at Defendants' counsel's offices on December 6, 2007, the Defendants cancelled the deposition because they were purportedly were unable to provide a translator.

13.    Defendants never rescheduled the deposition of Edison Alverez. A copy of a letter from opposing counsel discussing the scheduling of the depositions is attached hereto as "Exhibit K."

14.    Defendants further requested and received document production and discovery for the Prospective Named Plaintiffs. Notably, Defendants' request for production specifically asked for materials for all prospective opt-in plaintiffs, as well as interrogatory responses from all prospective opt-in plaintiffs. True and correct copies of the Interrogatories and Requests for Production are attached hereto as "Exhibits L" and "M," respectively.

15.    Discovery proceeded but was not completed by the April 18, 2008 scheduled status conference.

16.    On or about February 12, 2008, counsel for the parties had a telephonic discussion in which I did state Plaintiffs sought to withdraw their collective action and class action claims, since the original named plaintiffs had no interest in representing other employees or former employees of the Defendants – either under Rule 216(b) of the FLSA or under Rule 23 of the Federal Rules of Civil Procedure.

17.    However, Plaintiffs' recollection of the call is that the phone conversation discussed how to amend the Complaint so as to include the named plaintiffs and the opt-in plaintiffs, and drop the class wide allegations. Plaintiffs did not simply concede the individual Plaintiffs' claims or rights, they discussed the means by which to effect an amendment that would be mutually acceptable.

18.    Plaintiffs also note that the context of the phone call was within discussions regarding the settlement of the matter. Plaintiffs' conversation with Defendants counsel was potentially protected by FRE 408, however, Plaintiffs did discuss at length a means by which to withdraw the class allegations, and associated class damages, in return for amending the Complaint so as to facilitate settlement, and allow the Named Plaintiffs and opt-in plaintiffs to proceed on their individual claims only.

4

19.    During the April 18, 2008 Conference before the Court, the Defendants stated that they wished to move to remove all the Prospective Named Plaintiffs from the action, as Plaintiffs had not moved for class or collective action certification.  Plaintiffs responded that they were amenable to dropping the collective action claims, but requested to amend the Complaint to include the Prospective Named Plaintiffs (all of whom had filed consent forms).

20.    Defendants initially opposed the amendment, and the Plaintiffs pointed out that they could simply file separate actions and relate the complaints back to the filing of the consent forms in the present action.

21.    The Court then requested that Plaintiffs and Defendants attempt to draft an amended Complaint that both parties were amenable to (which would allow the entry of the amended complaint with consent of all parties under FRCP 15(a)).

22.    The Court noted that a stipulated amendment would be preferable, and would be in the interests of judicial efficiency.

23.    Plaintiffs supplied Defendants with a proposed amended complaint (not precisely the same as the one presented to the Court in Plaintiffs subsequent Motion to Amend) on or about June 10, 2008.

24.    The parties unfortunately have been unable to agree upon the form of a proposed amended Complaint.

25.    By letter dated July 3, 2008, Defendants set forth their objections to the proposed amendments.  Defendants stated that they refused to allow amendment of the Complaint to reflect any new, corrective, or supplemental factual information.  A true and correct copy of the July 3, 2008 letter is attached hereto as "Exhibit N."

26.    The letter in relevant part states as follows:

If you recall, at the conference before the judge, we agreed to consider stipulating to permit Plaintiffs to remove the collective and class claims based on your representation that your clients did not want to represent anyone other than themselves, and to add the opt-in plaintiffs as named plaintiffs for the federal and state claims. We did not agree to stipulate to allow you to amend the complaint in any other respect.

27.    Plaintiffs therefore realized that they were going to be unable to work with Defendants and submitted their proposed Motion to Amend, seeking adoption of the proposed Amended Complaint, relation back of the claims, addition of the parties, and elimination of the class-wide allegations on or about 7/12/08. A true and correct copy of the Notice of Motion is Attached Hereto as Exhibit O.

28.    A true and correct copy of Plaintiffs' Proposed Amended Complaint is attached hereto as Exhibit P.

29.    A true and correct copy of Plaintiffs' Memo of Law in Support of their Proposed Amended Complaint is attached hereto as Exhibit Q.

30.    The proposed amendments to the factual information contained in the proposed amended complaint either correct or supplement the information as a result of deposition testimony elicited by the Defendants from the Named Plaintiffs, and two of the Prospective Named Plaintiffs.

31.    Where the depositions of the Plaintiffs, and two of the Prospective Named Plaintiffs, were taken by Defendants, the proposed Amended Complaint draws directly from the deposition transcripts for the factual information being amended.

