Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
     ANGELO PENA, ROLANDO ROJAS,        )
4    JOSE DIROCHE, and FRANKLIN         )
     SANTANA, individually and on       )
5    behalf of others similarly         )
     situated,                          )
6                                       )
                        Plaintiffs,     )
7                                       )
     -against-                          )
8                                       ) Index No.
                                        ) 07 CV 7013
9    SP PAYROLL, INC., NICHOLAS         )
     PARKING, CORP., IVY PARKING        )
10   CORP., BIENVENIDO, LLC, CASTLE     )
     PARKING CORP., SAGE PARKING        )
11   CORP., and SAM PODOLAK,            )
                                        )
12                      Defendants.     )
     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
13

14

15

16

17

18

19              DEPOSITION OF DAVID SAPERSTEIN
                     New York, New York
20                     June 18, 2008
21

22

23

24   Reported by:
     Judi Johnson, RPR, CLR
25   Job No.: 17084

Page 2

```
 1
 2              110 East 59th Street
                New York, New York
 3
 4              June 18, 2008
                10:00 A.M.
 5
 6
 7
 8
 9
10
11
12
13        Deposition of DAVID SAPERSTEIN, held
14     at the offices of MICHAEL FAILLACE &
15     ASSOCIATES, P.C., 110 East 59th Street, New
16     York, New York, pursuant to Notice, before
17     Judi Johnson, a Registered Professional
18     Reporter, a Certified LiveNote Reporter and
19     Notary Public of the State of New York.
20
21
22
23
24
25
```

Page 3

```
 1              DAVID SAPERSTEIN
 2   APPEARANCES:
 3       MICHAEL FAILLACE & ASSOCIATES, P.C.
 4       Attorney for the Plaintiff
         110 East 59th Street
 5       New York, New York 10022
 6       BY: RICHARD BERNSTEIN, ESQ.
            MICHAEL FAILLACE, ESQ.
 7
 8
 9       SEYFARTH SHAW, LLP
10       Attorney for the Defendant
         620 Eighth Avenue
11       NEW YORK, NEW YORK 10018
12       BY: LORI M. MEYERS, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           DAVID SAPERSTEIN
 2       IT IS HEREBY STIPULATED AND AGREED by
 3   and between the attorneys for the respective
 4   parties herein, that filing and sealing and
 5   the same are hereby waived.
 6       IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form
 8   of the question, shall be reserved to the
 9   time of the trial.
10       IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16
17           - oOo -
18
19
20
21
22
23
24
25
```

Page 5

```
 1              DAVID SAPERSTEIN
 2   D A V I D   S A P E R S T E I N,
 3       Called as a witness herein, having
 4       first been duly sworn, was examined and
 5       testified as follows:
 6   BY THE REPORTER:
 7       Q    Please state your name and address for
 8   the record.
 9       A    David Saperstein, 357 Pocono Mountain
10   Lake Estates, Bushkill, Pennsylvania 18324.
11   EXAMINATION
12   BY MR. BERNSTEIN:
13       Q    Probably by now no introductions are
14   needed, but my name is Rich Bernstein. I
15   represent the plaintiffs in the lawsuit that
16   we've been concerned with in the depositions
17   yesterday, last week. And I want to be sure the
18   court reporter has your home address.
19       MR. BERNSTEIN: You have it on the
20   record?
21       THE REPORTER: Yes.
22       Q    Will you please state your business
23   address for the record?
24       A    575 Washington Street,
25       Q    Is that in Manhattan?
```

DAVID SAPERSTEIN

1
2   A   Yes.
3   Q   What office is located there?
4   A   It's an office that I share with a
5   friend of mine.
6   Q   And what company or companies do you
7   work for now?
8   A   SP Payroll, and I have my own company
9   that I work for and a number of other
10  restaurants that are unrelated to this.
11  Q   The Washington Street address you
12  said --
13  A   Yes.
14  Q   -- is that in downtown Manhattan or
15  somewhere else?
16  A   No, it's downtown. It's right off of
17  Houston Street.
18  Q   And do you do work for SP Payroll at
19  that location?
20  A   Yes.
21  Q   Do you ever do work for SP Payroll at
22  any other location?
23  A   Occasionally, I visit the locations,
24  Bienvenido, Castle, Sage, Marvel, J&L. There
25  are a couple of corporations that are no

DAVID SAPERSTEIN

1
2   longer -- well, those two are no longer in
3   existence and a few more that are no longer as
4   well.
5   Q   Did you visit them when they were
6   operating?
7   A   Yes.
8   Q   When did you start working for SP
9   Payroll.
10
11  A   About 2002.
12  Q   Can you tell me more specifically when
13  in 2002?
14  A   I'm going to guess the later part of
15  the year.
16  Q   Where did you work at that time, when
17  you started with SP Payroll? Did you work in an
18  office somewhere?
19  A   The 575 Washington Street address was
20  mainly where I did most of my paperwork. At
21  other times, I did visit the locations. So the
22  specific locations that we mentioned.
23  Q   Did you ever work in the Second Avenue
24  office of SP Payroll?
25  A   I visited there. I don't really do

DAVID SAPERSTEIN

1
2   too much work there. I visited there to
3   maintain the video surveillance system and
4   possibly look at -- there are lifts in the
5   garage. If there were problems, I'd look at
6   those.
7   Q   In the garage on Second Avenue?
8   A   Yes.
9   Q   And what was the video surveillance
10  system that was there?
11  A   It's just a basic surveillance system.
12  If Sam needed to see a specific instance, I
13  would go and put it on a flash drive so he would
14  just be able to view that instance.
15  Q   That's Sam Podolak?
16  A   Yes.
17  Q   Was the video -- was there a video at
18  the Second Avenue garage location or other
19  locations or some combination?
20  A   Some garages have cameras, different
21  systems. Some are more elaborate than others.
22  Q   Which garages have cameras?
23  A   Well, the one at 1832 Second Avenue
24  has. I believe the one at 155th Street had.
25  I believe the one at 121st Street has, but I'm

DAVID SAPERSTEIN

1
2   not positive.
3   Q   Which one is that at 121?
4   A   It's a new garage. I believe the name
5   is Magic.
6   Q   Are there any others that you think
7   have cameras?
8   A   I think Bien might. I don't really
9   remember.
10  Q   Do you know when cameras were first
11  installed at any of those locations?
12  A   All recent.
13  Q   How recent?
14  A   Eight months, maybe.
15  Q   Have you ever seen any of the
16  videotapes from those cameras?
17  A   Not from -- the only ones I've seen is
18  1832. I don't really look at the other ones.
19  Q   At 155th Street and Bienvenido, do
20  you know if there's one or more than one camera?
21  A   I don't remember.
22  Q   Do you know what area of the garage
23  either of those --
24  A   I believe it's at the entrance.
25  Q   -- either of those camera setups are

Page 10

DAVID SAPERSTEIN

1
2 focused on?
3    A    I believe the entrance.
4    Q    That's true for both, as far as you
5 know?
6    A    I believe so.
7    Q    Do the cameras operate 24 hours a day
8 or something else?
9    A    I believe it's 24 hours.
10    Q    When you say the entrance, are you
11 referring to the driveway where cars go in and
12 out?
13    A    Yes.
14    Q    Is there any other entrance for people
15 walking in and out?
16    A    No. Are we referring to all the
17 garages?
18    Q    Well, I'm asking about the ones that
19 have cameras.
20    A    1832 currently has two entrances, one
21 where cars come in, one where people can go out
22 but not cars.
23    Q    Okay. I'm asking about 155th and
24 Bienvenido.
25    A    One entrance.

Page 11

DAVID SAPERSTEIN

1
2    Q    Do you know how often the videotapes
3 are changed at either of those locations?
4    A    No. I don't know if it's video or
5 digital --
6    Q    Or whatever the recording is?
7    A    Yeah; I'm not familiar with the actual
8 device.
9    Q    Do you know how long the tapes or
10 recordings are stored?
11    A    If it's digital, which I believe it
12 is -- I do not believe it's video. If it's
13 digital, it loops and when it's full it just
14 rerecords over itself.
15    Q    Do you know how often the rerecording
16 happens?
17    A    It's probably anywhere between three
18 days and two weeks.
19    Q    What do you base that on that you
20 think it's three days to two weeks?
21    A    My knowledge of how much a specific
22 size hard drive can hold.
23    Q    Are you referring to the hard drive in
24 the video installation or something else?
25    A    Inside the video recorder.

Page 12

DAVID SAPERSTEIN

1
2    Q    How often have you visited the SP
3 Payroll office on Second Avenue?
4    A    Over what period of time?
5    Q    Well, is it different at different
6 periods of time?
7    A    It's rare.
8    Q    Okay.
9    A    Maybe in the entire time, 20 times.
10    Q    And when you did go to that office,
11 what generally was your purpose?
12    A    Drop something off for Sam. Check on
13 the lifts. If there was a car there that had
14 damage, I had to go once and look --
15 specifically look at the car. Pick up papers
16 from Sam. That's it.
17    Q    What type of papers did you pick up,
18 if you recall?
19    A    There were occasions where I would
20 pick up the payroll reports and store them in my
21 office. There were occasions where I just
22 picked up violations they would have to go and
23 answer.
24    Q    Besides going to the office to pick up
25 payroll reports or other materials, was there

Page 13

DAVID SAPERSTEIN

1
2 some other method whereby papers or records were
3 provided to you for your work?
4    A    Yes.
5    Q    How did that work?
6    A    There was a period of time where I
7 would actually meet Raj Kissoon at 155th
8 Street. I would meet Raj there at approximately
9 4:00 and 4:30 in the morning. I would give him
10 any paperwork that I had for Sam. He would give
11 me any paperwork that I needed, and that -- for
12 a very long time, that was one method that
13 paperwork flowed from one point to another
14 point.
15    Q    And did that change at some point?
16    A    Yes. When we lost 155th Street, I
17 believe I started to meet Raj at 121st Street.
18    Q    Is that the current practice?
19    A    Currently, paperwork doesn't flow back
20 and forth as much as it used to. Mostly I get
21 my paperwork from Sam through fax. Sam gets my
22 paperwork again, either through fax or I'll meet
23 Raj at a predetermined place.
24    Q    Let me back up a little bit to some
25 background type questions that I skipped when we

DAVID SAPERSTEIN

1
2 started.
3        Could you summarize your education for
4 me, formal education?
5    A    Associate's in business and 20 credits
6 away from a criminal justice degree.
7    Q    When did you get your associate's
8 degree?
9    A    I don't remember.
10    Q    Where did you get that from?
11    A    Brooklyn College.
12    Q    And you're in a criminal justice
13 program now?
14    A    Yes.
15    Q    Where is that?
16    A    University of Phoenix.
17    Q    And could you also summarize your
18 employment history for me?
19    A    Aside from working for SP Payroll, I
20 have my own company that does payroll and other
21 consulting, for lack of a better word, services
22 to restaurants.
23    Q    And when did you start in that
24 business, your separate business? How long have
25 you been doing that?

DAVID SAPERSTEIN

1
2    A    Since 1990 something. Late 1990s.
3 '98, '99, something like that.
4    Q    Before that and before SP Payroll, did
5 you have some other employment?
6    A    Yes.
7    Q    Maybe you could summarize this for me.
8    A    I'm not sure of the dates, but while I
9 was in college I worked for Dollar Rent a Car.
10 After college, I worked for a small parking
11 company, Bro Bro Operating Company. They had
12 parking garages and car rentals. Then after
13 them, I worked for Thrifty Car Rental, who are
14 the same owners as Bro Bro. Then after that, I
15 started my own and went with Sam, SP Payroll.
16    Q    Where was Bro Bro located?
17    A    Bro Bro had offices on, I think it was
18 16 Court Street.
19    Q    In Brooklyn?
20    A    In Brooklyn. And later at
21 575 Washington Street in Manhattan.
22    Q    And what about Thrifty?
23    A    Also 575 -- sorry, Thrifty was 16
24 Court Street. After Thrifty was Smart Park.
25    Q    Was it the same ownership?

DAVID SAPERSTEIN

1
2    A    Sons. Sons of Bro Bro.
3    Q    Do you recall how long you worked for
4 them?
5    A    Maybe three years.
6    Q    What type of work did you do for that
7 group of companies?
8    A    Well, Smart Park owned
9 approximately -- operated approximately 60
10 garages, and I was in charge of all of the
11 garages, including payroll and day-to-day
12 operations.
13    Q    How did you come to be employed by SP
14 Payroll?
15    A    The sons at Smart Park embezzled
16 $30 million from the bank, so Smart Park went
17 out of business.
18    Q    So how did you get in contact with
19 SP Payroll?
20    A    It's a small industry. I had been
21 introduced to Sam Podolak through a friend and
22 he hired me.
23        MR. BERNSTEIN: Let's mark as
24 Plaintiff's Exhibit 19 the corporation's
25 responses and objections to interrogatories.

DAVID SAPERSTEIN

1
2        (Whereupon, Defendant Corporations'
3 Responses and Objections to Plaintiffs'
4 First Set of Interrogatories was marked as
5 Plaintiff's Exhibit 19 for identification,
6 as of this date.)
7 BY MR. BERNSTEIN:
8    Q    Have you had a chance to glance at
9 that? (Handing.)
10    A    Yes.
11    Q    Do you recognize it?
12    A    Yes.
13    Q    What is it?
14    A    It's -- what you just said,
15 interrogatories, and at some point I did sign it
16 and return it to Peter Walker.
17    Q    And you read it before you signed it?
18    A    Yes.
19    Q    No other questions on that, at least
20 right now. Have you given a deposition in a
21 lawsuit at any time before today?
22    A    Yes.
23    Q    When was that?
24    A    The last one or all of them?
25    Q    How many times have you been in a

DAVID SAPERSTEIN

1
2 deposition?
3   A   Six or seven.
4   Q   When was the last one?
5   A   In a friend's divorce proceeding.
6   Q   You were a witness in that one?
7   A   Yes.
8   Q   Do you recall the other depositions
9 that you gave, what type of lawsuit it was?
10   A   Two were liability lawsuits, injury
11 claims. One was — I don't know the legal term
12 for it, but when the brothers embezzled
13 $30 million. I was called as a witness for the
14 bank.
15   Q   Okay.
16   A   And Thrifty Car Rental, the two
17 parties were suing each other. I was called as
18 a witness for the franchisee — sorry, for
19 Thrifty Car Rental. There were maybe one or two
20 liability claims.
21   Q   So in those instances you were a
22 witness, you were not suing or being sued,
23 right?
24   A   I was a witness.
25   Q   Have you testified under oath at any

DAVID SAPERSTEIN

1
2 other time besides what you just told me?
3   A   They do put me under oath at ECB
4 hearings.
5   Q   ECB?
6   A   Environmental Control Board.
7   Q   How often does that happen?
8   A   Every Thursday, almost.
9   Q   Is this in connection with SP Payroll?
10   A   It's in connection with SP Payroll and
11 my other entity, my company.
12   Q   What is the nature of those hearings?
13   A   It's usually buildings department
14 violations. Anything from not cleaning up the
15 sidewalk to an exit sign not working.
16   Q   And this happens every Thursday?
17   A   Yeah. It's every Thursday in
18 Manhattan. Almost.
19   Q   I see.
20   A   I can go a month without going, but
21 generally.
22   Q   Okay. Aside from that, any other
23 testimony that you've given under oath?
24   A   No.
25   Q   Now, when you started with SP Payroll,

DAVID SAPERSTEIN

1
2 what was your title or position?
3   A   For lack of better words, supervisor.
4   Q   And has that changed since you
5 started?
6   A   Well, it's still supervisor, but I
7 suppose you could also add payroll manager in
8 there.
9   Q   When did that occur that you also
10 became payroll manager?
11   A   I started taking over payroll
12 responsibilities in 2003.
13   Q   And you started with SP Payroll in
14 2000?
15   A   2002.
16   Q   When you started, what were your
17 responsibilities before you took over the
18 payroll?
19   A   As a supervisor, I just went from one
20 location to the next, similar to what
21 Mr. Kissoon does.
22   Q   Okay. And when in 2003 did you take
23 over the payroll?
24   A   Mid 2003. I'm going to guess June.
25   MS. MEYERS:   Don't guess.

