Page 14

1          L. Luna
2     A.   Grand Concourse -- it's an avenue.  The
3   building of the bodega is 1269.
4     Q.   What street?
5     A.   On Grand Concourse.  That's in the
6   Bronx.
7     Q.   That's what I was asking.  Thank you.
8   How long did you work at the bodega in Grand
9   Concourse?
10    A.   Eight months.
11    Q.   Is it correct then to say that you
12  began working for Grand Concourse in the beginning
13  of 2007?
14    A.   Yes.
15    Q.   What did you do for the bodega at Grand
16  Concourse?
17    A.   Arranging the merchandise.
18    Q.   What was your hourly wage?
19    A.   It was a fixed salary.  They would pay
20  350 per week.
21    Q.   Did you receive that in cash or check?
22    A.   Cash.
23    Q.   How many hours a week did you work for
24  the bodega?
25    A.   From four to eleven.  From four o'clock

TSG Reporting - Worldwide      877-702-9580

Page 15

1          L. Luna
2   in the afternoon to eleven o'clock.  Six days a
3   week.
4     Q.   So you worked for the bodega
5   approximately 42 hours a week?
6     A.   Yes.
7     Q.   And you were paid solely in cash by the
8   bodega?
9     A.   Yes.
10    Q.   Where did you work prior to working for
11  the bodega?
12    A.   In the parking.
13    Q.   You worked for the defendants prior to
14  working for the bodega?
15    A.   Yes.
16    Q.   During what period of time did you work
17  for the defendants?
18    A.   From 2002 to the end of 2004.
19    Q.   When were you initially hired by the
20  defendants?  You mentioned 2002.  When in 2002?
21    A.   26th March.
22    Q.   And approximately when did you stop
23  working for the defendants?  You mentioned the end
24  of 2004.  Does November 2004 sound accurate to
25  you?

TSG Reporting - Worldwide      877-702-9580

Page 16

1          L. Luna
2     A.   Yes.
3     Q.   What did you do for defendants?
4     A.   Park the cars.
5     Q.   Why did you stop working for the
6   defendants in November 2004?
7     A.   Because we couldn't understand each
8   other.
9     Q.   Did you resign from your employment
10  with the defendants or were you terminated?
11    A.   They fired me.
12    Q.   Why were you fired?
13         MR. FAILLACE: Objection. He
14    already answered. He said, We didn't
15    understand each other. What more do you
16    need?
17    Q.   I'll ask the question again. Why were
18  you fired?
19         MR. FAILLACE: Objection. He
20    answered already. He can answer. Go
21    ahead. Repeat the question.
22    A.   Because we couldn't understand each
23  other. Too many hours of work, and I was not
24  making enough money.
25    Q.   What was the reason the defendants told

TSG Reporting - Worldwide      877-702-9580

Page 17

1          L. Luna
2   you they were firing you?
3         MR. FAILLACE: Objection. He has
4    already answered it twice. Interpreter,
5    please tell him what I'm saying. But go
6    ahead. Answer.
7     A.   Can you please repeat the question?
8         MS. WHITE: Can the court reporter
9    please repeat the question?
10    (Record read.)
11    A.   There were too many hours of work and
12  that we couldn't understand each.
13    Q.   Who told you that?
14    A.   I told him that.
15    Q.   You told who?
16    A.   Raj, the supervisor.
17    Q.   If I understand correctly, you told
18  Raj, your supervisor, that there were too many
19  hours of work, and that you were not making enough
20  money?
21    A.   Exactly.
22    Q.   So I'll ask you again, Did you resign
23  from the company or did they fire you?
24    A.   They fired me because I didn't want to
25  continue.

TSG Reporting - Worldwide      877-702-9580

Page 22

1        L. Luna
2    employment around March 26th of 2002.  Who at the
3    company hired you?
4        A.  Raj.
5        Q.  And for which garage were you initially
6    hired?
7        A.  187 and Valentine.
8           MR. FAILLACE:  For clarification,
9        when he says 187 Valentine, he means
10       187th Street and Valentine Avenue.  The
11       same as 162 -- so we don't go through the
12       same mess with Grand Concourse.  When
13       they say a number and a name, they mean
14       this street and that avenue.  Okay.
15       Q.  Just to clarify, Mr. Luna, you were
16   just referring to 187 Valentine as the garage
17   where you were initially hired.  Were you
18   referring to 187th Street and -- the intersection
19   of 187th Street and Valentine?
20       A.  Yeah.
21       Q.  Do you know the name of that parking
22   garage?
23       A.  Ivy Parking.
24       Q.  For how long did you work at Ivy
25   Parking?

