PETER A. WALKER, ESQ.
LORI M. MEYERS ESQ.
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500
(212) 218-5526

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
                                                    :    ECF Case
ANGELO PENA, ROLANDO ROJAS, JOSE           :
DIROCHE, and FRANKLIN SANTANA,             :
individually and on behalf of others similarly   :    CIVIL ACTION NO.: 07-CV-7013 (RJH)
situated,                                         :
                                                    :    **REPLY AFFIDAVIT OF**
                        Plaintiffs,               :    **PETER A. WALKER**
                                                    :
            v.                                      :
                                                    :
SP PAYROLL, INC., NICHOLAS PARKING,        :
CORP., IVY PARKING, CORP., BIENVENIDO,      :
LLC, CASTLE PARKING CORP., SAGE            :
PARKING CORP., and SAM PODOLAK,            :
                                                    :
                        Defendants.               :
———————————————————————:


STATE OF NEW YORK      )
                                 )     s.s.:
COUNTY OF NEW YORK   )


        PETER A. WALKER, being duly sworn, deposes and says:

        1.      I am a member of the law firm of Seyfarth Shaw LLP, attorneys for defendants SP

Payroll, Inc. ("SP Payroll"), Nicholas Parking, Corp. ("Nicholas Parking"), Ivy Parking, Corp.

("Ivy Parking"), Bienvenido, LLC ("Bienvenido Parking"), Castle Parking Corp. ("Castle

Parking"), and Sage Parking Corp. ("Sage Parking") and Sam Podolak ("Podolak") (collectively,

"Defendants") in the above-captioned action.  This reply affidavit is submitted in further support of Defendants' Fed. R. Civ. P. 56 motion for partial summary judgment.

2.    Attached hereto as Exhibit A are true and correct copies of the relevant pages of the transcript of the Deposition of Rajesh Kissoon, taken on June 17, 2008.

3.    Attached hereto as Exhibit B are true and correct copies of the relevant pages of the transcript of the Deposition of David Saperstein, taken on June 18, 2008.

4.    Attached hereto as Exhibit C are true and correct copies of the relevant pages of the transcript of the Deposition of Sam Podolak, taken on June 11, 2008.

_____
Peter A. Walker

Sworn to and subscribed before
me this 8th day of September, 2008

_____
Notary Public

**ALAYNA BALDANZA**
**NOTARY PUBLIC, STATE OF NEW YORK**
**NO. 01BA6103726**
**QUALIFIED IN QUEENS COUNTY**
**COMMISSION EXPIRES JANUARY 12, 20 12**

2

# EXHIBIT A

Page 1

1

2              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
3

    ANGELO PENA, ROLANDO ROJAS,      )
4   JOSE DIROCHE, and FRANKLIN       )
    SANTANA, individually and on     )
5   behalf of others similarly       )
    situated,                        )
6                                    )
                    Plaintiffs,      )
7                                    )
                 vs.                 )
8                                    )
    SP PAYROLL, INC., NICHOLAS       )
9   PARKING, CORP., IVY PARKING      )
    CORP., BIENVENIDO, LLC, CASTLE )
10  PARKING CORP., SAGE PARKING      )
    CORP., and SAM PODOLAK,          )
11                                   )
                    Defendants.      )
12  ------------------------------)
13
14
15
16           DEPOSITION OF RAJESH KISSOON
17                New York, New York
18              Tuesday, June 17, 2008
19
20
21
22
23
24  Reported by:
    Philip Rizzuti
25  JOB NO. 17123

Page 10

1           **Kissoon**
2       A.  No.
3       **Q.   If you would like to take a break**
4  **during the deposition, just say so and we will**
5  **do that.  I do ask that we not take a break**
6  **while there is a question pending.**
7       A.  Okay.
8       **Q.   You will have an opportunity to**
9  **review the transcript and make any changes**
10 **that you want to make.  We may have the**
11 **ability to comment on any changes in later**
12 **proceedings.**
13          **Have you discussed your testimony**
14 **with anyone before coming here today?**
15      A.  No.
16      **Q.   When you started working for SP**
17 **Payroll what was your job or title at that**
18 **time?**
19      A.  Supervisor.
20      **Q.   What were your responsibilities**
21 **when you started?**
22      A.  Working for the manpower, making
23 sure that the guys were on time, scheduling.
24      **Q.   Okay?**
25      A.  Inventory for the garage.

Page 11

1               Kissoon
2  Reports, pick up reports.
3       **Q.   Any other responsibilities?**
4       A.  Maintenance for the garage.
5       **Q.   Anything else?**
6       A.  No.
7       **Q.   Has your job changed since you**
8  **started working for sample?**
9       A.  No.
10      **Q.   Are you still a supervisor?**
11      A.  Yes.
12      **Q.   What kind of responsibilities do**
13 **you have in regards to maintenance, I think**
14 **you said maintenance?**
15      A.  Maintenance, yes.
16      **Q.   What kind of things do you for**
17 **maintenance?**
18      A.  Lightbulbs, electricity, if there
19 is any damage in the garage I report it to the
20 office.
21      **Q.   What office do you report that to?**
22      A.  To Sam and David.
23      **Q.   Sam Podolak and David Saperstein?**
24      A.  Yes.
25      **Q.   Mr. Saperstein who is sitting**

Page 12

1           **Kissoon**
2  here?
3       A.  Yes.
4       **Q.   When you started with SP Payroll**
5  **were you responsible for one or more than one**
6  **garage?**
7       A.  More than one garage.
8       **Q.   How many garages were you**
9  **responsible for when you started?**
10      A.  Five.
11      **Q.   What were they?**
12      A.  Bienvenido, Castle Parking, Sage
13 Parking, Ivy Parking, 145th Street and 155th.
14 It was a total of six.
15      **Q.   Have you worked full-time for SP**
16 **Payroll since you started?**
17      A.  Yes.
18      **Q.   How much time did you spend at**
19 **each garage location when you started?**
20      A.  Half an hour to 45 minutes per
21 location.
22      **Q.   Per day or per week?**
23      A.  Per day.
24      **Q.   Did you have a schedule of what**
25 **time of day you would visit one garage or**

Page 13

1               **Kissoon**
2  another?
3       A.  No.
4       **Q.   How did you decide which garage**
5  **you would go to at a particular time?**
6       A.  I pick one, whatever, I am driving
7  to a location, I choose to go to one and then
8  I decide to go to the other.
9       **Q.   Has the list of garages that you**
10 **are responsible for changed since you started**
11 **working for SP Payroll?**
12      A.  No.
13      **Q.   You are still responsible for the**
14 **same six facilities?**
15      A.  No.
16      **Q.   How has it changed?**
17      A.  If I am responsible for the same
18 six that I identified?
19      **Q.   Yes?**
20      A.  It is not the same six any more.
21      **Q.   Can you tell me how that has**
22 **changed since you started?**
23      A.  More responsibility -- can you
24 repeat the question.
25      **Q.   Sure.  When you started you said**

Page 14

```
1              Kissoon
2    you were responsible for six different
3    facilities?
4         A.   Yes.
5         Q.   What I am asking is, are there or
6    have there been other facilities that you
7    became responsible for besides those six; was
8    there a time when you were no longer
9    responsible for one of the six?
10        A.   It is not changing.
11        Q.   So today you are responsible for
12   the same six facilities?
13        A.   Yes.
14        Q.   Has there ever been a time when
15   you were responsible for some other facility
16   besides the ones, the six that you have
17   mentioned?
18        A.   No.
19        Q.   Since you began working for SP
20   Payroll have you worked for any other
21   companies as well?
22        A.   No.
23        Q.   In your job currently do you still
24   spend half an hour to 45 minutes at each of
25   these six facilities?
```

TSG Reporting - Worldwide    877-702-9580

Page 15

```
1              Kissoon
2         A.   Same.
3         Q.   Has that been the same for the
4    whole time that you have worked for SP
5    Payroll?
6         A.   Yes.
7         Q.   When you are not spending time at
8    a garage or in transit what are your job
9    activities, for example do you work in the
10   office?
11        A.   No, I don't work in the office, I
12   work in the garages and I have a private
13   office on the side and I do inventory.
14        Q.   Where is that office located?
15        A.   It is -- all six garages have a
16   section that you sit down and I go over the
17   monthly list.
18        Q.   What type of lists are those?
19        A.   Monthly cards, parking.
20        Q.   It is a list of monthly parkers?
21        A.   Yes, I keep a past due list, make
22   sure everything is okay.
23        Q.   What do you do to make sure that
24   the workers are on time?
25        A.   I have them punch in, time card.
```

TSG Reporting - Worldwide    877-702-9580

Page 16

```
1              Kissoon
2         Q.   Has that been the same process
3    since you started working for SP Payroll?
4         A.   Same process.
5         Q.   Is there a time clock at each
6    garage that the men punch in and out?
7         A.   Yes.
8         Q.   What do you do to make sure that
9    they are doing that?
10        A.   I have a view of it every day when
11   I go there, I look at the time card.
12        Q.   You look at the time cards for the
13   workers who are there when you are at the
14   garage?
15        A.   Yes.
16        Q.   Where are the time cards kept in
17   different garages?
18        A.   In different places.
19        Q.   Is there an office?
20        A.   Yes, it is in the office.
21        Q.   Each garage has an office?
22        A.   Each garage has an office.
23        Q.   Is that the same office where you
24   go over the monthly lists?
25        A.   Yes.
```

TSG Reporting - Worldwide    877-702-9580

Page 17

```
1              Kissoon
2         Q.   What kind of work do you do in
3    terms of scheduling, I think you mentioned
4    scheduling is one of your responsibilities?
5         A.   Yes, from when I hire the guys, I
6    put them on the schedule, what time to come to
7    work.
8         Q.   Does each garage have a written
9    schedule?
10        A.   Yes.
11        Q.   Are the facilities that you
12   mentioned open 24 hours a day or something
13   else?
14        A.   24 hours a day.
15        Q.   Each of them is?
16        A.   Yes.
17        Q.   What type of shifts are there?
18        A.   Eight hour shifts and ten hour
19   shifts.
20        Q.   Eight and ten?
21        A.   Yes.
22        Q.   Can you tell me which facilities
23   have which type of shifts?
24        A.   Bienvenido has a 6 to 2.  2 to 10,
25   10 to 6.
```

TSG Reporting - Worldwide    877-702-9580

Page 18

```
1                    Kissoon
2        Q.   So that is three eight-hour
3    shifts?
4        A.   Yes.
5        Q.   How about castle?
6        A.   Castle has 6 to 4, 4 to 12, and 12
7    to 10.
8        Q.   So is there an overlap in the
9    shifts or -- so 6 a.m. to 4 p.m.?
10       A.   Yes.  4 p.m. to midnight and
11   midnight to 10 a.m.
12       Q.   So there is an overlap with the 6
13   a.m. and the midnight?
14       A.   Yes.
15       Q.   How about Sage?
16       A.   Sage, same thing like Castle.  6
17   to 4, 4 to midnight, and midnight to 10.
18       Q.   What about Ivy?
19       A.   The same.
20       Q.   And 145th Street?
21       A.   Same.
22       Q.   155th?
23       A.   The same.
24       Q.   So Bienvenido is the only one that
25   is different?
```

Page 19

```
1                    Kissoon
2        A.   Yes.  It is a one -- 6 to 2, 2 to
3    10 and 10 to 6.
4        Q.   The schedules that you are
5    describing are the current schedules?
6        A.   Yes.
7        Q.   Have the schedules changed since
8    you started working for SP Payroll?
9        A.   No, it has not changed.
10       Q.   Always been the same since you
11   started?
12       A.   Maybe adjustment a little bit.
13       Q.   Can you tell me more specifically
14   how it changed?
15       A.   It changed like if the garage is
16   busy, I need an extra man, I would take a man
17   from one garage and put him in the next
18   garage.
19       Q.   How would you find out if you
20   needed to do that, with a garage needed extra
21   help?
22       A.   If I am at the location at the
23   morning and I see by the tickets, they have a
24   special event in the neighborhood.
25       Q.   Okay.  When you sent one or
```

Page 20

```
1                    Kissoon
2    another worker from a garage to a different
3    garage for an adjustment like you mentioned,
4    did the person punch in and out at the place
5    that they were sent to?
6        A.   No.
7        Q.   What are your responsibilities in
8    terms of picking up reports; I think that is
9    one of the things that you mentioned, so tell
10   me what that involves?
11       A.   Picking up the reports, like the
12   shift reports in the day.  The day report.
13       Q.   What information is in the shift
14   reports?
15       A.   The total tickets in the day and
16   the cash and the checks.
17       Q.   You pick up checks and cash also?
18       A.   Yes.
19       Q.   You bring them back to --
20       A.   To the office, 1832 Second Avenue.
21       Q.   Has that process changed since you
22   started working at SP Payroll?
23       A.   No.
24       Q.   Always been the same?
25       A.   Always been the same.
```