32.    Plaintiffs added additional paragraphs in the Proposed Amended Complaint for each Prospective Named Plaintiff setting forth their expected testimony at trial, based upon the information communicated to counsel.

33.    The sections of the Complaint containing the allegations for the prospective collective and class actions were removed from the Proposed Amended Complaint.

34.    In addition, the section "Defendants' General Compensation and Employment Practices" was amended to reflect what was revealed in depositions and discovery. (See e.g. Proposed Amended Complaint paragraphs 107, 108, 109, 110 and 112.) The relief requested section was also substantially amended to reflect the removal of the class allegations and correct typographical errors.

35.    Further changes reflected in the Proposed Amended Complaint include the correction of occasional typographical errors, the splitting apart of larger paragraphs into smaller paragraphs, and the renumbering of the paragraphs.

36.    Plaintiffs fully agree that the proposed amended complaint submitted to Defendants is indeed different than that submitted to Defendants counsel, but it is not "drastically different."

37.    Plaintiffs simply provided more factual information to flesh out the proposed complaint, corrected typographical errors, and removed one Plaintiff who settled with Defendants individually (Mr. Patricio Gonzales).

38.    Plaintiffs note that the Defendants in their 56.1 statement omit the directive of the Court during the April 18, 2008 conference that Plaintiffs and Defendants attempt to fashion a mutually acceptable amended complaint so as to add all the named and opt-in Plaintiffs (not just ones that Defendants found acceptable) into this action as individual plaintiffs, relate the matter back to the filing, and in return Plaintiffs were to remove the class allegations, as it would increase judicial efficiency and more effectively resolve all the issues between the parties presented before the Court.

39.    Regardless, the Defendants refused to stipulate to the amendment, except for those portions of the amendment which severely curtailed Plaintiffs claims. For instance, Defendants only wish to allow amendment, but no relation back, for the named Plaintiffs in the present action, but "agreed to permit" Plaintiffs to drop the class allegations. This has the effect, according to Defendants memorandum of law and present partial motion to dismiss, of eliminating over half a year of damages from the four named Plaintiffs' claims. Therefore, it is not "agreeing" to do anything, rather it is an attempt to bully Plaintiffs into accepting an amendment that only benefits Defendants. This is why Plaintiffs ultimately decided to bring their amendment directly to the Court, as it became clear that Defendants were not truly seeking to cooperate in fashioning a mutually acceptable amendment, but rather gaining a litigation advantage in return for nothing.

40.    Although Defendants' comment is partially correct in that Defendants "agreed" to let Plaintiffs amend their complaint to add seven of the nine opt-in plaintiffs, they did not agree to allow the amendment to include Edison Alvarez, who inexplicably they oppose. As discussed in the Faillace Aff., they also initially sought to depose Mr. Alvarez, then cancelled his deposition. Mr. Alvarez has quite compelling claims, and Plaintiffs submit his claims have merit and should be included in the present action, and related back to the filing date of his initial opt-in.

41.    Plaintiffs ask that this Motion for Partial Summary Judgment therefore be heard in conjunction with, and in light of, Plaintiffs Motion to Amend.

## Only as a Precautionary Measure, The Named Plaintiffs Have Now Filed Consent Forms

42.    On July 30, 2008, Named Plaintiff Angelo Pena Filed his Consent Form, on August 7, 2008, named Plaintiffs Santana and Diroche filed their Consent Forms, and on August 8, 2007, Named Plaintiff Rolando Rojas filed his consent form. True and correct copies of these consent forms are attached hereto as Exhibit R.

43.    A true and correct copy of the ECF Docket Sheet, printed out as of 8/13/08 is attached hereto for reference as Exhibit S.

## Plaintiffs' Counsel is Not Opposing This Motion As Directed

44.    Plaintiffs do not oppose the Defendants' motions with respect to Mr. Patricio Gonzales. He informed us that we are to take no further action with respect to him on his matter. However, Plaintiffs make no representations whatsoever about the propriety of any settlement agreement or offer made by Defendants and accepted by prospective opt-in Plaintiff Gonzales, or whether it is binding or effective.

## Prospective Plaintiff Edison Alvarez

45.    Plaintiffs are somewhat surprised that Defendants now oppose the addition of Prospective Named Plaintiff Edison Alvarez.

46.    Plaintiffs note that (1) Defendants initially at the April 18, 2008 conference did not single out Alvarez as a Plaintiff they refused to consent to adding, (2) Defendants noticed and then cancelled the deposition of Alvarez, and (3) the grounds that Defendants seek to prevent Alvarez from being added appear to be based on disputed factual issues.