DAVID SAPERSTEIN

1
2   THE WITNESS:   Sorry.
3 BY MR. BERNSTEIN:
4   Q   Is that your best recall?
5   A   Yes.
6   Q   Did you have any involvement with the
7 payroll before you took it over in 2003?
8   A   No.
9   Q   And how did that come about, that you
10 took over the payroll sometime in 2003, mid
11 2003?
12   A   I suggested ways for Sam to streamline
13 his payroll functions.
14   Q   What did you suggest specifically?
15   A   Start paying everybody on the same pay
16 schedule.
17   Q   Okay.
18   A   Meaning Monday to Sunday. Monday the
19 first day, Sunday the last day of a pay period.
20 Paying everybody out of the same operating
21 company, which is SP Payroll, became the payroll
22 operating company.
23   Q   Anything else you recall suggesting to
24 Sam at that time?
25   A   No.

Page 22

DAVID SAPERSTEIN

1
2  Q   What companies was -- what companies
3  were the workers being paid out of when you
4  suggested that?
5      A   Each company had its own account with
6  ADP and each company had its own payroll.
7  Q   Did Sam adopt your suggestions?
8      A   Yes.
9  Q   And is that at the time that he made
10 you payroll manager?
11     A   It's not an official title. It's just
12 a job description.
13 Q   Function?
14     A   It's a function, yes.
15 Q   When you took over the payroll, did
16 you implement the suggestions that you had made
17 to Sam or did he do that before you started
18 taking over the payroll or something else?
19     A   Sam would've set up the accounts. I
20 would've set up the account with ADP. Sam would
21 set up the parameters of how -- of how much each
22 person would get paid. But other than that, it
23 was up to me to set up the -- I guess the
24 process or the system.
25 Q   When you say would, do you mean did?

Page 23

DAVID SAPERSTEIN

1
2      A   Did, yes.
3      MR. BERNSTEIN:  Read back that last
4  answer.
5      (Whereupon, the requested portion was
6  read back by the court reporter.)
7  BY MR. BERNSTEIN:
8  Q   Were you involved at that time in
9  determining how much each worker would be paid?
10 Did you have any input into that?
11     A   My input was to make sure that
12 everyone got paid at least minimum wage.
13 Q   How did you do that?
14     A   Made sure that their checks came out
15 to -- at that time, I believe it was 5.15 an
16 hour plus whatever time and a half comes out to
17 for anything over 40 hours a week.
18 Q   At that time, did any of the workers'
19 checks, and I'm asking about the checks, reflect
20 more than minimum wage for the hours on their
21 paystubs?
22     A   You mean regular rate?
23 Q   Either regular rate or overtime rate?
24     MS. MEYERS:  At which time?
25     MR. BERNSTEIN:  At the time that he

Page 24

DAVID SAPERSTEIN

1  took over --
2      MS. MEYERS:  First started?
3      MR. BERNSTEIN:  Yes. Took over and
4  made sure minimum wage was being paid.
5      A   I do not believe anyone at that time
6  was making more than minimum wage.
7  Q   Do you know whether at any subsequent
8  time any of the workers' paystubs have shown
9  more than -- the check paystubs have shown more
10 than minimum wage, either regular or overtime?
11     A   As we sit here today?
12 Q   As we sit here today, as the rate of
13 pay?
14     A   Currently there are some that do. I
15 don't know how many.
16 Q   Who made the decision as to what those
17 people are paid?
18     A   Sam.
19 Q   Did he ever tell you on what basis he
20 made the decision?
21     A   No.
22 Q   When you took over the payroll, what
23 was the process? What was the payroll process
24 whereby people were paid?

Page 25

DAVID SAPERSTEIN

1
2      A   Previous to me or --
3  Q   Previous to you, if you know?
4      A   Previous to me. Sam did all the
5  checks. I have no idea how he arrived at
6  whatever he did. When I took over, within a few
7  months, everything went ADPs, what they call PC
8  Payroll for Windows system, and everything was
9  done pretty much in my computer and through ADP.
10 Q   Before you took over -- withdrawn.
11     Do you know whether before you took
12 over, any workers were paid in cash as well as
13 getting paid checks?
14     A   Yes.
15 Q   How did you learn that?
16     A   There were times I had given out the
17 pays.
18 Q   By going to the different garages and
19 handing out envelopes or something else?
20     A   Either handing out the envelopes to
21 specific employees or by giving the pays to Raj
22 to distribute.
23 Q   And at that time, were you involved in
24 deciding what amount of cash would be -- was
25 given to any of the workers?

DAVID SAPERSTEIN

1
2  A    This is while Sam was doing --
3  Q    Yes.
4  A    No.
5  Q    Did Sam ever tell you how he arrived
6  at the cash amounts?
7  A    The specific amounts, no.
8  Q    Did he tell you anything generally
9  about how he was doing that?
10  A    That he inherited the system from I
11  believe it's Jose Tavares and his group.
12  Q    Did he tell you anything else about
13  the practice he had at that time about adding
14  cash to the paychecks?
15  A    It was to make up for lunch -- you
16  know, to pay them for their lunch hours. I
17  believe that's really what the extra cash was
18  for at that time.
19  Q    That's something that Sam told you at
20  the time?
21  A    Yes.
22  Q    Do you know if the workers were taking
23  a lunch hour off from work during the time that
24  Sam was handling the payroll?
25  A    Yes.

DAVID SAPERSTEIN

1
2  Q    What do you know about that?
3  A    That I witnessed workers taking --
4  leaving the garage to get lunch. Sometimes they
5  would come back with it and eat in their car, in
6  the office. I actually reprimanded an employee
7  for eating in a customer's car once. On a few
8  occasions, I've witnessed employees leaving --
9  not being in the garage while I was there and
10  coming back later, after -- you know, after
11  their lunch.
12  Q    This was during the time that Sam was
13  handling the payroll?
14  A    Yes.
15  Q    What was your work schedule at that
16  time in terms of visiting the various garages?
17  A    It varied. Some days I worked from
18  seven to three. Some days I worked from six to
19  six. Some days I worked from 4:00 a.m. to
20  8:00 p.m. It varied.
21  Q    How many days a week were you working
22  at that time?
23  A    Six.
24  Q    And how many garages did you cover in
25  a day?

DAVID SAPERSTEIN

1
2  A    I could've covered one. I could've
3  gone to one garage and not gone to another or I
4  could've gone to all of them. There was no set
5  schedule.
6  Q    And how many were there at the time
7  all together that you were responsible for?
8  A    I think seven.
9  Q    Seven, okay. Generally, how long did
10  you spend at each one?
11  A    Could've been five minutes. Could've
12  been three hours.
13  Q    So it varied a lot?
14  A    Yeah.
15  Q    Do you recall specific instances back
16  then when you saw someone leaving or taking a
17  lunch hour?
18  A    Specifically, I remember once Jose
19  Suazo taking lunch hour specifically.
20  Q    Why does that stand out in your mind?
21  A    Because that particular day, I caught
22  a car in the garage with no ticket and no
23  sticker, and he wasn't there to explain it to
24  me.
25  Q    You found out?

DAVID SAPERSTEIN

1
2  A    I had to wait for him to get back to
3  find out where he was.
4  Q    And he told you he was taking lunch?
5  A    Yes -- specifically, he said eating.
6  Q    Any other specific instances that you
7  recall?
8  A    No -- cancel that. The time that I
9  reprimanded the employee for eating in a
10  customer's car.
11  Q    What garage was that?
12  A    Castle.
13  Q    When did that happen, roughly?
14  A    Sometime in 2002 or 2003.
15  Q    Do you recall who the employee was?
16  A    No.
17  Q    When Sam was handling the payroll,
18  what garages did you cover? Which were the ones
19  that were operating that you covered?
20  A    Sage, Bien, Castle. Sam handled Ivy's
21  payroll for a very short time, so I did visit
22  Ivy every once in a while. That's it.
23  Q    Not 155?
24  A    Sam never handled the payroll for 155
25  or 145.

DAVID SAPERSTEIN

Q   Who did handle the payroll for those?

A   When we first acquired it, Jose Tavares for approximately one or two months was doing the check portion of it. I was doing the cash portion of it. And then the SP Payroll account became active and Jose Tavares was no longer doing any of it, and I was doing all of it.

Q   What about 145, was that operating at the time?

A   145 and 155, we took -- SP Payroll acquired them at the same time, or I should say Sam Podolak acquired them at the same time.

Q   When you say you handled the cash portion, what did you do?

A   Based upon the checks that I received from Jose Tavares, I figured out how much the employees were supposed to get in cash so they would be making the same amount of money that they were making while Jose Tavares was operating the garages.

Q   And where were you getting the checks from at that time or the check amounts that you worked with?

DAVID SAPERSTEIN

A   Jose -- either I went to Jose Tavares's office or Raj went to Jose Tavares's office to pick up the checks. Either I picked them on up or Raj would give them to me.

Q   How did you know how much to make up in cash?

A   Jose Tavares gave Sam the original amounts that the employees were making. I had to figure out -- mathematically, I somehow figured it out based upon his check that he gave us or me, I should say.

Q   Was it something more than arithmetically looking at the difference between the check amount and some number that Jose Tavares provided?

A   Under Sam's scheduling and shifts, they didn't work the same amount of hours, so I had -- Jose did not know how much he paid these people hourly. He only knew how much he gave them net. So I had to figure out how much net they had to get in order to be paid the same amount of money.

Q   The same as they were being paid by Jose?

DAVID SAPERSTEIN

A   Yes.

Q   Did Jose Tavares provide some kind of schedule with the gross amounts that people were supposed to be paid?

A   No.

Q   Can you give me an example of how you calculated the cash amounts and what information you used to do it?

A   I can give you an example of the information.

Q   Okay.

A   I don't remember --

Q   Okay. Fair enough.

A   Jose Tavares provided how much they were supposed to get for specific either shift or total hours, and he provided the checks. The numbers that Jose gave were all net numbers. Until I received the check, the physical check from Jose, I did not know the gross numbers. I did not -- also did not figure out how much cash to put in until I received the checks. I needed to see the net numbers.

Q   And this is net of withholding?

A   Yes.

DAVID SAPERSTEIN

Q   Once you knew the net number, how did you do the calculation?

A   Addition and subtraction, division and multiplication. Again, I don't remember how exactly I came up with the number, but it wasn't anything more complicated than division, multiplication, addition, subtraction.

Q   Did you use a spreadsheet or computer program to do that?

A   Yes.

Q   Did you keep some kind of record of the computations we're talking about?

A   Yes.

Q   What records did you keep?

A   They were payroll sheets or reports for each location per week.

Q   Do those records still exist?

A   Yes.

Q   Do you know if they've been turned over in this lawsuit?

A   Yes.

Q   They have?

A   Yes.

Q   Now, when you took over the payroll,

DAVID SAPERSTEIN

1
2  did employees continue to be paid partly in
3  cash?
4    A  Yes.
5    Q  How did you determine what cash
6  amounts each employee was supposed to get?
7    A  It was a net number based on their
8  hours worked plus one hour for lunch per shift.
9    Q  Did Jose tell you why he was paying
10 employees partly in cash?
11   A  No.
12   Q  Did you ever ask him?
13   A  My contact with Jose Tavares was very
14 limited.
15   Q  Did Sam ever tell you why, before you
16 took over the payroll, the workers were being
17 paid partly in cash?
18   A  Say that again.
19   Q  Did Sam ever tell you why the workers
20 were being paid partly in cash?
21   A  The cash was to make up for their
22 lunch hour that was deducted from the time
23 cards.
24   Q  Sam told you that?
25   A  Yes.

DAVID SAPERSTEIN

1
2    Q  To your knowledge, was there a reason
3  why the lunch hour amounts were not included in
4  the paychecks?
5    A  You would have to ask Sam that.
6    Q  You don't know?
7    A  No.
8    Q  He never told you?
9    A  No.
10   Q  Did you ever ask him?
11   A  No.
12   Q  When you took over the payroll, what
13 was the process whereby paychecks were
14 generated?
15   A  Are you referring to when I started to
16 do it?
17   Q  When you started to do it?
18   A  I would get the hours from Raj and/or
19 Sam.
20      The hours included the one hour per
21 shift lunch, which I deducted from the check and
22 then added back in in the form of cash.
23   Q  When you got the hours from Raj, what
24 kind of information, what type of report --
25 withdrawn.