TSG Reporting - Worldwide       877-702-9580

Page 23

1        L. Luna
2        A.  Until the end of 2004.
3        Q.  For which garage did you work after you
4    worked for Ivy Parking?
5        A.  For the same one -- 169.
6        Q.  Do you know the name of that garage?
7        A.  It's called the parking of 169, because
8    it's the same company.  And when they needed
9    somebody there, they would move the person there.
10       Q.  So after you worked at Ivy Parking on
11   187th Street, you worked at 169th Street?
12       A.  Because it's the same company, the same
13   owner.
14          MR. FAILLACE:  Excuse me.  His
15       question was after you worked at 187 you
16       went to work at 169.  He is answering at
17       the same time he worked at both places.
18       And you can ask the interpreter.
19          MS. WHITE:  Let me ask the
20       interpreter.  Is that exactly what he
21       said, or is Mr. Faillace interpreting
22       what he said?
23          THE INTERPRETER:  I don't
24       remember.  Sorry.
25          MS. WHITE:  I will confirm.

TSG Reporting - Worldwide       877-702-9580

Page 24

1        L. Luna
2        Q.  Did you work for Ivy Parking and the
3    garage at 169th Street at the same time, or did
4    you work for one after you worked for the other?
5        A.  If there was people not coming or
6    missing on 169th Street, they would send people
7    who didn't have much work on Ivy Parking to work
8    on the 169.
9        Q.  Okay.  What other garages did you work
10   at between March 2002 and November 2004 besides
11   Ivy Parking and the garage at 169th Street?
12       A.  No others.
13       Q.  Those are the only two garages you
14   worked for the defendants?
15       A.  Yes.
16       Q.  For which garage did you work the most?
17       A.  187 and Valentine.
18       Q.  Did you have any other jobs while you
19   were employed by the defendants?
20       A.  No.
21       Q.  Did you own your own business at the
22   time that you were working for the defendants?
23       A.  No.
24       Q.  What were your hours when you were
25   initially hired by the defendants in March 2002?

TSG Reporting - Worldwide       877-702-9580

Page 25

1        L. Luna
2        A.  From six in the afternoon to six
3    o'clock in the morning.
4        Q.  How many hours a week did you work?
5        A.  Twelve and thirteen hours.  Because
6    sometimes the other people wouldn't come and we
7    had to wait.
8        Q.  Let me repeat the question.
9           How many hours per week did you work?
10   You testified you worked from seven p.m. to
11   six a.m.  How many hours a week?
12          MR. FAILLACE:  Objection.  He
13       worked from six p.m. to six a.m.
14       Q.  Six p.m. to six a.m.
15          How many hours per week did you work?
16       A.  Sometimes I would work 72 hours.
17       Q.  How many days a week did you work?
18       A.  Six and sometimes seven.
19       Q.  Let me make sure I'm understanding your
20   testimony.  Your regular schedule was typically
21   from six p.m. to six a.m., six days a week.  And
22   sometimes you worked seven days a week; is that
23   correct?
24       A.  Yes.
25       Q.  How often did you work seven days a

TSG Reporting - Worldwide       877-702-9580

Page 26

L. Luna

1
2  week?
3      A.   An average of four months.  Something
4  like that.
5      Q.   Are you testifying that for a period of
6  approximately four months you worked seven days a
7  week?
8      A.   Yes.
9      Q.   When was it that you worked seven days
10 a week?
11     A.   Because they needed me and they didn't
12 have any personnel.
13     Q.   In what year was it that you worked
14 seven days a week?
15     A.   For instance, on a year that we -- that
16 year we didn't have personnel.  So we went on
17 working seven days a week.
18     Q.   Let me try to clarify this.  You
19 testified that you had worked seven days a week
20 for about four months, correct?  Are you
21 testifying that you worked those seven days a week
22 in four consecutive months?
23     A.   No, not consecutive.
24     Q.   So for approximately four months over
25 the entire time that you worked for the defendants

TSG Reporting - Worldwide    877-702-9580

Page 27

L. Luna

1
2  you worked seven days a week?
3      A.   Yes.
4      Q.   Was your shift generally six p.m. to
5  six a.m. till the end of 2004 when you stopped
6  working for defendants, or did your shift change?
7      A.   Yes, it was like that.  No, it did not
8  change.
9      Q.   What day of the week did you generally
10 have off?
11     A.   Tuesday.
12     Q.   Did you always punch a time clock when
13 you arrived at the beginning of your shift?
14     A.   Yes.
15     Q.   Did you punch a time clock when you
16 left at the end of your shift?
17     A.   Yes.
18     Q.   Did you ever punch out if you left
19 during your shift?
20     A.   But if I would leave, I would have to
21 punch or add an hour or two, but I would always
22 have to punch the clock at six o'clock in the
23 afternoon.  And I -- six o'clock in the morning.
24     MS. WHITE:  I'm sorry.  Can you
25 repeat that?