Page 21

```
1                    Kissoon
2        Q.   While you have worked for SP
3    Payroll has anyone else been involved in
4    hiring and firing employees?
5        A.   Can you repeat the question.
6        Q.   Since you started working for SP
7    Payroll are there other supervisors for that
8    company besides yourself?
9        A.   Yes, David Saperstein.
10       Q.   How about supervisors with the
11   same type of responsibilities that you have,
12   people going to the garages and so forth?
13       A.   We had assistants.
14       Q.   You had an assistant?
15       A.   Yes.
16       Q.   When was that?
17       A.   About two years ago.
18       Q.   What was his name?
19       A.   Pablo Oleas.
20       Q.   Pablo was your assistant for a
21   period of time?
22       A.   Yes.
23       Q.   What kind of work did he do?
24       A.   Typically the same thing that I
25   do.
```

Kissoon

1
2     Q.   When you started most all of them
3  got cash along with their paychecks?
4     A.   Yes.
5     Q.   Now today some workers get cash
6  and some don't?
7     A.   Mostly all of them get cash along
8  with the check.
9     Q.   Has that been true for all of the
10  time that you worked for SP Payroll, that some
11  workers get cash along with their paychecks?
12     A.   Yes.
13     Q.   Again correct me if I am wrong,
14  you are not involved in deciding -- if I
15  understand you correctly, you are not involved
16  in deciding what amount of cash any particular
17  worker is supposed to get?
18     A.   I am not involved.
19     Q.   Do you know who makes that
20  decision?
21     A.   David.
22     Q.   Did David ever tell you how he
23  makes that decision?
24     A.   No.  I don't remember.
25     Q.   He didn't?

Kissoon

1
2     A.   Maybe he did tell me, but I don't
3  remember.
4     Q.   He might have you?
5     A.   Yes, but I don't remember what he
6  said.  I don't know.
7     Q.   You don't remember?
8     A.   No.
9     Q.   Do you recall if you have
10  discussed that with David on one occasion or
11  more than one occasion?
12     A.   He might have told me, but I don't
13  remember discussing it.
14     Q.   How about discussing it with Sam
15  Podolak?
16     A.   I didn't discuss it with Sam
17  Podolak.
18     Q.   Do you know Miguel Alcantara?
19     A.   Yes.
20     Q.   Does he or did he work at one of
21  the garages that you handle?
22     A.   He did.
23     Q.   Which one was that?
24     A.   Two location, 145th and 155th.
25     Q.   Does he still work there?

Kissoon

1
2     A.   No, he doesn't.
3     Q.   Do you know Edison Alvarez?
4     A.   Yes.
5     Q.   Did he work for one of the
6  garages?
7     A.   Yes, Ivy Parking.
8     Q.   Does he still work there?
9     A.   No.
10     Q.   How about do you know
11  Mr. Diroche -- I want to ask about another
12  person, I just don't remember his first name.
13  Jose Diroche?
14     A.   Yes.
15     Q.   Do you know him?
16     A.   Yes.
17     Q.   Is he assigned to one of the
18  garages that you are responsible for?
19     A.   Yes.
20     Q.   Which one?
21     A.   Two.  Bienvenido, LLC and Sage
22  Parking.
23     Q.   Does he still work at both those
24  locations?
25     A.   No.

Kissoon

1
2     Q.   Does he still work at either one
3  or did he stop working?
4     A.   He stopped working.  Let me strike
5  that, he quit.
6     Q.   He quit?
7     A.   Yes.
8     Q.   When was that, do you remember?
9     A.   I don't remember.
10     Q.   Is there a Mr. Garcia that worked
11  or works at one of the garages?
12     A.   There is a lot of Garcia's.
13     Q.   Miguel Garcia?
14     A.   Yes.
15     Q.   Where does he or did he work?
16     A.   145th Street.
17     Q.   Does he still work there?
18     A.   No.
19     Q.   How about Patricio Gonzalez, do
20  you know him?
21     A.   Yes.
22     Q.   Where does he or did he work?
23     A.   He worked at Sage Parking.
24     Q.   Does he still work there?
25     A.   No.

Page 42

```
1              Kissoon
2      Q.   Next I would like to show you what
3  we marked as Plaintiff's Exhibit 6.
4          (Handing document to witness.)
5      A.   Okay.
6      Q.   After you had a chance to look at
7  it my question is whether you recognize this
8  type of document?
9      A.   Yes.
10     Q.   What is it?
11     A.   Paycheck.
12     Q.   Pay stub?
13     A.   Pay stub, yes.
14     Q.   Is this a type of document that
15 you work with normally in the course of your
16 work?
17     A.   No.
18     Q.   Can you tell me where you have
19 seen pay stubs, in the office, in the garage,
20 in the envelopes, anything else?
21     A.   It is in the envelope to the men,
22 with the checks.
23     Q.   Are there pay stubs or copies of
24 pay stubs that are kept in the office on
25 Second Avenue, do you know?
```
TSG Reporting - Worldwide     877-702-9580

Page 43

```
1              Kissoon
2      A.   I don't know.
3      Q.   Let me ask you to look at what we
4  marked as Plaintiff's Exhibit 7, and when you
5  have had a chance to look at it my question is
6  whether you recognize that particular
7  document.
8          (Handing document to witness.)
9      A.   Yes, I do recognize it.
10     Q.   What is it?
11     A.   Time card.
12     Q.   For?
13     A.   For Angelo Pena.
14     Q.   Up at the top there where it says
15 7/16/07, is that the date?
16     A.   That is the date, 7/16/07.
17     Q.   Is that the date -- first of all
18 do you know whose handwriting that is?
19     A.   It could have been mine.
20     Q.   It might be yours?
21     A.   Yes.
22     Q.   It is?
23     A.   It is.
24     Q.   When you put the date on this time
25 card was it already punched in and out, or was
```
TSG Reporting - Worldwide     877-702-9580

Page 44

```
1              Kissoon
2  it blank?
3      A.   It was blank.
4      Q.   Now, the 7/16/07, is that --
5      A.   That is the month, the date and
6  the year.
7      Q.   Do you make out a blank time card
8  for each worker at each garage?
9      A.   Yes, I do.
10     Q.   Do you do that on a weekly basis
11 or some other basis?
12     A.   Every two weeks.
13     Q.   Does this time card show when
14 Mr. Pena punched in and out?
15     A.   Yes.
16     Q.   Do you know which garage this is
17 at?
18     A.   No, I don't.
19     Q.   We can't tell by looking at it;
20 right?
21     A.   It might be Sage and Bienvenido.
22     Q.   Two different garages?
23     A.   Yes.
24     Q.   Is there some information on the
25 time card that shows that he was at two
```
TSG Reporting - Worldwide     877-702-9580

Page 45

```
1              Kissoon
2  different garages?
3      A.   No.
4      Q.   But you remember in July of '07 he
5  was working in two different places?
6      A.   Yes.  Two different garages.
7      Q.   If we look at the times that are
8  punched in and out here, it starts with July
9  30; is that right?
10     A.   Yes, right.
11     Q.   So he punched in 3:50 p.m. and out
12 at 11:50 p.m.?
13     A.   Yes.
14     Q.   Then July 31, 4:05 people to 11:56
15 p.m.  August 1, 3:52 p.m. to 11:51 p.m.; is
16 that right?
17     A.   Yes.
18     Q.   And August 3rd, 4 p.m.?
19     A.   Yes.
20     Q.   That is handwritten?
21     A.   Yes.
22     Q.   Do you know whose handwriting that
23 is?
24     A.   Angelo's handwriting.
25     Q.   Do you know why it is in
```
TSG Reporting - Worldwide     877-702-9580

Page 46

Kissoon

1
2  handwriting rather than stamped?
3      A.  Probably forgot to punch.
4      Q.  So August 3rd, we have 4 to 12:03?
5      A.  Yes.
6      Q.  Then there is another entry for
7  August 3rd?
8      A.  Yes, because he came in at -- on
9  August 3rd, 4:23 p.m. and he left at 12:18
10  a.m.
11      Q.  Let's back up a minute.  He starts
12  at 3 p.m. -- I am sorry, August 3rd, 4 p.m.?
13      A.  That should not have been August
14  3, it should have been August 2nd.
15      Q.  August 2nd, 4 p.m. to August 3rd,
16  12:03 a.m., so the date changed because he
17  went past midnight; is that correct?
18      A.  Yes.
19      Q.  Then August 3rd he is pack at 4:23
20  p.m. to --
21      A.  He is late.
22      Q.  He is supposed to start at 4 p.m.?
23      A.  Yes.
24      Q.  He is past midnight, so it is
25  August 4th?

TSG Reporting - Worldwide    877-702-9580

Page 47

Kissoon

1
2      A.  Yes.
3      Q.  August 6th, 4:08 p.m. to 11:51
4  p.m.?
5      A.  Yes.
6      Q.  August 7th?
7      A.  3:55 p.m. to 11:52 p.m..
8      Q.  Okay, then for August 8th there is
9  only one entry, do you see that?
10      A.  Yes.
11      Q.  It says August 8th, 3:58 p.m., do
12  you see that?
13      A.  He forgot to punch out.
14      Q.  Is there any way to know how long
15  he worked that day?
16      A.  Yes.
17      Q.  How would we find out?
18      A.  How we would find that out, the
19  man who came to relieve him.
20      Q.  You would ask that person or you
21  would look at his time card or something else?
22      A.  Look at his time card.
23      Q.  And you would make an assumption
24  that Mr. Pena left when the other person
25  started?

TSG Reporting - Worldwide    877-702-9580

Page 48

Kissoon

1
2      A.  Yes.
3          MS. MEYERS:  Objection.
4      Q.  Were you there when Mr. Pena
5  forgot to punch out?
6      A.  No, I wasn't.
7      Q.  Let's see, August 17th, August
8  18th is 4:03 p.m. to 12:07 a.m. on the 19th?
9      A.  Yes.
10      Q.  Then August 20th, 11:52 p.m. to --
11  what happened according to this on August 20?
12      A.  He didn't punch in.
13      Q.  The 11:52 p.m. is a punch out
14  time?
15      A.  Yes.
16      Q.  Did you need to know when he
17  punched in on August 20th?
18      A.  He forgot the punch in, but he
19  relieved the other day, the next person.
20      Q.  Do you know who the other person
21  was that he took over for?
22      A.  Samuel.
23      Q.  You are not sure?
24      A.  Samuel, yes.
25      Q.  Did you need to find out how many

TSG Reporting - Worldwide    877-702-9580

Page 49

Kissoon

1
2  hours Mr. Pena worked on August 20th?
3      A.  I could know by looking at the
4  other time card.
5      Q.  You could know?
6      A.  Yes.
7      Q.  Is that something that you did, do
8  you remember doing that?
9      A.  I can't remember.
10      Q.  Let's put that aside for the
11  moment.
12      A.  Yes.
13      Q.  Well, before I finish with that.
14  I think you said the time cards are always
15  kept at the garages; is that correct?
16      A.  Yes.
17      Q.  They are never moved to the office
18  on Second Avenue?
19      A.  No.
20      Q.  How are the time cards stored, are
21  they in a file box?
22      A.  In a box.
23      Q.  How if at all are they organized?
24      A.  Mostly organized.
25      Q.  Sorry?