47.    To the degree that Defendants purposely did not take the deposition of Mr. Alvarez so as to avoid the testimony that he might provide, and to assist in their present motion for partial summary judgment on his claims, Mr. Alvarez submits the attached affidavit. (A true and correct copy of Mr. Alvarez' affidavit is attached hereto as Exhibit T.)

48.    Mr. Alvarez sets forth the basic aspects of his claims in his sworn affidavit, and therefore provides sufficient support for his claims that he was not appropriately compensated for his overtime, or his Spread of Hours pay under the rules and regulations promulgated pursuant to the New York Labor Law.

49.    Mr. Alvarez, counter to the statements made by Mr. Walker in his affidavit, did not "admit" or otherwise concede that he was paid in full, thereby negating his potential claims.

50.    Mr. Walker states in paragraph 84 of his 56.1 statement that "Mr. Alvarez is not a proper party plaintiff to this action because he has admitted in writing that he was properly paid for all time that he worked," citing to the Walker Aff., Ex. S.

51.    Notably, Mr. Walker's Affidavit falls well short of that statement, instead stating the following:

> Attached hereto as Exhibit S is a true and correct copy of a document dated October 13, 2002 with an attachment which reveals that Mr. Alvarez was paid in full for all hours worked for the time period indicated on the document and the attachment.

See Walker Aff. at ¶ 20.

52.    Exhibit S of the Walker Affidavit, the document(s) purportedly functioning as an admission, attached to the Walker affidavit as Exhibit S, first, is only relevant to the time period for which it purports to be covering, that of 2002. See Walker Aff., Exhibit S.

53.    A quick perusal of the document(s) shows that Mr. Alvarez only executed the document(s) in 2002, and therefore it cannot function as any sort of admission for any time

period beyond that of 12/27/2002 (the date of the last purported signature). See Walker Aff., Exhibit S.

54. The language of the document itself only states the following on the first page:

> 10/13/02
> I, Edison Alvarez, have been paid for all my hours in full prior to 10/13/02. Beginning 10/14/02 I will be working 40 hours at the rate of $5.15 an hour

On the second page, the document, containing a series of signatures dated 9/6/02 through 12/27/02, under the statement that "I, Edison Alvarez have been working… for a total of 40 hours a week…" See Walker Aff., Exhibit S.

55. There is no way that this document can function for any time period beyond 12/27/02. Further, this was not a knowing or voluntary waiver of any claims by Mr. Alvarez, as he states in his Affidavit. See Aff. at 29.

56. Further, I note, and as is set forth more in our accompanying memorandum of law, it is settled law that an employee cannot waive overtime pay or wage and hour claims, as it is counter to public policy and would undermine the statutes designed to protect workers from precisely this type of scenario. See e.g. Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706, 65 S.Ct. 895, 902 (U.S. 1945); Caserta v. Home Lines Agency, Inc., 273 F.2d 943, 496 (2nd Cir. 1959).

57. Further, Mr. Alvarez disputes that this document functioned in any way as an admission, and he only executed it in 2002 for fear that he would not receive that weeks wages, stating "I never agreed that I would not be paid for work over 40 hours per week, and never waived any of my rights for my owed compensation." See Alvarez Aff. at 25-29.

58. Notably, Defendants do not contend that Alvarez received any consideration for this release, or for this to function as a binding agreement.

59.    Defendants further state in their 56.1 Statement that "Mr. Alvarez acknowledged on his pay stubs that he received large and varying amounts of cash in addition to his check, which represented overtime wages. (Walker Aff., Ex. T.)" See Defendants 56.1 Statement at ¶85.

60.    What Defendants attach in Exhibit T in support of this statement is a misrepresentative sample of 8 paychecks, on which an unidentified person has written an amount. See Walker Aff. Exhibit T.

61.    Mr. Alvarez produced almost two hundred of his paychecks to Defendants in discovery (Bates-Stamped p 184-380), of which only a scant few had any hand-written notations on them. Defendants' characterization of these few markings on eight pages out of almost 200 as some form of "acknowledge[ment] on his pay stubs that he received large and varying amounts of cash in addition to his check, which represented overtime wages" is ridiculous and disingenuous.

62.    As example Plaintiffs have supplied the last 36 pages of his document production, which represent paycheck stubs in Mr. Alvarez's possession from 5/29/05 through 1/22/06, true and correct copies of which are attached hereto as Exhibit U.

63.    Mr. Alvarez in his affidavit also states that "Defendants did not habitually write down the amount of cash I received anywhere, rather there was an occasional time, for instance when I took a vacation day, where they would deduct that pay from my cash payment, and note that directly on my paycheck." See Alvarez Aff. at ¶ 33.