DAVID SAPERSTEIN

1
2      That was in some written form?
3    A  Yes.
4    Q  How often did Raj or Sam provide that
5  type of record?
6    A  Weekly.
7    Q  Weekly?
8    A  Yes.
9    Q  What did you do with those records
10 after you had utilized the information?
11   A  Depending on the period of time. At
12 one point it went back to Sam. Another point it
13 was just scanned into my computer and sits
14 there.
15   Q  Do you know what Sam did with those
16 records when they went back to him?
17   A  I believe he just put them in a box.
18   Q  Is that at the Second Avenue location
19 or somewhere else?
20   A  I believe Second Avenue.
21   Q  And when you scanned those records
22 into your computer, what happened to the paper
23 copies?
24   A  I believe I destroyed them.
25   Q  We talked about reports you got from

DAVID SAPERSTEIN

1
2  Raj or Sam. What, if any, records did you
3  create in the payroll process? Did you generate
4  lists, spreadsheets?
5    A  Yes. Certain locations were all put
6  on one sheet, Castle, Sage, Bien and Ivy were
7  put on one sheet. The hours inclusive of the
8  one hour for lunch, the net pay and the amount
9  they received in cash were put on a report. At
10 some point, I don't know when, I added gross pay
11 to the reports. 145 and 155 had their own
12 report and Magic has its own report.
13   Q  Where is Magic located?
14   A  121 and St. Nick.
15   Q  Were you responsible at any time
16 for -- withdrawn.
17      Have you discussed your testimony or
18 your prospective testimony for today with anyone
19 before coming here to the deposition?
20   A  No.
21   Q  Just so we're clear, I'm asking
22 whether you discussed your testimony or your
23 prospective testimony at any time before coming
24 to the deposition today?
25   A  My testimony, no.

Page 38

DAVID SAPERSTEIN

1
2    Q    Did you do anything to prepare for
3    your deposition today?
4    A    No.
5    Q    Were you responsible for gathering,
6    copying documents for purposes of this lawsuit?
7    A    Yes.
8    Q    Can you tell me what you did and when
9    you did it in that process?
10   A    When would be more difficult. What I
11   did is I instructed Raj to get me all of the
12   time cards. I made copies of any paper
13   reports -- strike that. I didn't make copies.
14   I made copies of some paper reports. I got all
15   of the ADP reports together in an understandable
16   manner, and I made copies of all computer files.
17   Q    Do you know where Raj got the time
18   cards from?
19   A    Wherever he keeps them.
20   Q    When you got them from Raj, did you go
21   through them to see what was there?
22   A    No.
23   Q    The paper reports, what were -- what
24   were those? You said copies of paper reports,
25   so what type of reports did you get?

Page 39

DAVID SAPERSTEIN

1
2    A    Whatever of the hourly sheets that Raj
3    and/or Sam submitted to me. Raj also
4    submitted -- at some point, raj also submitted
5    grids as far as what hours people worked a day.
6    I think as far as paper goes, that's all I
7    copied.
8    Q    The hourly sheets, did you have those
9    or Raj gave you those or something else?
10   A    Some of them I had. Some of them Sam
11   had -- I had picked up at 1832 Second Avenue.
12   Q    And the same with the grids, did you
13   have those or did you get them from somewhere
14   else?
15   A    Some of them I had, some of them Raj
16   had.
17   Q    Is there any particular breakdown in
18   terms of which ones you had, which ones Raj had,
19   like in terms of timeframe or garage or
20   something else?
21   A    It would've been timeframe. When I
22   started to scan information -- scan documents
23   into the computer for safekeeping, that's when
24   I -- somewhere in that period of time was where
25   Raj would've stopped maintaining his or Sam

Page 40

DAVID SAPERSTEIN

1
2    would've stopped maintaining his.
3    Q    I think you said you didn't review the
4    time cards that you got from Raj?
5    A    That's correct.
6    Q    How about the hourly sheets and the
7    grids that you got from Raj, did you look
8    through them?
9    A    When I was compiling them?
10   Q    When you were compiling them for the
11   lawsuit, yes?
12   A    No -- I attempted to put them in some
13   sort of date order, that's as far as looking
14   through them as I went.
15   Q    Did you succeed?
16   A    Kind of. I would say 90 percent.
17   Q    What about the time cards, did you
18   attempt to organize them in date order or some
19   other way?
20   MS. MEYERS: Objection.
21   He said he didn't look through the
22   time cards.
23   BY MR. BERNSTEIN:
24   Q    So you didn't do anything to reorder
25   or reorganize them?

Page 41

DAVID SAPERSTEIN

1
2    A    No.
3    Q    Were there any gaps in the hourly
4    sheets or the grids that you noticed when you
5    were going through them?
6    A    I really did not go through the hourly
7    grids, so I don't know whether there were any
8    gaps or not. The sheets, might have been
9    missing one, two, I don't recall.
10   Q    And you also printed out reports that
11   you had scanned, that you previously scanned,
12   that you printed them out; am I understanding
13   that correctly?
14   A    The hourly reports you mean?
15   Q    Any type reports.
16   A    Yes.
17   Q    Those were hourly reports that you
18   scanned at some previous time?
19   A    Hourly reports and the grids.
20   Q    And the grids, okay.
21   A    Yeah.
22   Q    Did you print them in a particular
23   order or did you organize in some fashion after
24   they were printed?
25   A    Actually, I did not print them. I

Page 42

DAVID SAPERSTEIN

1
2 just copied the electronic file onto a -- I
3 think I did it on a flash drive, and it was just
4 put with all the other information.
5      Q    And the reports that you copied onto a
6 flash drive, do you know how they were ordered,
7 if at all? Were they in date order at the time
8 or by garage or something else?
9      A    It depends on how whoever looked at it
10 sorted it. You could've done it in a number of
11 different ways.
12      Q    How, if at all, were they ordered on
13 your computer?
14      A    By date.
15      Q    And what types of reports were these?
16 Were these spreadsheets or something else?
17      A    They would be handwritten reports from
18 Raj and/or Sam and the grids.
19      Q    And then I think you said you turned
20 over computer files of some sort?
21      A    The spreadsheets.
22      Q    Those are spreadsheets that you
23 created?
24      A    Yes.
25      Q    And how were they kept on your

Page 43

DAVID SAPERSTEIN

1
2 computer? Are they in some sort of date order
3 or something else? Are they in files by garages
4 or something else?
5      A    Filed by garage in date order.
6      Q    When you turned over the -- well, I
7 think I already asked you that.
8           When you turned over the reports that
9 had been scanned -- and I understand you did
10 that by putting them onto a flash drive?
11      A    Yes.
12      Q    Did you notice if there were any
13 reports that were missing, either for a date
14 period or garage or something else?
15      A    No, I didn't even look.
16      Q    Okay. And how about the computer
17 files, the spreadsheets? Do you know if there
18 were any gaps in the ones that you turned over?
19      A    There were one or two that I
20 accidentally corrupted.
21      Q    One or two out of how many?
22      A    Out of 2003 to 2006 or 2007, one per
23 week per garage. So whatever that multiplies
24 out to.
25      Q    Okay. Do you know if there are any

Page 44

DAVID SAPERSTEIN

1
2 records that demonstrate or -- from which you
3 can tell how many cars are in a particular
4 garage at any particular time?
5      A    There are monthly reports that are
6 done -- they're supposed to be done twice a day.
7 At about eight in the morning and somewhere
8 around 11 or 12 at night -- I'm sorry, at three
9 in the afternoon and 11 or 12 at night. Again,
10 there are supposed to be two of them. One at
11 somewhere around three and one somewhere around
12 midnight. There are no reports available to
13 figure out how many transient cars are in at any
14 given time.
15      Q    So those are monthly customer reports,
16 in other words?
17      A    It depends on which garage we're
18 talking about. Some garages, a lot less
19 complicated reports than others.
20      Q    What types of complications go into a
21 report like that?
22      A    An example is Bien had -- just had a
23 sheet, a numbered sheet, one through, I think
24 100 or maybe 200. No information on it at all.
25 All the attendant had to do was walk around the

Page 45

DAVID SAPERSTEIN

1
2 garage. If he saw car number one, he checked
3 off the box in one. If he saw 50, he checked
4 off the box in 50. Ivy had the report that had
5 the specific car on it, that theoretically the
6 attendant was supposed to check that the car
7 that was on the list was the same as the car in
8 the garage.
9      Q    Were you involved or have you been
10 involved at all in assigning workers to
11 particular facilities?
12      A    No.
13      Q    After you took over the payroll, did
14 you continue to visit the garages?
15      A    Only when there were problems.
16      Q    About how often was that, generally?
17      A    Once a month. Except for 155th
18 Street. I went six days a week, mainly to meet
19 Raj.
20      Q    How long did you spend at 155th each
21 day?
22      A    Could've been two minutes, could've
23 been an hour.
24      Q    It varied a lot?
25      A    Yeah.

Page 46

DAVID SAPERSTEIN

Q    Did you ever meet Miguel Alcatara?

A    Yes.

Q    When did you first meet him?

A    Shortly after we took 145th Street and 155th Street from Jose Tavares.

Q    Do you recall specifically anything that was said between you at that time?

A    Very little. He speaks almost no English.

Q    And how were you introduced to him?

A    I don't remember.

Q    Have you spoken with him since then?

A    Yes.

Q    When was that?

A    We have an outstanding Workers' Comp. case with him.

Q    When did you last speak with him?

A    A year.

Q    A year ago?

A    Maybe.

Q    Have you spoken with him in between when you first met him and the Workers' Comp. case?

A    You mean while he was working?

Page 47

DAVID SAPERSTEIN

Q    While he was working?

A    Hello. Buenos dias, buenas noches.

Q    Just casual conversation?

A    Yes.

Q    How about after he stopped working?

A    Not until the Workers' Comp. case.

Q    Do you know who Edison Alvarez is?

A    Yes.

Q    Have you met or spoken with him in person?

A    Yes.

Q    When was that?

A    Various times throughout his period of employment.

Q    Was that at one or more than one of the garages that we're concerned with?

A    It was definitely at Ivy Parking.

Q    About how many times have you spoken with Edison Alvarez?

A    Over the period of his employment?

Q    Yeah.

A    Thirty, 40, 50 maybe.

Q    What generally did you speak with him about?

Page 48

DAVID SAPERSTEIN

A    At the time, I maintained the monthly list at Ivy Parking; and if I had any questions about it, I called him.

Q    Was that while you were a supervisor?

A    No. Also while I was doing payroll, I maintained the list for Ivy Parking. It was one of the only garages -- it was the only garage in the Bronx that I maintained the list for.

Q    What list was that?

A    The monthly list.

Q    The monthly list that you mentioned a few minutes ago?

A    Yes.

Q    Monthly customers, in other words?

A    Yes.

Q    Do you recall ever speaking with Edison Alvarez on any other subject?

A    Occasionally, he would question his pay. Occasionally, he would question his -- the amount of cash that he received.

Q    Is this when you were a supervisor or when you were handling the payroll or something else?

A    Both.

Page 49

DAVID SAPERSTEIN

Q    Where did these conversations take place?

A    Probably the phone.

Q    Telephone?

A    Yes.

Q    About how many times has that happened?

A    Not very often, because Sam decided what he would get paid so any questions referring to his pay were referred to Sam.

Q    Is that something that you told him, you should speak to Sam?

A    Yes.

Q    Did you ever learn whether he did speak to Sam?

A    No.

Q    Did Sam ever speak with you about Mr. Alvarez's complaints?

A    He, on a couple of occasions asked me how much Alvarez's check was and how much cash he got and how many hours he worked. I assumed that they were because Sam needed information to respond to Alvarez's inquiries.

Q    Did Sam ever tell you how he responded

Page 50

DAVID SAPERSTEIN

2 to the -- to Mr. Alvarez's questions?
3    A    No. The only conversations I had with
4 Sam regarding Alvarez is Sam told me Alvarez
5 couldn't make more than 40 hours on a check due
6 to some sort of a personal issue and that he was
7 to get 40 hours on a check and everything else
8 in cash.
9    Q    Was there a limit to the number of
10 hours that Mr. Alvarez could work?
11    A    That, I don't know.
12    Q    When you say a personal issue, I think
13 you said?
14    A    Yeah. I think it had something to do
15 with his apartment. I'm not sure.
16    Q    Do you have any more information about
17 why Mr. Alvarez was limited in the way that you
18 said he was?
19    A    No.
20    Q    After you spoke with Sam, did you make
21 some changes in the amount of cash for
22 Mr. Alvarez?
23    A    No.
24    Q    You gave him the amount that Sam said
25 to give him?

Page 51

DAVID SAPERSTEIN

2    A    Yes.
3    Q    When was the last time, if you can
4 recall, that Mr. Alvarez complained to you about
5 the amount of his pay?
6    A    I don't remember.
7    Q    Was it anytime in the last year?
8    A    No.
9    Q    Do you know Jose Diroche?
10    A    I know the name.
11    Q    Did you ever meet him?
12    A    Not personally, no.
13    Q    Have you ever spoken with him?
14    A    No.
15    Q    You recognize the name as one of the
16 employees; is that right?
17    A    I recognize him both as an employee
18 and a member of this proceeding.
19    Q    But you knew who he was before the
20 lawsuit?
21    A    I knew the name.
22    Q    You knew the name?
23    A    Yes.
24    Q    Before the lawsuit got started?
25    A    Yes.

Page 52

DAVID SAPERSTEIN

2    Q    How about Patricio Gonzalez, do you
3 know who that is?
4    A    I know the name.
5    Q    You never met or spoke with him?
6    A    I never met him. I am aware of
7 paperwork regarding him and this suit where he
8 had come to some sort of a settlement previous
9 to this suit.
10    Q    Do you know who Victor Gonzalez is?
11    A    An employee.
12    Q    Have you ever met or spoken with him?
13    A    No.
14    Q    How about Luis Luna?
15    A    Employee.
16    Q    Have you ever met or spoken with him?
17    A    No.
18    Q    Have you ever met or spoken with
19 Angelo Pena?
20    A    Yes.
21    Q    Once? More than once?
22    A    More than one occasion.
23    Q    Can you put a timeframe on those
24 meetings?
25    A    No.

Page 53

DAVID SAPERSTEIN

2    Q    Was that at a garage or somewhere
3 else?
4    A    At a garage.
5    Q    Do you recall which one?
6    A    1155, maybe 145.
7    Q    What generally was discussed between
8 you and Mr. Pena?
9    A    Nothing of substance, just hello and
10 goodbye.
11    Q    Do you know who Miguel Rojas is?
12    A    Yes.
13    Q    Have you ever met or spoken with him?
14    A    I don't know whether I've ever met
15 him. I just know the name. I could've met him
16 in a garage, I don't know.
17    Q    How about Rolando Rojas, do you know
18 who he is?
19    A    I know who he is. I've met him; but
20 if I met him again, I wouldn't know it was him.
21    Q    What do you recall about meeting him?
22    A    Just cordial. Again, he speaks
23 limited English.
24    Q    Franklin Santana, do you know who he
25 is?