TSG Reporting - Worldwide    877-702-9580

Page 28

L. Luna

1
2      (Record read.)
3      Q.   Let me rephrase the question.
4      Did you ever punch out the time clock
5  in the middle of your shift?
6      A.   In the morning I had to leave at six.
7      Q.   Right.  You would come in at six p.m.
8  and you would punch the time clock, correct?
9      A.   Come in.
10     Q.   And you would punch out at six in the
11 morning?
12     A.   Yes.
13     Q.   Did you ever punch out if you left the
14 garage between six p.m. and six a.m.?
15     MR. FAILLACE:  Objection.  Form.
16     A.   No, because you would not leave there.
17     Q.   Did you ever start work prior to the
18 start of your shift?
19     A.   Yes, sometimes I would come at five.
20     Q.   Did you punch in at five o'clock or
21 would you punch in at six o'clock?
22     A.   No, I had to punch my card at six.
23     Q.   How many times did you come in at five
24 o'clock and punch in at six o'clock?
25     A.   When they told me to do so.

TSG Reporting - Worldwide    877-702-9580

Page 29

L. Luna

1
2      Q.   How often did that happen?
3      A.   Weekly.
4      Q.   So your testimony is every single week,
5  at least once every single week, during the time
6  you were employed with the defendant, you came in
7  at five o'clock at night instead of six o'clock at
8  night?
9      A.   Yes, because we were supposed to punch
10 at six and not at five.
11     Q.   Did you get paid for that hour between
12 five p.m. and six p.m.?
13     A.   No.
14     Q.   So your testimony is you never got paid
15 when you came into work an hour early?
16     A.   If I would come at five o'clock to
17 work, no, I wasn't, because my schedule -- my
18 shift was from six to six.
19     Q.   If you came in at five o'clock, what
20 time would you leave?
21     A.   At six o'clock in the morning.
22     Q.   Were you ever paid in cash for that
23 hour that you worked between five p.m. and six
24 p.m.?
25     A.   10 or $15 he would give us per week.

TSG Reporting - Worldwide    877-702-9580

Page 30

```
 1            L. Luna
 2      Q.   So it's your testimony that you would
 3  receive 10 or $15 in cash to compensate you for
 4  that hour that you came in before the beginning of
 5  your shift?
 6      MR. FAILLACE: Objection. That is
 7  not his testimony. You're putting
 8  words --
 9      MS. WHITE: I'm asking -- I'm
10  asking if that's his testimony. He can
11  respond to the question.
12      MR. FAILLACE: That is not his
13  testimony. You're putting words in his
14  mouth.
15      MS. WHITE: He can respond to the
16  question.
17      MR. FAILLACE: Objection. You're
18  putting words in his mouth. That is not
19  his testimony.
20      MS. WHITE: Your objection is
21  noted, Mr. Faillace. I'm asking a
22  question and --
23      MR. FAILLACE: Please interpret
24  what I'm saying. Please, interpreter,
25  say what I'm saying. Please let my
```

Page 31

```
 1            L. Luna
 2  client know what I'm saying.
 3      A.   It was not per hour. It was per week.
 4      Q.   So you received 10 to $15 in cash per
 5  week?
 6      A.   Yes, per week.
 7      Q.   Did you ever receive more than $15 in
 8  cash in a week?
 9      A.   No.
10      Q.   So are you testifying under oath that
11  you never received more than $40 in cash in a
12  week?
13      A.   No.
14      Q.   Just to clarify, you never received
15  greater than $100 in cash in a week?
16      A.   $100, no, no.
17      Q.   Never?
18      A.   No, never.
19      Q.   Were there ever any weeks when you
20  didn't receive any cash?
21      A.   No.
22      Q.   When you came into work at five p.m.,
23  why didn't you punch in at five p.m.?
24      A.   Because my time -- my schedule was from
25  six o'clock.
```