TSG Reporting - Worldwide    877-702-9580

Page 58

Kissoon

1
2    **Q.  Yes.**
3    A.  Employees.
4    **Q.  When you wrote this, the writing**
5    **by Sam, that was put on by Sam, that was**
6    **afterwards; right?**
7    A.  Yes.
8    **Q.  Tell me how you went about**
9    **creating this particular report?**
10    A.  Look at the time cards, the man on
11    duty, when they punch in, punch out, calculate
12    the hours.
13    **Q.  So you would go through each time**
14    **card?**
15    A.  Yes.
16    **Q.  When you did that were you at**
17    **the -- at each garage or you did that in the**
18    **office or something else?**
19    A.  I did that at the garage.
20    **Q.  So if we look at the first garage**
21    **which is Bienvenido, the first one that is**
22    **listed?**
23    A.  Yes.
24    **Q.  And it says the first name there**
25    **is Sammy, six days, 72 hours?**

TSG Reporting - Worldwide    877-702-9580

Page 59

Kissoon

1
2    A.  Yes.
3    **Q.  Is that information that you got**
4    **from the time card for that person?**
5    A.  Yes.
6    **Q.  The 72 is 72 hours, that was the**
7    **time worked according to his time card?**
8    A.  Yes.
9    **Q.  Then over on the left there is a**
10    **40 plus 26, that is Sam's writing?**
11    A.  Yes.
12    **Q.  When did Sam write that, you gave**
13    **this report to Sam or he came to the garage or**
14    **what?**
15    A.  I handed in end of the week.
16    **Q.  Did he give it back to you after**
17    **he had put numbers on here?**
18    A.  No.
19    **Q.  Do you know what Sam did with your**
20    **report after you gave it to him?**
21    A.  No, I don't know.
22    **Q.  Do you know what the 40 plus 26**
23    **means that Sam wrote here?**
24    A.  No.
25    **Q.  What does it mean?**

TSG Reporting - Worldwide    877-702-9580

Page 60

Kissoon

1
2    A.  40 hours regular, 26 hours
3    overtime.
4    **Q.  So that is a total of 66; is that**
5    **right?**
6    A.  Yes.
7    **Q.  Was the 66 hours the amount of**
8    **hours that this particular person was paid for**
9    **do you know?**
10    MS. MEYERS:  Don't guess.
11    **Q.  I don't need you to guess?**
12    A.  I can't remember.
13    **Q.  Did Sam ever tell you how he**
14    **arrived at the numbers for the workers when he**
15    **wrote the numbers on these type of reports,**
16    **for example with Sammy, how he got from 72**
17    **hours worked to a total of 40 plus 26, a total**
18    **of 66?**
19    A.  I cannot remember.
20    **Q.  Did anyone else ever tell you how**
21    **Sam did that?**
22    A.  No.
23    **Q.  You never spoke with David about**
24    **it?**
25    A.  No.

TSG Reporting - Worldwide    877-702-9580

Page 61

Kissoon

1
2    **Q.  Or anyone else?**
3    A.  No.
4    **Q.  No one else you said?**
5    A.  No one else.
6    **Q.  Now, this is a type of report that**
7    **you would fill out at each garage and then**
8    **bring it to Sam at the office; is that**
9    **correct?**
10    A.  Yes.
11    **Q.  You did that on a weekly basis**
12    **ever since you started working for SP Payroll?**
13    A.  Yes.
14    **Q.  Down at the bottom where it says**
15    **Raj, 20, do you see that?**
16    A.  Yes.
17    **Q.  Do you know what that refers to?**
18    A.  No, I don't.
19    **Q.  Were you paid on an hourly basis?**
20    A.  Salary.
21    **Q.  Were you ever paid on an hourly**
22    **basis by SP Payroll?**
23    A.  No.
24    **Q.  Is there a name for the type of**
25    **report that we are looking at on the second**

TSG Reporting - Worldwide    877-702-9580

Page 62

```
 1              Kissoon
 2  page here of Exhibit 9, is there a name that
 3  you would refer to it by?
 4      A.  No.
 5      Q.  Did you ever call it a weekly
 6  report or anything?
 7      A.  I am not sure.
 8      Q.  You are not sure?
 9      A.  I am not sure.
10      Q.  Are these reports kept in the
11  office at, what is it 1832 Second Avenue, is
12  that where they are kept?
13      A.  Yes.
14      Q.  And how are they stored there, are
15  they in a file cabinet or something else?
16      A.  File cabinet.
17      Q.  Do you know how far back in time
18  the records go that are there today, the
19  reports that are there today?
20      A.  No, I don't.
21      Q.  Do you know who is responsible for
22  maintaining them?
23      A.  No, I don't.
24      Q.  Were you involved in gathering or
25  copying these type of reports for this
```

TSG Reporting - Worldwide    877-702-9580

Page 63

```
 1              Kissoon
 2  lawsuit?
 3      A.  No.
 4      Q.  Do you know who was involved in
 5  doing that?
 6      A.  I don't know.
 7          MR. BERNSTEIN:  Let's mark as
 8  Plaintiff's Exhibit 12, a series of
 9  documents that was produced by your
10  attorney.  Again the Bates numbers didn't
11  print out, but it is 4294 to 4355.  So
12  that is going to be Plaintiff's Exhibit
13  12.
14          (Plaintiff's Exhibit 12, Bates
15  numbers 4294 to 4355, marked for
16  identification, as of this date.)
17      A.  Can I open it?
18      Q.  Yes, sure.
19          Have you had a chance to glance at
20  Exhibit 12?
21      A.  Over it?
22      Q.  Not in detail, I know it is a lot?
23      A.  Okay.
24      Q.  My first question is, are there
25  some pages in Exhibit 12 that you prepared,
```

TSG Reporting - Worldwide    877-702-9580

Page 64

```
 1              Kissoon
 2  that you wrote?
 3      A.  I wrote this.
 4      Q.  You wrote all of the reports?
 5      A.  All of these reports.
 6      Q.  Right up on the first page there
 7  up at the top it says 8/25/03 to 9/1/03, it
 8  says Raj okay?
 9      A.  Yes.
10      Q.  You wrote that?
11      A.  Yes.
12      Q.  What did you mean by writing Raj
13  okay?
14      A.  I just put my name on it.
15      Q.  These are the same type of reports
16  that we looked at in the previous exhibit?
17      A.  Yes.
18      Q.  You looked at the time cards to
19  get the hours for each person?
20      A.  Yes.
21      Q.  You did that at each garage?
22      A.  At each garage.
23      Q.  Then you handed the report to Sam?
24      A.  Correct.
25      Q.  And he put his numbers on there
```

TSG Reporting - Worldwide    877-702-9580

Page 65

```
 1              Kissoon
 2  after you gave it to him; is that correct?
 3      A.  Yes.
 4      Q.  Did you get a copy of these
 5  reports back from Sam after he put these
 6  numbers on them?
 7      A.  No.
 8          MR. BERNSTEIN:  Let's mark as
 9  Plaintiff's Exhibit 13, a series of
10  documents that was produced by your
11  attorney.
12          (Plaintiff's Exhibit 13, Bates
13  number 4270 to 4293, marked for
14  identification, as of this date.)
15      Q.  Again the Bates numbers did not
16  print out, but it is Bates number 4270 to
17  4293.
18      A.  Okay.
19      Q.  Have you had a chance to look at
20  that one?
21      A.  Yes.
22      Q.  Do you recognize these pages?
23      A.  Yes, I do.
24      Q.  Can you tell me what they are?
25      A.  The weekly pays, that I get for
```

TSG Reporting - Worldwide    877-702-9580

Page 66

Kissoon
1    the day, how many hours per day they work.
2    **Q.    This is a record that you created?**
3    A.    Yes.
4    **Q.    This is your handwriting?**
5    A.    Yes.
6    **Q.    So look at the first page for**
7    **example, this is for Bienvenido?**
8    A.    Yes.
9    **Q.    And it is for December 31, 2007 to**
10   **January 6, 2008; is that right?**
11   A.    Yes.
12   **Q.    It lists six workers at**
13   **Bienvenido?**
14   A.    Six employees.
15   **Q.    The numbers for each person for**
16   **each day, is that the number of hours that**
17   **they actually worked?**
18   A.    Yes.
19   **Q.    Where did you get the information**
20   **to fill in for each person?**
21   A.    From the time cards.
22   **Q.    Is this a type of record that you**
23   **prepared at each garage?**
24   A.    Yes.

Page 67

Kissoon
1    **Q.    Did you do that on a weekly basis?**
2    A.    Yes.
3    **Q.    And what if anything did you do**
4    **with these reports after you created them?**
5    A.    I fax this over to David.
6    **Q.    You faxed it to David?**
7    A.    Yes.
8    **Q.    When you started working at SP**
9    **Payroll were you creating these type of**
10   **reports, or did they start later on?**
11   A.    They started later on.
12   **Q.    When did it start?**
13   A.    Around 2003 or 2004.
14   **Q.    How did that happen, did someone**
15   **ask you to do the reports in this form or**
16   **something else?**
17   A.    David made a copy of the sheet
18   blank and I fill it in.
19   **Q.    So this is a type of report that**
20   **you gave to David?**
21   A.    End of the week.
22   **Q.    Did David tell you why he wanted**
23   **you to fill out these type of reports?**
24   A.    Yes, for the man hours per day.

Page 68

Kissoon
1    **Q.    He wanted to know the man hours**
2    **per day?**
3    A.    Yes.
4    **Q.    Do you know how David utilized the**
5    **information that you gave him in these**
6    **reports?**
7    A.    No.
8    MR. BERNSTEIN:  Let's mark as
9    Plaintiff's Exhibit 14, documents that
10   were produced by your attorney, Bates
11   stamped 3078 and 3079.
12   (Plaintiff's Exhibit 14, Bates
13   stamps 3078 and 3079, marked for
14   identification, as of this date.)
15   **Q.    Now, the second page there, is**
16   **that a report that you created?**
17   A.    Yes.
18   **Q.    Then Sam wrote numbers on here as**
19   **well?**
20   A.    Yes.
21   **Q.    Now, the first page, do you**
22   **recognize that, the printed page?**
23   A.    Yes.
24   **Q.    What is the first page?**

Page 69

Kissoon
1    A.    First page is the employee's name.
2    **Q.    Okay.**
3    A.    And total hours that they worked.
4    **Q.    Do you know who created the report**
5    **that is on the first page there?**
6    A.    This page (indicating)?
7    **Q.    Yes.**
8    A.    Who created it; David.
9    **Q.    Is there a name for this type of**
10   **report?**
11   A.    I don't know, I don't know what
12   the name of it is.
13   **Q.    Okay.  So looking at the first**
14   **page here, it goes by garages, Bienvenido and**
15   **so forth.  With workers names for each one; is**
16   **that correct?**
17   A.    Yes.
18   **Q.    Then there is a column that says**
19   **pay, there is some ones?**
20   A.    Yes.
21   **Q.    Do you know what those numbers**
22   **are?**
23   A.    Yes.
24   **Q.    What that means?**

Kissoon

1
2    A.  No.
3    Q.  Then there is a column for total
4  net pay, do you see that?
5    A.  Yes.
6    Q.  Did David give you copies of
7  reports like this?
8    A.  Yes, he did.
9    Q.  On a weekly basis?
10    A.  Weekly basis.
11    Q.  How did you utilize these reports,
12  what did you do with them if anything?
13    A.  I kept them.
14    Q.  Sorry?
15    A.  I filed them in the garages at
16  155th Street.
17    Q.  I am sorry, they are filed at the
18  different garages or at 155th Street or both?
19    A.  At 155th Street.
20    Q.  These are filed at 155th Street?
21    A.  Yes.
22    Q.  Do they ever go to the other
23  garages before they are filed at 155th Street?
24    A.  I don't know.
25    Q.  Well, when you get them do you

Kissoon

1
2  bring them directly to 155th Street; is that
3  right?
4    A.  No, this is what the man pays with
5  envelopes.
6    Q.  So you take this to the location?
7    A.  Each location and then I file it
8  at the end.
9    Q.  Then there is a column for total
10  hours worked?
11    A.  Yes, I see it.
12    Q.  Do you know where that number
13  comes from?
14    A.  No.
15    Q.  The next column is net check, do
16  you know what that number is, what that number
17  represents?
18    A.  No.
19    Q.  You don't know?
20    A.  No.
21    Q.  You need to say --
22    A.  I don't know, no.
23    Q.  You don't?
24    A.  No, I don't.
25    Q.  Then there is a column C, do you

Kissoon

1
2  know what those numbers represent?
3    A.  Yes.
4    Q.  What is that?
5    A.  Cash.
6    Q.  Is that the amount of cash that
7  was supposed to be given to the different
8  workers?
9    A.  That were in envelopes.
10    Q.  Then what does that last column of
11  numbers?
12    A.  Where it says $17?
13    Q.  Yes.
14    A.  Cash.  Rounded off from $17.21,
15  $17.
16    Q.  So the rounded off number, is that
17  the number that each worker was supposed to
18  get?
19    A.  17.
20    Q.  I see.
21        Did David ever tell you what or
22  how he arrived at the cash amounts for the
23  different workers?
24    A.  He may have told me, but I don't
25  remember.