64.    At the minimum, these paychecks, coupled with Mr. Alvarez' statements that he was being paid cash "off the books" only for his straight pay, and not at the time-and-a-half rate

required by the overtime provisions of the New York Labor Law, and the Fair Labor Standards Act, sufficiently supply an issue of fact.

65.     Notably, Defendants, although Mr. Saperstein states that he possesses "records" of thousands of dollars of overtime pay to Mr. Alvarez in his affidavit, did not supply any of these cash payment records to Mr. Alvarez, as required by the NYLL and FLSA. Further Mr. Saperstein admits to FLSA and NYLL recordkeeping violations by reporting off the books, establishing a violation in his own affidavit. See Saperstein Aff. at 24-25.

66.     Notably, the Saperstein Deposition Transcript regarding Mr. Alvarez that Defendants attach to the Walker Aff. in support of their motion leaves off the prior page, Page 49, which supplies testimony by Mr. Saperstein that Mr. Alvarez was complaining about the amount of the cash payments he was receiving at flat rate instead of overtime, and therefore putting Defendants on notice of their wage violations.

> Q   Do you recall ever speaking with Edison Alvarez on any other subject?
> A   Occasionally he would question his pay. Occasionally he would question his – the amount of cash that he received.
> Q   Is this when you were a supervisor or when you were handling the payroll or something else?
> A   Both.
> Q   Where did these conversations take place?
> A   Probably the phone.
> Q   Telephone?
> A   Yes.
> Q   About how many times has that happened?
> A   Not very often because Sam decided what he would get paid so any questions referring to his pay were referred to Sam.
> Q   Is that something that you told him, you should speak to Sam?
> A   Yes.
> Q   Did you ever learn whether he did speak to Sam?
> A   No.
> Q   Did Sam ever speak with you about Mr. Alvarez's complaints?
> A   He, on a couple of occasions asked me how much Alvarez's check was and how much cash he got and how many hours he worked. I assumed that they were because Sam needed information to respond to Alvarez's inquiries.
> Q   Did Sam ever tell you how he responded to the -- to Mr. Alvarez's questions?
> A   No. The only conversations I had with Sam regarding Alvarez is Sam told me Alvarez couldn't make more than 40 hours on a check due to some sort of a personal issue and that he was to get 40 hours on a check and everything else in cash.
> Q   Was there a limit to the number of hours that Mr. Alvarez could work?
> A   That, I don't know.
> Q   When you say a personal issue, I think you said?

A   Yeah. I think it had something to do with his apartment. I'm not sure.

Q   Do you have anymore information about why Mr. Alvarez was limited in the way that you said he was?

A   No.

Q   After you spoke with Sam, did you make some changes in the amount of cash for Mr. Alvarez?

A   No.

Q   You gave him the amount that Sam said to give him?

A   Yes.

Q   When was the last time, if you can recall, that Mr. Alvarez complained to you about the amount of his pay?

A   I don't remember.

Q   Was it anytime in the last year?

A   No.

See Saperstein Deposition Transcript at 49-52, a true and correct copy of which is attached hereto, with the omitted page 49, as Exhibit V.

67.    Therefore, Mr. Alvarez was complaining about wage violations. Plaintiffs submit that this may be used to establish a willful violation.

68.    Further, Mr. Alvarez's claims that only 40 hours a week were being reported on his check while the rest of his overtime compensation was being paid "straight rate" in cash, and he was not being paid overtime or spread of hours pay, is supported by this testimony. This shows a willful disregard of the recordkeeping requirements of the NYLL and FLSA.

69.    Plaintiffs note that if Alverez is forced to file a separate action, he will simply relate this action to Alverez's new one, and request relation back to his opt-in consent form, which was filed on 8/14/97, less than 20 days after the filing of the Complaint. Plaintiffs submit that such an action will not be "futile" as Defendants suggest, and it will be judicially inefficient to require him to file a separate matter.

70.    Mr. Alvarez also notes that neither he, nor other employees he witnessed, were able to take any lunch breaks on the job. (See Alvarez Aff. at ¶¶ 6-7, Exhibit W.)

### Mr. Pena

71.    In his deposition (Page 11: lines 10 through 25 & Page 12: lines 1-8), Mr. Pena discusses "working with" certain individuals, but he clarifies that they do the other shifts ("day shifts"), and that they relieve him. A true and correct copy of Pena's relevant Depo. Transcript citations are attached hereto as Exhibit X.

72.    He also explains, in his affidavit in support of these opposition papers, attached hereto at Exhibit Y, that he would be accompanied by a coworker when he had to cover for an absent coworker, but that at his current position at Bienvenido Garage that he has been made to work alone (he said approximately for the last two years).