Page 54

DAVID SAPERSTEIN

1:
2   A   Yes.
3   Q   Have you ever met or spoken with him
4   in person?
5   A   No.
6   Q   Christian Santos, do you know who that
7   is?
8   A   Yes.
9   Q   He is also an employee?
10  A   Was.
11  Q   Have you ever met or spoken with him
12  in person?
13  A   No.
14  Q   How about Jose Reyes, do you know who
15  that is?
16  A   Sounds like he was an employee; but
17  off the top of my head, I don't know.
18      MS. MEYERS: Rich, I think that's not
19  his first name.
20  Q   Jose De Arce Reyes?
21  A   Former employee.
22  Q   Have you ever met or spoken with him
23  in person?
24  A   No.
25      MR. BERNSTEIN: Let's take a short

Page 55

DAVID SAPERSTEIN

1
2   break here.
3       (Whereupon, a break was taken.)
4   BY MR. BERNSTEIN:
5   Q   At what point did you start working
6   with the information that you got from Jose
7   Tavares? I think you said you got a net number,
8   and then you worked out a cash number based on
9   that in some way. Do I understand that
10  correctly?
11  A   Jose Tavares paid some portion in cash
12  as well as check.
13  Q   Okay.
14  A   Whatever date that we started managing
15  145 and 155 is the date. I want to say May of
16  2003, but I'm not sure.
17  Q   But whatever date that was, that's
18  when you started utilizing information from Jose
19  Tavares in terms of a net number that you worked
20  into a cash number in some way?
21  A   Me?
22  Q   Yes. Is that something you did?
23  A   Yes.
24  Q   And did you continue to go through
25  that process after you took over the payroll?

Page 56

DAVID SAPERSTEIN

1
2   A   Once the ADP program was up and
3   running, we discontinued getting checks from
4   Jose Tavares.
5   Q   But in terms of figuring out the cash
6   amount, how did you do that once you took over
7   the payroll?
8   A   We continued to pay the employees the
9   same -- in the same manner that Jose Tavares
10  did.
11  Q   So you began with a net amount and
12  then computed a cash amount in some way based on
13  that?
14  A   We began with a net amount and a net
15  check -- a net check to find out how much cash
16  needed to be added to come up with the original
17  net amount.
18  Q   Explain to me what you mean by the
19  original net amount.
20  A   Jose Tavares was paying his employees
21  a net amount. I don't remember what that number
22  is. But he paid a net amount. So rather than
23  to have disgruntled employees, we continued to
24  follow Jose's system. I knew how much net they
25  were supposed to get for a specific amount of

Page 57

DAVID SAPERSTEIN

1
2   hours.
3   Q   I see.
4   A   So in order to figure out the gross
5   numbers never came into play other than to make
6   sure that they got paid minimum wage for their
7   time worked. Minimum wage plus overtime.
8   Q   And the net amount for a certain
9   amount of hours is net of payroll withholding?
10  A   It's what they actually walked home
11  with.
12  Q   Cash plus check?
13  A   Cash plus check.
14  Q   I see. Do you know if the amount you
15  got from Jose Tavares varied if the amount of
16  hours that an employee worked varied?
17  A   From Jose Tavares, I have no idea what
18  he did if someone worked less hours than they
19  were scheduled.
20  Q   How about once you started taking over
21  the payroll, you still started with a net amount
22  for a certain number of hours?
23  A   If they worked -- they got paid for
24  the amount of hours they worked plus one hour
25  per shift for lunch.

Page 58

DAVID SAPERSTEIN

Q   When you say they got paid for the
number of hours they worked plus, did the amount
that they were paid for hours worked vary when
the number of hours varied?

A   Yes.

Q   Higher number if the number of hours
was higher and so forth?

A   Yes.

Q   Has that system changed in any way
since you started -- since you took over the
payroll back in 2003?

A   Yes.

Q   How has it changed?

A   Currently, we do not pay many people
in cash and the hours that they worked inclusive
of the lunch hour is in the check.

Q   Are there any people who are still
paid in cash?

A   A few.

Q   Which ones are they?

A   Forgive me if I don't say everybody.

Q   Well, I don't know if it's just a
random group of names or there's -- it's a
particular garage or something else?

Page 59

DAVID SAPERSTEIN

A   It's usual the same employees every
week. Occasionally it changes; but for the most
part, it's the same.

Q   What accounts for the fact that those
people are still on the previous system?

A   Sam's decision.

Q   Did Sam ever explain to you his basis
for keeping them on the same system?

A   It's not the same system.

Q   Okay.

A   I'm just going to use employee A
worked 55 hours plus five hours for lunch.

Q   Okay.

A   Employee A got a check for 40 hours
plus 20 overtime plus some cash. It had nothing
to do with his lunch or how much he got. He
would just -- Sam decided that he wanted to give
him extra. That's current.

Q   Have there been any other changes
besides what you just told me?

A   Other than the minimum wage changes,
no.

Q   So if I understand correctly, there
are now some employees that are paid exclusively

Page 60

DAVID SAPERSTEIN

by check?

A   Most employees are paid exclusively by
checks.

Q   And when did that begin to be done?

A   I think sometime in 2006.

Q   Who made the decision to do that?

A   Sam.

Q   What did he tell you about that?

A   He said that he wanted -- he no longer
wanted to pay cash to most of the employees to
change the way people -- change the way checks
were being cut to include hours worked and
lunch.

Q   Did he tell you why he wanted to make
that change?

A   No.

Q   Did you ask him?

A   Yeah.

Q   What did he say about that?

A   Didn't get an answer.

Q   He didn't say anything?

A   He went onto something else, and I
never returned to the question.

Q   For the employees that are now paid

Page 61

DAVID SAPERSTEIN

exclusively by check, what is the process
whereby their paycheck is generated?

A   From beginning to end?

Q   Yes. Generally describe the process.

A   The process is generally the same.
Raj or Sam faxes me a handwritten sheet that has
their hours on it, either by location or group
of locations, and I enter into ADP's payroll
system the amount of hours, 40 hours plus
whatever additional. Next day I get a check;
and somehow I get it to Raj.

Q   Let's look at Exhibit 5. (Handing.)
Paragraph can you tell me what time of record
that is? Is that something you recognize?

A   Yes.

Q   What is it?

A   It's generated from ADP PC Payroll for
Windows. It is an earnings statement from the
beginning of when Angelo Pena -- let me back up
a little. It is an itemization of every check
that Angelo Pena received from SP Payroll.
Includes gross pay and net pay and week ending
and so forth.

Q   Is it a type of record that SP Payroll

Page 62

DAVID SAPERSTEIN

2 keeps in the normal course of business or was it
3 created for the lawsuit or something else?

4     A   This particular record was created for
5 the lawsuit.

6     Q   Is it a summary of amounts that are on
7 the actual paystubs?

8     A   More information appears on the
9 paystubs than does in this report.

10     Q   But it does itemize the gross and net?

11     A   That's correct.

12     Q   Then if we look at Exhibit 6.

13 (Handing.)

14     Is that a paystub for Mr. Pena or a

15 copy?

16     A   It's a reproduction of a paystub
17 generated by PC Payroll for Windows.

18     Q   This says it's for pay date August
19 3rd, 2007, period ending July 29th, '07. Do
20 you see that?

21     A   Yes.

22     Q   Do you know if at that time Mr. Pena
23 was being paid exclusively by check?

24     A   Yes.

25     Q   He was?

Page 63

DAVID SAPERSTEIN

2     A   Yes.

3     Q   When you were a supervisor, did you
4 personally hand out the pay to the workers?

5     A   Rare occasions, but yes.

6     Q   When you were a supervisor, who
7 normally did that?

8     A   Raj.

9     Q   On what types of occasions did you do
10 that? What were the rare occasions,
11 circumstances?

12     A   If Raj was sick, if Raj was on
13 vacation or if I just happened to be going there
14 for another reason.

15     Q   While you were supervisor, did the
16 workers -- did any of the workers give a written
17 receipt for the cash?

18     A   Not that I'm aware of, no.

19     Q   Do you know if Raj ever gotten written
20 receipts for cash?

21     A   Not that I'm aware of.

22     Q   And how about after you took over the
23 payroll, did workers ever provide written
24 receipts for cash that they got?

25     A   Not that I'm aware of.

Page 64

DAVID SAPERSTEIN

2     Q   Do you know if any of the workers were
3 ever asked to give a receipt for the cash?

4     A   Let me actually back up on that one.
5 Edison Alvarez actually gave Sam some form of
6 acknowledgment that he received cash.

7     Q   Aside from that, are you aware of any
8 kind of cash or acknowledgment that workers gave
9 or were asked to give?

10     A   No.

11     Q   When you were supervisor, did
12 employees who worked the same number of hours in
13 a week get the same amount of cash? For
14 example, if there were two employees that
15 worked, say, 72 hours, they both worked 72 hours
16 in a given week, did they get the same amount of
17 cash?

18     A   I don't know. I wasn't doing payroll
19 at that time.

20     Q   What about when you started doing
21 payroll?

22     A   It depended. Since their pays were
23 based on net, it depended on how many
24 deductions. If their nets were the same, their
25 pay was the same.

Page 65

DAVID SAPERSTEIN

2     Q   As part of your job, do you look at or
3 go through time cards, the time cards
4 themselves?

5     MS. MEYERS: Objection. When?

6     MR. BERNSTEIN: At any time.

7     A   It doesn't really matter, no. Let me
8 back up. I occasionally glance at them. If I'm
9 at a location, I might just glance just to make
10 sure they're being used.

11     Q   When you say to make sure they're
12 being used, you mean that the employees --

13     A   Are punching in and out.

14     Q   Have you found times when employees
15 are not punching in and out every time they're
16 supposed to?

17     A   Occasionally. They also refused to
18 punch in and out for lunch when we attempted to
19 get them to do that.

20     Q   Okay. We'll get to that.

21     A   Okay.

22     Q   Occasionally, if I understand you
23 correctly, there are missing punch-ins or
24 punch-outs that you've seen?

25     A   Yes.

DAVID SAPERSTEIN

1
2  Q   I should say time cards that you've
3  seen with a missing punch-in or punch-out time?
4  A   Yes.
5  Q   When the punch-in or punch out-time is
6  missing, how, if at all, are the employees'
7  hours figured for that day?
8  A   It was up to Raj. Raj was the one
9  that knew when they were coming and going. He
10  was the one that determined what time they got
11  there and what time they left.
12  Q   Now, you said that employees refused
13  to punch in and out for a lunch break; am I
14  correct?
15  A   Refused might have been a wrong word.
16  Q   Okay. They didn't do it?
17  A   Unable to do it might be a better
18  choice of words.
19  Q   Tell me what you remember about that.
20  A   At some point, I had requested Raj to
21  get the employees to punch in and out whenever
22  they left the garage.
23  Q   Not just for lunch but whatever?
24  A   My choice of words was "whatever," but
25  it meant lunch, and Raj understood that. And we

DAVID SAPERSTEIN

1
2  just couldn't -- could not get them to do it.
3  They either forgot, they didn't want to do it;
4  for whatever reason, they did not do it.
5  Q   Do you recall when you --
6  MR. BERNSTEIN: Can you repeat the
7  last answer and question.
8  (Whereupon, the requested portion was
9  read back by the court reporter: Q, tell me
10  what you remember about that? A, at some
11  point I had requested Raj to get the
12  employees to punch in and out whenever they
13  left the garage. Q, Not just for lunch but
14  whatever? A, My choice of words was
15  'whatever,' but it meant lunch, and Raj
16  understood that. And we just couldn't --
17  could not get them to do it. They either
18  forgot, they didn't want to do it; for
19  whatever reason, they did not do it.)
20  BY MR. BERNSTEIN:
21  Q   How were workers told to punch in and
22  out for lunch?
23  A   Verbally.
24  Q   By you or Raj?
25  A   By Raj.

DAVID SAPERSTEIN

1
2  Q   Was that something you asked Raj to
3  do?
4  A   Yes.
5  Q   When did that happen?
6  A   It was more than one request, and they
7  were made sometime in the early part -- early
8  and mid part of 2004.
9  Q   And what caused you to ask Raj to do
10  that?
11  A   The time cards were not reflecting
12  that they were going out, so I needed -- I
13  needed that to happen.
14  Q   And how do you know that the time
15  cards were not reflecting that?
16  A   Raj told me.
17  Q   What did he tell you about that?
18  A   That after the first time I had asked
19  him to get them to punch in and out for when
20  they left the garage, I asked him if they were
21  doing it, he said no. After the second time I
22  asked him to do it, I asked him again, the same
23  question, he said no.
24  Q   Do you know if Raj did anything
25  besides asking the workers to punch in and out

DAVID SAPERSTEIN

1
2  for lunch? Did he take any other steps to see
3  to it that they did that?
4  A   I don't know.
5  Q   Did you ask him to take any other
6  steps besides telling the workers to punch in
7  and out for lunch?
8  A   I did tell him that if they don't do
9  it, they're going to receive reprimands for it.
10  I don't know whether he told them that or not.
11  Q   Do you know if anyone was ever
12  reprimanded for not punching in and out for
13  lunch?
14  A   No official letter was written.
15  Q   How about unofficially?
16  A   It wouldn't have come from me, it
17  would've come from Raj.
18  Q   So you don't know one way or the
19  other?
20  A   No.
21  Q   Do you know if there are any time
22  cards that show a worker punching in or out for
23  a lunch hour?
24  A   I don't know.
25  Q   Let's look at Exhibit 9. (Handing.)

Page 70

DAVID SAPERSTEIN

1
2     I think my question is, what type of
3   record are we looking at here?
4       A     These documents are previous to when I
5   was doing payroll, but are similar to the ones
6   that I would receive from Raj and/or Sam, or
7   some of them are similar.
8       Q     Do you have one that you can tell me
9   is similar?
10      A     The second page. The one dated
11  May 8th, '03.
12      Q     Okay.
13      A     It's similar to what I currently get.
14      Q     Similar in that there's a list of
15  employees for various garages with days and
16  hours worked?
17      A     Correct.
18      Q     And then the ones you now get also
19  have numbers added onto them by Sam?
20      A     Some do, some don't.
21      Q     Which ones do and which ones don't?
22  Does it vary --
23      A     It varies.
24      Q     -- by garage or something else?
25      A     No. It depends on whether Sam happens

Page 71

DAVID SAPERSTEIN

1
2   to be in time to write these, like eight plus
3   four. If he happens in time to write it in,
4   then he does that. If he's not in in time, then
5   I have to do it on my own.
6       Q     How do you do it on your own?
7       A     It's more or less arbitrary. This
8   eight plus four means he worked 12 hours. At
9   this particular garage, the allotment of regular
10  time -- we're talking about Persio. At this
11  particular garage, the allotment is eight
12  regular hours, four overtime hours at this
13  particular garage. And then somewhere on there
14  there's probably 32 hours plus whatever extra
15  overtime you worked underneath it. At Sage, he
16  worked 32 plus 16, which brings his 40 regular,
17  20 overtime.
18      Q     When you say allotment, I'm not sure
19  what you mean by that.
20      A     It really has nothing to do with the
21  employee. It's how the labor cost is
22  distributed from one garage to the other because
23  he worked in two separate garages.
24      Q     Who makes that distribution?
25      A     In this particular case, Sam did.