Page 32

```
 1            L. Luna
 2      Q.   Did somebody tell you not to punch in
 3  at five p.m.?
 4      A.   It was not -- I was not supposed to
 5  punch before six.
 6      Q.   Who told you that you were not supposed
 7  to punch before six?
 8      A.   The supervisor himself told me.
 9      Q.   Which supervisor told you that?
10      A.   Raj.
11      Q.   When did Raj tell you that?
12      A.   He would say that to us right there in
13  the parking.
14      Q.   When you say "us," who are you
15  referring to?
16      A.   To me and the workers.
17      Q.   Which workers are you referring to? I
18  would like their names.
19      A.   The people that work there.
20      Q.   Which people? I would like their
21  names.
22      A.   Of the schedule that work with me.
23  People that work with me and my schedule.
24      Q.   Who worked with you?
25      A.   There was a worker that was called Jose
```

Page 33

```
 1            L. Luna
 2  and myself on that shift.
 3      Q.   Did you ever work with anybody else
 4  besides Jose on your shift?
 5      A.   With him. That was my colleague.
 6      Q.   Did you hear Raj tell Jose that he was
 7  not to punch in before the beginning of his shift?
 8      A.   Yes.
 9      Q.   How many times a week would you come in
10  at five o'clock p.m. instead of six o'clock p.m.?
11      MR. FAILLACE: Objection. He
12  already answered.
13      MS. WHITE: He can answer the
14  question again.
15      A.   That was when they call you to come
16  earlier.
17      Q.   You testified earlier that --
18      A.   Three or four times during the week.
19      Q.   So is it your testimony that even
20  though your shift was typically six p.m. to six
21  a.m. three to four times per week, from March 2002
22  to November 2004, you came in at five p.m. instead
23  of six p.m.?
24      A.   Yes.
25      Q.   Every single week?
```

L. Luna

A. No.

Q. Your paycheck never listed overtime hours?

A. No, no.

Q. If you look at the very first page of Exhibit 2 that's in front of you right here, see where it says "regular"? "Forty hours at 5.15." Do you see that?

A. Yes.

Q. And do you see under that it says overtime?

A. But they didn't give us that on the check. They would give it to us cash.

MR. FAILLACE: He didn't say that.

THE INTERPRETER: No?

MR. FAILLACE: No.

Q. Could you repeat what you just said for the interpreter?

A. That money was not given to us on the check. The overtime, no.

Q. So right here where it says overtime -- six hours. Do you see that on here? And it says that at a rate of $7.25 per hour. Do you see that?

L. Luna

A. Yes.

Q. And you see across it says "for this period, $46.35," correct? And that's in addition to $206 of regular pay. Do you see that?

A. Yes.

Q. For a total gross pay of 252.35.

A. Yes. But they would give that to us in cash.

Q. Okay. Do you see where it says "net pay" on here, "$218.79"? Please look at Exhibit 2. Would you receive in that check the entire amount of net pay?

A. I don't remember. But if it says so, I am sure that -- but I don't remember.

Q. Let me rephrase my question. These paychecks that you have in front of you, the pay stubs, reflect that you were paid by check for at least some overtime hours; isn't that correct?

A. Yes. They would give it to me on a check.

Q. Okay. That's my question. Thank you.

Do you understand what the term "time and a half" means?

A. No.

L. Luna

Q. Do you understand that the overtime rate of pay was one and a half times your regular rate of pay?

A. The overtime, yes. Yes, that's time and a half.

Q. Did you receive time and a half for your overtime hours?

MR. FAILLACE: He was asking. He was asking.

Q. He was asking? What were you asking? I'm sorry.

A. No, I'm telling you that time and a half -- that's the hour for overtime.

Q. Right. Do you agree that you were paid time and a half for the overtime hours that you worked?

A. Yeah, the overtime.

Q. You testified that you received cash in addition to your check, correct?

A. When you work more.

Q. Why did you receive -- explain to me why you received cash in addition to your check.

A. Because it goes over the 40 hours of the five days of work.

L. Luna

Q. So let me -- I'm trying to understand your testimony. Is your testimony that you received cash to compensate you for hours that you worked in addition to the hours that were compensated in your paycheck?

A. Yes. Because that was when you went over the time. When you work seven days -- if you work more than seven days -- five days -- for instance, if you work seven days, they would give you 40 to $45 for that.

Q. Who gave you the cash?

A. Raj.

Q. Isn't it true that some of the cash that you received was to compensate you for a lunch hour or a meal break during your shift?

A. No, we never got breaks. There were no breaks.

Q. Did you keep a record of the amount of cash that you received?

A. The check. No, no. Now that you're mentioning cash -- no, no. There was no receipt, nothing.

Q. Did you make any note of the amount of cash that you received?