Kissoon

1
2    Q.  So you don't remember?
3    A.  He might have told me, but I don't
4  remember.
5    Q.  What makes you think that he might
6  have told you?
7    A.  He might have told me because it
8  is for lunch hours.
9    Q.  When you say he might have told
10  you that it was for lunch hours, what do you
11  base that on?
12    A.  That he got paid $17 for lunch
13  hours.
14    Q.  Why do you think it was for lunch
15  hours?
16    A.  Because he told me.
17    Q.  David told you?
18    A.  Yes.
19    Q.  It was for lunch hours?
20    A.  Yes.
21    Q.  When David told you that, do you
22  recall where that happened, were you in the
23  office or somewhere else?
24    A.  I might be at the office.
25    Q.  You are not sure?

1              Kissoon
2      A.  I am not sure.
3      Q.  Do you remember if it was in
4  person conversation or on the telephone or
5  something else?
6      A.  Private conversation or telephone.
7  I don't recall, I am not sure.
8      Q.  You are not sure?
9      A.  No.
10     Q.  How did that come up, did you ask
11 David about it or he initiated the discussion
12 or something else?
13     A.  He told me about it.
14     Q.  When did this happen?
15     A.  2004.
16     Q.  Can you tell me how you remember
17 that it was sometime in 2004?
18     A.  I am looking at the paper.
19     Q.  Because the paper is dated
20 12/31/04?
21     A.  Yes.
22     Q.  Do you recall when David first
23 started giving you these type of reports?
24     A.  No, I don't recall.
25     Q.  Was it at the beginning of when

TSG Reporting - Worldwide    877-702-9580

1              Kissoon
2  you worked for SP Payroll or a later time?
3      A.  The beginning of SP Payroll.
4      Q.  I may have asked you this, did
5  David ever tell you how you arrived at the
6  different amounts for each person for the
7  lunch hour cash?
8      A.  No.
9      Q.  He never --
10     A.  He never did.
11     Q.  Did David ever tell you why the
12 workers were supposed to get cash for lunch
13 hours as opposed to putting it in their
14 paycheck?
15     A.  Can you repeat it back one more
16 time, please.
17     Q.  Yes.  According to this report
18 there is a cash amount that is supposed to go
19 to each worker for lunch hour is what David
20 told you; is that correct?
21     A.  Yes.
22     Q.  Did David ever tell you why that
23 part of the workers pay was supposed to be
24 given to them in cash as opposed to putting it
25 in their paycheck?

TSG Reporting - Worldwide    877-702-9580

1              Kissoon
2      A.  No, he never did explain it to me.
3      Q.  Did Sam ever explain it to you?
4      A.  No.
5      Q.  Did you ever ask anyone about it?
6      A.  No.
7      Q.  Do you know who made the decision
8  to pay the workers for lunch hour?
9      A.  No, I don't.
10     Q.  It was not a decision that you
11 made?
12     A.  No.
13     Q.  Did anyone ever tell you why the
14 workers were supposed to get cash for lunch
15 hours -- I am sorry, did anyone ever tell you
16 why workers were supposed to be paid for their
17 lunch hour?
18     A.  No.
19     Q.  Did you ever ask about that?
20     A.  No, I never did.
21         MR. BERNSTEIN:  Let's mark as
22 Plaintiff's Exhibit 15, documents that
23     were turned over to us by your attorney,
24     Bates numbered 4240 to 4269.
25         (Plaintiff's Exhibit 15, Bates

TSG Reporting - Worldwide    877-702-9580

1              Kissoon
2      numbers 4240 to 4269, marked for
3      identification, as of this date.)
4      Q.  Have you had a chance to look
5  through that exhibit?
6      A.  Yes, I did.
7      Q.  Do you recognize those pages?
8      A.  Yes.
9      Q.  What are they?
10     A.  Man hours per week.
11     Q.  Are these reports that David gave
12 you?
13     A.  Yes.
14     Q.  Similar to the one that we just
15 looked at?
16     A.  Similar, yes.
17     Q.  If you look at the first page it
18 says period ending 9/10/06, there is a list of
19 garages with different workers names; is that
20 correct?
21     A.  Yes.
22     Q.  So for example if I look at the
23 first one, why don't we take Jose Diroche, the
24 fourth one down, there is a number for total
25 net pay is 137; is that right?

TSG Reporting - Worldwide    877-702-9580

Page 106

```
         Kissoon
1
2     Q.   Once or twice a month --
3     A.   They have the Yankee game, and I
4  go by and help them out.
5     Q.   What do you do to help them out?
6     A.   I help them park the car.  I issue
7  tickets for the car.
8     Q.   So once or twice a month you are
9  at the 155th Street garage between 10 p.m. and
10 4 a.m.?
11    A.   Between -- between 8 to 12.  8
12 p.m. to 12 a.m.
13    Q.   But what I want to know is whether
14 you are ever at that garage or another garage
15 in the hours between midnight -- I am sorry.
16 Between the hours of 10 p.m. and 4 a.m.?
17    A.   Yes.
18    Q.   Sometimes up to midnight?
19    A.   Sometimes up to midnight.
20    Q.   How about between midnight and 4
21 a.m., were you ever in any garage?
22    A.   I stop by, I come in at 4 a.m. in
23 the morning.
24    Q.   Before 4 a.m.?
25    A.   No.
```
TSG Reporting - Worldwide    877-702-9580

Page 107

```
         Kissoon
1
2     Q.   That is a no?
3     A.   Before 4 a.m.; yes, I am at the
4  garage at 4 a.m.
5     Q.   I mean before 4 a.m., like at 2
6  a.m., 3 a.m.?
7     A.   No, I am not there.
8     Q.   Were the employees ever given cash
9  for any reason other than you have already
10 said.  You said they got cash for lunch hour,
11 sometimes extra pay for being a good worker?
12    A.   Yes.
13    Q.   Were there any other reasons why
14 employees got cash?
15    A.   No.
16    Q.   How do you know that?
17    A.   I know because I see the printout
18 of what David gives them.
19    Q.   Was there ever a time when the
20 employees punched in and out for lunch break?
21    A.   We tried it and it never happened, we
22 couldn't do it.
23    Q.   What did you try and -- first of
24 all you say we tried, who is we?
25    A.   Chris, he is the one that asked
```
TSG Reporting - Worldwide    877-702-9580

Page 108

```
         Kissoon
1
2  the men, to have them punch out during lunch.
3     Q.   What is Chris's last name?
4     A.   I don't know the last name.
5     Q.   This is not --
6     A.   The same guy that went around with
7  me with this.
8     Q.   What garage is he at?
9     A.   Wooster Parking.
10    Q.   What did you and Chris do or talk
11 about?
12    A.   I explained to Chris to tell them
13 that they are going to have lunch from 12 to
14 one or 11 to 12 or 2 to 3, to let them punch
15 out and punch back in when they return.
16    Q.   You told Chris to tell the workers
17 that?
18    A.   Yes.
19    Q.   What garages was that for?
20    A.   All six garages.
21    Q.   Why did you tell Chris or ask
22 Chris to do that?
23    A.   Because they told me to let them
24 punch in and punch out, for lunch hours, and
25 they always punch in times, but they never
```
TSG Reporting - Worldwide    877-702-9580

Page 109

```
         Kissoon
1
2  punch out, so they never get it right.
3     Q.   You are talking about lunch break?
4     A.   Only the lunch break.
5     Q.   So they never -- they forgot to
6  punch out?
7     A.   Or punch in.
8     Q.   But they would punch back in?
9     A.   Yes, they would forget to punch
10 out, but they would forget to punch in.
11    Q.   When did this happen, when did you
12 try this?
13    A.   2004.
14    Q.   How long did this last, this
15 experiment?
16    A.   We tried to do it, but they didn't
17 comprehend.
18    Q.   So when did it start in 2004?
19    A.   Middle of the year.
20    Q.   How long did they try to do this?
21    A.   For a week, two weeks.
22    Q.   Did someone decide that the
23 process was not working; did someone come to
24 that conclusion?
25    A.   No, I don't think no one came to
```
TSG Reporting - Worldwide    877-702-9580

Page 110

```
1              Kissoon
2  that conclusion.
3     Q.   Did you have some discussion with
4  David about that?
5     A.   I spoke to David and Sam about it.
6     Q.   What did they say, or what did you
7  tell them?
8     A.   I explained to them, I was trying
9  to get them to punch in and out for lunch and
10 the guys were not doing it right.
11    Q.   What did they say to you?
12    A.   I don't remember what they said to
13 me.
14    Q.   Did they tell you to have the
15 workers not punch in and out any more for
16 lunch?
17    A.   I don't remember.
18    Q.   You don't remember?
19    A.   No.
20    Q.   How did you know that people were
21 forgetting to punch in or punch out for lunch
22 break?
23    A.   Because I would go to the time
24 cards and look at it.  I would see that they
25 are going for lunch and they never punched
```
TSG Reporting - Worldwide     877-702-9580

Page 111

```
1              Kissoon
2  out.
3     Q.   So there are time cards for -- so
4  there are time cards for --
5     A.   The same card that they used to
6  punch in and out in the morning, they use the
7  same card.
8     Q.   So there are time cards from
9  sometime in the middle of '04 that show people
10 punching in, and maybe punching out for lunch,
11 maybe both or maybe not?
12    A.   I don't know, I can't remember.
13    Q.   But you did see time cards at the
14 time that showed that people were forgetting?
15    A.   Yes.
16    Q.   I think I am pretty much done, I
17 would like to take a couple of minutes.  Off
18 the record.
19        (Recess taken.)
20    Q.   Back on the record.
21        Let me show you what we marked as
22 Exhibit 8, do you recognize that particular
23 document, is that something that you have seen
24 before today, either the original or a copy?
25    A.   I might have seen something like
```
TSG Reporting - Worldwide     877-702-9580

Page 112

```
1              Kissoon
2  this.
3     Q.   You might have?
4     A.   Yes.
5     Q.   Did you?
6     A.   I am not sure, but I might have.
7     Q.   But I want to know if you did; I
8  am more interested in the type of document
9  than the specific information on that one?
10    A.   I am not sure.
11    Q.   Did you work with this type of
12 report in your usual normal course of your
13 work?
14    A.   Yes.
15    Q.   Tell me how you used that type of
16 report?
17    A.   How I used it?
18    Q.   Yes.
19    A.   They would issue it to me,
20 correspond the hours that they worked.
21    Q.   David gave you copies like this?
22    A.   Copies like this, for the paid
23 checks, I break down the hours that they
24 worked.
25    Q.   So the one we are looking at is
```
TSG Reporting - Worldwide     877-702-9580

Page 113

```
1              Kissoon
2  J&I, what is that 155th Street?
3     A.   Yes.
4     Q.   This says it is for the period
5  ending January 6, '08?
6     A.   Yes.
7     Q.   Is this something that David gave
8  you along with the paychecks that you were
9  going to give out?
10    A.   Yes.
11    Q.   So we have the names of the
12 employees and then the next column is that
13 hours?
14    A.   Yes.
15    Q.   That they are being paid for?
16    A.   Yes.
17    Q.   Then the next column, what is
18 that, what information is that?
19    A.   I don't know what is that.
20    Q.   These columns don't have any
21 headers?
22    A.   No, they don't have any header
23 breakdown.
24    Q.   Do any of the numbers refer to
25 cash amounts do you know on this particular
```
TSG Reporting - Worldwide     877-702-9580

# EXHIBIT B

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
     ANGELO PENA, ROLANDO ROJAS,       )
4    JOSE DIROCHE, and FRANKLIN        )
     SANTANA, individually and on      )
5    behalf of others similarly        )
     situated,                         )
6                                      )
                    Plaintiffs,        )
7                                      )
     -against-                         )
8                                      ) Index No.
                                       ) 07 CV 7013
9    SP PAYROLL, INC., NICHOLAS        )
     PARKING, CORP., IVY PARKING       )
10   CORP., BIENVENIDO, LLC, CASTLE    )
     PARKING CORP., SAGE PARKING       )
11   CORP., and SAM PODOLAK,           )
                                       )
12                  Defendants.        )
     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
13

14

15

16

17

18

19            DEPOSITION OF DAVID SAPERSTEIN
                   New York, New York
20                   June 18, 2008
21

22

23

24   Reported by:
     Judi Johnson, RPR, CLR
25   Job No.: 17084

**DAVID SAPERSTEIN**

1
2     A     This is while Sam was doing --
3     Q     Yes.
4     A     No.
5     Q     Did Sam ever tell you how he arrived
6  at the cash amounts?
7     A     The specific amounts, no.
8     Q     Did he tell you anything generally
9  about how he was doing that?
10     A     That he inherited the system from I
11  believe it's Jose Tavares and his group.
12     Q     Did he tell you anything else about
13  the practice he had at that time about adding
14  cash to the paychecks?
15     A     It was to make up for lunch -- you
16  know, to pay them for their lunch hours. I
17  believe that's really what the extra cash was
18  for at that time.
19     Q     That's something that Sam told you at
20  the time?
21     A     Yes.
22     Q     Do you know if the workers were taking
23  a lunch hour off from work during the time that
24  Sam was handling the payroll?
25     A     Yes.