73.    Mr. Pena clearly states that he was not compensated for his lunch hours, and he was never able to take them at any time. See Pena Aff., attached as Exhibit Y

74.    In counter to the suggestion made by Defendants in paragraphs 19 and 20 to their Rule 56.1 Statement to the effect that Mr. Pena was paid the "minimum wage," I note Plaintiff Pena was only discussing the hourly rate that he received. Plaintiffs admit that Mr. Pena was paid at the minimum wage rate per hour that he was paid (i.e. at $5.15 per hour). However, Pena claims he is not paid for the lunch hour that Defendants unlawfully deducted from his pay, and he could not take this lunch hour for the last 2 years. See Complaint, generally (attached hereto as Exhibit A.)

75.    Mr. Pena did not concede anything beyond that for the hours he was actually paid (not including the lunch hours), Defendants paid him at the hourly rate that was equal to the minimum wage. Mr. Pena never stated in these deposition citations, or anywhere in his deposition, that he was paid in full for all his hours worked. Walker Aff., Ex. G at 15:23-16:4; 28:16-18.

76.    I submit that this non-payment for an hour a day for a "lunch hour" that none of the employees could take, has the effect of reducing the actual hourly wage Mr. Pena received to below minimum wage, as the base wage rate is derived by dividing the total weekly wages over actual hours worked.

77.    If Pena, as he testified, was receiving only the base minimum wage rate per hour, and remained uncompensated for one hour a day that was deducted from his paycheck for a lunch our he could not take, he was then effectively receiving less than the required minimum wage per hour.

78.    Pena specifically stated that he was not compensated for the hours beyond $10 or $20 extra dollars for work performed at other garages, which did not appear on his paycheck, and he had to complain in order to receive it. Pena TR at 35-37.

79.    Pena also maintained in the deposition that he was not paid for his lunch hour, therefore he was not paid for those hours. Pena TR 40-21. He held up further when Defendants again challenged him by asking him if he was paid for the lunch hour in cash.

> Q.    Isn't it a fact since February of 2006 the company has paid you for your lunch hour?
> A.    No, sir.
> Q.    Isn't it a fact that prior to February of 2006 you received cash to pay for your lunch hour?
> A.    No, sir.

Pena TR at 43:20-44:2

80.    Pena also notes that his paycheck did not include the Spread of Hours pay that is required under NYS regulations. Pena TR at 41.

81.    It is unclear what the money Pena received in cash is actually for, and he does not state what it is in his transcript. In any event, it does not cover the hundreds of total hours a year he lost due to his untaken "lunch hour" being deducted improperly from his wages.

82.    Further, a flat $10 or $20 extra, without any additional accounting of the actual hours worked in the other garages, or for overtime in general, fails to meet the statutorily required recordkeeping requirements.

83.    Mr. Pena is not an attorney and therefore is unable to intelligently state his full legal claims in response to the deposition questioning that was presented by defendants in paragraph 27 of their Rule 56.1 statement, and *Walker Aff., Ex. G at 36:15-17, 38:12-41:5.* Therefore, he cannot make any legal representations as to the effect of non-payments of his lunch hours on his total hours per week, overtime pay, or the effect of dropping his base wage as calculated according to the actual total hours worked per week below statutory minimum wage laws. A true and correct copy of the above referenced sections of Pena's Transcript are attached as Exhibit Z.

## Plaintiff Rojas

84.    Mr. Rojas began working in May 2003 and left in February of 2007. See Rojas TR at 9:24-10:2.

85.    In response to paragraph 30 of Defendants' Rule 56.1 Statement, Plaintiff Rojas was only referring to a brief period of time, not all time thereafter. See Rojas Depo TR at 22-24.

86.    Mr. Rojas also stated that he did not receive a lunch break, and was not paid for the lunch break. See Rojas Depo at page 26:21-25.

87.    Mr. Rojas additionally states that he did not receive his spread of hours pay. See Rojas Depo TR at page 13:4-15.

88.    Rojas states that he was paid minimum for the first 40 hours, but that he was not paid completely at the overtime rate for those hours over 40. Rojas TR at 11:20 to 12:4; TR 11:1-12:4

89.    The relevant portions of Mr. Rojas's deposition transcript cited above are attached hereto as Exhibit AA.

90.    Plaintiffs submit therefore that his pay fell below statutory minimum wage, as he was not being compensated for 5-6 hours a week, one hour a day, and was purportedly being paid at exactly the minimum wage. The net effect is to reduce the average pay to that of pay below minimum wage.