Page 72

DAVID SAPERSTEIN

1
2       Q     Do you know on what basis he does that
3   or what basis you do it when you do it?
4       A     If an employee worked 12 hours five
5   days a week, I would basically do eight plus
6   four for every 12 hours, and it would, you
7   know -- it would kind of add up to 40 plus or
8   whatever. Forty plus 20.
9       Q     Let's look at Exhibit 12. (Handing.)
10      Quickly, are there reports in here
11  from the time when you were handling the
12  payroll?
13      A     Yes.
14      Q     Can you give me an example?
15      A     Let me back up. At this -- let's just
16  go with the first page. 8-25-03 to 9-1-03, I
17  was only handling the check portion of the
18  payroll.
19      Q     So in that instance, how did you
20  utilize the information from this report?
21      A     In this particular instance?
22      Q     Yes.
23      A     Let's take in Bien, Felix, he got on
24  his check 40 hours regular, 26 hours overtime at
25  whatever the minimum wage rate was.

Page 73

DAVID SAPERSTEIN

1
2       Q     Is there an example in here of when
3   you were handling both the check and the cash
4   portion?
5       A     Let's go to the last one, since it's
6   probably the last date.
7       Q     The last one?
8       A     Let me see what that date is. We
9   can't read that date, so let's go to the one
10  before the last one.
11      Q     Okay.
12      A     I believe I was handling both portions
13  at this point.
14      Q     Okay. And in that instance, how did
15  you utilize the information that you were given?
16      A     In this particular one, Sam figured
17  out the distribution of regular and overtime
18  pays. Let's take Sammy, for instance.
19      Q     The first one?
20      A     The first one. Forty hours regular,
21  26 overtime is what his check was. And I'm
22  guessing that at some point I put cash in his
23  envelope as well.
24      Q     And what method did you use to arrive
25  at the cash amount?

Page 74

DAVID SAPERSTEIN

1
2    A    I added in six hours for lunch because
3    six days, six hours.
4    Q    And we know it's six because -- well,
5    it says six days?
6    A    It says six.
7    Q    And 72 hours?
8    A    Yeah.
9    Q    And then Sam wrote 40 plus 26?
10   A    Yes.
11   Q    Meaning the check amount was for 40
12   regular and 26 overtime hours?
13   A    Yes.
14   Q    Let's look at Exhibit 13.  (Handing.)
15       Are these pages, or most of them,
16   examples of the grid that you said you got from
17   Raj at times?
18   A    Yes. There are also additional pages
19   in here with the hours that I would get from Raj
20   and/or Sam. In this particular case, I did the
21   distribution of regular and overtime hours on my
22   own.
23   Q    What's the date on that?
24       MS. MEYERS: Page number?
25       THE WITNESS: Looks like 17.

Page 75

DAVID SAPERSTEIN

1
2    BY MR. BERNSTEIN:
3    Q    Is there a date on the page you just
4    looked at?
5    A    1-14 to 1-20-2008, and it's the sixth
6    page.
7    Q    So Raj sometimes gave you information
8    in a grid form and sometimes in the list form
9    that we've looked at; is that right?
10   A    Currently I get them in both grid form
11   and list form.
12   Q    For the same workers or --
13   A    Yes.
14   Q    When did Raj start providing the grid
15   type format?
16   A    I believe in 2007, but I'm not sure.
17   Q    And how did it come about that he
18   started doing that? Was it his idea or somebody
19   else's to do it?
20   A    No, it was my idea.
21   Q    And what was your basis for asking him
22   to do that?
23   A    I needed to see how many hours per
24   shift the employees were working, because at
25   this time we were trying to control our

Page 76

DAVID SAPERSTEIN

1
2    overtime.
3    Q    How does the grid format show the
4    number of hours per shift that people were
5    working?
6    A    Well, let's take the first page, Bien.
7    Q    Sure.
8    A    Sammy Gerardo, Monday, eight hours.
9    Tuesday, eight hours and so on. It specifically
10   says in this particular day how many hours they
11   worked in that day.
12   Q    I see. That's a piece of information
13   that's not on the list form; is that right?
14   A    That's correct.
15   Q    How did having the information in the
16   grid help you to control overtime?
17   A    It just made it easier for me to see
18   where people were working 12 hours a day or 10
19   hours a day or eight hours a day, and it helped
20   me, you know -- it helped me advise Sam that we
21   need to cut down on overtime costs. And if it
22   means to hire an extra man to work less
23   overtime, that's what it means doing.
24   Q    Next let's look at Exhibit 14.
25   (Handing.)

Page 77

DAVID SAPERSTEIN

1
2    Do you recognize that -- I'm just
3    focusing on the first page. Do you recognize
4    that document --
5    A    Yes.
6    Q    -- or type of document?
7    A    Yes.
8    Q    What is it?
9    A    It's a document that I generated to
10   figure out how much cash to give the employees.
11   Q    Can you tell me what information is in
12   the numerical columns?  I see there's a list of
13   garages by the list of workers' names.
14   A    Okay.
15   Q    You have total net pay and so forth.
16   A    So total net pay is the total net
17   they're supposed to be receiving for the hours
18   worked plus the lunch hour in cash and check.
19   Total hours worked is the total hours worked
20   inclusive of the lunch hour. The net check is
21   how much the check is net for this location.
22   17.21 is the cash amount. Seventeen, it's
23   rounded off.
24   Q    Let's go back to total net pay.
25   A    Uh-huh.

Page 78

DAVID SAPERSTEIN

1
2    Q    In this case this is Persio. $126.
3    Where did that number come from?
4    A    It's 24 times whatever it figures
5    out -- the amount that figures out to net. It's
6    not a gross number. So its got to figure out to
7    a net number. So it's 24 -- if you divide 126
8    by 24, you'll get what it is.
9    Q    If we divide 126 by 24, we get a
10   number that's five something?
11   A    Right.
12   Q    But where does the 126 come from?
13   A    Twenty-four times whatever that number
14   is. Twenty-four times 5.25 is 126.
15   Q    So where does the 5.25 come from?
16   A    There was the net -- that's how I
17   figured out what they were supposed to get net
18   based on --
19   Q    But how did you know to use 5.25? It
20   may be very elementary here?
21   A    No, I understand what you're saying.
22   I'm not 100 percent sure. This was four years
23   ago; and after I did it the first time, I never
24   did it again. I believe we took whatever Jose
25   Tavares was paying them net, divided it by

Page 79

DAVID SAPERSTEIN

1
2    whatever amount of hours they worked, inclusive
3    of the lunch hour, and that's where the number
4    came from.
5    Q    That's where the 5.25 came from?
6    A    Right. Which equates to something
7    like six something gross.
8    Q    How do you get from the net to the
9    gross?
10   A    It didn't matter. It didn't matter
11   because the employees didn't know -- they didn't
12   care about their gross. They only cared about
13   what they walked home with. For payroll
14   purposes, I'm sorry, it didn't matter.
15   Q    I understand. But you still had to
16   have a method to go from net to gross?
17   A    No. I didn't need -- I only needed a
18   method to get from gross to net. Their gross
19   was very simple. Gross was based on minimum
20   wage, hours worked.
21   Q    I see. Minimum wage and hours worked?
22   A    Minimum wage meaning 40 regular and
23   whatever 1.5 times the minimum wage rate at
24   whatever time it was. I believe 2004 was 5.15.
25   Q    Did overtime -- did the overtime rate

Page 80

DAVID SAPERSTEIN

1
2    go into that computation?
3    A    Which computation.
4    Q    Well, when you said based on -- I
5    think you said based on hours worked and gross?
6    A    I don't know which computation you're
7    talking about. Overtime went into their gross
8    check.
9    Q    Okay.
10   A    So if they worked -- let's just take
11   an example here. In this case, Persio at Bien
12   worked 24 hours.
13   Q    And that would come from the time
14   cards?
15   A    Well, I would get it from the sheets
16   that we looked at earlier.
17   Q    Raj got it from the time cards and
18   gave it to you; is that right?
19   A    That's correct.
20   Q    24 hours?
21   A    24 hours. So some variation of 24
22   hours was regular pay and some variation -- I'm
23   sorry, this 24 hours is inclusive of the hour
24   for lunch.
25   Q    Okay.

Page 81

DAVID SAPERSTEIN

1
2    A    So some variation of 22 hours went to
3    regular pay and some variation -- you know,
4    whatever variation went to overtime. The total
5    net check attributed to Bien was $108.79. I
6    needed to get him to 126 so he netted what he
7    wanted to. You know, what he expected.
8    Q    Okay.
9    A    Which was 126 minus 108.79 is 17.21.
10   Within a penny or so.
11   Q    So the cash number is total net pay
12   minus net check?
13   A    Correct.
14   Q    Where does the net check number come
15   from?
16   A    I got it from a report from ADP, but I
17   could've just as easily waited for the check and
18   looked at the check.
19   Q    I see. I see.
20   A    Let me back up on that. I could not
21   have gotten it from looking at the report -- not
22   looking at the check. I would've gotten it from
23   a labor distribution report that ADP generates
24   after I send them the information.
25   Q    Is the net check number the net pay

DAVID SAPERSTEIN

2 that's actually the amount of the check that
3 Persio got?
4     A    Not -- when an employee works at two
5 separate locations, for accounting reasons, not
6 for payroll reasons, but for accounting reasons,
7 you want to attribute the proper amount to the
8 proper location. So each location pays its fair
9 portion of the payroll.
10    Q    Of course.
11    A    So if you look at it, somewhere else
12 on here there's Persio, 108.79 plus 101.96 --
13    Q    This is at Suge, right?
14    A    Yes. Which is what he actually saw
15 and deposited into his account or whatever he
16 did with it.
17    Q    It would be the 108 plus the 101?
18    A    Yes.
19    Q    I see. And that's the number that you
20 got from ADP?
21    A    Correct.
22    Q    Why don't we take one where someone
23 worked at just one location.
24    A    Okay. Let's make it easy and say
25 Franklin Santana.

DAVID SAPERSTEIN

2    Q    Right. He's the last one at Bien?
3    A    Right.
4    Q    In order to arrive at the amount of
5 cash that he's supposed to get, that's the
6 purpose of this worksheet; is that right?
7    A    It's the main purpose of the
8 worksheet. The other purpose is also
9 accounting-wise it distributes where the funds
10 are supposed to be coming from.
11    Q    Okay. All right. In terms of getting
12 to the cash number for Franklin Santana, which
13 is $54 -- 55?
14    A    54.56.
15    Q    Right. How would you go about doing
16 that? And I'm sorry to belabor it, but I want
17 to make sure I understand.
18    A    Again, 315 divided by 60 would've
19 given me the net hourly rate.
20    Q    Again, that's 5.25, as it happens?
21    A    Okay. So now we've got the hourly
22 rate. Sixty hours times 5.25, that's 315.
23 That's how much he's got to get for working 55
24 hours plus one hour each shift for lunch, which
25 I'm guessing here is five shifts at 60 hours.

DAVID SAPERSTEIN

2    Q    Sixty under hours looks to you like --
3 like it was probably 12 hours five times a week?
4    A    Yes. That would've been confirmed by
5 those other reports we looked at earlier.
6    Q    The number of hours?
7    A    Number of shifts, because it says the
8 days.
9    Q    The number of shifts?
10    A    The other report would say for
11 Franklin Santana -- without looking at it, I
12 know what it's going to say. It's going to say
13 five days, 60 hours.
14    Q    Okay. Good.
15    A    So you take 260.44, which was his net
16 check.
17    Q    That's a number you got from ADP?
18    A    Yes. Subtract 260.44 from 315, and
19 you get 54.56. In this particular case, it got
20 rounded up to 55.
21    Q    I see that. And where does the 315
22 come from?
23    A    Sixty times 5.25.
24    Q    And where does the 5.25 come from?
25    A    That was his net.

DAVID SAPERSTEIN

2    Q    Rate?
3    A    That's how I came up with the net
4 rate --
5    Q    Where did you get the 5.25 originally
6 from?
7    A    Originally from --
8    Q    Jose?
9    A    Yes.
10    Q    I see.
11    A    So in order for me to be able to
12 figure this out in an efficient manner, I had to
13 break it down hourly. Otherwise, I would have
14 to manually do these calculations every single
15 time. I did not want to do that. It would take
16 too long to do that.
17    Q    Right.
18    A    What he got paid for time worked was
19 5.15 an hour plus whatever applicable hours in
20 overtime were. It happened that dividing the
21 net worked out within a few cents every week.
22 So I didn't have to adjust anything. And the
23 additional five hours is basically lunch.
24    Q    So the 5.25, is that a number that you
25 used for each of the workers listed here?

Page 86

DAVID SAPERSTEIN

1
2    A    I don't remember.
3    Q    We could figure it out?
4    A    We could figure it out. You'd have to
5  base it on -- I based it on whatever I was given
6  from Jose Tavares. Let me stress, he did not
7  personally give it to me. It was just given to
8  me, I don't remember how. Maybe his wife might
9  have given it to me.
10    Q    Was it in a list or verbally or
11  something else?
12    A    Some kind of scribbled list, which
13  wasn't easy to decipher. I do remember that.
14  Anyway, we took the nets based on whatever he
15  was paying them. So in other words, we wanted
16  it to be seamless.
17    Q    So the 5.25 number is a number that he
18  gave you or that you got --
19    A    No. The 5.25 number is a number I
20  figured out. If somebody worked -- if he told
21  me somebody worked 12 hours and they received X
22  amount of dollars net, I just divided their --
23  that number by 12 and figured out how much they
24  were getting net.
25    Q    Did you have a net number for 12

Page 87

DAVID SAPERSTEIN

1
2  hours?
3    A    No.
4    Q    So I'm not sure how you could do that
5  computation.
6    A    Whatever his net number was, I divided
7  it by five, and that's how much the net number
8  was for 12 hours.
9    Q    So the net number that you started
10  with was for the week?
11    A    A week, yes.
12    Q    Divided by five is going to give you
13  a -- in this case, a 12-hour number?
14    A    Correct.
15    Q    In another case, let's take Enrique
16  Lara under Castle. He's got 72 hours?
17    A    Okay. That 72 hours is inclusive of
18  his one hour per day.
19    Q    So you would be dividing something by
20  six in his case?
21    A    Assuming that that's the information
22  that I got from Jose's list. If Jose's list
23  said that this net is for six days, then that's
24  how I would have done it. If Jose's list said
25  this net was for or five days, then that's how I

Page 88

DAVID SAPERSTEIN

1
2  would have done it.
3    Q    Well, 72 hours is probably six days,
4  isn't it?
5    A    Yes. In this particular case, I
6  happen to know it is, and we can confirm it if
7  we find the proper sheet.
8    Q    So looking at 72, we know we're going
9  to take some number and divide it by six; is
10  that right?
11    A    We probably took 390.24 and divided it
12  by 72.
13    Q    And the 390.24 was a number that was
14  provided by Jose Tavares?
15    A    Actually, it was probably 390, and I
16  probably rounded it to make things easier for
17  me.
18    Q    But the three-point number was
19  provided by Jose?
20    A    The 390 net number was always provided
21  by Jose. Not on this particular day. You
22  understand that, right?
23    Q    Right.
24    A    At some point, when we had taken over
25  the locations from him.