DAVID SAPERSTEIN

1
2     Q     What do you know about that?
3     A     That I witnessed workers taking --
4  leaving the garage to get lunch. Sometimes they
5  would come back with it and eat in their car, in
6  the office. I actually reprimanded an employee
7  for eating in a customer's car once. On a few
8  occasions, I've witnessed employees leaving --
9  not being in the garage while I was there and
10  coming back later, after -- you know, after
11  their lunch.
12     Q     This was during the time that Sam was
13  handling the payroll?
14     A     Yes.
15     Q     What was your work schedule at that
16  time in terms of visiting the various garages?
17     A     It varied. Some days I worked from
18  seven to three. Some days I worked from six to
19  six. Some days I worked from 4:00 a.m. to
20  8:00 p.m. It varied.
21     Q     How many days a week were you working
22  at that time?
23     A     Six.
24     Q     And how many garages did you cover in
25  a day?

**DAVID SAPERSTEIN**

1
2     A     I could've covered one. I could've
3  gone to one garage and not gone to another or I
4  could've gone to all of them. There was no set
5  schedule.
6     Q     And how many were there at the time
7  all together that you were responsible for?
8     A     I think seven.
9     Q     Seven, okay. Generally, how long did
10  you spend at each one?
11     A     Could've been five minutes. Could've
12  been three hours.
13     Q     So it varied a lot?
14     A     Yeah.
15     Q     Do you recall specific instances back
16  then when you saw someone leaving or taking a
17  lunch hour?
18     A     Specifically, I remember once Jose
19  Suazo taking lunch hour specifically.
20     Q     Why does that stand out in your mind?
21     A     Because that particular day, I caught
22  a car in the garage with no ticket and no
23  sticker, and he wasn't there to explain it to
24  me.
25     Q     You found out?

**DAVID SAPERSTEIN**

1
2     A     I had to wait for him to get back to
3  find out where he was.
4     Q     And he told you he was taking lunch?
5     A     Yes -- specifically, he said eating.
6     Q     Any other specific instances that you
7  recall?
8     A     No -- cancel that. The time that I
9  reprimanded the employee for eating in a
10  customer's car.
11     Q     What garage was that?
12     A     Castle.
13     Q     When did that happen, roughly?
14     A     Sometime in 2002 or 2003.
15     Q     Do you recall who the employee was?
16     A     No.
17     Q     When Sam was handling the payroll,
18  what garages did you cover? Which were the ones
19  that were operating that you covered?
20     A     Sage, Bien, Castle. Sam handled Ivy's
21  payroll for a very short time, so I did visit
22  Ivy every once in a while. That's it.
23     Q     Not 155?
24     A     Sam never handled the payroll for 155
25  or 145.

DAVID SAPERSTEIN

1  did employees continue to be paid partly in
2  cash?
3     A    Yes.
4     Q    How did you determine what cash
5  amounts each employee was supposed to get?
6     A    It was a net number based on their
7  hours worked plus one hour for lunch per shift.
8     Q    Did Jose tell you why he was paying
9  employees partly in cash?
10    A    No.
11    Q    Did you ever ask him?
12    A    My contact with Jose Tavares was very
13 limited.
14    Q    Did Sam ever tell you why, before you
15 took over the payroll, the workers were being
16 paid partly in cash?
17    A    Say that again.
18    Q    Did Sam ever tell you why the workers
19 were being paid partly in cash?
20    A    The cash was to make up for their
21 lunch hour that was deducted from the time
22 cards.
23    Q    Sam told you that?
24    A    Yes.

DAVID SAPERSTEIN

1     Q    To your knowledge, was there a reason
2  why the lunch hour amounts were not included in
3  the paychecks?
4     A    You would have to ask Sam that.
5     Q    You don't know?
6     A    No.
7     Q    He never told you?
8     A    No.
9     Q    Did you ever ask him?
10    A    No.
11    Q    When you took over the payroll, what
12 was the process whereby paychecks were
13 generated?
14    A    Are you referring to when I started to
15 do it?
16    Q    When you started to do it?
17    A    I would get the hours from Raj and/or
18 Sam.
19       The hours included the one hour per
20 shift lunch, which I deducted from the check and
21 then added back in the form of cash.
22    Q    When you got the hours from Raj, what
23 kind of information, what type of report --
24 withdrawn.

DAVID SAPERSTEIN

1        That was in some written form?
2     A    Yes.
3     Q    How often did Raj or Sam provide that
4  type of record?
5     A    Weekly.
6     Q    Weekly?
7     A    Yes.
8     Q    What did you do with those records
9  after you had utilized the information?
10    A    Depending on the period of time.  At
11 one point it went back to Sam.  Another point it
12 was just scanned into my computer and sits
13 there.
14    Q    Do you know what Sam did with those
15 records when they went back to him?
16    A    I believe he just put them in a box.
17    Q    Is that at the Second Avenue location
18 or somewhere else?
19    A    I believe Second Avenue.
20    Q    And when you scanned those records
21 into your computer, what happened to the paper
22 copies?
23    A    I believe I destroyed them.
24    Q    We talked about reports you got from

DAVID SAPERSTEIN

1  Raj or Sam.  What, if any, records did you
2  create in the payroll process?  Did you generate
3  lists, spreadsheets?
4     A    Yes.  Certain locations were all put
5  on one sheet, Castle, Sage, Bien and Ivy were
6  put on one sheet.  The hours inclusive of the
7  one hour for lunch, the net pay and the amount
8  they received in cash were put on a sheet.  At
9  some point, I don't know when, I added gross pay
10 to the reports.  145 and 155 had their own
11 report and Magic has its own report.
12    Q    Where is Magic located?
13    A    121 and St. Nick.
14    Q    Were you responsible at any time
15 for -- withdrawn.
16       Have you discussed your testimony or
17 your prospective testimony for today with anyone
18 before coming here to the deposition?
19    A    No.
20    Q    Just so we're clear, I'm asking
21 whether you discussed your testimony or your
22 prospective testimony at any time before coming
23 to the deposition today?
24    A    My testimony, no.

**DAVID SAPERSTEIN**

1
2    A    Yes.
3    Q    Have you ever met or spoken with him
4  in person?
5    A    No.
6    Q    Christian Santos, do you know who that
7  is?
8    A    Yes.
9    Q    He is also an employee?
10   A    Was.
11   Q    Have you ever met or spoken with him
12 in person?
13   A    No.
14   Q    How about Jose Reyes, do you know who
15 that is?
16   A    Sounds like he was an employee; but
17 off the top of my head, I don't know.
18       MS. MEYERS:  Rich, I think that's not
19 his first name.
20   Q    Jose De Arce Reyes?
21   A    Former employee.
22   Q    Have you ever met or spoken with him
23 in person?
24   A    No.
25       MR. BERNSTEIN:  Let's take a short

**DAVID SAPERSTEIN**

1
2  break here.
3       (Whereupon, a break was taken.)
4  BY MR. BERNSTEIN:
5    Q    At what point did you start working
6  with the information that you got from Jose
7  Tavares?  I think you said you got a net number,
8  and then you worked out a cash number based on
9  that in some way.  Do I understand that
10 correctly?
11   A    Jose Tavares paid some portion in cash
12 as well as check.
13   Q    Okay.
14   A    Whatever date that we started managing
15 145 and 155 is the date.  I want to say May of
16 2003, but I'm not sure.
17   Q    But whatever date that was, that's
18 when you started utilizing information from Jose
19 Tavares in terms of a net number that you worked
20 into a cash number in some way?
21   A    Me?
22   Q    Yes.  Is that something you did?
23   A    Yes.
24   Q    And did you continue to go through
25 that process after you took over the payroll?

**DAVID SAPERSTEIN**

1
2    A    Once the ADP program was up and
3  running, we discontinued getting checks from
4  Jose Tavares.
5    Q    But in terms of figuring out the cash
6  amount, how did you do that once you took over
7  the payroll?
8    A    We continued to pay the employees the
9  same -- in the same manner that Jose Tavares
10 did.
11   Q    So you began with a net amount and
12 then computed a cash amount in some way based on
13 that?
14   A    We began with a net amount and a net
15 check -- a net check to find out how much cash
16 needed to be added to come up to the original
17 net amount.
18   Q    Explain to me what you mean by the
19 original net amount.
20   A    Jose Tavares was paying his employees
21 a net amount.  I don't remember what that number
22 is.  But he paid a net amount.  So rather than
23 to have disgruntled employees, we continued to
24 follow Jose's system.  I knew how much net they
25 were supposed to get for a specific amount of

**DAVID SAPERSTEIN**

1
2  hours.
3    Q    I see.
4    A    So in order to figure out the gross
5  numbers never came into play other than to make
6  sure that they got paid minimum wage for their
7  time worked.  Minimum wage plus overtime.
8    Q    And the net amount for a certain
9  amount of hours is net of payroll withholding?
10   A    It's what they actually walked home
11 with.
12   Q    Cash plus check?
13   A    Cash plus check.
14   Q    I see.  Do you know if the amount you
15 got from Jose Tavares varied if the amount of
16 hours that an employee worked varied?
17   A    From Jose Tavares, I have no idea what
18 he did if someone worked less hours than they
19 were scheduled.
20   Q    How about once you started taking over
21 the payroll, you still started with a net amount
22 for a certain number of hours?
23   A    If they worked -- they got paid for
24 the amount of hours they worked plus one hour
25 per shift for lunch.

DAVID SAPERSTEIN

1
2    Q    When you say they got paid for the
3    number of hours they worked plus, did the amount
4    that they were paid for hours worked vary when
5    the number of hours varied?
6    A    Yes.
7    Q    Higher number if the number of hours
8    was higher and so forth?
9    A    Yes.
10    Q    Has that system changed in any way
11    since you started -- since you took over the
12    payroll back in 2003?
13    A    Yes.
14    Q    How is it changed?
15    A    Currently, we do not pay many people
16    in cash in the hours that they worked inclusive
17    of the lunch hour is in the check.
18    Q    Are there any people who are still
19    paid in cash?
20    A    A few.
21    Q    Which ones are they?
22    A    Forgive me if I don't say everybody.
23    Q    Well, I don't know if it's just a
24    random group of names or there's -- it's a
25    particular garage or something else?

**DAVID SAPERSTEIN**

1
2    A    It's usual the same employees every
3    week.  Occasionally it changes; but for the most
4    part, it's the same.
5    Q    What accounts for the fact that those
6    people are still on the previous system?
7    A    Sam's decision.
8    Q    Did Sam ever explain to you his basis
9    for keeping them on the same system?
10    A    It's not the same system.
11    Q    Okay.
12    A    I'm just going to use employee A
13    worked 55 hours plus five hours for lunch.
14    Q    Okay.
15    A    Employee A got a check for 40 hours
16    plus 20 overtime plus some cash.  It had nothing
17    to do with his lunch or how much he got.  He
18    would just -- Sam decided that he wanted to give
19    him extra.  That's current.
20    Q    Have there been any other changes
21    besides what you just told me?
22    A    Other than the minimum wage changes,
23    no.
24    Q    So if I understand correctly, there
25    are now some employees that are paid exclusively

**DAVID SAPERSTEIN**

1
2    by check, what is the process
3    A    Most employees are paid exclusively by
4    checks.
5    Q    And when did that begin to be done?
6    A    I think sometime in 2006.
7    Q    Who made the decision to do that?
8    A    Sam.
9    Q    What did he tell you about that?
10    A    He said that he wanted -- he no longer
11    wanted to pay cash to most of the employees to
12    change the way people -- change the way checks
13    were being cut to include hours worked and
14    lunch.
15    Q    Did he tell you why he wanted to make
16    that change?
17    A    No.
18    Q    Did you ask him?
19    A    Yeah.
20    Q    What did he say about that?
21    A    Didn't get an answer.
22    Q    He didn't say anything?
23    A    He went onto something else, and I
24    never returned to the question.
25    Q    For the employees that are now paid

**DAVID SAPERSTEIN**

1
2    exclusively by check, what is the process
3    whereby their paycheck is generated?
4    A    From beginning to end?
5    Q    Yes.  Generally describe the process.
6    A    The process is generally the same.
7    Raj or Sam faxes me a handwritten sheet that has
8    their hours on it, either by location or group
9    of locations, and I enter into ADP's payroll
10    system the amount of hours, 40 hours plus
11    whatever additional.  Next day I get a check,
12    and somehow I get it to Raj.
13    Q    Let's look at Exhibit 5.  (Handing.)
14    Paragraph can you tell me what time of record
15    that is?  Is that something you recognize?
16    A    Yes.
17    Q    What is it?
18    A    It's generated from ADP PC Payroll for
19    Windows.  It is an earnings statement from the
20    beginning of when Angelo Pena -- let me back up
21    a little.  It is an itemization of every check
22    that Angelo Pena received from SP Payroll.
23    Includes gross pay and net pay and week ending
24    and so forth.
25    Q    Is it a type of record that SP Payroll

Page 62

DAVID SAPERSTEIN

1
2  keeps in the normal course of business or was it
3  created for the lawsuit or something else?
4      A    This particular record was created for
5  the lawsuit.
6      Q    Is it a summary of amounts that are on
7  the actual paystubs?
8      A    More information appears on the
9  paystubs than does in this report.
10     Q    But it does itemize the gross and net?
11     A    That's correct.
12     Q    Then if we look at Exhibit 6.
13 (Handing.)
14         Is that a paystub for Mr. Pena or a
15 copy?
16     A    It's a reproduction of a paystub
17 generated by PC Payroll for Windows.
18     Q    This says it's for pay date August
19 3rd, 2007, period ending July 29th, '07.  Do
20 you see that?
21     A    Yes.
22     Q    Do you know if at that time Mr. Pena
23 was being paid exclusively by check?
24     A    Yes.
25     Q    He was?