91.    Attached to this affidavit is a true and correct copy of a short sampling of Plaintiff Rojas' timesheets (Bates-stamped 1000-1010), showing that for these 11 pay period, 8 of them had precisely the exact same hours (40 hours regular, 15 overtime), and every one of the 11 has round numbers for the hours worked. Attached hereto as Exhibit BB.

**Plaintiff Diroche**

92.    Diroche began working in February 2001. See Complaint, Diroche Depo TR 7:19-22.

93.    Mr. Diroche's paychecks do not indicate he worked any less than 58 hours typically for these periods of time (Feb.-March 2006 or 2006). See e.g. Plaintiff Diroche's paycheck stubs, bearing Bates Stamp numbers 105-109, 146-154, attached hereto as exhibit CC.

94.    Therefore, Defendants are essentially admitting that the paychecks and the documents given to Plaintiffs in which their hours are purportedly set forth are basically worthless with respect to accurately reporting Plaintiffs' hours, when they state in their 56.1

statement that an uncontroverted fact is that Plaintiff Diroche's hours were only 48 per week during this period.

95.    All these paycheck stubs report round numbers, which is next to impossible to produce on a consistent basis if timecards are used. See Exhibit CC.

96.    Plaintiffs state that Plaintiff Diroche, and all of the Plaintiffs, have been consistent in stating that they were not ever able to take a lunch break, they did not take lunch breaks, and they were not paid for the lunch breaks. See Diroche Depo. TR 12:18-21. See also Pena Depo. TR 43:20-44:2; Rojas Depo. TR 16:19-21; Santana Dept. TR 44: 5-14; Luna Depo. TR 57:14-18, 67:19-20; Alcantara Depo. TR 22: 22-24 (wherein Plaintiffs consistently state that they were not paid for the "lunch break" they never got to take). A true and correct copy of these transcript sections are attached hereto as Exhibit DD.

97.    Diroche in his Depo TR 12:25-13:4 states that the paycheck's reported hours were inaccurate in that they did not include his complete hours worked. Plaintiff Diroche also testified in the same portion of the transcript that he never took any breaks, for lunch or for any other reason. See Diroche Depo TR at 26:2-15. Plaintiff Diroche also states that his overtime was not accurately recorded and compensated for as follows: "Q. Were there any other hours missing? A. What you asked me before about time and a half, that they were supposed to pay, they didn't pay. See Diroche TR at 15:8-10. A true and correct copy of these transcript citations are included in Exhibit EE, attached hereto.

**Plaintiff Santana**

98.    Plaintiff Santana began working for the Defendants on August 10, 2003. See Santana Depo. TR at 10:12-14

99.    Plaintiffs do not admit that the hours for which he was not paid are limited to *"for the one hour lunch period prior to 2007, spread of hours pay for work in excess of ten hours in one day and for some hours worked on a seventh day or on the infrequent occasions when he would cover for another employee)"* as stated in Defendants' 56.1 statement, rather these are portions of the damages. See Complaint (attached hereto as Exhibit A).

100.    Plaintiff Santana notes that his required Spread of Hours pay was not paid (TR 16:14-16), and his overtime was not accurately recorded and compensated for "many times" (i.e. when he worked 7 days a week, See TR at 16:25 – 19:16.)

101.    Mr. Santana notes that these additional hours, although reported to Raj (his supervisor), they were not clocked on his timecard as he was sent to another garage where he did not have any timecard present to clock in with. See Santana TR 19:2-16.

102.    A true and correct copy of these transcript sections are attached hereto as Exhibit FF.

103.    Further, Santana is not an attorney, and Plaintiffs refer Defendants to the Complaint and the proposed Amended Complaint, in which Santana claims categories of damages under the NYLL and FLSA.

104.    Plaintiffs also note, as set forth in response to paragraph 56-7 of Defendants' Rule 56.1 statement, that he did not receive his lunch hour, and was not paid for work he performed during this lunch hour. See e.g. Exhibit DD, attached hereto. Therefore, Plaintiff Santana has claims for unpaid compensation that exceed simply that of the categories set forth in paragraph 60, such as the effect of these non-payments on his total hours per week, overtime pay, or the effect of dropping his base wage as calculated according to the actual total hours worked per week below statutory minimum wage laws.

## Plaintiff Alcantara

105.    Plaintiffs admit that Mr. Alcantara stated that he was paid overtime at time and a half, to the degree he understood the concept in the deposition, but state that he sufficiently created an issue of fact with respect to this issue, as Mr. Alcantara spoke with respect to minimum wage in terms of his base rate per hour.