Page 89

DAVID SAPERSTEIN

1
2    Q    Was that kind of a standing number for
3  each employee?
4    A    What the 390.24?
5    Q    Yes, the net number.
6    A    No. The net number -- I mean, some
7  were the same, some were different. It depended
8  on how many hours they worked.
9    Q    I mean, for each employee he gave you
10  that number once?
11    A    A net number.
12    Q    A number that you were supposed to use
13  from week to week?
14    A    Yes.
15    Q    That's what I meant.
16        Let's also look at Exhibit 15.
17  (Handing.)
18        And when you've had a chance to look
19  at it, my question is what type of record are we
20  looking at here?
21    A    It's a weekly payroll report for Bien,
22  Castle and Sage.
23    Q    That's the first page. The first page
24  is that. There are some other pages that have
25  Jesse and J&L, if you look towards the end.

Page 90

DAVID SAPERSTEIN

2  A  Right.

3  Q  Why don't we just focus on the first

4  page here.

5  A  Okay.

6  Q  Is it a report that you prepared?

7  A  Yes.

8  Q  Sometime around September 10th of

9  '06?

10  A  Yes.

11  Q  And what type of report is this?

12  A  It's the same as the report we were

13  just discussing. It gives total net pay. The

14  actual net --

15  Q  It's got an additional column, doesn't

16  it?

17  A  Yeah. It gives the total hours worked

18  gross check, net check. I'm not sure what this

19  net pay column is. Previous to the minimum wage

20  going up, that's what their net pay would've

21  been.

22  Q  I see.

23  A  So it's just a reference column for

24  me. In this particular case, no additional cash

25  was given and this is at a period of time when

Page 91

DAVID SAPERSTEIN

2  we stopped paying for employees' lunch.

3  Q  When did you stop paying for the

4  employees' lunch?

5  A  It was sometime in 2006, most probably

6  very early, when I believe minimum wage went up

7  at this point to 6.75.

8  Q  Is that -- and who made the decision

9  to stop paying for employees' lunch?

10  A  Sam.

11  Q  Is that something he told you?

12  A  Yes.

13  Q  Did he tell you why he made that

14  decision?

15  A  No.

16  Q  Did you ever ask him?

17  A  No.

18  Q  Did anyone else ever tell you why Sam

19  made that decision?

20  A  No.

21  Q  If we look at Persio there, total

22  hours worked 36, that's a number that you got

23  from the report from Raj or the grid or

24  something like that?

25  A  The report.

Page 92

DAVID SAPERSTEIN

2  Q  The report?

3  A  Yes. That's inclusive of their lunch

4  hour.

5  Q  Then the gross check, did that come

6  from ADP or actually --

7  A  Do you want to pick Franklin Santana,

8  since it's one location?

9  Q  Yes. Forget Persio. Let's look at

10  Franklin Santana. Sixty hours?

11  A  Yeah. That's 55 that he worked and

12  five lunch.

13  Q  Because we know that 60 hours is five

14  days?

15  A  Right.

16  Q  And that's something you could get

17  from Raj's report?

18  A  Yes.

19  Q  So we're going to divide something by

20  five, is that the next step here?

21  A  No, here, there is no other step

22  because we are no longer adding anything in

23  cash. They're getting paid straight minimum

24  wage, whatever applicable overtime and that's

25  it.

Page 93

DAVID SAPERSTEIN

2  Q  Gross check, that comes from ADP?

3  A  In this particular case, it would

4  appear on ADP reports plus it would appear on

5  the employee's paystub.

6  Q  And net check, same thing?

7  A  Same thing. It would appear on ADP

8  reports, and it would appear on the employee's

9  actual check and paystub.

10  Q  Then what about the 364 number, where

11  does that come from, total net pay?

12  A  That's how much his total net pay was.

13  Q  It's the same as the net check?

14  A  Yes.

15  Q  Except for --

16  A  Give or take a couple of cents. The

17  total net pay for this particular report -- at

18  this particular time, the total net pay and net

19  pay reports are functions of accounting, not

20  payroll. Not figuring out how much to give

21  anybody in cash. Because at this particular

22  time, with the exception of two people, there

23  was no cash.

24  Q  What was the purpose of creating this

25  report, since you don't need to figure out the

Page 94

DAVID SAPERSTEIN

1
2  cash numbers at this point?
3       A   It just carried over. I just never
4  changed the format of the report because there
5  was no reason to. But to allocate funds
6  properly, we still needed to know the total net,
7  total net pay.
8       Q   And that's why you have total columns
9  for each garage?
10      A   Yes.
11      Q   Now, the two exceptions, are those the
12 ones that are shaded in?
13      A   No.
14      Q   What were the exceptions?
15      A   Juan Lorenzo and Jose Suazo.
16      Q   Where are they?
17      A   Sage.
18      Q   Why are they getting cash amounts?
19      A   Sam likes them.
20      Q   A simple answer to a simple question.
21 So Sam told you what amount to give them?
22      A   Yes.
23      Q   What about the ones that are shaded
24 in, that's a different situation?
25      A   I believe this is an error, that the

Page 95

DAVID SAPERSTEIN

1
2  shading is there because it bears no relevance
3  to anything. Angelo Pena always got paid
4  straight.
5       Q   Down at the bottom, it says shaded
6  employees are gross. Does that -- what does
7  that mean?
8       A   One or two periods of time there were
9  a couple of employees that their pay was not
10 based on net, it was based on gross. And this
11 particular week none of those employees actually
12 worked at these garages.
13      Q   So these two -- actually, it's Angelo
14 Pena at two places?
15      A   No, my error. When Angelo Pena was
16 hired, he was hired at a gross number. So
17 that's why his are shaded to reflect that he
18 is -- we did not inherit him from Jose.
19      Q   So when he was hired -- when you say
20 he was hired at a gross number, can you explain
21 to me --
22      A   Whatever minimum wage was.
23          MR. BERNSTEIN: I need to take a short
24 lunch break.
25          (Whereupon, a lunch break was taken.)

Page 96

DAVID SAPERSTEIN

1
2          MR. BERNSTEIN: Back on the record.
3  BY MR. BERNSTEIN:
4       Q   Mr. Saperstein, you understand you're
5  still under oath?
6       A   Yes.
7       Q   Before Sam decided to stop paying for
8  lunch hour -- I think you said he decided at
9  some point to stop paying the employees for
10 lunch hour; is that right?
11      A   Yes.
12      Q   Up to that point, the employees were
13 being paid in cash for lunch hour?
14      A   Yes.
15      Q   Once the employees were no longer
16 being paid in cash for their lunch hour, was
17 there some way they were paid for lunch hour?
18 Was it taken into account in their checks at
19 that point?
20      A   No. It was taken into account in
21 their checks starting in 2007. Let me just
22 clarify that.
23      Q   When did that begin?
24      A   January, February 07.
25      Q   And how was that done?

Page 97

DAVID SAPERSTEIN

1
2       A   It was just straight in their check.
3       Q   So there was a period of time when it
4  was not in their check, like in '06?
5       A   In -- when minimum wage went up to, I
6  believe, 6.75, which was 06, I believe, that's
7  when Sam decided not to supplement their checks
8  with cash for lunch.
9       Q   And at that point -- okay. And then
10 in '07 he started supplementing their checks
11 again?
12      A   We just -- it's not that we started
13 supplementing their checks. They just
14 received -- the hours that they were -- not the
15 hours. If they worked a five-day work week, and
16 they worked 55 hours. We just added the five
17 extra hours for lunch into the total, and it was
18 paid in the check. So they would've gotten 40
19 plus 20.
20      Q   So there was no subtraction being
21 made?
22      A   That's correct.
23      Q   When the employees were being paid for
24 lunch in cash, do you know if they were told
25 that the cash was for their lunch hour?

Page 98

DAVID SAPERSTEIN

1
2  A    I don't know.
3  Q    I think you said starting in '07, they
4  were paid through their checks for lunch hour?
5  A    Correct.
6  Q    Do you know if any of the workers were
7  told at that point that there was some amount in
8  their checks for lunch hour?
9  A    I don't know.
10 Q    Let's look at Exhibit 10. (Handing.)
11       Do you recognize those pages?
12 A    Yes.
13 Q    What are they?
14 A    They're notification -- they're
15 notification and clarifications so the employees
16 understood that they had to -- that they were
17 going to take a break at their own discretion
18 and that it would be deducted from their -- from
19 their time card.
20 Q    Is this a notice that you prepared?
21 A    Yes.
22 Q    And did you have someone translate it
23 into Spanish for the second paragraph?
24 A    Yes.
25 Q    Who made the translations for you?

Page 99

DAVID SAPERSTEIN

1
2  A    I think it was my ex-fiance at the
3  time. I don't remember.
4  Q    When did you prepare this?
5  A    Sometime in 2004. Late portion of
6  2004.
7  Q    What caused you to do that?
8  A    We attempted to have the employees
9  punch in and out on the time cards. But as I
10 said before, they, for whatever reason, they did
11 not do it. So this was the next best thing that
12 they understood what was going on.
13 Q    This was a substitute for their
14 punching in and out?
15 A    Yes.
16 Q    Were you present when any of these
17 were given to the employees to sign?
18 A    No.
19 Q    Do you know who did give them to the
20 employees to sign?
21 A    I gave them to Raj with the assistance
22 of Christian Cherrez, C-H-E-R-R-E-Z, who speaks
23 fluent English and Spanish, with the
24 instructions to explain the policy to those
25 signing it.

Page 100

DAVID SAPERSTEIN

1
2  Q    Who made the decision to give the
3  employees this type of notice?
4  A    It was my idea to give the employees
5  the notice and Sam okayed it.
6  Q    Had you been told at any time up to
7  when you prepared this notice that employees
8  were not taking meal breaks?
9  A    No.
10 Q    Did anyone ever complain to you or did
11 you learn of any complaints after this point
12 that employees were not taking meal breaks?
13 A    No.
14 Q    Did it ever come to your attention
15 that employees, for whatever reason, were
16 starting to work and working for a period of
17 time before they punched in?
18 A    I'm sorry?
19 Q    Did you ever learn that it was
20 happening, did anyone ever tell you that
21 employees were not punching in right when they
22 started working? That they were asked to wait
23 and punch in after working for some time?
24 A    That they were asked to wait?
25 Q    Or that they did wait?

Page 101

DAVID SAPERSTEIN

1
2  A    No.
3  Q    Neither of those?
4  A    No.
5  Q    Okay. Did anyone ever complain to you
6  that they had been sent to work at a different
7  garage from the one they were usually assigned
8  to and they were not being paid for the time at
9  the other garage?
10 A    There were isolated incidents where
11 either Raj forgot to put their hours on the
12 sheet or I did not pick it up. But for whatever
13 reason, the hours were missed. Raj would
14 receive the complaint and the hours would be
15 added in the following week.
16 Q    Do you recall any specific instances?
17 A    I don't recall specific instances, but
18 I know it happened once -- more than once with
19 Angelo Pena; and it happened, I believe, once
20 with Franklin Samana. It happened once with
21 one other employee. I just don't remember his
22 name.
23 Q    What records, if any, would show the
24 missed hours being added in at a later time?
25 A    On the following week's paystub, there

Page 102

DAVID SAPERSTEIN

1
2  would be whatever the amount of hours were coded
3  under "P," for previous.
4    Q   Let's look at Exhibit 8.  (Handing.)
5        Do you recognize that?
6    A   Yes.
7    Q   What is it?
8    A   It looks like somebody pressed print
9  screen in one of my Excel spreadsheets.
10   Q   How can you tell it's a print screen
11  printout?
12   A   I'm not sure if it is or it isn't, but
13  I don't print out the columns and the row
14  numbers and I don't print out with the grid.
15   Q   I see.  Okay, leaving aside the column
16  and row headers and the grid lines, is the
17  information here information from one of your
18  spreadsheets?
19   A   Yes.
20   Q   And which -- period ending 1-6-08 for
21  J&I?
22   A   Yes.
23   Q   Can you tell me what information is in
24  each column?
25   A   It's basically the same as the other

Page 103

DAVID SAPERSTEIN

1
2  sheet we were referring to earlier.  Hours,
3  gross pay, net, cash, cash rounded.  Total net
4  pay.  These numbers, I'm not really sure what
5  the last two columns are.  It doesn't look like
6  they're being used for anything, because the --
7  where it says number DIV/zero, it just refers to
8  there's no information for that to find.
9    Q   Can you tell me where each of the
10  entries comes from if we read across?  How about
11  Raphael Pena -- he's got zeroes, Raphael Pena.
12  Just so I understand how this works, suppose we
13  take Juan Fuentes.
14   A   Okay.
15   Q   Can you tell me where each of those
16  numbers comes from going across there?
17   A   Ten would come from one of Raj's
18  sheets that he would send me.
19   Q   That's hours?
20   A   Yes.  71.50 would come from one of the
21  ADP reports.  That's his gross check that's
22  attributed to this location.
23   Q   Okay.
24   A   Ten hours is something Juan Fuentes
25  doesn't usually work.  He usually works a full

Page 104

DAVID SAPERSTEIN

1
2  week, so I'm guessing this week he worked in
3  another location.  65.67 is his net check for
4  this particular location.  17.63 is what we
5  needed to add in in cash -- because this is
6  somebody that -- again, an old employee of Jose
7  Tavares -- to make up whatever he was making
8  with Jose, which was 17.63, rounded up to $18.
9  The 83.30 simply looks like that's his gross,
10  including the cash.
11   Q   Okay.  What about the 8.33?
12   A   Well, looking at that, I'll take a
13  guess that it's --
14       MS. MEYERS:  Don't guess.
15  BY MR. BERNSTEIN:
16   Q   Is that some sort of effective hourly
17  rate?
18   A   No.
19   Q   It's not the 83.30 divided by 10?
20   A   It could be, but there's no -- these
21  last two columns have, at this point, no use.
22  They might have been useful in '04 or '03.  But
23  at this point, as I said, I never updated the
24  sheets.  I just used whatever information was
25  applicable.