Page 63

DAVID SAPERSTEIN

1
2      A    Yes.
3      Q    When you were a supervisor, did you
4  personally hand out the pay to the workers?
5      A    Rare occasions, but yes.
6      Q    When you were a supervisor, who
7  normally did that?
8      A    Raj.
9      Q    On what types of occasions did you do
10 that?  What were the rare occasions,
11 circumstances?
12     A    If Raj was sick, if Raj was on
13 vacation or if I just happened to be going there
14 for another reason.
15     Q    While you were supervisor, did the
16 workers -- did any of the workers give a written
17 receipt for the cash?
18     A    Not that I'm aware of, no.
19     Q    Do you know if Raj ever gotten written
20 receipts for cash?
21     A    Not that I'm aware of.
22     Q    And how about after you took over the
23 payroll, did workers ever provide written
24 receipts for cash that they got?
25     A    Not that I'm aware of.

Page 64

DAVID SAPERSTEIN

1
2      Q    Do you know if any of the workers were
3  ever asked to give a receipt for the cash?
4      A    Let me actually back up on that one.
5  Edison Alvarez actually gave Sam some form of
6  acknowledgment that he received cash.
7      Q    Aside from that, are you aware of any
8  kind of cash or acknowledgment that workers gave
9  or were asked to give?
10     A    No.
11     Q    When you were supervisor, did
12 employees who worked the same number of hours in
13 a week get the same amount of cash?  For
14 example, if there were two employees that
15 worked, say, 72 hours, they both worked 72 hours
16 in a given week, did they get the same amount of
17 cash?
18     A    I don't know.  I wasn't doing payroll
19 at that time.
20     Q    What about when you started doing
21 payroll?
22     A    It depended.  Since their pays were
23 based on net, it depended on how many
24 deductions.  If their nets were the same, their
25 pay was the same.

Page 65

DAVID SAPERSTEIN

1
2      Q    As part of your job, do you look at or
3  go through time cards, the time cards
4  themselves?
5      MS. MEYERS:  Objection.  When?
6      MR. BERNSTEIN:  At any time.
7      A    It doesn't really matter, no.  Let me
8  back up.  I occasionally glance at them.  If I'm
9  at a location, I might just glance just to make
10 sure they're being used.
11     Q    When you say to make sure they're
12 being used, you mean that the employees --
13     A    Are punching in and out.
14     Q    Have you found times when employees
15 are not punching in and out every time they're
16 supposed to?
17     A    Occasionally.  They also refused to
18 punch in and out for lunch when we attempted to
19 get them to do that.
20     Q    Okay.  We'll get to that.
21     A    Okay.
22     Q    Occasionally, if I understand you
23 correctly, there are missing punch-ins or
24 punch-outs that you've seen?
25     A    Yes.

DAVID SAPERSTEIN

1
2    Q    I should say time cards that you've
3    seen with a missing punch-in or punch-out time?
4    A    Yes.
5    Q    When the punch-in or punch out-time is
6    missing, how, if at all, are the employees'
7    hours figured for that day?
8    A    It was up to Raj. Raj was the one
9    that knew when they were coming and going. He
10   was the one that determined what time they got
11   there and what time they left.
12   Q    Now, you said that employees refused
13   to punch in and out for a lunch break; am I
14   correct?
15   A    Refused might have been a wrong word.
16   Q    Okay. They didn't do it?
17   A    Unable to do it might be a better
18   choice of words.
19   Q    Tell me what you remember about that.
20   A    At some point, I had requested Raj to
21   get the employees to punch in and out whenever
22   they left the garage.
23   Q    Not just for lunch but whatever?
24   A    My choice of words was "whatever," but
25   it meant lunch, and Raj understood that. And we

DAVID SAPERSTEIN

1
2    just couldn't -- could not get them to do it.
3    They either forgot, they didn't want to do it;
4    for whatever reason, they did not do it.
5    Q    Do you recall when you --
6        MR. BERNSTEIN: Can you repeat the
7    last answer and question.
8        (Whereupon, the requested portion was
9    read back by the court reporter: Q, tell me
10   what you remember about that? A, at some
11   point I had requested Raj to get the
12   employees to punch in and out whenever they
13   left the garage. Q, Not just for lunch but
14   whatever? A, My choice of words was
15   'whatever,' but it meant lunch, and Raj
16   understood that. And we just couldn't --
17   could not get them to do it. They either
18   forgot, they didn't want to do it; for
19   whatever reason, they did not do it.)
20   BY MR. BERNSTEIN:
21   Q    How were workers told to punch in and
22   out for lunch?
23   A    Verbally.
24   Q    By you or Raj?
25   A    By Raj.

DAVID SAPERSTEIN

1
2    Q    Was that something you asked Raj to
3    do?
4    A    Yes.
5    Q    When did that happen?
6    A    It was more than one request, and they
7    were made sometime in the early part -- early
8    and mid part of 2004.
9    Q    And what caused you to ask Raj to do
10   that?
11   A    The time cards were not reflecting
12   that they were going out, so I needed -- I
13   needed that to happen.
14   Q    And how do you know that the time
15   cards were not reflecting that?
16   A    Raj told me.
17   Q    What did he tell you about that?
18   A    That after the first time I had asked
19   him to get them to punch in and out for when
20   they left the garage, I asked him if they were
21   doing it, he said no. After the second time I
22   asked him to do it, I asked him again, the same
23   question, he said no.
24   Q    Do you know if Raj did anything
25   besides asking the workers to punch in and out

DAVID SAPERSTEIN

1
2    for lunch? Did he take any other steps to see
3    to it that they did that?
4    A    I don't know.
5    Q    Did you ask him to take any other
6    steps besides telling the workers to punch in
7    and out for lunch?
8    A    I did tell him that if they don't do
9    it, they're going to receive reprimands for it.
10   I don't know whether he told them that or not.
11   Q    Do you know if anyone was ever
12   reprimanded for not punching in and out for
13   lunch?
14   A    No official letter was written.
15   Q    How about unofficially?
16   A    It wouldn't have come from me, it
17   would've come from Raj.
18   Q    So you don't know one way or the
19   other?
20   A    No.
21   Q    Do you know if there are any time
22   cards that show a worker punching in or out for
23   a lunch hour?
24   A    I don't know.
25   Q    Let's look at Exhibit 9. (Handing.)

1        **DAVID SAPERSTEIN**
2        **I think my question is, what type of**
3    **record are we looking at here?**
4        A    These documents are previous to when I
5    was doing payroll, but are similar to the ones
6    that I would receive from Raj and/or Sam, or
7    some of them are similar.
8        **Q    Do you have one that you can tell me**
9    **is similar?**
10        A    The second page. The one dated
11    May 8th, '03.
12        **Q    Okay.**
13        A    It's similar to what I currently get.
14        **Q    Similar in that there's a list of**
15    **employees for various garages with days and**
16    **hours worked?**
17        A    Correct.
18        **Q    And then the ones you now get also**
19    **have numbers added onto them by Sam?**
20        A    Some do, some don't.
21        **Q    Which ones do and which ones don't?**
22    **Does it vary --**
23        A    It varies.
24        **Q    -- by garage or something else?**
25        A    No. It depends on whether Sam happens

1            DAVID SAPERSTEIN
2    to be in time to write these, like eight plus
3    four. If he happens in time to write it in,
4    then he does that. If he's not in in time, then
5    I have to do it on my own.
6        **Q    How do you do it on your own?**
7        A    It's more or less arbitrary. This
8    eight plus four means he worked 12 hours. At
9    this particular garage, the allotment of regular
10    time -- we're talking about Persio. At this
11    particular garage, the allotment is eight
12    regular hours, four overtime hours at this
13    particular garage. And then somewhere on there
14    there's probably 32 hours plus whatever extra
15    overtime you worked underneath it. At Sage, he
16    worked 32 plus 16, which brings his 40 regular,
17    20 overtime.
18        **Q    When you say allotment, I'm not sure**
19    **what you mean by that.**
20        A    It really has nothing to do with the
21    employee. It's how the labor cost is
22    distributed from one garage to the other because
23    he worked in two separate garages.
24        **Q    Who makes that distribution?**
25        A    In this particular case, Sam did.

1            DAVID SAPERSTEIN
2        **Q    Do you know on what basis he does that**
3    **or what basis you do it when you do it?**
4        A    If an employee worked 12 hours five
5    days a week, I would basically do eight plus
6    four for every 12 hours, and it would, you
7    know -- it would kind of add up to 40 plus or
8    whatever. Forty plus 20.
9        **Q    Let's look at Exhibit 12. (Handing.)**
10        **Quickly, are there reports in here**
11    **from the time when you were handling the**
12    **payroll?**
13        A    Yes.
14        **Q    Can you give me an example?**
15        A    Let me back up. At this -- let's just
16    go with the first page. 8-25-03 to 9-1-03, I
17    was only handling the check portion of the
18    payroll.
19        **Q    So in that instance, how did you**
20    **utilize the information from this report?**
21        A    In this particular instance?
22        **Q    Yes.**
23        A    Let's take in Bien, Felix, he got on
24    his check 40 hours regular, 26 hours overtime at
25    whatever the minimum wage rate was.

1            DAVID SAPERSTEIN
2        **Q    Is there an example in here of when**
3    **you were handling both the check and the cash**
4    **portion?**
5        A    Let's go to the last one, since it's
6    probably the last date.
7        **Q    The last one?**
8        A    Let me see what that date is. We
9    can't read that date, so let's go to the one
10    before the last one.
11        **Q    Okay.**
12        A    I believe I was handling both portions
13    at this point.
14        **Q    Okay. And in that instance, how did**
15    **you utilize the information that you were given?**
16        A    In this particular one, Sam figured
17    out the distribution of regular and overtime
18    pays. Let's take Sammy, for instance.
19        **Q    The first one?**
20        A    The first one. Forty hours regular,
21    26 overtime is what his check was. And I'm
22    guessing that at some point I put cash in his
23    envelope as well.
24        **Q    And what method did you use to arrive**
25    **at the cash amount?**

Page 74

DAVID SAPERSTEIN

1
2    A    I added in six hours for lunch because
3  six days, six hours.
4    Q    And we know it's six because -- well,
5  it says six days?
6    A    It says six.
7    Q    And 72 hours?
8    A    Yeah.
9    Q    And then Sam wrote 40 plus 26?
10    A    Yes.
11    Q    Meaning the check amount was for 40
12  regular and 26 overtime hours?
13    A    Yes.
14    Q    Let's look at Exhibit 13.  (Handing.)
15        Are these pages, or most of them,
16  examples of the grid that you said you got from
17  Raj at times?
18    A    Yes.  There are also additional pages
19  in here which are that I would get from Raj
20  and/or Sam.  In this particular case, I did the
21  distribution of regular and overtime hours on my
22  own.
23    Q    What's the date on that?
24        MS. MEYERS:  Page number?
25        THE WITNESS:  Looks like 17.