106.    As noted in our 56.1 statement, Plaintiffs deny that Mr. Alcantara "conceded" he was paid "minimum wage for all hours up to forty hours in a week." The transcript reads as follows and speaks for itself:

> Q.    Were you paid at least minimum wage for the first 40 hours that you
>        worked each week?
> A.    Minimum wage.

Alcantara Depo at 23:15-17 (no clarification follows)

107.    Further, Mr. Alcantara states that he was not paid for his lunch break, which he was never allowed to take. See Alcantara Depo. TR 33:11-17.

108.    Therefore, his statement as a non-lawyer that he received minimum wage and overtime wage needs to be tempered in light of his statement that he received no pay for his lunch hours, which would, as stated throughout this 56.1(b) statement, severely change both. Plaintiffs therefore submit that this is hardly any concession, and at the minimum creates an issue of fact.

109.    The very transcript citation that Defendants assert stands for this proposition is immediately followed by a statement by Alcantara that Defendants did not properly compensate him for his overtime pay.

> Q.    Other than the lunch hour, and the extra hour after working 10 hours, are there any other hours of
>        time that you're claiming you weren't paid for in this case?

> A.    The extra hours worked after 40 hours a week. I only received 15 to $20 to compensate for that — cash. Besides the check. The other hours were paid regular.

Alcantara Depo. TR at 23:7-14.

110.    True and correct copies of the aforementioned transcript citations with respect to Alcantara are attached hereto as Exhibit GG.

111.    Alcantara's statement is clearly is referring to the cash payments received on top of Mr. Alcantara's reported pay.

112.    As stated herein, the paychecks that Mr. Alcantara received are not accurate reflections of his actual hours worked. For example, Mr. Alcantara received paychecks that had round numbers for hours worked for every week he received a paycheck. Many of these paychecks had the exact same number of hours a week (which Plaintiffs submit is difficult if the time cards were actually used as a basis to record the actual time worked). As example, Plaintiffs attach hereto samples of Plaintiff Alcantara's paycheck stubs (Bates Stamp Numbered 900-909) and attach them hereto as Exhibit HH.

113.    Plaintiffs submit that this alone is enough, in the absence of accurate recordkeeping under the NYLL and FLSA to create an issue of fact.

114.    Further, Mr. Alcantara is a non-lawyer, and if he failed to include the ramifications of not being paid for several hours a week, and how that changed the minimum wage and resulting overtime wages, it should not be held against him, and at the minimum his statements create an issue of fact.

### Plaintiff Luna

115.    Mr. Luna states that he began working for the Defendants in approximately March 26th 2002 (Luna Depo TR 15: 19-21).

116.   Plaintiff Luna additionally stated that about 1/3 of the time (approximately 4 months total out of a year) he worked 7 days a week. See Luna Dept. TR at 25:14-27:3.

117.   Plaintiff Luna additionally stated in his deposition that he really started an hour earlier 3-4 times a week at the request of his manager, Raj, starting at about 5:00. He was specifically told not to clock in with his time card until 6:00 by his manager, and Mr. Luna also witnessed the manager order other employees not to clock in for coming in an hour early. Mr. Luna said he would often receive an additional small cash payment per week for this. See Luna Depo. TR at 31:22-34:13

118.   Although Plaintiff Luna stated at one point in his deposition that "I think that the minimum wage was 5.15 that they pay me" this statement was regarding the amount he was paid per hour he was paid. This is not a concession of any sort that Mr. Luna agrees he was fully compensated for his hours worked, or received the appropriate minimum wage when all of his hours were taken into account. See Luna Depo. TR at 54:17-18.

119.   Plaintiff Luna additionally stated that he received only part of his overtime pay, and recounted what would happen when he worked seven days a week instead of his usual six as an example. Mr. Luna stated that he would work the extra day and it would not be paid on his check, rather, he would receive a cash payment from his manager Raj for approximately 40 to 45 dollars. See Luna Depo TR at 56:7 – 57:13. Plaintiff Luna additionally stated that about 1/3 of the time (approximately 4 months total out of a year) he worked 7 days a week. See Luna Dept. TR at 25:14-27:3.

120.   Further, Mr. Luna specifically testified that he was never paid for his lunch break, and he was unable to take it. Therefore, all the overtime calculation and base pay rates are

incorrect on his paychecks, and he was not appropriately compensated for overtime, or minimum wage. See Luna Depo. at 57:14-18.

121.    A true and correct copy of these relevant sections of the deposition transcript of Plaintiff Luna are attached hereto as Exhibit II.