Page 105

DAVID SAPERSTEIN

1
2    Q   And why were these columns not of use
3  at this point, these last two columns?
4    A   I didn't do anything with them.  The
5  information went nowhere.  That's why they're
6  not printed.
7    Q   And why was there no need to do
8  anything with them?
9    A   Because they didn't bother me.
10   Q   Okay.  Well, why don't we go back
11  to -- well, first, why don't we look at
12  Exhibit 16.  (Handing.)
13       Tell me what kind of report this is.
14   A   Similar to Exhibit 8, except this is
15  something that I had to use while Jose Tavares
16  or Jose Tavares' wife prepared the checks.
17   Q   Now, is this -- let me back up a
18  minute.
19       Did you keep printed copies of your
20  spreadsheets?
21   A   No.
22   Q   Is this something -- this particular
23  document, is this something that you printed
24  out?
25   A   I never printed it out.

DAVID SAPERSTEIN

Q   Do you know who did?

A   Again, it looks like somebody pressed print screen on one of my Excel spreadsheets.

Q   Do you know if that was done in order to print it for the document production in the lawsuit?

A   I don't know.

Q   Let's look at Exhibit 18.  (Handing.) This says "Weekly Comparison"?

A   Right.

Q   Is this a type of report that you -- or spreadsheet that you prepared?

A   It's a spreadsheet that I prepared, yes.

Q   And for what purpose?

A   Again, this is at a period of time where we were relying on Jose Tavares for payroll still.

Q   Okay.

A   I just did a current week to previous week comparison to make sure they were somewhat close to each other.

Q   Were there particular numbers that you were comparing from week to week?

DAVID SAPERSTEIN

A   I'm guessing that I -- I honestly don't remember. I don't remember what I was doing here. I remember that I did it because I just -- we were relying totally on Jose Tavares and I just needed to make sure that the numbers were within a certain range from week to week.

Q   What type of range? When you say within a certain range, can you help me understand what you mean by that?

A   Hours, check totals and cash totals.

Q   What was the range? How did you know something was out of range?

A   Here's an example. 452 were the total hours for Kide. If all of a sudden it went to a thousand, we'd know it would be a problem.

Q   So you were interested to compare the total hours for a garage?

A   Not just total hours, more the gross numbers. I shouldn't say the gross numbers. The total numbers. Hours 452, check 242749, cash 667.7. That's what the totals for the location were that week. The previous week, they were 403, 2171 613.97. So it gave me a difference of $53.73. It's a negligible

DAVID SAPERSTEIN

difference, not really worth looking at why it was $53.73.

Q   That's a difference in the cash amount?

A   Column K appears to be a difference in the cash amount.

Q   So when you prepared this type of report, the weekly comparison, you already had available for the various workers the hours, the check amount and the cash amount?

A   Yes.

MR. BERNSTEIN: Let's mark as Exhibit 20 documents produced by your attorney Bates No. 1989 and 1990.

(Whereupon, Bates No. 1989 and 1990 was marked as Plaintiff's Exhibit 20 for identification, as of this date.)

BY MR. BERNSTEIN:

Q   Have you had a chance to look at Exhibit 20?  (Handing.)

A   Yes.

Q   Do you recognize it or the information in it?

A   Again, it looks like somebody pressed

DAVID SAPERSTEIN

the print key in one of my Excel spreadsheets.

Q   You don't know who or when?

A   No.

Q   What type spreadsheet are we looking at?

A   It's similar to the exhibit that we were looking at before. It gives the net pay, hours, net check, cash given, cash rounded and the net rate that I had to use to get to this -- to the net pay.

Q   The first column says pay, and there's a column of ones there. Can you tell me what that means?

A   Nothing. It means absolutely nothing. When I exported information from one sheet to another, ones were just an identifier to make sure I only got the name once.

Q   The name of the column?

A   No, the name of the employee.

Q   Okay. Then net, what number is that in the net column?

A   That's what they need to get net to make their pay the same as when they were totally with Jose Tavares.

Page 110

DAVID SAPERSTEIN

1
2    Q    And where did that number come from?
3    Like, for example, if we look at Rolando Rojas,
4    he's got 375. Where would you get that from?
5    A    Rolando Rojas, we were given 375 for
6    60 hours. I divided 375 by 60 and came up with
7    6.25.
8    Q    And the number of hours, that came
9    from the summary that you got from Raj?
10   A    Those are the number of hours that he
11   worked that particular week.
12   Q    Where did you get those numbers from?
13   A    From -- at this point, I got them
14   either from Raj or from Jose Tavares. I'm not
15   sure.
16   Q    Now, the 40 plus 20 for the hours
17   here, does that include lunch hour?
18   A    Yes.
19   Q    And how do you know that?
20   A    Because if he worked a five-day week
21   times 12 is 60 minus one per day would be 55.
22   Here it's 60. So that includes their lunch
23   hour.
24   Q    And the net 375 is the amount that the
25   employee has to -- is supposed to go home with

Page 111

DAVID SAPERSTEIN

1
2    in his pocket?
3    A    Yes.
4    Q    As some combination of check and cash?
5    A    Yes.
6    Q    And that was a number that you got in
7    some way from Jose Tavares?
8    A    Yes.
9    Q    What about the numbers in the check
10   and cash column, where does the check number
11   come from?
12   A    At this particular time, it came
13   directly from the check.
14   Q    And is that -- that's the net pay on
15   the check, the actual amount of the check?
16   A    If the employee were to cash it,
17   that's how much he would cash the check for.
18   Q    So the amount in the C column, is that
19   the difference between the 375 and the 301.27?
20   A    I don't see 301.27 -- I'm looking at
21   the wrong column. Yes, that is correct.
22   Q    So if he's supposed to get 375 in his
23   pocket and his check is 301.27, then he gets
24   73.73 in cash?
25   A    Yes.

Page 112

DAVID SAPERSTEIN

1
2    Q    Rounded to 74?
3    A    Right.
4    Q    I think you said the 375 divided by 60
5    would be 6.25?
6    A    I believe so, yes.
7    Q    We can certainly double-check that.
8    It is.
9    A    Okay.
10   Q    How did you utilize the 6.25 number?
11   A    Again, it was a net number. It was
12   explained to me through either Jose or his wife,
13   I don't know which, that these guys didn't
14   understand gross or any of that. They only
15   understood what they went home with. So we had
16   to take -- his agreement with an employee was if
17   you work -- let's take Rolando Rojas. If you
18   work 60 hours, you're getting $375 in any
19   combination that he decided to give it.
20   Q    Combination of check and cash?
21   A    Right. That Jose decided to give it.
22   We, on the other hand, insisted on a certain
23   portion being in the check. Meaning 40 plus 15.
24   But again, we still had to deal with the net
25   issue. So the only way for me to deal with the

Page 113

DAVID SAPERSTEIN

1
2    net issue was to figure it out.
3    Q    And by you had to deal with the net
4    issue meaning --
5    A    We could not pay the employees gross.
6    We had to pay them in a net format.
7    Q    Again, I'm not sure what you mean by
8    that.
9    A    In other words, I think the easiest
10   way for me to explain it, I could not give an
11   employee a check for 40 hours plus 15 hours and
12   then add $5.15 for five hours for their lunch.
13   According to Jose and his wife, it didn't work.
14   They said they tried it. I don't remember who
15   told it to me. It was one or the other. So we
16   just continued to pay the way Jose paid, net.
17   Q    And by that you mean paying them a
18   number that Jose was paying them?
19   A    Correct.
20   Q    In their pocket?
21   A    Net, in their pocket. That was Jose's
22   agreement with the attendants.
23   Q    I see.
24       So in the case of Rolando Rojas, where
25   it says check 30127 --

Page 114

DAVID SAPERSTEIN

1
2  A  Uh-huh.
3  Q  -- was that a number that was supplied
4  by ADP or something else?
5  A  In -- at this time, I did not actually
6  get the reports. I only got the checks, so I
7  had to actually get that number off of the
8  check.
9  Q  Do you know how ADP arrived at the
10 301.27?
11  MS. MEYERS: Objection. I don't
12 believe he said it was ADP.
13  MR. BERNSTEIN: Or wherever the check
14 came from.
15  A  Well, it was ADP. I do not recall
16 what the gross amount was. Again, I did not
17 process these checks. Jose or Jose's wife
18 processed them.
19  Q  I see. So they arrived at the net
20 number, they took the gross, took out whatever
21 taxes were mandatory and that's how they got the
22 net.
23  Do you know how they computed the
24 gross number?
25  A  From whatever hours Jose or his wife

Page 115

DAVID SAPERSTEIN

1
2  submitted to them.
3  Q  Do you know if that included time for
4  a lunch break?
5  A  I have no idea. I don't know what
6  they submitted, so there's no way for me to
7  know.
8  MR. BERNSTEIN: Let's mark as
9  Exhibit 21 documents produced by your
10 attorney. It's Bates numbers 2023 to 2027.
11  (Whereupon, Bates numbers 2023 to 2027
12 was marked as Plaintiff's Exhibit 21 for
13 identification, as of this date.)
14 BY MR. BERNSTEIN:
15  Q  Is this another printout or series of
16 printouts from your spreadsheets? (Handing.)
17  A  Yes.
18  Q  Do you know who printed it out or
19 when?
20  A  No.
21  Q  This says it's for the period ending
22 August 3rd, '03.
23  A  Yes.
24  Q  Up at the top?
25  A  Yes.

Page 116

DAVID SAPERSTEIN

1
2  Q  Was Jose Tavares still involved in the
3  payroll process at that point?
4  A  Not at all. At this point, it became
5  J&I and Marvel, and the ADP system that we're
6  currently using was active or became active.
7  Q  Which facilities was Marvel?
8  A  145th Street.
9  Q  So if I look at Miguel Alcatara, is
10 the first one there under Marvel?
11  A  Uh-huh.
12  Q  He has 36 regular and 12 overtime
13 hours?
14  A  Correct.
15  Q  That's what it says?
16  A  Correct.
17  Q  Are those numbers that you entered
18 into the spreadsheet?
19  A  Yes.
20  Q  And where did you get them from?
21  A  Raj.
22  Q  It was on a list or a grid that you
23 got from Raj?
24  A  One of those lists that we were
25 discussing before.

Page 117

DAVID SAPERSTEIN

1
2  Q  Now, did Raj ever give you 36 and 12,
3  or did he give you a total?
4  A  No, he gave me a total.
5  Q  48 would be the total?
6  A  Yes. Uh-huh.
7  Q  Was the breakdown to 36 and 12 written
8  on there by Sam or you figured it out yourself
9  or something else?
10  A  I believe this was done by me, and
11 there was no real reason for it. It didn't
12 impact how it was input to the check, how the
13 check was made. It was just at some point when
14 I originally made this sheet, it was made with
15 paying people from the sheet in whatever hours
16 and breakdown was on the sheet. I later changed
17 it to just show total hours and didn't separate
18 it out.
19  Q  When did you change it to total hours?
20  A  I don't remember. It's in one of
21 those sheets somewhere.
22  Q  So on this sheet, the 36 and 12 is an
23 arbitrary breakdown?
24  A  Yes.
25  Q  Net 280, where does that number come

Page 118

DAVID SAPERSTEIN

1 from?
2
3    A    That would have come from one of the
4 ADP reports, specifically the labor distribution
5 report.
6    Q    Is that --
7    A    Oh, I'm sorry. That number does not
8 come from the ADP report. My mistake. The 280
9 is what he needs to get net to make his pay what
10 it was while he was with Jose.
11    Q    And how did you know that that number
12 was 280 in this case?
13    A    Same way I knew about the others.
14 Originally, we took the numbers that were given
15 to us by Jose and divided them. In his
16 particular case, I believe it's 583 net.
17    Q    Well, there is a 583 in one of those
18 last columns there. I'm still not sure I
19 understand. Is the 280 a number that you were
20 actually given by Jose Tavares?
21    A    No. The 280 did not -- this 280 did
22 not come from Jose Tavares. If we go back to
23 one of the sheets that Jose Tavares was
24 providing -- I shouldn't say providing.
25    While he was doing the payroll, the

Page 119

DAVID SAPERSTEIN

1
2 net number would have come from him. In this
3 particular case, no, the net number came from a
4 calculation based on 48 hours times 5.83. I'm
5 willing to bet comes up to 280. Do we want to
6 bet first?
7    Q    No. It's within pennies, so yes.
8    A    Okay.
9    Q    Is the 5.83 a number you got from Jose
10 Tavares?
11    A    He did not specifically give me the
12 number 5.83. I had to calculate it out in order
13 to continue to do payroll in an efficient
14 manner.
15    Q    How did you calculate -- what
16 calculation did you do to get to the 5.83 in
17 this case?
18    A    Originally, Jose Tavares or his wife
19 would have given me a net number for a specific
20 amount of hours. What I would do is take that,
21 divide it out, figure out how much that comes
22 out to net per hour and just carried that net
23 rate over.
24    Q    Okay. The check number, that comes
25 from ADP?