Page 75

DAVID SAPERSTEIN

1
2  BY MR. BERNSTEIN:
3    Q    Is there a date on the page you just
4  looked at?
5    A    1-14 to 1-20-2008, and it's the sixth
6  page.
7    Q    So Raj sometimes gave you information
8  in a grid form and sometimes in the list form
9  that we've looked at; is that right?
10    A    Currently I get them in both grid form
11  and list form.
12    Q    For the same workers or --
13    A    Yes.
14    Q    When did Raj start providing the grid
15  type format?
16    A    I believe in 2007, but I'm not sure.
17    Q    And how did it come about that he
18  started doing that?  Was it his idea or somebody
19  else's to do it?
20    A    No, it was my idea.
21    Q    And what was your basis for asking him
22  to do that?
23    A    I needed to see how many hours per
24  shift the employees were working, because at
25  this time we were trying to control our

Page 76

DAVID SAPERSTEIN

1
2  overtime.
3    Q    How does the grid format show the
4  number of hours per shift that people were
5  working?
6    A    Well, let's take the first page, Bien.
7    Q    Sure.
8    A    Sammy Gerardo, Monday, eight hours.
9  Tuesday, eight hours and so on.  It specifically
10  says in this particular day how many hours they
11  worked in that day.
12    Q    I see.  That's a piece of information
13  that's not on the list form; is that right?
14    A    That's correct.
15    Q    How did having the information in the
16  grid help you to control overtime?
17    A    It just made it easier for me to see
18  where people were working 12 hours a day or 10
19  hours a day or eight hours a day, and it helped
20  me, you know -- it helped me advise Sam that we
21  need to cut down on overtime costs.  And if it
22  means to hire an extra man to work less
23  overtime, that's what it means doing.
24    Q    Next let's look at Exhibit 14.
25  (Handing.)

Page 77

DAVID SAPERSTEIN

1
2        Do you recognize that -- I'm just
3  focusing on the first page.  Do you recognize
4  that document --
5    A    Yes.
6    Q    -- or type of document?
7    A    Yes.
8    Q    What is it?
9    A    It's a document that I generated to
10  figure out how much cash to give the employees.
11    Q    Can you tell me what information is in
12  the numerical columns?  I see there's a list of
13  garages by the list of workers' names.
14    A    Okay.
15    Q    You have total net pay and so forth.
16    A    So total net pay is the total net
17  they're supposed to be receiving for the hours
18  worked plus the lunch hour in cash and check.
19  Total hours worked is the total hours worked
20  inclusive of the lunch hour.  The net check is
21  how much the check is net for this location.
22  17.21 is the cash amount.  Seventeen, it's
23  rounded off.
24    Q    Let's go back to total net pay.
25    A    Uh-huh.

**DAVID SAPERSTEIN**

1
2     A    Right.
3     Q    Why don't we just focus on the first
4  page here.
5     A    Okay.
6     Q    Is it a report that you prepared?
7     A    Yes.
8     Q    Sometime around September 10th of
9  '06?
10    A    Yes.
11    Q    And what type of report is this?
12    A    It's the same as the report we were
13 just discussing.  It gives total net pay.  The
14 actual net --
15    Q    It's got an additional column, doesn't
16 it?
17    A    Yeah.  It gives the total hours worked
18 gross check, net check.  I'm not sure what this
19 net pay column is.  Previous to the minimum wage
20 going up, that's what their net pay would've
21 been.
22    Q    I see.
23    A    So it's just a reference column for
24 me.  In this particular case, no additional cash
25 was given and this is at a period of time when

DAVID SAPERSTEIN

1
2  we stopped paying for employees' lunch.
3     Q    When did you stop paying for the
4  employees' lunch?
5     A    It was sometime in 2006, most probably
6  very early, when I believe minimum wage went up
7  at this point to 6.75.
8     Q    Is that -- and who made the decision
9  to stop paying for employees' lunch?
10    A    Sam.
11    Q    Is that something he told you?
12    A    Yes.
13    Q    Did he tell you why he made that
14 decision?
15    A    No.
16    Q    Did you ever ask him?
17    A    No.
18    Q    Did anyone else ever tell you why Sam
19 made that decision?
20    A    No.
21    Q    If we look at Persio there, total
22 hours worked 36, that's a number that you got
23 from the report from Raj or the grid or
24 something like that?
25    A    The report.

DAVID SAPERSTEIN

1
2     Q    The report?
3     A    Yes.  That's inclusive of their lunch
4  hour.
5     Q    Then the gross check, did that come
6  from ADP or actually --
7     A    Do you want to pick Franklin Santana,
8  since it's one location?
9     Q    Yes.  Forget Persio.  Let's look at
10 Franklin Santana.  Sixty hours?
11    A    Yeah.  That's 55 that he worked and
12 five lunch.
13    Q    Because we know that 60 hours is five
14 days?
15    A    Right.
16    Q    And that's something you could get
17 from Raj's report?
18    A    Yes.
19    Q    So we're going to divide something by
20 five, is that the next step here?
21    A    No, here, there is no other step
22 because we are no longer adding anything in
23 cash.  They're getting paid straight minimum
24 wage, whatever applicable overtime and that's
25 it.

DAVID SAPERSTEIN

1
2     Q    Gross check, that comes from ADP?
3     A    In this particular case, it would
4  appear on ADP reports plus it would appear on
5  the employee's paystub.
6     Q    And net check, same thing?
7     A    Same thing.  It would appear on ADP
8  reports, and it would appear on the employee's
9  actual check and paystub.
10    Q    Then what about the 364 number, where
11 does that come from, total net pay?
12    A    That's how much his total net pay was.
13    Q    It's the same as the net check?
14    A    Yes.
15    Q    Except for --
16    A    Give or take a couple of cents.  The
17 total net pay for this particular report -- at
18 this particular time, the total net pay and net
19 pay reports are functions of accounting, not
20 payroll.  Not figuring out how much to give
21 anybody in cash.  Because at this particular
22 time, with the exception of two people, there
23 was no cash.
24    Q    What was the purpose of creating this
25 report, since you don't need to figure out the

DAVID SAPERSTEIN

1
2  cash numbers at this point?
3      A    It just carried over. I just never
4  changed the format of the report because there
5  was no reason to. But to allocate funds
6  properly, we still needed to know the total net,
7  total net pay.
8      Q    And that's why you have total columns
9  for each garage?
10     A    Yes.
11     Q    Now, the two exceptions, are those the
12  ones that are shaded in?
13     A    No.
14     Q    What were the exceptions?
15     A    Juan Lorenzo and Jose Suazo.
16     Q    Where are they?
17     A    Sage.
18     Q    Why are they getting cash amounts?
19     A    Sam likes them.
20     Q    A simple answer to a simple question.
21  So Sam told you what amount to give them?
22     A    Yes.
23     Q    What about the ones that are shaded
24  in, that's a different situation?
25     A    I believe this is an error, that the

DAVID SAPERSTEIN

1
2  shading is there because it bears no relevance
3  to anything. Angelo Pena always got paid
4  straight.
5      Q    Down at the bottom, it says shaded
6  employees are gross. Does that -- what does
7  that mean?
8      A    One or two periods of time there were
9  a couple of employees that their pay was not
10  based on net, it was based on gross. And this
11  particular week none of those employees actually
12  worked at these garages.
13     Q    So these two -- actually, it's Angelo
14  Pena at two places?
15     A    No, my error. When Angelo Pena was
16  hired, he was hired at a gross number. So
17  that's why his are shaded to reflect that he
18  is -- we did not inherit him from Jose.
19     Q    So when he was hired -- when you say
20  he was hired at a gross number, can you explain
21  to me --
22     A    Whatever minimum wage was.
23         MR. BERNSTEIN: I need to take a short
24  lunch break.
25         (Whereupon, a lunch break was taken.)

DAVID SAPERSTEIN

1
2         MR. BERNSTEIN: Back on the record.
3  BY MR. BERNSTEIN:
4      Q    Mr. Saperstein, you understand you're
5  still under oath?
6      A    Yes.
7      Q    Before Sam decided to stop paying for
8  lunch hour -- I think you said he decided at
9  some point to stop paying the employees for
10  lunch hour; is that right?
11     A    Yes.
12     Q    Up to that point, the employees were
13  being paid in cash for lunch hour?
14     A    Yes.
15     Q    Once the employees were no longer
16  being paid in cash for their lunch hour, was
17  there some way they were paid for lunch hour?
18  Was it taken into account in their checks at
19  that point?
20     A    No. It was taken into account in
21  their checks starting in 2007. Let me just
22  clarify that.
23     Q    When did that begin?
24     A    January, February 07.
25     Q    And how was that done?

DAVID SAPERSTEIN

1
2      A    It was just straight in their check.
3      Q    So there was a period of time when it
4  was not in their check, like in '06?
5      A    In -- when minimum wage went up to, I
6  believe, 6.75, which was 06, I believe, that's
7  when Sam decided not to supplement their checks
8  with cash for lunch.
9      Q    And at that point -- okay. And then
10  in '07 he started supplementing their checks
11  again?
12     A    We just -- it's not that we started
13  supplementing their checks. They just
14  received -- the hours that they were -- not the
15  hours. If they worked a five-day work week, and
16  they worked 55 hours. We just added the five
17  extra hours for lunch into the total, and it was
18  paid in the check. So they would've gotten 40
19  plus 20.
20     Q    So there was no subtraction being
21  made?
22     A    That's correct.
23     Q    When the employees were being paid for
24  lunch in cash, do you know if they were told
25  that the cash was for their lunch hour?

DAVID SAPERSTEIN

1
2   A   I don't know.
3   Q   I think you said starting in '07, they
4   were paid through their checks for lunch hour?
5   A   Correct.
6   Q   Do you know if any of the workers were
7   told at that point that there was some amount in
8   their checks for lunch hour?
9   A   I don't know.
10  Q   Let's look at Exhibit 10.  (Handing.)
11      Do you recognize those pages?
12  A   Yes.
13  Q   What are they?
14  A   They're notification -- they're
15  notification and clarifications so the employees
16  understood that they had to -- that they were
17  going to take a break at their own discretion
18  and that it would be deducted from their -- from
19  their time card.
20  Q   Is this a notice that you prepared?
21  A   Yes.
22  Q   And did you have someone translate it
23  into Spanish for the second paragraph?
24  A   Yes.
25  Q   Who made the translations for you?

DAVID SAPERSTEIN

1
2   A   I think it was my ex-fiance at the
3   time.  I don't remember.
4   Q   When did you prepare this?
5   A   Sometime in 2004.  Late portion of
6   2004.
7   Q   What caused you to do that?
8   A   We attempted to have the employees
9   punch in and out on the time cards.  But as I
10  said before, they, for whatever reason, they did
11  not do it.  So this was the next best thing that
12  they understood what was going on.
13  Q   This was a substitute for their
14  punching in and out?
15  A   Yes.
16  Q   Were you present when any of these
17  were given to the employees to sign?
18  A   No.
19  Q   Do you know who did give them to the
20  employees to sign?
21  A   I gave them to Raj with the assistance
22  of Christian Cherrez, C-H-E-R-R-E-Z, who speaks
23  fluent English and Spanish, with the
24  instructions to explain the policy to those
25  signing it.

DAVID SAPERSTEIN

1
2   Q   Who made the decision to give the
3   employees this type of notice?
4   A   It was my idea to give the employees
5   the notice and Sam okayed it.
6   Q   Had you been told at any time up to
7   when you prepared this notice that employees
8   were not taking meal breaks?
9   A   No.
10  Q   Did anyone ever complain to you or did
11  you learn of any complaints after this point
12  that employees were not taking meal breaks?
13  A   No.
14  Q   Did it ever come to your attention
15  that employees, for whatever reason, were
16  starting to work and working for a period of
17  time before they punched in?
18  A   I'm sorry?
19  Q   Did you ever learn that it was
20  happening, did anyone ever tell you that
21  employees were not punching in right when they
22  started working?  That they were asked to wait
23  and punch in after working for some time?
24  A   That they were asked to wait?
25  Q   Or that they did wait?