## The defendants' timekeeping procedure was faulty

122.    The supervisor of the garages, Raj Kissoon, was responsible for collecting and reporting the hours worked by each employee at each location. There are instances in which the time cards fail to indicate when an employee punched in or punched out. In those instances, Raj did not know how many hours the employee worked, but made an assumption based on when the previous worker left or when the next worker started, but he was not present to observe that this is what happened. Kissoon depo., pp. 43-49 and plaintiff's dep. ex. 7 (Angelo Pena time card for the two week period beginning 7/16/07). Composite exhibit of true and correct copies is attached hereto as Exhibit JJ.

## The defendants improperly computed employee's pay by backing-in some of their hours

123.    At times when the employees were paid partly by check and partly in cash, the cash portion of their wages was improperly determined by a process of backing-in the number of hours for which they were paid in cash. The paycheck amounts were arrived at excluding time for lunch. Kissoon depo., pp. 57-60; Saperstein depo., pp. 72-73; and plaintiffs' depo. ex. 12. Composite exhibit of true and correct copies is attached hereto as Exhibit KK.

124.    The defendants claim the cash payments represented pay for lunch hours. However, the cash amounts were not arrived at by applying an hourly rate to a daily recorded number of hours. Rather the cash amounts were figured as the difference between the net

weekly paycheck amount and a weekly net pay number which the defendants got from the previous owner. Podolak depo., pp. 21-22, 64-65; Kissoon depo., pp. 63-64; Saperstein depo., pp. 72-89, and plaintiff's depo. ex. 9, 12, and 14. Composite exhibit of true and correct copies is attached hereto as Exhibit LL.

125.    Saperstein's deposition revealed that Defendants appeared to be deriving the hours worked from time cards, but they were not actually accurate, or reflected in the paystubs that were ultimately given to Plaintiffs.

126.    Saperstein admits that the time cards were occasionally not reliable, and he simply guessed at the actual arrival and departure times of employees. In this event, Saperstein then states that Raj was truly the person who knew when all the Plaintiffs were present at work. See e.g. Saperstein Depo. 65:22 – 66:11 (admits that time cards were missing entries, he or Raj would have to fill them in); 101:10-13: "There were isolated incidents where either Raj forgot to put their hours on the sheet or I did not pick it up. But for whatever reason, the hours were missed." Composite exhibit of true and correct copies is attached hereto as Exhibit MM.

127.    This renders many of Saperstein's statements regarding the lunch hours, and his assurances that all the wage and hour laws were followed suspect. See e.g. Saperstein Depo., Page 68 lines 11 through 16 "The time cards were not reflecting that they were going out, so I needed – I needed that to happen") (referring to how the employees weren't punching their time cards for lunch breaks he claims they took). See also Saperstein Depo at 66:12-67:4 (employees were not punching out for lunch). Composite exhibit of true and correct copies is attached hereto as Exhibit NN.

128.    It also calls into question the accuracy of the hours Raj reported as Raj appears to have only been present for half an hour to 45 minutes at each of the six facilities each day, and

therefore could not possibly have seen when employees were present or not. See Raj Kissoon Depo TR at 14:23-6. Further Raj only really reviewed the time cards themselves to determine when employees were present at the garages, and not actual time periods. See Raj Kissoon Depo TR at 16. Further, Raj admits that his accounting for hours of employees filling in at other garages is not accurate, as they do not punch in any timecard. See Raj Kissoon Depo at 20:22-28:2. Composite exhibit of true and correct copies is attached hereto as Exhibit OO.

129.    Interestingly, when Raj was questioned as to how much it was decided to pay an employee based on their hours worked, he identified Saperstein as the decision maker. See Kissoon Depo at 30-31. However, Saperstein identifies Raj Kissoon as the decision-maker with respect to hours reported. See Saperstein Depo. 65:22 – 66:11. Composite exhibit of true and correct copies is attached hereto as Exhibit PP.

130.    Plaintiffs attach hereto a true and correct copy of a worksheet that Defendants used to derive Plaintiffs'' pay, in which it is clear that Defendants are arbitrarily reducing the hours worked. Attached thereafter is a sampling of Plaintiffs' paychecks from the same period with the hours that show rounded reduced hours that clearly are less than those reported in the hand written worksheet. This composite exhibit is attached hereto as Exhibit QQ.

131.    Plaintiffs therefore contend that there are sufficient issues of fact to counter this motion for summary judgment.

Dated: New York, New York
       August 13, 2008

Michael A. Faillace [MF-8436]

Sworn to before me this
13th day of August, 2008

Notary Public

YOLANDA RIVERO
Notary Public, State of New York
No. 02**061584
Qualified in Queens County
Commission Expires July 16, 2011

26