Page 120

DAVID SAPERSTEIN

1
2    A    In the case of Exhibit 21, that would
3 have come from ADP's distribution report in the
4 case of Miguel Alcatara.
5    Q    Okay.
6    A    Net check, you said?
7    Q    Yes. That came from ADP?
8    A    Yes.
9    Q    And that was the number on
10 Mr. Alcatara's check if he worked only at that
11 location?
12    A    Yes. But I'm looking at this, and I
13 see he did not only work at that location. So
14 if you take 48.06 plus 222.75, that's what would
15 have been on his check.
16    Q    And how did ADP know what number --
17 you know, how much to put on his check?
18    A    To distribute, you mean, or the total?
19    Q    The total. I guess this is a total
20 net pay.
21    A    If you take 48.06 plus 222.75, that's
22 a net pay, yes.
23    Q    They get to the total net pay by
24 taking withholding or deductions from something?
25    A    They take the gross minus the

Page 121

DAVID SAPERSTEIN

1
2 withholding and come up with net.
3    Q    And where do they get the gross from?
4    A    I submit to ADP the hours 40 plus
5 whatever overtime is applicable. They multiply
6 it by the base rate at this time was 5.15. Then
7 for overtime they take 5.15 times 1.5 times
8 whatever the overtime hours are.
9    Q    So in this case you submitted to ADP,
10 I guess, 40 plus 16?
11    A    Twelve plus 48.
12    Q    I'm sorry, that's not right. He has
13 36 at one facility and eight at the other?
14    A    No. He's got 48 at Marvel and 12 at
15 J&I.
16    Q    No, I'm just looking at regular hours.
17    A    That's not what was submitted though.
18 Because if you added it up, it just doesn't work
19 out right. What would have been submitted to
20 ADP was 40 plus 15. Forty regular, 15 overtime.
21    Q    And how do you know it was 40 plus 15?
22    A    I could certainly go back to one of
23 those exhibits you showed me before, and it
24 would show it on his -- on the replication of
25 his paystub, but I also know how I did payroll

Page 122

DAVID SAPERSTEIN

1 at the time. He worked 60 hours -- I mean, he
2 worked 55 hours plus six hours for -- five hours
3 for lunch. So he worked five days 12 hours a
4 day minus an hour for lunch every day is 55
5 hours.
6 Q    So the regular hours and overtime
7 hours on the sheet here, those numbers did not
8 go to ADP?
9 A    No.
10 Q    Is that -- at this point, is that also
11 an arbitrary breakdown?
12 A    I'm not sure. It's a long time ago.
13 I just don't remember. I remember when I did
14 the sheet that I was looking towards the future,
15 and that's why I broke down regular and OT. But
16 that future never -- we took a different path.
17 Q    And what was the different path?
18 A    At this time I believe ADP was going
19 to have a system where I could just export this
20 to them.
21 Q    Export a spreadsheet?
22 A    Export a spreadsheet, export specific
23 cells from a spreadsheet so I wouldn't have to
24 enter it into ADP's program, but it never

Page 123

DAVID SAPERSTEIN

1 happened. So when that never happened, I
2 just -- I consolidated the regular hours column
3 and the OT column into one column.
4 Q    Can you tell me what the numbers in
5 the last three columns represent on the next
6 page?
7 A    Same as in the previous spreadsheets.
8 They were net -- net rate as based on net pays
9 that we were given by Jose Tavares.
10 Q    And the last column, is that a copy of
11 the first column?
12 A    I believe I did it as a check column
13 to column F, just to make sure there were no
14 mathematical or any sort of errors.
15 Q    I see. Then on the next page, can you
16 tell me what information is on that part of the
17 spreadsheet?
18 A    Similar to one of the other
19 spreadsheets that you showed me. I created a
20 quick spreadsheet to compare one week to another
21 to make sure there were no major differences.
22 It was really to check myself to make sure there
23 were no errors.
24 Q    Where it says cash current and cash

Page 124

DAVID SAPERSTEIN

1 previous, those are the cash amounts for the
2 employees?
3 A    Yes.
4 Q    And what about the other current and
5 previous, is that hours or something else?
6 A    Hours.
7 (Whereupon, a break was taken.)
8 BY MR. BERNSTEIN:
9 Q    Have you had any responsibility for
10 preparing tax returns for SP Payroll?
11 A    No.
12 Q    Do you know who does that or who did
13 that?
14 A    Sam.
15 Q    Did you provide information to Sam or
16 do you provide information to Sam for payroll
17 tax returns?
18 A    Just the quarterly reports from ADP.
19 Q    Is that the current -- your current
20 practice on quarterly reports from ADP?
21 A    That's the only thing with tax on it
22 that I would give to Sam.
23 Q    Has that been the practice since you
24 started handling the payroll?

Page 125

DAVID SAPERSTEIN

1 A    Yes.
2 Q    Do you know if the cash amounts that
3 were paid to the employees were included in the
4 base for computing payroll taxes?
5 A    I don't know.
6 MR. BERNSTEIN: Let's mark as
7 Plaintiff's Exhibit 22 documents produced by
8 your attorney Bates stamped 1470 to 1474.
9 (Whereupon, Bates stamped 1470 to 1474
10 was marked as Plaintiff's Exhibit 22 for
11 identification, as of this date.)
12 BY MR. BERNSTEIN:
13 Q    This is titled Procedures and Rules.
14 (Handing.)
15 My next question is do you recognize
16 that document?
17 A    Yes.
18 Q    Okay. What is it?
19 A    It is a document that was handed out
20 to the employees or a variation of a document
21 that's handed out to the employees every -- once
22 or twice a year.
23 Q    When was it first given to the
24 employees?

Page 126

DAVID SAPERSTEIN

A    2006, maybe.

Q    You're asking me?

A    I'm taking a guess. It's somewhere in 2006.

Q    Is it something that you prepared?

A    Yes. It's actually something I prepared 20 years ago. I just kind of used a variation of it.

Q    Is it something that you were asked to start distributing to the employees or have distributed to the employees?

A    Did somebody ask me to do it?

Q    Yes. How did it come about that the Rules and Procedures was given out to the employees starting sometime around 2006? What started that?

A    We had been involved in an unemployment hearing, and we lost the hearing because I couldn't prove the employee knew not to wash cars while on a shift without permission. So because of that, I started to, at random times, give out and update a Rules and Procedures pamphlet.

Q    Was there a problem with employees not

Page 127

DAVID SAPERSTEIN

taking lunch breaks at that time?

A    Not taking lunch breaks?

Q    Right.

A    They always took lunch breaks.

Q    And again, what's your basis for saying that?

A    I personally witnessed a couple. I've been in the business for over 20 years. I know that employees do not spend their entire time in the garage.

MR. BERNSTEIN: Off the record.

(Whereupon, a discussion was held off the record.)

MR. BERNSTEIN: Back on the record.

BY MR. BERNSTEIN:

Q    Have there been times when the workers were taking lunch breaks and they were being paid for their lunch hour?

A    Yes.

Q    Who made the decision to pay them for lunch hour?

A    Sam.

Q    Is that something you discussed with him?

Page 128

DAVID SAPERSTEIN

A    No.

Q    Did you ever ask him why he was doing that?

A    No.

Q    Did anyone ever tell you why Sam had decided to do things that way?

A    No.

MR. BERNSTEIN: Off the record.

(Whereupon, a discussion was held off the record.)

BY MR. BERNSTEIN:

Q    At the point where the employees were no longer being paid for their lunch hour -- because I think you said there came a time when Sam decided to no longer pay the workers for their lunch hour?

A    Yes.

Q    Okay. Do you know whether the employees continued to take a lunch hour or not?

A    Yes.

Q    What do you know about that?

A    They continued to take their lunch hour, same as they did before.

Q    And how do you know that?

Page 129

DAVID SAPERSTEIN

A    I've witnessed it on a couple of occasions.

Q    Other than that, do you have any basis for your answer?

A    Other than witnessing it?

Q    Yes.

A    Raj would tell me, but that's about it.

Q    What did Raj tell you?

A    On one occasion, I remember he was in a location and he had to wait until the guy came back before he left.

Q    And Raj told you that whoever it was was on a lunch break?

A    He told me a break. He didn't specifically say lunch.

Q    Was there a practice or a policy whereby someone would cover for an employee who was taking a break, a lunch break?

A    If there were two men on duty, it was very simple. The second man -- one man would cover for the other. One garage has -- is connected to another garage. So when one man goes out, the attendant from one garage covers

Page 130

DAVID SAPERSTEIN

1
2  both.
3     Q    When you say one garage is connected
4  to another garage?
5     A    They're right next door.
6     Q    Which garages?
7     A    Sage and Bien.
8     Q    What about the other garages, though?
9     A    They all have more than one person per
10 shift.
11        MR. BERNSTEIN: I think we're done.
12 Let me just check my notes for a second.
13        (Whereupon, a discussion was held off
14 the record.)
15        MR. BERNSTEIN: I do have one more
16 question.
17 BY MR. BERNSTEIN:
18    Q    When you got information from Jose
19 Tavares about the net amount, I think you called
20 it, that he was paying various employees, was
21 that in the form of a list or some other kind of
22 written form? Was it verbal or something else?
23    A    I believe I said earlier that it was a
24 list, and it was a list that was very difficult
25 to comprehend.

Page 131

DAVID SAPERSTEIN

1
2     Q    Why was it difficult to comprehend?
3     A    Because it was handwritten, and I
4  could barely read it.
5     Q    It was hard to read the handwriting?
6     A    Yes.
7     Q    Was it a list of names and amounts?
8     A    Yes.
9     Q    Do you know where that list is today?
10    A    No idea.
11    Q    When was the last time you saw it?
12    A    2003.
13    Q    I take it you didn't come across it in
14 gathering records for -- to turn over in the
15 lawsuit?
16    A    No.
17    Q    When you last saw it, where was it?
18 Was it at the SP Payroll office or somewhere
19 else?
20    A    I don't remember.
21    Q    Do you remember the circumstances?
22    A    I don't remember.
23    Q    Was it a list you referred to on a
24 regular basis or frequently?
25    A    No.

Page 132

DAVID SAPERSTEIN

1
2     Q    Was it a list of weekly salaries or
3  hourly rates or something else?
4     A    It was weekly, names of employees,
5  gross amount next to the name, amount of hours
6  that gross amount was for. I'm pretty sure
7  that's all that was on the list. Some other
8  scribble that I have no idea what it's for.
9     Q    And by gross amount you mean --
10    A    Sorry, net amount. Net amount.
11    Q    And that was the amount that the
12 employees took home, as far as you know?
13    A    That was their net pay for whatever
14 amount of hours that was written next to that
15 amount.
16    Q    So it had names, hours and amounts?
17    A    I think it was names, amounts and
18 hours.
19    Q    Was there any division as between
20 regular and overtime hours on that list?
21    A    No.
22    Q    When you got this list from Jose
23 Tavares -- withdrawn.
24        First of all, do you know if anyone
25 else had copies of it?

Page 133

DAVID SAPERSTEIN

1
2     A    I don't know.
3     Q    Like Sam or Raj or anybody?
4     A    I don't know. What I did say is I got
5  them from either Jose, his wife, and I don't
6  remember whether I got them directly or whether
7  Raj brought them to me. I don't remember.
8     Q    "Them" meaning more than one list?
9     A    No. "They" meaning Jose or his wife.
10    Q    I see.
11        When you got the list, did you make
12 some kind of record of your own with the
13 information in it or put it into a computer or
14 do anything else to -- so that you would not
15 have to keep referring back to it?
16    A    The first payroll that I had done from
17 the list, which is one of these exhibits, has
18 the numbers that correlate with what was on the
19 list.
20    Q    Is the first payroll -- you say the
21 first payroll that you did when you took over
22 the payroll function, am I understanding you
23 correctly?
24    A    No. The first payroll that I had to
25 figure out how much cash to give them, Jose

Page 134

DAVID SAPERSTEIN

2 and/or his wife. I don't know who submitted
3 their payroll. But that first payroll that I
4 had to figure it out, I had to -- it was based
5 upon the list that I had gotten from either Jose
6 or his wife. I think her name is Isabel.
7    Q    So from that point, the numbers that
8 you got from Jose or his wife were inputted into
9 your computer?
10    A    They were input into that first
11 spreadsheet.
12    Q    And you think that that first
13 spreadsheet is one that we looked at today?
14    A    I believe it is one of the ones that
15 we looked at. I remember seeing a spreadsheet
16 that said May, and that's when we started to
17 manage the facility.
18    Q    May of '03?
19    A    May of '03.
20    Q    If you just bear with me and let's see
21 if we can find it.
22    A    It's one that's going to say Marvel or
23 Kide on it.
24    Q    Maybe Exhibit 16?  (Handing.)
25    A    This is not the first payroll. The

Page 135

DAVID SAPERSTEIN

2 first payroll, without seeing a calendar, would
3 be the 7th, 8th, 9th.  Some date around there.
4    Q    The 7th, 8th or 9th in May of '03?
5    A    Yeah.  The period ending would have
6 been -- might have been -- it's either going to
7 be the first or second Sunday of the month.
8    Q    Of May 2003?
9    A    Yes.  Again, it depends on what --
10 what the calendar says.
11       Yes.  So if you show me a calendar, I
12 might be able to figure it out a little better.
13 The first payroll that I would have done would
14 have most probably been the 11th, because the
15 4th was only four days.
16    Q    So that would be the date --
17    A    This would've been the first complete
18 week that we had, we operated the garage.  The
19 11th would have been the first complete pay
20 week.
21    Q    And the 11th is the pay period
22 ending day?
23    A    Yes.
24    Q    I see.  Okay.  So if we could find
25 that spreadsheet, that would be the first one

Page 136

DAVID SAPERSTEIN

2 that you did, using the information from Jose?
3    A    Most probably.
4    Q    From the Tavares family?
5    A    Right.
6       MR. BERNSTEIN:  I have no other
7 questions at this time.  If there are
8 further documents that come to light, we may
9 have.
10       MS. MEYERS:  We consider it concluded.
11       (Time noted 3:20 p.m.)
12
13       DAVID SAPERSTEIN
14
15 Subscribed and sworn to before me
   this       day of       , 2008.
16
17
18
19
20
21
22
23
24
25

Page 137

PROCEEDINGS
CERTIFICATE

4    I, JUDI JOHNSON, RPR, CRR, CLR, a Notary Public in
5 and for the State of New York, do hereby certify:
6    THAT the witness whose testimony is hereinbefore
7 set forth, was duly sworn by me; and
8    THAT the within transcript is a true record
9 of the testimony given by said witness.  I further
10 certify that I am not related, either by blood or
11 marriage, to any of the parties to this action; and
12    THAT I am in no way interested in the outcome of
13 this matter.
14    IN WITNESS WHEREOF, I have hereunto set
15 my hand this 30th day of June, 2008.
16
17
18       JUDI JOHNSON, RPR, CRR, CLR
19
20
21
22
23
24
25

Page 138

```
1              PROCEEDINGS
2                 INDEX
3    ATTORNEY                          PAGE
4        By Mr. Bernstein                5
5
6
7
8
9
10
11        INDEX OF PLAINTIFF'S EXHIBITS
12   I.D.        DESCRIPTION            PAGE
13   Exhibit 19  Defendant Corporations'  17
14         Responses and Objections to
15         Plaintiffs' First Set of Interrogatories
16   Exhibit 20  Bates No. 1989 and 1990   108
17   Exhibit 21  Bates numbers 2023 to 2027  115
18   Exhibit 22  Bates stamped 1470 to 1474  125
19
20
21
22
23
24
25
```

Page 139

```
1              ERRATA SHEET
2    NAME OF CASE:  PENA V. SP PAYROLL
3    DATE OF DEPOSITION: June 18, 2008
4    NAME OF WITNESS:  DAVID SAPERSTEIN
5
6    Reason codes:
7        1. To clarify the record.
8        2. To conform to the facts
9        3. To correct the transcription
10          errors.
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   _____
25        DAVID SAPERSTEIN
```