DAVID SAPERSTEIN

1
2   A   No.
3   Q   Neither of those?
4   A   No.
5   Q   Okay.  Did anyone ever complain to you
6   that they had been sent to work at a different
7   garage from the one they were usually assigned
8   to and they were not being paid for the time at
9   the other garage?
10  A   There were isolated incidents where
11  either Raj forgot to put their hours on the
12  sheet or I did not pick it up.  But for whatever
13  reason, the hours were missed.  Raj would
14  receive the complaint and the hours would be
15  added in the following week.
16  Q   Do you recall any specific instances?
17  A   I don't recall specific instances, but
18  I know it happened once -- more than once with
19  Angelo Pena; and it happened, I believe, once
20  with Franklin Santana.  It happened once with
21  one other employee.  I just don't remember his
22  name.
23  Q   What records, if any, would show the
24  missed hours being added in at a later time?
25  A   On the following week's paystub, there

DAVID SAPERSTEIN

1
2    A    2006, maybe.
3    Q    You're asking me?
4    A    I'm taking a guess.  It's somewhere in
5    2006.
6    Q    Is it something that you prepared?
7    A    Yes.  It's actually something I
8    prepared 20 years ago.  I just kind of used a
9    variation of it.
10   Q    Is it something that you were asked to
11   start distributing to the employees or have
12   distributed to the employees?
13   A    Did somebody ask me to do it?
14   Q    Yes.  How did it come about that the
15   Rules and Procedures was given out to the
16   employees starting sometime around 2006?  What
17   started that?
18   A    We had been involved in an
19   unemployment hearing, and we lost the hearing
20   because I couldn't prove the employee knew not
21   to wash cars while on a shift without
22   permission.  So because of that, I started to,
23   at random times, give out and update a Rules and
24   Procedures pamphlet.
25   Q    Was there a problem with employees not

DAVID SAPERSTEIN

1
2    taking lunch breaks at that time?
3    A    Not taking lunch breaks?
4    Q    Right.
5    A    They always took lunch breaks.
6    Q    And again, what's your basis for
7    saying that?
8    A    I personally witnessed a couple.  I've
9    been in the business for over 20 years.  I know
10   that employees do not spend their entire time in
11   the garage.
12       MR. BERNSTEIN:  Off the record.
13       (Whereupon, a discussion was held off
14   the record.)
15       MR. BERNSTEIN:  Back on the record.
16   BY MR. BERNSTEIN:
17   Q    Have there been times when the workers
18   were taking lunch breaks and they were being
19   paid for their lunch hour?
20   A    Yes.
21   Q    Who made the decision to pay them for
22   lunch hour?
23   A    Sam.
24   Q    Is that something you discussed with
25   him?

DAVID SAPERSTEIN

1
2    A    No.
3    Q    Did you ever ask him why he was doing
4    that?
5    A    No.
6    Q    Did anyone ever tell you why Sam had
7    decided to do things that way?
8    A    No.
9        MR. BERNSTEIN:  Off the record.
10       (Whereupon, a discussion was held off
11   the record.)
12   BY MR. BERNSTEIN:
13   Q    At the point where the employees were
14   no longer being paid for their lunch hour --
15   because I think you said there came a time when
16   Sam decided to no longer pay the workers for
17   their lunch hour?
18   A    Yes.
19   Q    Okay.  Do you know whether the
20   employees continued to take a lunch hour or not?
21   A    Yes.
22   Q    What do you know about that?
23   A    They continued to take their lunch
24   hour, same as they did before.
25   Q    And how do you know that?

DAVID SAPERSTEIN

1
2    A    I've witnessed it on a couple of
3    occasions.
4    Q    Other than that, do you have any basis
5    for your answer?
6    A    Other than witnessing it?
7    Q    Yes.
8    A    Raj would tell me, but that's about
9    it.
10   Q    What did Raj tell you?
11   A    On one occasion, I remember he was in
12   a location and he had to wait until the guy came
13   back before he left.
14   Q    And Raj told you that whoever it was
15   was on a lunch break?
16   A    He told me a break.  He didn't
17   specifically say lunch.
18   Q    Was there a practice or a policy
19   whereby someone would cover for an employee who
20   was taking a break, a lunch break?
21   A    If there were two men on duty, it was
22   very simple.  The second man -- one man would
23   cover for the other.  One garage has -- is
24   connected to another garage.  So when one man
25   goes out, the attendant from one garage covers

**EXHIBIT C**

Page 1

1                        Podolak - 6/11/08
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3
     - - - - - - - - - - - - - - - - - - - - - - - -
4

     ANGELO PENA, ROLANDO ROJAS,
5    JOSE DIROCHE, and FRANKLIN SANTANA,
     individually and on behalf of others
6    similarly situated,q
7                              Plaintiffs,
                  vs.
8

     SP PAYROLL, INC., NICHOLAS PARKING, CORP.,
9    IVY PARKING CORP., BIENVENIDO, LLC,
     CASTLE PARKING CORP., SAGE PARKING CORP.,
10   and SAM PODOLAK,
11                             Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - -
12                                  No. 07 CV 7013
13
14
15                 DEPOSITION OF SAM PODOLAK
                       New York, New York
16                 Wednesday, June 11, 2008
17
18
19
20
21
         Reported by:
22
         Joseph V. Connolly
23
         JOB NO.  16899
24
25

Page 18

Podolak - 6/11/08

1
2    back, please?
3        (The requested material was read
4    aloud.)
5        Q.    And to whom are the bills submitted?
6        A.    The bills are submitted to the
7    individual garages and then those garages have to
8    pay SP Payroll.
9        Q.    Is there a particular individual that
10   the bills go to at the particular garages?
11       A.    The bills go to me and I write the
12   checks from the garages into SP Payroll.
13       MR. BERNSTEIN:  Would you read that
14   back, please?
15       (The requested material was read
16   aloud)
17       Q.    How frequently are the bills for the
18   garages created?
19       A.    On a monthly basis, once a month.
20       Q.    What information is contained in the
21   bills?
22       A.    A week-to-week breakdown of the
23   actual labor costs, which, I guess, come off the
24   ADP sheets and then a surcharge on top of thatso SP
25   Payroll has money to operate.

TSG Reporting - Worldwide    877-702-9580

Page 19

Podolak - 6/11/08

1
2        Q.    What are the ADP sheets that you just
3    referred to?
4        A.    We deal with ADP and all the checks
5    are generated by them.  And, you know, everything
6    is computerized.
7        Q.    What checks are generated by ADP?
8        A.    The mens' salary.  The men who are
9    employees of SP Payroll gets checks on a weekly
10   basis and that's all generated from the company, SP
11   Payroll.
12       Q.    Are there any employees who are not
13   paid through ADP, employees of any of the garages?
14       A.    Everything you have listed, everyone,
15   you know, no.
16       I would like to make a correction.
17       Q.    Sure.
18       A.    9495 Parking Corp. is a separate
19   entity and there's a separate account for that
20   garage alone, with ADP.  Those men are not part of
21   SP Payroll.
22       It's a union shop, so that's the
23   reason for it being a separate entity.
24       Q.    Do you know when Ivy started
25   operating?

TSG Reporting - Worldwide    877-702-9580

Page 20

Podolak - 6/11/08

1
2        A.    I don't recall.
3        Q.    But it was sometime before 2002 or
4    2003?
5        A.    Yes.
6        Q.    What payroll functions did you
7    perform for Ivy before Mr. Saperstein was hired?
8        A.    The supervisor would provide a list
9    of the hours worked and then the men would be paid,
10   based on whatever he wrote.
11       Q.    Who was the supervisor at that time?
12       A.    Rajesh Kissoon, R-A-J-E-S-H,
13   K-I-S-S-O-O-N.
14       Q.    And how were the workers paid, check,
15   cash, some combination, something else?
16       A.    There was a combination.
17       Q.    How was it decided what amounts would
18   be paid in check and what amounts would be paid in
19   cash?
20       A.    This is a long time ago, so I can
21   only tell you what I think was done.  I'm not one
22   hundred percent sure.
23       This is a company that I inherited
24   from a previous operator, so I decided to pay the
25   men exactly the way the previous operator paid

TSG Reporting - Worldwide    877-702-9580

Page 21

Podolak - 6/11/08

1
2    them.
3        They got paid for their regular
4    hours, time and a-half for the overtime and some
5    cash for their lunch hour.
6        That's to the best of my
7    recollection.
8        Q.    And if I understand correctly, that
9    was the method that the previous owner had used?
10       A.    The previously operator.
11       Q.    The previously operator?
12       A.    Yes.
13       Q.    And who was the previous operator?
14       A.    Jose Tavares.
15       Q.    Did you ever discuss that method of
16   payment with Mr. Tavares?
17       A.    I don't understand the question.
18       MR. BERNSTEIN:  Well, let me try to
19   clarify it.
20       Q.    You described the method of payment
21   that you said you inherited from the previous
22   operator.
23       A.    Huh-huh.
24       Q.    Mr. Tavares.
25       Did you ever talk with him about that

TSG Reporting - Worldwide    877-702-9580

**Podolak - 6/11/08**

1
2     **Do you see that?**
3     A.    Yes.
4     **Q.    Okay.  What information is recorded**
5 **on this first page here?**
6     A.    How many days the men worked and how
7 much cash they got, in addition to their check.
8     **Q.    What - - what are the cash numbers**
9 **here?**
10     **Like if you can just give me an**
11 **example?**
12     A.    Well, they got a check, plus this
13 amount of cash that's indicated here.
14     **Q.    Well, if I look at the first - -**
15 **you'll have to forgive me, I'm kind of in first**
16 **grade here - - but if we look at the first name,**
17 **which is "Sammy"?**
18     A.    Huh-huh.
19     **Q.    What does the "6" mean, do you know?**
20     A.    He worked 6 days.
21     **Q.    Okay.  And then it says "70."**
22     A.    He was given 70 in cash, in addition
23 to his check.
24     **Q.    And Felix, it says he worked 6 days?**
25     A.    Six days.

Podolak - 6/11/08

1
2     **Q.    And - -**
3     A.    Eighty, in addition to his cash.
4     **Q.    His cash?**
5     A.    Check.  Check, rather.
6     **Q.    And then the "120" that's off to the**
7 **side there, can you tell me what that represents?**
8     A.    That's all the numbers added up.
9     **Q.    Well, it wouldn't be 70, 80, 30, 10?**
10     A.    It says "minus 70," at the bottom.
11     **Q.    Oh, I see.**
12     A.    Which comes to 120.
13     **Q.    And is that where it says "70 Raj"?**
14     A.    Yes, it says "70, minus Raj."
15     **Q.    Seventy minus.**
16     **And what does that represent?**
17     A.    Some how he described $70.00, I don't
18 remember for what.
19     Maybe it was a loan.
20     **Q.    I see.**
21     A.    I don't know what it represents.
22     **Q.    I see.  So, the numbers that each - -**
23 **opposite each name is the amount they got in cash -**
24 **-**
25     A.    Correct.

Podolak - 6/11/08

1
2     **Q.    That week; is that right?**
3     A.    Correct.
4     **Q.    And who determined what amount of**
5 **cash each person was to get?**
6     A.    Raj and myself.
7     **Q.    And how did you decide that?**
8     A.    I don't recall how we did this.  But
9 it was certainly based on the amount of hours they
10 worked and it probably was a combination of their
11 check and cash to equal minimum pay standard for
12 regular time and time and a-half for overtime.
13     **Q.    When you say "it probably was," can**
14 **you tell me what you base that on?**
15     A.    Well, just thinking about how we did
16 things in those days, I believe that's what we did.
17     **Q.    Do you recall ever discussing that**
18 **with Raj?**
19     A.    I don't recall a specific conversa-
20 tion with Raj over that issue.
21     **Q.    Do you recall anything generally**
22 **about what Raj might have said to you or you might**
23 **have said to Raj about that issue?**
24     A.    Well, I may have discussed it with
25 him and I probably did the computations myself, I

Podolak - 6/11/08

1
2 would think, and maybe he had some imput on some-
3 thing.
4     But that's it.
5     **Q.    Well, say for Felix, the second**
6 **person that's listed up at the upper left there - -**
7 **and this is - -**
8     A.    Okay.
9     **Q.    Is that Bienvenido?**
10     A.    Yes.
11     **Q.    Okay.  How would you arrive at the 80**
12 **there?**
13     **What was the process?**
14     A.    Probably he worked - -
15     MS. MEYERS:  If you recall?
16     MR. BERNSTEIN:  I'm sorry.
17     MS. MEYERS:  I said, if he recalls.
18 I don't want him guessing.
19     THE WITNESS:  Yes.
20     A.    Other than - -
21     MR. BERNSTEIN:  Let me just make sure
22 that you understand.
23     **Q.    Unless I say differently, all of my**
24 **questions are directed to your knowledge and your**
25 **recollection.**